Purchase and Sale Agreement

By and Between

Marathon Oil Company

and

Forcenergy Inc

dated December 12, 1996
Effective October 1, 1996

Cook Inlet & Prudhoe Bay
Alaska

FOC 000220

**EXHIBIT G**
**Page 1 of 66**

<u>**INDEX**</u>

<u>**SECTION**</u>

1.   -   DEFINITIONS

2.   -   PURCHASE AND SALE

3.   -   PURCHASE PRICE

4.   -   REPRESENTATIONS AND WARRANTIES

5.   -   TITLE MATTERS

6.   -   ENVIRONMENTAL MATTERS

7.   -   REPRESENTATIONS BY SELLER

8.   -   DUE DILIGENCE

9.   -   REPRESENTATIONS BY PURCHASER

10.   -   OPERATIONS AND PRODUCTION AFTER THE EFFECTIVE DATE; POST CLOSING ADJUSTMENT PROCEDURE

11.   -   TAXES

12.   -   OBLIGATIONS OF THE PARTIES

13.   -   INDEMNIFICATION

14.   -   EXISTING CONTRACTS

15.   -   PREFERENTIAL RIGHTS AND CONSENTS

16.   -   CONDITIONS PRECEDENT

17.   -   CLOSING

18.   -   TERMINATION

19.   -   PURCHASER'S REMEDIES

20.   -   NOTICES

FOC 000221

21.   -      COMPLETE AGREEMENT

22.   -      FURTHER ASSURANCES

23.   -      FILES AND RECORDS

24.   -      CONFIDENTIALITY AND PUBLIC ANNOUNCEMENTS

25.   -      COUNTERPART EXECUTION

26.   -      SURVIVAL

27.   -      MISCELLANEOUS PROVISIONS

28.   -      LIKE KIND EXCHANGE

29.   -      HART-SCOTT-RODINO

FOC 000222

## EXHIBITS

| | | |
|---|---|---|
| A | - | the Leases |
| B | - | Associated Contracts |
| C-1 | - | Assignment (oil and gas properties) |
| C-2 | | Assignment (Cook Inlet Pipe Line Company stock) |
| D | - | Litigation |
| E | - | Preferential Rights |
| F | - | Consents |
| G | - | Allocated Values |
| H | - | Letter-in-Lieu |
| I | - | Non Foreign Certificate |
| J | - | Fuel Gas Agreement |

## DEFINITIONS

**SECTION**

| | | |
|---|---|---|
| 29. | - | Act |
| 6a. | - | ADEC |
| 6a. | - | Preamble - Agreement |
| 15. | - | Allocated Value |
| 16a.(iii)- | | Assignments |
| 1a.(iii) - | | Associated Contracts |
| 6a. | - | CERCLA |
| 6d. | - | Claims |
| 17. | - | Closing Date |
| 1e. | - | Contingent Bonus |
| 1a (vii) - | | Cook Inlet |
| 5c. | - | Defect Value |
| 3a. | - | Deposit |
| 10. | - | Downward Adjustment |
| 6a. | - | Environmental Defect |
| 6y. | - | Environmental Laws |
| 6a. | - | Environmental Notice Deadline |
| 6a. | - | EPA |
| 10. | - | Expenses |
| 10. | - | Final Purchase Price |

FOC 000224

| 10. | - | Final Settlement Date |
| 10. | - | Final Settlement Statement |
| 1f. | - | Funding Agreement |
| 12e. | - | GGS |
| 1g. | - | Guaranty Agreement |
| 1a. | - | Leases |
| 5a. | - | Marketable Title |
| 6a. | - | NORM |
| 5b. | - | Notification Deadline |
| 6a. | - | OSHA |
| 1b.(i) | - | Official Records |
| 1b. | - | Permitted Encumbrances |
| 1a. | - | Property |
| 6a. | - | Preamble - Purchaser |
| 12b. | - | Purchaser Indemnified Parties |
| 3a. | - | Purchase Price |
| 6a. | - | RCRA |
| 1a. | - | Retained Interests |
| 6a. | - | SARA |
| 6a. | - | Preamble - Seller |
| 6b. | - | Seller Indemnified Parties |
| 1a. | - | TBPF |
| 1a. | - | TBU |

FOC 000225

5b.    -    Title Defect

1d.    -    "To the best of a party's knowledge"

10.    -    Upward Adjustment

1a.(ii) -    Wells

1a.    -    WIPA

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement ("Agreement") is made and entered into this ____ day of _____, 199__ by and between Marathon Oil Company, an Ohio corporation ("Seller"), and Forcenergy Inc, a Delaware corporation ("Purchaser").

