To account for adjustments to the Purchase Price, as provided in Section 3b above, as soon as practicable after Closing, but no later than six (6) months after Closing, Seller shall prepare and deliver to Purchaser, in accordance with this Agreement and generally accepted accounting principles, a statement ("Final Settlement Statement") setting forth each adjustment or payment that was not finally determined as of Closing, and showing the calculation of such adjustments. Within sixty (60) days after receipt of the Final Settlement Statement, Purchaser shall deliver to Seller a written report containing changes that Purchaser proposes to be made to the Final Settlement Statement. The parties shall then attempt to agree with respect to the amounts due pursuant to such post closing adjustments no later than thirty (30) days after Seller receives Purchaser's proposed changes. The net amount of the agreed upon changes shall be either added to or subtracted from the Purchase Price and the Purchase Price as so adjusted shall be the "Final Purchase Price" and the date upon which the Final Purchase Price is agreed shall be the "Final Settlement Date". If the Final Purchase Price is more than the Purchase Price as adjusted at Closing (the difference being the "Upward Adjustment"), Purchaser shall pay the amount of such Upward Adjustment to Seller, via wire transfer in immediately available funds, within five (5) days after the Final Settlement Date. If the Final Purchase Price is less than the Purchase Price as adjusted at Closing (the difference being the "Downward Adjustment"), Seller shall pay the amount of Downward Adjustment to Purchaser, via wire transfer in immediately available funds, within five (5) days after the Final Settlement Date.

The foregoing provisions of this Section 10 shall not apply to Seller's shares in Cook Inlet. Should any matter be brought to a vote of the Board of Directors or Shareholders of Cook Inlet from the date hereof until Closing, then Seller shall consult with Purchaser on such matter and shall vote in accordance with Purchaser's written instructions, to the extent consistent with legal obligations and duties imposed on members of Cook Inlet's Board of Directors.

11.    <u>TAXES</u>.

a.    The owner of record on the assessment date of any property taxes shall file or cause to be filed all required reports and returns incident to the property taxes and shall pay or cause to be paid to the taxing authorities all property taxes relating to the tax period during which the Closing occurs.

b.    The Purchase Price excludes, and Purchaser shall be liable for, any sales, use, excise, stock, stamp, document, filing, recording, authorization and similar taxes, fees and charges required to be paid in connection with the sale of the Property pursuant to this Agreement. Purchaser agrees to indemnify the Seller Indemnified Parties from and against any such taxes, fees and charges required to be paid in connection with, or as a result of, the consummation of the transactions contemplated by this Agreement.

c.    Purchaser and Seller agree to provide each other with reasonable access to all relevant documents, data and other information (other than that which is subject to an

FOC 000242

attorney client or other privilege) which may be required by the other party for the purpose of preparing royalty reports and tax returns, filing refund claims and responding to any audit by any lessor or taxing jurisdiction. Except where disclosure is required by applicable law or judicial order, any information obtained by a party pursuant to this Section 11c. shall be kept confidential by such party, except to the extent disclosure is required in connection with the filing of any tax returns or claims for refund or in connection with the conduct of an audit, or other proceedings in response to any audit, by a taxing jurisdiction.

    d.    Purchaser shall be responsible for all other taxes relating to the Property from and after the Effective Date. Seller shall be responsible for all other taxes relating to the Property prior to the Effective Date.

12.    **OBLIGATIONS OF THE PARTIES.**

    a.    As of the Effective Date, Purchaser shall assume and agrees to perform, pay for and comply with the obligations and liabilities (express or implied) of Seller relating to the Property (i) of which Purchaser has knowledge and (ii) to the extent required by this Agreement or as set forth in the Official Records, the Associated Contracts, the Leases, or applicable laws or regulations, including without limitation, obligations arising with respect to plugging, abandonment and clearing of all Wells, jackets, and/or platforms insofar and only insofar as such Wells, jackets and platforms are part of the Property. Except as provided in Section 7g, and except to the extent of Seller's gross negligence or willful misconduct, Purchaser assumes the risk of any change in the condition of the Property from and after the Effective Date and there shall be no reduction in the Purchase Price due to such change in condition of the Property.

    b.    As set forth generally in Section 1a, Seller and Purchaser acknowledge that certain of Seller's interests in facilities and production in the area of the facilities and production which are part of the Property, including, without limitation, certain undivided interests in the TBPF, do not constitute a part of the Property ("Retained Interests"). Seller and Purchaser acknowledge that, EXCEPT AS EXPRESSLY PROVIDED OTHERWISE HEREIN, SELLER RETAINS ALL LIABILITY FOR THE RETAINED INTERESTS, INCLUDING, WITHOUT LIMITATION, ALL LIABILITY FOR POLLUTION, ENVIRONMENTAL DAMAGE, NORM, INJURY OR DEATH OF ANY PERSONS OR DAMAGE, LOSS OR DESTRUCTION OF ANY PROPERTY (REAL OR PERSONAL) AND ANY AND ALL LIABILITY ASSOCIATED WITH THE PLUGGING AND ABANDONMENT OF FACILITIES, PIPELINES, WELLS AND PLATFORMS TO THE EXTENT, BUT ONLY TO THE EXTENT, THAT THEY ARE PART OF THE RETAINED INTERESTS AND NOT EXPRESSLY PROVIDED OTHERWISE HEREIN AND SELLER SHALL INDEMNIFY AND SAVE PURCHASER, ITS DIRECTORS, OFFICERS, SHAREHOLDERS, EMPLOYEES, AGENTS AND ASSIGNS ("PURCHASER INDEMNIFIED PARTIES") HARMLESS FROM AND AGAINST ALL SUCH LIABILITIES INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEY'S FEES AND COURT COSTS, ASSOCIATED WITH THE RETAINED INTERESTS.