In consideration of the mutual promises contained herein, the benefits to be derived by each party hereunder and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby agree as follows:

1.    DEFINITIONS.    For purposes of this Agreement, the listed terms shall have the following meanings:

a.    "Property" means:

(i) all of Seller's right, title and interest in and to the lands described in Exhibit "A" including, without limitation, all mineral interest, royalty interest, overriding royalty interest, oil, gas or mineral leasehold interest, working interest, net revenue interest, easements, rights-of-way, servitudes, and reversionary rights related thereto (collectively "Leases"), and

(ii) all of Seller's right, title and interest in and to each of the oil, gas and injection wells on the Leases ("Wells"), and

(iii) all of Seller's right, title and interest in and to all joint operating agreements, pooling and unitization agreements, production and product sales agreements, transportation agreements, pipeline connection agreements, commingling agreements, exploration agreements, area of mutual interest agreements, farmout and farmin agreements, permits and licenses and all other similar agreements and instruments relating to the Leases or the Wells, including but not limited to such agreements listed on Exhibit "B" ("Associated Contracts"), and

(iv) all of Seller's right, title and interest in and to all tangible property consisting of equipment, inventory, components, pipelines, wells, platforms, machinery, fixtures, production facilities, measurement facilities, processing plants, tanks, dehydrators, separators, compressors, storage facilities, buildings, office equipment and other tangible property located on or used directly and exclusively in connection with the Leases, and

(v) all of Seller's right, title and interest in all geological, geophysical, engineering, technical and accounting data, records, files and information directly related to the Leases or Wells, including without limitation well logs, cores, structure maps, and

seismic data owned by Seller or to which Seller has rights or interests, except to the extent that Seller is contractually prohibited from transferring same, and

(vi)  all of Seller's right, title and interest in all oil, gas, distillate, condensate, casinghead gas, or other liquid or vaporous hydrocarbons or minerals produced from or attributable to the Leases or Wells, from and after the Effective Date, and

(vii)  any and all of Seller's stock in Cook Inlet Pipe Line Company, a Delaware corporation, ("Cook Inlet") not acquired by other owners of Cook Inlet pursuant to rights of first refusal to which such stock is subject.

With respect to rights, obligations, warranties and representations of the parties hereto after Closing, references herein to the "Property" shall mean only that portion of the Property which was conveyed at Closing.

Notwithstanding anything herein to the contrary, "Property" does not mean, and specifically excludes, all of Seller's right, title and interest in the Grayling Gas Sands Working Interest Participating Area ("WIPA") of the Trading Bay Unit ("TBU") or in any of the interests described in (i) - (vii) above associated with, or otherwise an incident of ownership of, the Grayling Gas Sands WIPA, including, but not limited to, certain facilities at the Trading Bay Production Facility ("TBPF") and the right to utilize all existing TBU gas pipelines. The Grayling Gas Sands WIPA is defined as all gas bearing sands above the G-Zone oil pool of the McArthur River Field including, but not limited to, the Upper A (shallow), A, B, C, D, E, (deep), F (deep), and G-0 (deep). Further, Property does not mean Seller's 51.2% interest in the Steelhead Platform and related gas facilities and pipelines. (Collectively, such excluded interests are referred to herein as the "Retained Interests"). Seller specifically reserves and excepts from this transaction all of the Retained Interests. Record title to the Grayling Gas Sands WIPA shall be retained by Seller on the State of Alaska form entitled "Assignment Affecting Record Title to Oil and Gas Lease" for each lease which is part of the Grayling Gas Sands WIPA and which is otherwise to be assigned to Purchaser pursuant to the terms of this Agreement.

b.    "Permitted Encumbrances" means:

(i) lessor's royalties, overriding royalties, and all other matters affecting the interests reflected in the official real property records, U.C.C. records, the State of Alaska Department of Natural Resources and/or other public records of the jurisdictions in which the Leases are located ("Official Records"), if the effect of such burden does not operate to reduce the Net Revenue Interest as to any Lease or Well to less than the Net Revenue Interest set forth in Exhibit "A" for such Lease or Well or increase the Working Interest as to any Lease or Well to more than that set forth in Exhibit "A" without a proportionate increase in the Net Revenue Interest;

(ii) the Associated Contracts;

(iii) required third party consents to assignments, preferential purchase rights and similar agreements with respect to which valid waivers or consents have been obtained from the appropriate parties or the time period for exercising such rights has expired without the exercise of such rights;

(iv) liens for taxes or assessments not yet delinquent;

(v) all rights to consent or approval by, required notices to, filings with, or other actions by, governmental entities in connection with the Assignment of oil and gas leases or easements or rights-of-way or interests therein if the same are customarily obtained subsequent to such Assignment;

(vi) the obligations contained in this Agreement and all Exhibits to this Agreement;

(vii) the Contingent Bonus.

c.    "Effective Date" means October 1, 1996 at 7:00 o'clock a.m. local time where the Properties are located.

d.    "To the best of a party's knowledge", when used herein, means that no present officer, director, management employee, or in house attorney of that party has, or would have after a reasonably diligent inquiry and with the exercise of due care, any knowledge materially inconsistent with the statements qualified by that phrase.

e.    "Contingent Bonus" means three percent (3%) of the value of Purchaser's share of production from the Property after deducting lessor's royalty. The amount of the Contingent Bonus shall be calculated in the same means as is the lessor's royalty. The Contingent Bonus shall be effective and payable only in those months between December 1996 and May 1998, inclusive, in which the daily average prices for oil posted by Union Oil Company of California ("Unocal"), or its successor, for Cook Inlet crude oil delivered to the Drift River Terminal, as adjusted for quality and gravity, less the amount of applicable, unreimbursed transportation charges incurred in delivering such crude oil to market from the Drift River Terminal is greater than $17.70 per barrel. The parties acknowledge that the Net Revenue Interests set forth in Exhibit "A" hereto do not reflect the Contingent Bonus. In the event the referenced posting ceases to exist, then the Alaska North Slope West Coast price as reported by Platts and adjusted for gravity and quality, plus or minus the average difference between the referenced posting and the Platts reported price for the one (1) year period immediately prior to the date when the referenced posting ceased to exist shall be used. Within forty-five (45) days following the end of each month during such eighteen (18) month period, Purchaser shall render a statement to Seller showing the price received for production sold from the Property and, if applicable, the amount of such Contingent Bonus due Seller for such month and a check in the amount due.