**EXHIBIT G**
**FOC 000243 Page 24 of 66**

c.    (i)    Seller shall be responsible for eighty percent (80%) of the environmental, plugging and abandonment liabilities attributable to Seller's fifty-one and two tenths percent (51.2%) ownership of the Steelhead Platform (which is part of the Retained Interests) and Purchaser shall be responsible for environmental, plugging and abandonment liabilities for the remainder of the Retained Interests.

(ii)    If and when Unocal should resign or be removed as Suboperator of the Steelhead Platform, then Purchaser agrees that upon written request from Seller and provided that, at the time of such request, Seller has an ownership interest in the Steelhead Platform, Purchaser shall take all reasonable and necessary action pursuant to the applicable agreements and to the extent Purchaser can do so without spending other than nominal sums of money (other than sums for which Seller agrees to reimburse Purchaser), to have Seller elected as successor Suboperator of the Steelhead Platform. Purchaser's obligations with respect to having Seller elected successor of the Steelhead Platform are personal to Marathon Oil Company and shall vest only in those of Seller's successors and assigns which are affiliates or subsidiaries of Marathon Oil Company, or which acquire all or substantially all of the assets of Marathon Oil Company.

(iii)    Seller shall have full access to the Dolly Varden, King Salmon and Grayling Platforms and to the TBPF for future gas production activities from the Retained Interests. Seller shall have the right but not the obligation to take over Purchaser's rights and obligations for any slot and wellbore on any of those three platforms prior to final abandonment by Purchaser. Seller's acceptance of a Well and slot shall not relieve Purchaser of any environmental, plugging and abandonment obligations for the platform, facilities, pipelines, slots and Wells at the time of final abandonment, but Seller, in turn, shall assume the environmental, plugging and abandonment liability for one of the Steelhead oil or water injection wells for each slot (and associated Well) which Seller takes over on the Dolly Varden, King Salmon and Grayling Platforms. Seller shall reimburse Purchaser for Purchaser's working interest ownership share of any Grayling Gas Sands Well investments made by Purchaser after the Effective Date, for each Well taken over (but not to exceed five hundred thousand dollars ($500,000) for each Well) and shall bear the cost of subsequent facility modifications required by Seller to produce gas well gas from each Well. Purchaser shall not be obligated to maintain these platforms for Seller's future use. Seller shall have the right, but not the obligation, to assume Purchaser's interest and abandonment obligations in any of these platforms prior to Purchaser's committing to abandonment.

d.    Seller shall allow Purchaser to board and inspect the Spurr Platform at Purchaser's sole cost, risk and expense. Purchaser shall be responsible for all liabilities and damages associated with such visits. If, within five (5) years from the Closing Date, Purchaser elects to drill, redrill or recomplete a well, or establish any oil and gas production operations from the Spurr Platform, then Seller shall convey such platform to Purchaser at no additional cost to Purchaser subject to mutually agreeable terms, including a requirement that Purchaser shall assume Spurr Platform ownership (which includes all environmental, plugging and abandonment liabilities associated with the Spurr Platform facilities, wells and pipelines). Purchaser understands that the Spurr Platform is inactive

**EXHIBIT G**

and will require expenditures to establish production. Seller shall not be obligated to maintain this platform for Purchaser's future use. Purchaser shall have the right, but not the obligation, to assume Seller's interest in the Spurr Platform at any time prior to Seller's committing to abandonment thereof or sale to a third party.

Seller shall allow Purchaser to board and inspect the Spark Platform at Purchaser's sole cost, risk and expense. Until the third anniversary of the Closing Date, Purchaser shall have the option to use the Spark Platform to drill, redrill or recomplete a well, or establish any oil and gas production operations. Subject to mutually agreeable terms, if Purchaser elects to exercise such option, Seller shall sell Seller's interest in the Spark Platform, including developed gas reserves and all other rights of Seller in the associated Leases, to Purchaser for ten million five hundred thousand dollars ($10,500,000) and Purchaser shall assume all obligations for the environmental, plugging and abandonment of the Spark Platform and its facilities, wells, and pipelines. If Purchaser elects to purchase the Spark Platform during the option period, Seller shall thereafter exchange gas pursuant to the agreement described in Section 12e below. Seller shall not be obligated to maintain this platform for Purchaser's future use. If Purchaser does not exercise the foregoing option prior to the third anniversary of the Closing Date, then Purchaser shall have the right, but not the obligation, to assume Seller's interest in this platform prior to Seller's committing to abandonment. If Seller receives a bona fide offer from a third party to purchase the Spark Platform on or after the third anniversary of the Closing Date, Seller shall immediately notify Purchaser of such offer, and Purchaser will then have sixty (60) days in which to match such offer to purchase the Spark Platform pursuant to this Section 12d. Purchaser's failure to match the third party offer in a timely manner will be a waiver of the right of first refusal.

The options to purchase the Spark and Spurr Platforms pursuant to this Section 12d are personal to Forcenergy Inc and shall vest only in those of its successors and assigns which are affiliates or subsidiaries of Forcenergy, or which succeed to all or substantially all of the assets of Forcenergy Inc.

e.    Seller shall, at no additional cost to Purchaser, provide up to 20 BCF of Grayling Gas Sands ("GGS") gas to Purchaser at McArthur River Field, to be used only for fuel gas in the oil operations at McArthur River and Trading Bay Fields. Seller and Purchaser shall enter into an agreement for the supply of this fuel gas in substantially the same form as Exhibit "J" hereto.

Seller shall exchange (swap) up to 20 BCF of gas with Purchaser with no exchange fee charged by Seller and Seller will not incur any additional costs associated with this gas exchange. This exchange shall be governed by the applicable provisions of a separate agreement in substantially the same form as Exhibit "J" hereto.