FOC 000229
**EXHIBIT G**
**Page 10 of 66**

3

f.    "Cook Inlet Funding Agreement" means that certain Cook Inlet Pipe Line Company Funding Agreement effective as of January 1, 1995 by and between Atlantic Richfield Company, Marathon, Unocal, Mobil Pipe Line Company and Cook Inlet.

g.    "Guaranty Agreement" means that certain Unocal Pipeline Company Guaranty Agreement effective as of January 1, 1995 from Marathon to Unocal Pipeline Company.

2.    PURCHASE AND SALE.    Subject to the terms of this Agreement, Seller agrees to sell and convey the Property to Purchaser and Purchaser agrees to purchase and pay Seller for the Property.

3.    PURCHASE PRICE.

a.    The purchase price for the Property shall be one hundred twenty-one million five hundred ten thousand dollars ($121,510,000) ("Purchase Price"), subject to adjustment as herein provided. Within two (2) business days from the execution of this Agreement by both parties, Purchaser shall pay an earnest money deposit of ten million dollars ($10,000,000) (the "Deposit") to Seller by wire transfer of immediately available funds.

b.    The Purchase Price shall be adjusted by the items listed below in this Section 3b. At Closing, Purchaser shall pay to Seller, by wire transfer in immediately available funds, the net amount of the Purchase Price as adjusted in accordance with this Section 3b. All amounts due by Purchaser shall be sent to the following account: Marathon Oil Company, National City Bank, Cleveland, Ohio, Transit Routing Number 041000124, Account Number 2110051, Reference: Gulf Coast Region for Alaska Region. The Purchase Price shall be adjusted after Closing in accordance with Section 10 below.

(i) The Purchase Price shall be adjusted upward by the following:

(1) the value of all oil in storage above the Cook Inlet pipeline connection at TBPF as of the Effective Date and not previously sold by Seller that is attributable to the Property, such value to be the Unocal price posted for Cook Inlet crude, adjusted for quality and gravity, delivered to the Drift River Terminal in effect as of the Effective Date less taxes; and

(2) the amount of all expenditures (including, without limitation, capital expenditures, but limited to capital expenditures incurred after the Effective Date), rental and other charges, ad valorem, property, production, excise, severance and similar taxes based upon or measured by the ownership of property or the production of hydrocarbons or the receipt of proceeds therefrom, expenses billed under applicable operating agreements and in the absence of an operating agreement, expenses of the sort customarily billed under such agreements, paid by Seller in connection with the operation of the Property, in accordance with generally accepted accounting principles, attributable to the period from and after the Effective Date; and

FOC 000230    **EXHIBIT G**
**Page 11 of 66**

4

(3) an amount equal to all prepaid expenses attributable to the Property that are paid by Seller that are, in accordance with generally accepted accounting principles, attributable to the period after the Effective Date, including without limitation, prepaid utility charges and prepaid ad valorem, property, production, severance, and similar taxes based upon or measured by the ownership of property or the production of hydrocarbons or the receipt of proceeds therefrom; and

(4) an amount equal to the outstanding balance of advances made by Seller to the operator of the Property as of the Effective Date.

(ii) The Purchase Price shall be adjusted downward by the following:

(1) the proceeds, net of royalty, received by Seller attributable to the Property that are, in accordance with generally accepted accounting principles, attributable to the production of hydrocarbons for the period from and after the Effective Date pursuant to arms-length sales to unaffiliated third parties, or in the absence of such an arms-length sale, the fair market value thereof; and

(2) an amount equal to all unpaid ad valorem, property, production, severance, and similar taxes and assessments (but not including income taxes) based upon or measured by the ownership of property or the production of hydrocarbons or the receipt of proceeds therefrom accruing to the Property prior to the Effective Date, which amount shall be computed based upon such taxes assessed against the applicable portion of the Property for the preceding calendar year or, if such taxes are assessed on other than a calendar year basis, for the tax-related year last ended; and

(3) the value of all uncured Title Defects; and

(4) the Allocated Value (as defined in Section 15 hereof and listed on Exhibit "G" hereof) of the portions of the Property excluded from this Agreement pursuant to Section 6 hereof; and

(5) the Deposit; and

(6) the proportionate share of the Allocated Value of the shares of Cook Inlet acquired by other owners of Cook Inlet as a result of the right of first refusal process to which such shares are subject; and

(7) that portion of any dividend received from Cook Inlet by Seller in 1996 attributable to Cook Inlet's operation from the Effective Date through the Closing Date.

c.    All adjustments made to accounting records for the Property after the Effective Date but attributable to costs and expenses paid by Seller to co-working interest owners in the Property prior to the Effective Date shall be for the account of Seller.