At Purchaser's election, Seller shall sell gas to Purchaser pursuant to the applicable provisions of a separate agreement in substantially the same form as Exhibit "J" hereto.

f.    If the owners of Cook Inlet, other than Seller, do not consent to Purchaser as having adequate financial responsibility to meet the obligations of Seller under the Cook

**EXHIBIT G**
**Page 26 of 66**

Inlet Funding Agreement and the Guaranty Agreement, Purchaser agrees to procure and maintain liability insurance, provided such insurance is obtainable at commercially reasonable rates, with financially reputable liability insurance providers, with such deductible and/or self insurance retention levels and in such policy amounts as is commercially reasonable and prudent in connection with the ownership of the Property. Such insurance shall extend to Purchaser's liabilities under the Cook Inlet Funding Agreement and the Guaranty Agreement. Such insurance shall designate Seller as an additional insured thereunder.

g.    Seller shall take all necessary action on behalf of Purchaser to insure that Purchaser derives all benefit of Seller in that certain letter agreement dated January 29, 1996 between Seller and Unocal.

h.    If Purchaser is ever entitled, as a TBU working interest owner, to vote on the possible expansion of the Grayling Gas Sands WIPA, Purchaser will vote on such question as directed by the written instructions of Seller. If the Grayling Gas Sands WIPA should ever be expanded (horizontally or vertically), Purchaser shall execute the necessary State of Alaska forms to effectuate record title transfer of its interests to Seller in the TBU Grayling Gas Sands in the expanded area. If Purchaser desires to drill a well which results in the expansion of the Grayling Gas Sands WIPA, Purchaser shall first consult with Seller and, if Seller approves such well, Seller shall reimburse Purchaser for Seller's share of the costs of such well simultaneously with Purchaser's assignment of record title in the expanded Grayling Gas Sands WIPA to Seller.

13.    INDEMNIFICATION. CONTINGENT UPON COMPLETION OF THE CLOSING, AND SUBJECT TO OTHER INDEMNITY PROVISIONS CONTAINED HEREIN:

a.    SELLER SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE PURCHASER INDEMNIFIED PARTIES FROM ANY AND ALL LIABILITY, LIENS, DEMANDS, JUDGMENTS, SUITS, CLAIMS AND EXPENSES OF ANY KIND OR CHARACTER, INCLUDING WITHOUT LIMITATION, REASONABLE ATTORNEY'S FEES AND COURT COSTS, ARISING OUT OF OR IN CONNECTION WITH THE PROPERTY PRIOR TO THE EFFECTIVE DATE; INCLUDING WITHOUT LIMITATION, AUDIT ADJUSTMENTS UNDER APPLICABLE JOINT OPERATING AGREEMENTS, ROYALTIES, RENTALS AND TAXES, CONTRACTUAL CAUSES OF ACTION, CLAIMS FOR INJURY OR DEATH OF ANY PERSONS OR DAMAGE, LOSS, OR DESTRUCTION OF ANY PROPERTY, REAL OR PERSONAL, UNDER ANY THEORY OF TORT, CONTRACT OR STRICT LIABILITY.

b.    EXCEPT FOR SELLER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, PURCHASER SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE SELLER INDEMNIFIED PARTIES FROM ANY AND ALL LIABILITY, LIENS, DEMANDS, JUDGMENTS, SUITS, CLAIMS AND EXPENSES OF ANY KIND OR CHARACTER, INCLUDING REASONABLE ATTORNEY'S FEES AND COURT COSTS, ARISING OUT OF OR IN

CONNECTION WITH THE PROPERTY FROM AND AFTER THE EFFECTIVE DATE; INCLUDING WITHOUT LIMITATION, AUDIT ADJUSTMENTS UNDER APPLICABLE JOINT OPERATING AGREEMENTS, CONTRACTUAL CAUSES OF ACTION, CLAIMS FOR INJURY OR DEATH OF ANY PERSONS OR DAMAGE, LOSS, OR DESTRUCTION OF ANY PROPERTY, REAL OR PERSONAL, UNDER ANY THEORY OF TORT, CONTRACT OR STRICT LIABILITY.

c.    SELLER AND PURCHASER AGREE THAT THE INDEMNITY PROVISIONS OF THIS SECTION 13 SHALL APPLY REGARDLESS OF WHETHER THE APPLICABLE INDEMNIFIED PERSON WAS WHOLLY OR PARTIALLY, ACTIVELY OR PASSIVELY, NEGLIGENT OR OTHERWISE AT FAULT, AND WHETHER OR NOT THE CLAIMS ARE BASED ON A THEORY OF NEGLIGENCE, NEGLIGENCE PER SE, STRICT LIABILITY, WILLFUL MISCONDUCT, PRODUCTS LIABILITY, PREMISES LIABILITY, LIABILITY BASED ON STATUTE, OR OTHER THEORY OF LIABILITY AS TO THE APPLICABLE INDEMNIFIED PERSON, AND REGARDLESS OF BY WHOM THE CLAIMS ARE MADE OR BROUGHT, INCLUDING, WITHOUT LIMITATION, PURCHASER'S OR SELLER'S EMPLOYEES, AGENTS OR REPRESENTATIVES, PRIVATE CITIZENS, PERSONS OR ORGANIZATIONS, OR ANY REPRESENTATIVES OF ANY FEDERAL, STATE OR LOCAL GOVERNMENT.