**EXHIBIT G**

d.    Notwithstanding any provision of this Agreement to the contrary, Purchaser shall not be obligated to close the transaction contemplated by this Agreement, and shall have the option to terminate this Agreement if the aggregate value of all Title Defects which have not been cured to Purchaser's satisfaction prior to the Closing Date exceeds ten percent (10%) of the Purchase Price.

e.    Notwithstanding any provision of this Agreement to the contrary, Purchaser shall not be obligated to close the transaction contemplated by this Agreement if the Allocated Value of the portion of the Property on which preferential rights are exercised exceeds twenty percent (20%) of the Purchase Price.

4.    REPRESENTATIONS AND WARRANTIES. NOTWITHSTANDING ANY PROVISION CONTAINED IN THIS AGREEMENT TO THE CONTRARY, THE TRANSFER OF THE PROPERTY BY SELLER TO PURCHASER SHALL BE WITHOUT WARRANTY OF TITLE, EXPRESS, STATUTORY, OR IMPLIED, EXCEPT THAT SELLER SHALL WARRANT TITLE (EXCEPT FOR TITLE DEFECTS WAIVED BY PURCHASER OR FOR WHICH AN ADJUSTMENT WAS MADE TO THE PURCHASE PRICE) TO THE PROPERTY AGAINST THE CLAIMS AND DEMANDS OF ALL PERSONS CLAIMING THE SAME OR AN INTEREST (INCLUDING A SECURITY INTEREST) THEREIN BY, THROUGH OR UNDER SELLER, BUT NOT OTHERWISE; PROVIDED HOWEVER, PURCHASER SHALL HAVE THE RIGHT OF FULL SUBSTITUTION AND SUBROGATION IN AND TO ANY AND ALL RIGHTS AND ACTIONS OF WARRANTY WHICH SELLER HAS OR MAY HAVE AGAINST ANY AND ALL PRECEDING OWNERS OR VENDORS FOR THE PROPERTY THROUGH THIS AGREEMENT AND THE ASSIGNMENTS TO BE EXECUTED IN CONSUMMATION OF THIS AGREEMENT.

Purchaser acknowledges that (i) it has had and pursuant to this Agreement will have prior to the Closing access to the Property and the employees of Seller and (ii) in making the decision to enter into this Agreement and consummate the transactions contemplated hereby, Purchaser has relied solely on the basis of its own independent investigation of the Property and upon the representations, warranties, covenants and agreements set forth in this Agreement. Accordingly, Purchaser acknowledges that, except as expressly set forth herein, Seller has not made, AND SELLER HEREBY EXPRESSLY DISCLAIMS AND NEGATES, ANY REPRESENTATION OR WARRANTY, EXPRESSED, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE RELATING TO (x) THE CONDITION OF THE PROPERTY (INCLUDING WITHOUT LIMITATION, ANY IMPLIED OR EXPRESSED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, OR ENVIRONMENTAL CONDITION), (y) ANY INFRINGEMENT BY SELLER OF ANY PATENT OR PROPRIETARY RIGHT OF ANY THIRD PARTY, AND (z) ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) FURNISHED OR COMMUNICATED TO, OR MADE AVAILABLE FOR REVIEW BY, PURCHASER BY OR ON BEHALF OF SELLER; AND PURCHASER WILL HAVE SOLE RESPONSIBILITY FOR ANY ACTION

FOC 000232

TAKEN BY PURCHASER, OR BY OTHER PERSONS RELYING ON PURCHASER'S ADVICE, BASED ON ANY SUCH INFORMATION, DATA AND MATERIALS; provided, however, that the foregoing disclaimer and negation of representations and warranties shall not affect or impair the representations and warranties of Seller set forth in Section 7 hereof.

5.    TITLE MATTERS.

a.    Marketable Title.  As used herein, the term "Marketable Title" shall mean such right, title and interest owned or of record that, except for Permitted Encumbrances:

(i) is free from reasonable doubt to the end that a prudent person engaged in the business of purchasing and owning, developing and operating producing oil and gas properties, and with respect to Cook Inlet, crude petroleum pipelines, with knowledge of all of the facts and their legal bearing would be willing to accept the same.

(ii) subject to Section 6(b) hereof, entitles Seller to receive not less than the interest set forth in Exhibit "A" as the "Net Revenue Interest" or "NRI" with respect to the oil, gas, and associated hydrocarbon minerals produced, saved and marketed from each unit, Lease or Well, as the case may be.

(iii) obligates Seller to pay costs and expenses relating to the operations on and the maintenance and development of each unit or Well, as the case may be, in an amount not greater than the "Working Interest" or "WI" set forth in Exhibit "A" with respect to such Property, without a corresponding increase in the NRI.

(iv) is free and clear of all material encumbrances, mortgages, liens and security interests.

(v) is free and clear of all consent requirements and preferential rights which, as of the Closing, have neither been waived nor expired.

(vi)  is not subject to any agreement whereby any person has the right to take production without full payment therefor, or at a reduced price, or pursuant to a call on production.