14.    EXISTING CONTRACTS.    The Assignments will be made subject to this Agreement.  Effective as of the Effective Date, Purchaser shall assume Seller's debt associated with its ownership in Cook Inlet not to exceed $6,700,000 (or if and to the extent that rights of first refusal with respect to Cook Inlet stock are exercised, a proportionately reduced amount).  Any such debt in excess of $6,700,000 (or the proportionately reduced amount) shall not be assumed by Purchaser.  Any change in the debt of Cook Inlet after the Closing shall be for the account of and the responsibility of Purchaser.  As a stockholder in Cook Inlet, Purchaser shall also assume Seller's share of Cook Inlet's obligation to maintain a letter of credit in favor of the EPA concerning Cook Inlet ballast water treatment facilities in an amount up to $4,800,000 (or, if and to the extent rights of first refusal to purchase Cook Inlet stock are exercised, a proportionately reduced amount) and shall replace Seller as the obligor of such letter of credit.  If and when such letter of credit is drawn down, either in whole or in part for claims directly related to the Cook Inlet ballast water treatment facilities, Seller shall, within three (3) business days of receipt of written notice thereof, pay to Purchaser, by wire transfer of immediately available funds, the full amount by which the letter of credit was drawn down.

15.    PREFERENTIAL RIGHTS AND CONSENTS.    Seller shall cause all preferential rights of third parties, if any, to purchase all or a portion of the Property to be exercised or waived prior to Closing.  To facilitate the consummation of the transactions contemplated by this Agreement, the Parties may defer Closing for any portion of the Property subject to the exercise of preferential purchase rights which have not been waived prior to the time that the Parties agree to close on the remaining portion of the Property.  Seller shall

FOC 000247

**EXHIBIT G**
**Page 28 of 66**

procure all necessary third party consents to the Assignments prior to Closing except for such consents customarily granted by government agencies following execution of assignments of oil and gas leases, easements, rights of way and interests therein. Exhibit "G" attached hereto is an allocation of the Purchase Price among the portions of the Property. Said allocation or pertinent portion thereof shall be provided to third parties owning preferential purchase rights to establish the portion of the Purchase Price to be allocated to the portion of the Property ("Allocated Value") associated with the preferential rights.

16.    CONDITIONS PRECEDENT.

a.    Purchaser's obligations to deliver the Purchase Price at Closing is subject to Purchaser's satisfaction that the following conditions (which may occur simultaneously with the delivery of the Purchase Price) have been met.

(i).    Seller shall have performed and complied with all terms of this Agreement required to be performed or complied with by Seller on or before Closing, and all of the representations and warranties made by Seller in this Agreement shall be true and correct in all material respects on and as of Closing; and

(ii).    no suit, action or proceeding by or before any governmental authority shall have been instituted or threatened (and not subsequently dismissed, settled, or otherwise terminated) which might restrain, prohibit or invalidate any of the transactions contemplated by this Agreement other than an action or proceeding instituted or threatened by Purchaser or any of its affiliates; and

(iii).    Seller and Purchaser shall have executed and delivered to Purchaser an assignment(s) of the Property, which assignment(s) shall be in the representative form which is attached as Exhibits "C-1" and "C-2" (the "Assignments"); and

(iv).    all liens and encumbrances not constituting Permitted Encumbrances affecting the Property shall have been released; and

(v).    that there are no Title Defects (except those waived by Purchaser or which cumulatively have Defect Values of less than $600,000) and Seller has Marketable Title to the Property free and clear of all unreleased mortgages, security interests liens and encumbrances, except for Permitted Encumbrances, that Seller's interest in each of the Leases and Wells being transferred is as recited in Exhibit "A" and such interest entitles Seller to not less than the Net Revenue Interest nor more than the Working Interest unless there is a proportionate increase in the Net Revenue Interest set out in Exhibit "A"; and

(vi).    that there are no Environmental Defects identified by Purchaser by the Environmental Notice Deadline which have not been remedied to Purchaser's satisfaction.

FOC 000248    **EXHIBIT G**
**Page 29 of 66**

(vii). all requisite filings, if any, pursuant to the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, have been made and all necessary approvals with respect thereto have been received.

b. Seller's obligation to proceed with Closing is subject to Seller's satisfaction that the following conditions have been met:

(i). Purchaser shall have performed and complied with all terms of this Agreement required to be performed or complied with by Purchaser prior to Closing, and all of the representations and warranties made by Purchaser under this Agreement shall be true and correct in all material respects on and as of the Closing; and

(ii). No suit, action or proceeding by or before any governmental authority shall have been instituted or threatened (and not subsequently dismissed, settled, or otherwise terminated) which might restrain, prohibit or invalidate any of the transactions contemplated by this Agreement other than an action or proceeding instituted or threatened by Seller or any of its affiliates; and

(iii). Seller and Purchaser shall have executed and delivered to Purchaser the Assignments; and

(iv). Purchaser shall have delivered to Seller the Purchase Price as adjusted by delivering an amount equal to the sum provided for in Section 3a as adjusted pursuant to Section 3b.

(v) Seller shall have received documentation satisfactory to Seller evidencing the release of Seller from any and all liability up to $4,800,000 (or the proportionately reduced amount if applicable) with respect to the letter of credit in favor of the EPA concerning Cook Inlet's ballast water treatment facilities, and up to $6,700,000 (or the proportionately reduced amount if applicable) with respect to Cook Inlet's $22,000,000 credit facility. Seller shall use all reasonable efforts to accomplish the foregoing prior to the Closing Date.

(vi) Purchaser shall have executed counterpart originals of the Cook Inlet Funding Agreement and the Guaranty Agreement.

17. <u>CLOSING</u>. The Closing shall occur on or before April 30, 1997 ("Closing Date") at the offices of Seller at 5555 San Felipe, Houston, Texas 77056 (or at such other place as the parties may agree). The following shall take place at the Closing:

a. Seller and Purchaser shall execute the Assignments, and the Assignments shall be delivered to Purchaser;

b. Purchaser shall pay by wire transfer to the Seller the Purchase Price, as adjusted. All amounts due by Purchaser shall be sent to the following account: Marathon Oil Company, National City Bank, Cleveland, Ohio, Transit Routing Number 041000124, Account Number 2110051, Reference: Gulf Coast Region for Alaska Region.