(vii)  is not subject to a contract for the sale of production from the Property which cannot be terminated upon ninety (90) days notice or less.

b.    Notice of Title Defect.  Purchaser shall notify Seller in writing, as soon as reasonably practicable after Purchaser acquires knowledge, and in any event at least ten (10) days prior to the Closing Date (the "Notification Deadline"), of any matter ("Title Defect") that would cause Seller's title to any portion of the Property not to be Marketable Title, in each case together with an explanation of (a) the nature of such Title Defect, (b) the Leases (or portions thereof) affected thereby, and (c) the Defect Value (as hereinafter defined) for such Title Defect.  Any matters that would otherwise constitute

FOC 000233

**EXHIBIT G**
**Page 14 of 66**

Title Defects but which are not specifically raised in writing by Purchaser prior to the Notification Deadline shall conclusively be deemed waived by Purchaser.

      c.      <u>Defect Value</u>. As used herein, the term "Defect Value" shall mean:

      (i)      with respect to Title Defects under Section 5 a (ii), an amount calculated by multiplying the Allocated Value of the affected portion of the Property by a fraction the denominator of which is the NRI set forth on Exhibit "A" and the numerator of which is the correct net revenue interest.

      (ii)      with respect to Title Defects under Section 5 a (iii), an amount calculated by multiplying the Allocated Value of the affected portion of the Property by a fraction the numerator of which is the Working Interest as set forth on Exhibit "A" and the denominator of which is the correct Working Interest.

      (iii)      with respect to Title Defects under Section 5 a (iv), the cost to remove such encumbrance, mortgage, lien or security interest, but not more than the Allocated Value of the portion of the Property affected.

      (iv)      with respect to all other Title Defects, the Allocated Value of the portion of the Property affected or such lesser amount upon which the parties agree in writing.

      d.      <u>Remedies for Title Defects</u>.

      Seller shall have the right, but not the obligation, to attempt to cure any Title Defect with respect to which it has received notice from Purchaser prior to the Notification Deadline. Subject to Section 3b(ii)(4), with respect to any uncured Title Defect for which Seller receives the required notice from Purchaser before the Notification Deadline if Seller has not cured all such Title Defects by the Closing Date, the Purchase Price shall be reduced accordingly to its Defect Value or, at Seller's option, the portion of the Property subject to the Title Defect shall be excluded from the Property and the Purchase Price shall be reduced by the Allocated Value of such excluded portion. The foregoing notwithstanding, no adjustment shall be made to the Purchase Price for Title Defects unless the aggregate of all Defect Values exceeds six hundred thousand dollars ($600,000).

6.      <u>ENVIRONMENTAL MATTERS</u>.

      a.      Purchaser acknowledges that the Property has been used by Seller and others for the purpose of exploration, development and production of oil and gas. Purchaser acknowledges that wastes and products, including, but not limited to, crude oil, natural gas, natural gas liquids, produced water, and other wastes associated with oil and gas production and exploration operations may have been spilled, released or disposed of on-site by, among other ways, placement in pits, burial, land farming, land spreading and

underground injection, into or onto the Property. In addition, Purchaser acknowledges that some oilfield production equipment may contain asbestos and/or naturally occurring radioactive materials ("NORM"). In this regard, Purchaser expressly understands that NORM may affix or attach itself to the inside of wells, materials and equipment as scale or in other forms, and that wells, materials and equipment located on the Property may contain NORM and that NORM-containing materials may be buried or have been otherwise disposed of on the Property. Purchaser also expressly understands that special procedures may be required for the removal and disposal of asbestos and NORM from the equipment and properties where it may be found, and that Purchaser assumes all liability when such activities are performed.

b.     Purchaser also agrees and acknowledges that (i) it has had, or prior to the Closing Date will have, access to and the opportunity to inspect the Property and the property of Cook Inlet for all purposes, including without limitation, for the purposes of detecting the presence of hazardous or toxic substances, pollutants or other contaminants, environmental hazards, NORM and contamination of surface and/or subsurface properties, (ii) it has, or prior to the Closing Date will have, satisfied itself as to the physical and environmental condition of the Property and the property of Cook Inlet, both surface and subsurface, and their method of operation and except as set forth herein, agrees to accept an assignment of the Property at the Closing on an "AS IS, WHERE IS" basis, "WITH ALL FAULTS" and (iii) in making the decision to enter into this Agreement and consummate the transactions contemplated hereby, Purchaser has relied solely on the basis of the representations, warranties and covenants of Seller contained herein and its own independent investigation of the Property and the Property of Cook Inlet and the records related hereto. Purchaser specifically acknowledges having received a copy of that certain Compliance Order by Consent entered into among Unocal, Seller and the Alaska Department of Environmental Conservation on June 21, 1996. If Purchaser notifies Seller at least ten (10) days prior to the Closing Date (the "Environmental Notice Deadline") of the existence of any environmental conditions, other than environmental conditions addressed in the Compliance Order by Consent or otherwise disclosed by Seller to Purchaser in writing prior to the date hereof, on the Property that constitutes a violation of Environmental Laws (as hereinafter defined) ("Environmental Defect") as in effect on the date hereof, and Seller does not remediate such Environmental Defect to Purchaser's satisfaction prior to the Closing Date, then Purchaser may at its sole option and as its sole remedy either,

x.     exclude the affected property from this Agreement and reduce the Purchase Price by the Allocated Value for such property or

y.     terminate this Agreement whereupon Seller shall immediately refund the Deposit without interest.