**EXHIBIT G**
FOC 000249
**Page 30 of 66**

c.      Seller shall deliver to Purchaser a certificate of non-foreign status in the form attached hereto as Exhibit 'T'.

d.      Seller shall deliver to Purchaser a statement of an officer of Seller certifying that, as of the Closing Date, all of Seller's representations and warranties herein remain true and correct and that Seller has complied with all the material terms of this Agreement.

e.      Purchaser shall deliver to Seller a statement of an officer of Purchaser certifying that, as of the Closing Date, all of its representations and warranties herein remain true and correct and that Purchaser has complied with all the material terms of this Agreement.

f.      Purchaser and Seller shall execute transfer orders or letters-in-lieu thereof in the form attached as Exhibit "H" hereto, directing purchasers of production from the Property to deliver proceeds from production on and after the Effective Date to Purchaser.

No instrument to be executed and delivered at the Closing, or action to be taken at the Closing, shall be effective until all such agreements have been executed and delivered or actions have been taken, and all such instruments and actions shall be deemed to be effective concurrently.

If this Agreement is terminated, or the transactions contemplated herein do not close by April 30, 1997 for any reason other than Purchaser's breach of this Agreement, then Seller shall immediately thereafter refund the Deposit, without interest. The parties hereby acknowledge that the extent of damages to Seller occasioned by Purchaser's breach of this Agreement would be impossible or extremely difficult to ascertain and that the amount of the Deposit is a fair and reasonable estimate of such damages under the circumstances. In the event of Purchaser's breach of this Agreement, Seller shall retain ten percent (10%) of the Deposit as liquidated damages as its sole remedy and shall promptly refund the remaining ninety percent (90%) to Purchaser. Provided however, if Purchaser elects to close excluding Cook Inlet as provided in Section 6c, and such closing occurs, then Seller shall have the remedy of specific performance with respect to the purchase and sale of Cook Inlet only.

18. <u>TERMINATION.</u>

a.      This Agreement and the transactions contemplated hereby may be terminated:

(i)   at any time at or prior to Closing by mutual consent of Seller and Purchaser; or

(ii)  at any time after April 30, 1997, by Seller or Purchaser, by the delivery of written notice to the other party, if the Closing shall not have occurred by such date;

FOC 000250      **EXHIBIT G**
**Page 31 of 66**

(iii) by Seller, if the total Allocated Value of all portions of the Property excluded by Purchaser from this Agreement exceeds ten percent (10%) of the Purchase Price.

provided, however that a Party may not exercise any right of termination pursuant to this Section 18a if the event giving rise to such termination right shall be due to the willful failure of such Party to perform or observe in any material respect any of the covenants or agreements set forth herein to be performed or observed by such Party;

b.    If this Agreement is terminated pursuant to Section 18a, this Agreement shall become void and of no further force or effect (except for the provisions of Section 24 which shall survive such termination and continue in full force and effect); provided, however, that such termination shall not relieve either Party from liability for any defaults under this Agreement that occurred prior to such termination.

19. PURCHASER'S REMEDIES. Purchaser shall be entitled to specific performance of this Agreement. Purchaser shall be entitled to recover its reasonable litigation expenses, attorneys fees and costs which are incurred by Purchaser as a result of Seller's default.

20.   NOTICES.   All notices and communications required or permitted under this Agreement shall be in writing and shall be deemed given when actually received by the party entitled to notice, addressed as follows:

Seller:      Marathon Oil Company
             P.O. Box 196168
             Anchorage, AK  99519-6168
             Attention:  Alaska Region Manager
             Fax:    (907) 564-6489

Purchaser:   Forcenergy Inc
             2730 S.W. 3rd Avenue, Suite 800
             Miami, FL  33129-2237
             Attention:      President
             Fax:  (305) 856-4300

21. COMPLETE AGREEMENT  This Agreement (including the Exhibits) constitutes the entire understanding and agreement between the parties with respect to the subject matter hereof, and supersedes all negotiations, prior discussions and prior agreements and understandings relating to the subject matter hereof.  The terms of this Agreement shall survive the Closing.

22.   FURTHER ASSURANCES.   The parties agree to do such further acts or execute such further documents as may reasonably be required to effectuate the terms of this Agreement, including, without limitation, executing assignments of the Leases on forms as may be required by the State of Alaska.

FOC 000251           **EXHIBIT G**
                     **Page 32 of 66**

## 23. FILES AND RECORDS.

a.      Promptly after Closing, Seller shall deliver to Purchaser originals of all files, records, data and information in the possession of Seller relating to the Property, with the exception of Seller's corporate, financial and general tax records, privileged communications between Seller and its attorneys and the work product of Seller's attorneys, but including copies of all Lease files, land files, Well files, oil sales contract files, division order files, abstracts, title opinions, accounting files for the Property and back up data relating thereto (including, but not limited to computerized data) and other files, records, data and information in the possession of Seller; also, information and data, including engineering, geological, geophysical and seismic data, logs, core sample reports, seismic data and all rights thereto of Seller, insofar as same are related to the Property and are in the possession of Seller, but only to the extent transfer of such geological, geophysical and seismic data or information is not prohibited by existing contractual obligations with third parties.  Any engineering, geological and geophysical data or information developed or prepared by Seller and delivered to Purchaser shall be delivered to Purchaser without any warranty or representation by Seller.  Seller may retain copies of such files, data, records and information at Seller's expense.

b.      Purchaser agrees that the records given to it pursuant to Section 23a. shall be open for inspection by representatives of Seller at reasonable times and upon reasonable notice during regular business hours for a period of ten (10) years following the date of Closing (or for such longer period as may be required by law or governmental regulation), and that Seller may during such period at its expense make such copies thereof as it may reasonably request.  Seller and Purchaser each shall use commercially reasonable efforts for a reasonable period of time following Closing to afford the other access to, (i) in the case of Seller, employees of Seller who remain employees of Seller following the date of Closing and are familiar with the ownership and operation of the Property and (ii) in the case of Purchaser, employees of Purchaser who are familiar with the ownership and operation of the Property, in each case which the Party desiring such access shall reasonably request for its proper corporate purpose, including, without limitation, the defense of legal proceedings.  Such access may include interviews or attendance at depositions or legal proceedings; provided, however, that in any event all out-of-pocket expenses reasonably incurred by any Party in connection with this Section 23b shall be paid or promptly reimbursed by the Party requesting such access.