As used herein, the term "Environmental Laws" shall mean any and all laws, statutes, regulations, rules, orders, ordinances, permits, or determinations of any governmental authority including without limitation the Alaska Department of Environmental Conservation ("ADEC") and the Environmental Protection Agency

9          FOC 000235

("EPA") pertaining to health, safety or the environment and applicable to the operation or maintenance of any portion of the Property, including, without limitation, the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, the River and Harbor Act, as amended, the Safe Drinking Water Act, as amended, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended, the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), as amended, the Resource Conservation and Recovery Act ("RCRA"), as amended, the Hazardous and Solid Waste Amendments Act of 1984, as amended, the Toxic Substances Control Act, as amended, the Occupational Safety and Health Act ("OSHA"), as amended and other federal, state, and local laws whose purpose is to conserve or protect health, the environment, wildlife, or natural resources.

    b.    If the Closing occurs, and without limiting Purchaser's other obligations hereunder, PURCHASER HEREBY ASSUMES AND SHALL BE RESPONSIBLE FOR AND AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS SELLER, ITS DIRECTORS, OFFICERS, SHAREHOLDERS, EMPLOYEES, AGENTS, AND ASSIGNS (THE "SELLER INDEMNIFIED PARTIES") FROM AND AGAINST ANY AND ALL LIABILITY, LIENS, DEMANDS, JUDGMENTS, SUITS, CLAIMS AND EXPENSES OF ANY KIND OR CHARACTER, INCLUDING REASONABLE ATTORNEY'S FEES AND COURT COSTS, ATTRIBUTABLE TO DAMAGE TO PROPERTY, INJURY TO OR DEATH OF PERSONS OR OTHER LIVING THINGS, NATURAL RESOURCE DAMAGES, CERCLA RESPONSE COSTS, ENVIRONMENTAL REMEDIATION AND RESTORATION COSTS, OR FINES OR PENALTIES RELATED TO THE ENVIRONMENTAL CONDITION OF THE PROPERTY (INCLUDING DISPOSAL OF WASTES ON THE PROPERTY), AND SUBJECT TO SECTION 1a (vii), ANY CLAIM TO WHICH THE SELLER INDEMNIFIED PARTIES ARE SUBJECT PURSUANT TO THE GUARANTY AGREEMENT AND THE COOK INLET FUNDING AGREEMENT (COLLECTIVELY, "CLAIMS") ARISING OUT OF OR ATTRIBUTABLE TO, IN WHOLE OR IN PART, EITHER DIRECTLY OR INDIRECTLY, THE OWNERSHIP, CONDITION OR OPERATION OF THE PROPERTY OR THE PROPERTY OF COOK INLET AT ANY TIME BEFORE, AT OR AFTER THE CLOSING DATE, INCLUDING, WITHOUT LIMITATION, ANY SUCH CLAIM THAT IS THE RESULT OF OR CAUSED IN WHOLE OR IN PART BY THE SELLER INDEMNIFIED PARTIES' VIOLATION OF OR FAILURE TO FULFILL DUTIES IMPOSED BY, OR INCURRENCE OF LIABILITY UNDER, ANY ENVIRONMENTAL LAWS, IN EACH CASE WITHOUT REGARD TO SOLE, PARTIAL OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF THE SELLER INDEMNIFIED PARTIES, BUT NOT FOR THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY SELLER INDEMNIFIED PARTY; PROVIDED, THAT THE PARTIES AGREE, ANYTHING TO THE CONTRARY IN THIS AGREEMENT NOTWITHSTANDING, THAT NONE OF THE ACTS OR OMISSIONS WHICH IN ANY WAY CREATED THE CONDITIONS ADDRESSED BY THE COMPLIANCE ORDER BY CONSENT REFERRED TO IN THIS SECTION 6 SHALL EVER BE CONSTRUED AS ATTRIBUTABLE, IN

FOC 000236

**EXHIBIT G**
**Page 17 of 66**

WHOLE OR IN PART, TO THE GROSS NEGLIGENCE OR WILLFUL
MISCONDUCT OF ANY SELLER INDEMNIFIED PARTY.

c.     Notwithstanding any provision of this Agreement to the contrary,
Purchaser may elect to close the transactions contemplated by this Agreement prior to the
preferential purchase rights for Cook Inlet expiring or being waived but excluding the
transactions which would effect the transfer of Cook Inlet and pay the Purchase Price, as
adjusted less the Allocated Value of Cook Inlet. Should Purchaser so elect, Purchaser
may, three (3) business days prior to such Closing, provide Seller with written notice of
Environmental Defects affecting the property of Cook Inlet and Seller hereby agrees to
indemnify and save the Purchaser Indemnified Parties from and against any and all Claims
with respect to such Environmental Defects in Purchaser's notice. If and to the extent that
subsequent to such a Closing prior to the preferential purchase rights for Cook Inlet
expiring or being waived, such preferential purchase rights are waived or the time within
which they were to be exercised expires, then Purchaser shall within ten (10) business days
of such waiver or expiration, close on the purchase of Cook Inlet (or the applicable
portion thereof) and pay to Seller the proportionate share of the Allocated Value of Cook
Inlet (or a proportionately reduced amount to the extent preferential purchase rights were
exercised).