## 24. CONFIDENTIALITY AND PUBLIC ANNOUNCEMENTS.

a.      Seller and Purchaser agree to use reasonable business efforts to maintain the confidentiality of this Agreement and any proprietary and confidential technical information relating to Property, except for information (i) which becomes available on a non-confidential basis from another source not subject to an obligation of confidentiality with respect to such information, (ii) which becomes generally available to the public or within the industry other than through a breach of this Agreement, or (iii) the disclosure of which is required by law or the Associated Contracts or (iv) which is necessary to provide pursuant to preferential purchase rights.  The parties hereto agree not to record this

**FOC 000252**

**EXHIBIT G**
**Page 33 of 66**

Agreement. Upon execution of this Agreement by both parties, Seller shall make all records and documents, including, without limitation, title records, respecting the Property available to Purchaser for Purchaser's inspection and evaluation.

    b.    Seller and Purchaser shall consult with each other prior to issuing any news release or making any similar public announcement concerning this Agreement or the transactions contemplated hereby and, except as required by applicable law or the applicable rules or regulations of any governmental body or stock exchange, neither Party shall, prior to Closing, issue any news release or make any similar public announcement without the prior written consent of the other Party.

25. <u>COUNTERPART EXECUTION</u>. This Agreement may be executed by signing the original or a counterpart thereof. If this Agreement is executed in multiple counterparts, each counterpart shall be deemed an original, and all of which when taken together, shall constitute but one and the same agreement with the same effect as if both Parties had signed the same instrument.

26. <u>SURVIVAL</u>. The representations, warranties, and indemnities made or provided for herein shall survive the Closing and shall not be deemed to have merged with the separate representations, warranties and covenants made in the Assignments; provided, however, that any claim with respect to the breach thereof must be brought within four (4) years from the Closing Date after which time it shall be deemed to have been waived.

27. <u>MISCELLANEOUS PROVISIONS</u>.

    a.    Captions have been inserted for reference purposes only and shall not define or limit the terms of this Agreement.

    b.    If any provision of this Agreement is held invalid, illegal or incapable of being enforced under any rule of law, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a materially adverse manner with respect to either party.

    c.    This Agreement cannot be modified or amended except by a written instrument duly executed by Seller and Purchaser. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly provided.

    d.    All expenses incurred by each party incidental to the preparation and carrying out of this Agreement are for the account of the party incurring the same.

    e.    Except as expressly provided herein to the contrary, neither party hereto shall assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other party and any assignment made without such consent shall be void. Except as otherwise provided herein, this Agreement shall be binding upon and

FOC 000253

inure to the benefit of the parties hereto and their respective successors and permitted assigns. Seller acknowledges and agrees that the restrictions set forth in this Section 27e shall not, after Closing, obligate Purchaser to obtain the written consent of Seller prior to an assignment by Purchaser of its ownership interest in the Property, and Purchaser acknowledges and agrees that any such assignment shall not release Purchaser from any of its liabilities or obligations hereunder.

      f.     Except as expressly provided herein, this Agreement is not intended to create, nor shall it be construed to create, any rights in any third party under doctrines concerning third-party beneficiaries.

      g.     Purchaser and Seller waive any and all rights to incidental, consequential (including, without limitation, loss of profits), special, punitive and exemplary damages resulting from a breach of this Agreement or any representation or warranty hereunder.

      h.     This Agreement, the other documents delivered pursuant hereto and the legal relations among the parties hereto, shall be governed by and construed in accordance with the internal laws of the State of Alaska. Any action brought to enforce any provision hereof or claiming a breach hereof shall be brought in a court of competent jurisdiction in Anchorage, Alaska.

28.  <u>LIKE KIND EXCHANGE</u>. Seller shall have the option, at or before Closing, to structure the Closing of this transaction in such a manner so as to qualify as part of a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code. Purchaser will cooperate with Seller to facilitate a "like-kind" exchange(s). In the event Seller desires such an exchange(s)(including three corner exchanges), Seller shall timely notify Purchaser, in writing, of its intent and Seller shall be responsible for arrangement of the like-kind exchange(s), compliance with time limits on like-kind exchange(s), the preparation of appropriate documents to complete the transaction, and all additional costs related thereto. Seller shall defend, indemnify and hold harmless the Purchaser

FOC 000254

**EXHIBIT G**
**Page 35 of 66**

**EXHIBIT "C-1" to**
Purchase and Sale Agreement dated December 12, 1996
by and between Marathon Oil Company and Forcenergy Inc

## ASSIGNMENT

This Assignment ("Assignment"), effective as of 7:00 a.m. Anchorage, Alaska time, on October 1, 1996 (the "Effective Date"), is from Marathon Oil Company, an Ohio corporation ("Assignor"), whose address is P.O. Box 196168, Anchorage, Alaska 99519-6168 to Forcenergy Inc, a Delaware corporation ("Assignee"), whose address is 2730 S.W. 3rd Avenue, Suite 800, Miami, Florida 33129-2237.

### PART I

### GRANTING AND HABENDUM CLAUSES

1.  For ten dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which Assignor hereby acknowledges, Assignor has transferred, granted, bargained, conveyed, and assigned, and does hereby transfer, grant, bargain, convey, and assign, to Assignee effective for all purposes as of the Effective Date, the following properties (hereinafter called the "Property"):

    (a) All of Assignor's right, title and interest in and to the oil, gas and mineral leasehold estate and other real property and mineral interests described in Exhibit "A", together with all of the rights of Assignor in respect of any pooled, communitized or unitized acreage of which such interest is a part (collectively, the "Leasehold Interests").