7.     REPRESENTATIONS BY SELLER. Seller represents to Purchaser that:

a.     Seller is a corporation duly organized, validly existing and in good standing
under the laws of the State of Ohio, has the corporate power and authority, and is duly
qualified to own the Property and to enter into and carry out the terms of this Agreement.

b.     The execution and delivery of this Agreement and the consummation of the
transactions contemplated by this Agreement have been duly authorized by all necessary
corporate action on behalf of Seller and constitute the legal, valid and binding obligations
of Seller enforceable against Seller in accordance with their terms. The consummation of
the transactions contemplated hereby will not violate, conflict with or constitute a default
(or an event which without notice or lapse of time or both would become a default) under,
or result in the creation of a lien, or encumbrance on, the Property pursuant to;

(i) any provisions of its charter or bylaws or;

(ii) to the best of Seller's knowledge, any contract, agreement or
instrument to which Seller is a party or by which the Property is bound or affected or;

(iii) any law, regulation or any order, writ, injunction or decree of any court
or governmental instrumentality; and

c.     this Agreement has been duly executed and delivered on behalf of Seller,
and all documents and instruments required hereunder to be executed and delivered by it
shall have been duly executed and delivered; and

d.     to the best of Seller's knowledge,

FOC 000237     **EXHIBIT G
Page 18 of 66**

(i) the instruments listed on Exhibit "B", constitute all of the Associated Contracts which could materially affect the Property after the Effective Date; and

(ii) except as set forth in the Associated Contracts, no present or future production from any of the Property is dedicated under or subject to any contract, commitment, agreement or arrangement of any kind which is not terminable on ninety (90) or fewer days notice; and

(iii) no person or entity has any call upon, option to purchase or similar right with respect to the Property or production therefrom except for production which is subject to agreements which are terminable on ninety (90) or fewer days notice; and

(iv) except with respect to Seller's non-consent of the Hemlock completion in the K-26RD well, Seller is not obligated, by virtue of a prepayment arrangement, a production payment, a non-consent provision or any other arrangement, to deliver hydrocarbons produced from the Property at some future time without payment therefor or at a reduced rate of payment; and

(v) Seller is not in default of its material obligations under the Associated Contracts; and

e.    to the best of Seller's knowledge, the Property includes all material permits, licenses, easements and rights of ingress and egress and other rights necessary for operations currently conducted on the Leases and Wells; and

f.    to the best of Seller's knowledge, no notice from any governmental body, including without limitation the ADEC and EPA, has been served upon Seller or the operator of the Property with respect to the Property claiming any violation of any law or any other code, rule or regulation, which could have a material adverse effect on the Property other than those disclosed to Purchaser in writing prior to the date hereof.  To the best of Seller's knowledge, none of the Property, nor the ownership, leasing, occupancy, or the operation thereof, is in violation of any such law, ordinance, code, rule or regulation, which would have a material adverse effect on the Property.  Except as disclosed to Purchaser or known to Purchaser prior to the date hereof, neither Seller nor, to the best of Seller's knowledge, the operator of the Property or any portion thereof has received notice of any  violation of applicable Environmental Laws, rules, regulations, ordinances and orders relating thereto, including laws relating to the generation, manufacture, processing, transportation or distribution of pollutants, contaminants or hazardous or toxic substances or wastes, the noncompliance with which could have a material adverse effect on the ownership or operation of the Property; and

g.    there has been no material adverse change with respect to operations conducted on the Property or the production from the Property, not caused by acts of God, which has affected the Property from and after the Effective Date, and Seller has not done anything with respect to the Property which is not in the ordinary course of Seller's business, and which would have a material adverse effect on the Property; and

FOC 000238

**EXHIBIT G**
**Page 19 of 66**

h.    to the best of Seller's knowledge, there is no suit or action or legal or administrative proceeding or arbitration pending or threatened, nor any claim, by any administrative agency or governmental body pending or threatened against any of the Property, or against Seller and relating to or affecting in any way the Property, which could have a material adverse effect on the Property, other than those reflected in Exhibit "D" attached hereto; and

i.    to the best of Seller's knowledge, the operator of the Property has timely paid all taxes, governmental charges, duties, penalties, interests and fines due and payable by it and affecting the Property and its operations on or before the date of this Agreement where the failure to make such payment could jeopardize the continued validity of a lease; and

j.    neither Seller nor any affiliate of Seller has employed any investment banker, broker or finder in connection with the transactions contemplated by this Agreement, nor have any of them taken any action which would give rise to a valid claim against any party hereto for a brokerage commission, finder's fee royalty or overriding royalty or like payment and Seller shall indemnify and hold Purchaser, its affiliates, and their respective officers, directors, agents and employees harmless from any and all such obligations; and

k.    to the best of Seller's knowledge, except as set forth in Exhibit "D", and except with respect to the Prudhoe Bay Unit, no personal injury, material property damage or other casualty loss has occurred on the Property, which has not been finally resolved prior to the Effective Date, which could subject Purchaser to liability; and

l.    no third party has a preferential right to purchase the Property or any portion thereof, except as set forth in Exhibit "E"; and

m.    no third party consents to the Assignment are required, except as set forth in Exhibit "F" or except to the extent such consents are customarily obtained subsequent to an Assignment; and

n.    Seller owns twelve thousand (12,000) shares of the stock of Cook Inlet which represents thirty percent (30%) of the outstanding shares of stock of Cook Inlet; and

o.    to the best of Seller's knowledge, there are no outstanding claims, bills, charges or debts associated with Seller's ownership in Cook Inlet except normal operating expenses and except as set forth in Section 14 hereof.