    (b) To the extent same are specifically attributable or allocable to the Leasehold Interests, all of Assignor's right, title and interest in and to (i) all wells (including, without limitation, the wells and interests therein described in Exhibit A), equipment and facilities (excluding vehicles, furniture, office supplies and equipment, telephones, telephone systems and related equipment, computers and other similar personal property) that, as of the Effective Date, are located on and used solely and directly in connection with the production, treatment or transportation of oil and gas from the Leasehold Interests, (ii) all oil and gas and other hydrocarbon volumes produced on or after the Effective Date, (iii) to the extent same are assignable or transferable by Assignor without restriction under applicable law or third-party agreements (without the payment of any funds or other consideration), all orders, contracts, agreements and other instruments, (iv) to the extent same are assignable or transferable by Assignor under applicable law or third-party agreements (without the payment of any funds or other consideration), all easements, authorizations, permits and similar rights and

FOC 000255

**EXHIBIT G**
**Page 36 of 66**

interests, and (v) all other rights, privileges, benefits, powers and obligations conferred or imposed upon the owner and holder of the Leasehold Interests.

Notwithstanding anything herein to the contrary, "Property" does not mean, and specifically excludes, all of Seller's right, title and interest in the Grayling Gas Sands Working Interest Participating Area ("WIPA") of the Trading Bay Unit or in any of the interests described in (a) or (b) above associated with, or otherwise an incident of ownership of, the Grayling Gas Sands WIPA (the "Retained Interests"), and such Retained Interests are specifically reserved unto Assignor and excepted from this Assignment.

TO HAVE AND TO HOLD, subject to the terms, exceptions, and other provisions herein stated, the Property unto Assignee, its successors and assigns, forever, and Assignor does hereby bind itself, its successors and assigns, to warrant and forever defend, subject to the terms hereof, Assignor's title to the Property (to the extent of the interests of Assignor reflected therein) unto Assignee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through or under Assignor, but not otherwise.

Assignee hereby assumes and agrees to pay, perform and discharge the obligations respecting the Property which accrue and relate to, or are based upon or arise out of, events and times occurring after the Effective Date.

PART II

MISCELLANEOUS

2.1   Warranty: Subrogation.  Except as provided above and in that certain Purchase and Sale Agreement by and between Assignor and Assignee dated December 12, 1996 ("Agreement"), the assignments and conveyances made by this Assignment are made without warranty of title express, implied, or statutory, and without recourse, but with full substitution and subrogation of Assignee, and all persons claiming by, through and under Assignee, to the extent assignable, in and to all covenants and warranties by the Assignor's predecessors in title and with full subrogation of all rights accruing under the statutes of limitation under the laws of the State of Alaska and all rights of actions of warranty against all former owners of the Property other than Assignor. The conveyance of the Property is accepted by Assignee subject to the exceptions and reservations noted in Exhibit A and to all contracts, agreements, encumbrances and other matters to which the Property is subject. Any covenants or warranties implied by statute or law by the use of the words "grant," "transfer" or "convey" or other similar words in this assignment are hereby expressly disclaimed, waived and negated.

2.2   Further Assurances.  The parties agree to take all such further actions and execute, acknowledge and deliver all such further documents that are necessary or useful in

2

**FOC 000256**

**EXHIBIT G**
**Page 37 of 66**

carrying out the purposes of this Assignment. So long as authorized by applicable law so to do, (i) Assignor agrees to execute, acknowledge and deliver to Assignee all such other additional instruments, notices, division orders, transfer orders and other documents and to do all such other and further acts and things as may be necessary to more fully and effectively grant, convey and assign to Assignee the Property conveyed hereby or intended so to be; and (ii) Assignee agrees to execute, acknowledge and deliver to Assignor all such other additional instruments, notices, division orders, transfer orders and other documents and to do all such other and further acts and things as may be necessary to more fully and effectively evidence Assignor's rights in and to the Retained Interests excepted and reserved in Exhibit A.

2.3    Governmental Assignments.  Separate assignments of certain of the Leasehold Interests shall be executed on officially approved forms by Assignor to Assignee in sufficient counterparts to satisfy applicable statutory and regulatory requirements. Those assignments shall be deemed to contain all of the exceptions, reservations, rights, titles, power, and privileges set forth herein as fully as though they were set forth in each such assignment. The interests conveyed by such separate assignments are the same, and not in addition to, the Leasehold Interests conveyed herein.

2.4    Exhibits.  Reference is made to Exhibit A attached hereto and made a part hereof for all purposes.  References in such Exhibit A to instruments on file in the public records are made for all purposes.  Unless provided otherwise, all recording references in such Exhibits are to the appropriate records of the Recording District in which the Property is located.

2.5    Headings.  Headings are included in this Assignment for convenience of reference and shall in no way define, limit, extend, or describe the scope or intent of any provision of this Assignment.

2.6.    Successors and Assigns.  This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

2.7    Multiple Counterparts.  This Assignment may be executed in any number of counterparts, and each counterpart hereof shall be deemed to be an original instrument, but all such counterparts shall constitute but one assignment.

2.8    Governing Law.  All provisions of this Assignment shall be governed by and construed in accordance with the laws of the State of Alaska, excluding any conflicts of law rule or principle that might refer same to the laws of another jurisdiction.

FOC 000257   **EXHIBIT G**
**Page 38 of 66**

29.     Miscellaneous.  This Assignment is subject to the terms of the Agreement.


        EXECUTED on December ___, 1996 to be effective for all purposes as the
Effective Date.