8.    DUE DILIGENCE.

a.    Promptly after the execution of this Agreement and until the Closing Date, Seller will permit Purchaser to review at Seller's office all available title files, ownership maps, lease files, assignments, division orders, payout statements, agreements and similar documents respecting the Property and production, engineering and environmental books,

13          FOC 000239

**EXHIBIT G**
**Page 20 of 66**

records and data in possession of Seller, and all other files, records, and data related to the Property, except those subject to attorney client privilege and such seismic, geological and geophysical data which Seller is prevented from disclosing by contractual obligations with third parties. All such information made available to Purchaser shall be subject to that certain letter agreement dated September 27, 1996 between Seller and Purchaser.

b.     As set forth above, Seller shall allow Purchaser or Purchaser's designee at reasonable times and at Purchaser's sole risk, cost and expense, to conduct physical inspections of the Property prior to Closing. Purchaser does hereby indemnify and hold harmless the Seller Indemnified Parties from and against any and all losses, costs, damages, obligations, claims, liabilities, expenses (including court costs and attorneys fees), or causes of action arising from their inspection and observation of the Property after the execution of this Agreements, including, without limitation, claims for personal injuries or death of their employees, their contractors, agents, consultants and representatives and the employees thereof, and property damages, regardless of whether such claims are caused by the sole or concurrent negligence of Seller or the condition of the Property.

9.     REPRESENTATIONS BY PURCHASER.  Purchaser hereby represents to Seller that:

a.     Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, has the corporate power and authority and is duly qualified to own the Property and to do business in the State of Alaska and to enter into and carry out the terms of this Agreement.

b.     The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate action on behalf of Purchaser and constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their terms. The consummation of the transactions contemplated hereby will not violate, conflict with or constitute a default (or an event which without notice or lapse of time or both would become a default) pursuant to

(i) any provisions of its charter or bylaws; or

(ii) to the best of Purchaser's knowledge, any contract, agreement or instrument to which Purchaser is bound or affected; or

(iii) any law, regulation or any order, writ, injunction or decree of any court or governmental instrumentality.

c.     This Agreement has been duly executed and delivered on behalf of Purchaser, and all documents and instruments required hereunder to be executed and delivered by it shall have been duly executed and delivered.

FOC 000240     **EXHIBIT G**
**Page 21 of 66**

d.    Neither Purchaser nor any affiliate of Purchaser has employed any investment banker, broker or finder in connection with the transactions contemplated by this Agreement, nor have any of them taken any action which would give rise to a valid claim against any party hereto for a brokerage commission, finder's fee or like payment and Purchaser shall indemnify and hold the Seller Indemnified Parties harmless from any and all such obligations.

e.    The Property to be acquired by Purchaser pursuant to this Agreement is to be acquired for the benefit of their shareholders and not for distribution in violation of the securities laws of the United States of America or any state thereof.

f.    There is no suit or action or legal or administrative proceeding or arbitration pending nor any claim by any administrative agency or governmental body pending or threatened which could have an adverse effect on the ability of Purchaser to perform its obligations under this Agreement.

10.    OPERATIONS AND PRODUCTION AFTER THE EFFECTIVE DATE; POST CLOSING ADJUSTMENT PROCEDURE.  Seller shall be responsible for all necessary and reasonable expenses incurred for the operation of the Property prior to the Effective Date, except as to any operations which Seller chose not to participate in or with respect to which Seller elected to go non-consent pursuant to the applicable Associated Contract. Purchaser shall be responsible for all necessary and reasonable expenses incurred for the operation of the Property from and after the Effective Date. "Expenses" as used in this Section 10 shall include, without limitation, operation, production, workover and maintenance of the Property facilities, Leases and Wells. From and after the date hereof until Closing, Seller shall maintain and operate the Property (or cause the operator of the Property to maintain and operate the Property) in a prudent manner consistent with past practices of Seller and/or the operator of the Property and with good oil and gas field practices. Except in the case of emergency, from and after the date hereof, Seller shall not make any single expenditure related to the Property, or commit to do so, in an amount that requires the approval of Seller pursuant to the applicable Associated Contract without Purchaser's prior written consent. In case of emergency, Seller may take such action and make such expenditures as are reasonably necessary to meet the emergency and shall provide Purchaser with prompt, written and detailed information on the nature of the emergency and the expenditures. Except for the sale of production in the ordinary course of business, from and after the Effective Date, Seller shall not sell, trade, bargain, convey or otherwise dispose of the Property or any portion thereof, or commit to do so without the prior written consent of Purchaser. From and after the date hereof, Seller shall not drill, sidetrack, rework, recomplete or abandon any Well or commit to do so irrespective of the cost thereof, without Purchaser's prior written consent.

The production from the Property and all proceeds from the sale thereof attributable to production prior to the Effective Date shall be the property of Seller. The production from the Property and all proceeds from the sale thereof attributable to production from and after the Effective Date shall be the property of Purchaser.

FOC 000241 **EXHIBIT G**
**Page 22 of 66**