FORCENERGY INC                          MARATHON OIL COMPANY


_____                 _____
Assignee's Signature                    Assignor's Signature

## CORPORATION ACKNOWLEDGMENT

State of Texas )
)ss
County of Harris )

The foregoing instrument was acknowledged before me this ___ day of December, 1996 by _____ of Marathon Oil Company, an Ohio corporation, on behalf of the corporation.

_____
Notary's Signature

My commission expires:_____

## CORPORATION ACKNOWLEDGMENT

State of Texas )
)ss
County of Harris )

The foregoing instrument was acknowledged before me this ___ day of December, 1996 by Stig Wennerstrom, President of Forcenergy Inc, a Delaware corporation, on behalf of the corporation.

_____
Notary's Signature

My commission expires:_____

FOC 000259    **EXHIBIT G**
**Page 40 of 66**

5

**EXHIBIT "C-2" to**
Purchase and Sale Agreement dated December 12, 1996
by and between Marathon Oil Company and Forcenergy Inc

## ASSIGNMENT

This Assignment ("Assignment"), effective as of 7:00 a.m. Anchorage, Alaska time, on October 1, 1996 (the "Effective Date"), is from Marathon Oil Company, an Ohio corporation ("Assignor"), whose address is P.O. Box 196168, Anchorage, Alaska 99519-6168 to Forcenergy Inc, a Delaware corporation ("Assignee"), whose address is 2730 S.W. 3rd Avenue, Suite 800, Miami, Florida 33129-2237.

### PART I

### GRANTING AND HABENDUM CLAUSES

1.      For ten dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which Assignor hereby acknowledges, Assignor has transferred, granted, bargained, conveyed, and assigned, and does hereby transfer, grant, bargain, convey, and assign, to Assignee effective for all purposes as of the Effective Date, all of Assignor's right title and interest in and to 12,000 shares of the common stock of Cook Inlet Pipe Line Company, a Delaware corporation (hereinafter called the "Property").

TO HAVE AND TO HOLD, subject to the terms, exceptions, and other provisions herein stated, the Property unto Assignee, its successors and assigns, forever, and Assignor does hereby bind itself, its successors and assigns, to warrant and forever defend, subject to the terms hereof, Assignor's title to the Property (to the extent of the interests of Assignor reflected therein) unto Assignee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through or under Assignor, but not otherwise.

Assignee hereby assumes and agrees to pay, perform and discharge the obligations respecting the Property which accrue and relate to, or are based upon or arise out of, events and times occurring from and after the Effective Date.

### PART II

### MISCELLANEOUS

2.1    <u>Warranty: Subrogation</u>. Except as provided above, or in that certain Purchase and Sale Agreement by and between Assignee and Assignor late December 12,

FOC 000260

**EXHIBIT G**
**Page 41 of 66**

1

1996 (the "Agreement"), the assignment and conveyance made by this Assignment are made without warranty of title express, implied, or statutory, and without recourse, but with full substitution and subrogation of Assignee, and all persons claiming by, through and under Assignee, to the extent assignable, in and to all covenants and warranties by the Assignor's predecessors in title and with full subrogation of all rights accruing under the statutes of limitation under the laws of the State of Alaska and all rights of actions of warranty against all former owners of the Property other than Assignor.

2.2    Further Assurances. The parties agree to take all such further actions and execute, acknowledge and deliver all such further documents that are necessary or useful in carrying out the purposes of this Assignment. So long as authorized by applicable law so to do, (i) Assignor agrees to execute, acknowledge and deliver to Assignee all such other additional endorsements and other documents and to do all such other and further acts and things as may be necessary to more fully and effectively grant, convey and assign to Assignee the Property conveyed hereby or intended so to be; and (ii) Assignee agrees to execute, acknowledge and deliver to Assignor all such other additional instruments and other documents and to do all such other and further acts and things as may be necessary to more fully and effectively convey and assign to Assignee the Property conveyed hereby or intended to so be.

2.3    Transfer Restrictions. This instrument and the conveyance of the Property set forth herein is fully subject to and contingent upon the satisfaction of the terms and conditions of that certain Shareholders Agreement dated as of March 22, 1966 among Assignor, Mobil Pipe Line Company, Atlantic Richfield Company, Unocal and Cook Inlet, as amended from time to time.

2.4    Headings. Headings are included in this Assignment for convenience of reference and shall in no way define, limit, extend, or describe the scope or intent of any provision of this Assignment.

2.5    Successors and Assigns. This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

2.6    Multiple Counterparts. This Assignment may be executed in any number of counterparts, and each counterpart hereof shall be deemed to be an original instrument, but all such counterparts shall constitute but one assignment.

2.7    Governing Law. All provisions of this Assignment shall be governed by and construed in accordance with the laws of the State of Alaska, excluding any

FOC 000261    **EXHIBIT G**
**Page 42 of 66**

conflicts of law rule or principle that might refer same to the laws of another jurisdiction.

EXECUTED on December ___, 1996 to be effective for all purposes as the Effective Date.

FORCENERGY INC                              MARATHON OIL COMPANY


_____                   _____
Assignee's Signature                        Assignor's Signature

FOC 000262          **EXHIBIT G**
                    **Page 43 of 66**

3

## CORPORATION ACKNOWLEDGMENT

State of Texas      )
                      )ss
County of Harris    )

The foregoing instrument was acknowledged before me this ___ day of December, 1996 by _____ of Marathon Oil Company, an Ohio corporation, on behalf of the corporation.

_____
                     Notary's Signature

My commission expires:_____

## CORPORATION ACKNOWLEDGMENT

State of Texas      )
                      )ss
County of Harris    )

The foregoing instrument was acknowledged before me this ___ day of December, 1996 by Stig Wennerstrom, President of Forcenergy Inc, a Delaware corporation, on behalf of the corporation.

_____
                     Notary's Signature

My commission expires:_____

FOC 000263

**EXHIBIT G**
**Page 44 of 66**