C.   Wells Drilled, Deepened or Worked over by Sub-Operator. All wells drilled by Sub-Operators through independent contractors shall be at not more than the usual rates prevailing in the area. A Sub-Operator may employ its own tools and equipment, but the charge therefor shall be at actual cost, but not to exceed the prevailing rate in the area, and the work shall be performed by that Sub-Operator under terms and conditions customary in the area in contracts of independent contractors doing work of a similar nature.

8.3   Unit Operator and Sub-Operators.

A.   Workmanlike Conduct. Unit Operator and each Sub-Operator shall conduct all Unit operations in a good and workmanlike manner. Unit Operator and Sub-Operators shall not be liable to the Parties for damages, unless such damages result from their gross negligence or willful misconduct.

B.   Liens and Encumbrances. Unit Operator and each Sub-Operator shall endeavor to see that the lands and leases in the Unit Area are kept free from all liens and encumbrances occasioned by Unit operations, except the liens of Unit Operator and Sub-Operators granted hereunder.

C.   Employees. All individuals employed by Unit Operator and each Sub-Operator in conducting Unit operations shall be the employees of that party employing same, and their selection, hours of labor, compensation, and all other matters relating to their employment shall be determined by such party.

D.   Expenditure Approval.

1.   The Operator and Sub-Operators shall have the right to make expenditures up to an aggregate of one hundred thousand dollars ($100,000.00) for any single project of any kind without prior written consent of all Parties. (Amended 10/6/75, 1/1/90)

2.   For all projects exceeding twenty-five thousand dollars ($25,000.00), but less than one hundred thousand dollars ($100,000.00), an informational Authority for Expenditure (AFE) shall be prepared by the Operator or Sub-Operator and supplied by the Operator to all other Parties. (Amended 10/6/75, 1/1/90)

3.   All projects exceeding one hundred thousand dollars ($100,000.00) shall require approval of the Parties. An AFE shall be prepared by the Operator or Sub-Operator and supplied by the Operator to all other Parties for approval. Response to a Request for Approval shall be given to the Operator within sixty (60) days after receipt of the request. A party failing to vote shall be

Conformed Unit Operating Agreement
#41015/76-216
Page 13 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 20 of 58

deemed to have voted in the negative.  The provisions of Article 26 shall apply hereto.  (Amended 10/6/75, 1/1/90)

4.    If, at any time, it becomes apparent that expenditures for an AFE and any Supplemental AFE's for such item previously approved pursuant to this Subsection 8.3D will be or has exceeded the authorized limit by ten percent (10%) or fifty thousand dollars ($50,000.00) whichever is greater, or by one million dollars ($1,000,000.00), the Operator or Sub-Operator shall notify the Parties and shall, without delay, prepare a Supplemental AFE.  A Supplemental AFE should also be prepared for an informational AFE if it becomes apparent that expenditures will have or have exceeded the $100,000.00 formal AFE threshold. The Supplemental AFE shall include reasons for the increased costs, and shall request approval for the additional commitment.  The Operator or Sub-Operator shall give verbal notification to the Parties advising that a Supplemental AFE may be required.  (Amended 10/6/75, 1/1/90)

5.    Unless otherwise stated in an AFE or Supplemental AFE, the approval granted for the project described in the AFE or Supplemental AFE will be cancelled if no work has been performed or money spent on the project six (6) months after the AFE or Supplemental AFE has received requisite approval, or six (6) months after proposed start date, whichever occurs first.  (Amended 10/6/75, 1/1/90)

6.    If any emergency occurs, Operator or any Sub-Operator may immediately make or incur such expenditures as in its opinion are required to deal with the emergency.  Operator or Sub-Operator shall report to the Parties as promptly as possible the nature of the emergency and the action taken and, as soon as practical, prepare an AFE if otherwise required by the provisions of this Sub-section 8.3D.  (Amended 10/6/75, 1/1/90)

## ARTICLE IX

## DETERMINATION OF WORKING INTEREST PARTICIPATING AREAS AND BASIC PARTICIPATING INTERESTS

9.1    Hemlock WIPA and BPI.  The initial determination of the WIPA and BPI for the Hemlock WIPA, as shown on appendices "A-1" and "B-1", respectively, have been made by the Parties.  Specified Redeterminations for the Hemlock WIPA shall be made effective as of July 1, 1968 (First Redetermination), January 1, 1970 (Second Redetermination), July 1, 1971 (Third Redetermination) and January 1, 1973 (Fourth Redetermination).

Conformed Unit Operating Agreement
#41015/76-216
Page 14 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 21 of 58

9.2    Initial Determination of WIPA.  Upon the request of any Party, representatives of the Parties shall meet for the purpose of making the initial determination of a WIPA for each other Pool heretofore or hereafter discovered which is capable of producing Unitized Substances.  Each such WIPA shall be determined in accordance with sound engineering principles by unanimous agreement of the parties, and shall include all of each governmental quarter section if any portion thereof lies within the area reasonably deemed to be capable of producing Unitized Substances from that Pool. Each such WIPA and its effective date shall be shown on Appendix "A" hereto.

9.3    Determination of Initial BPI.  Upon the initial determination of each WIPA, representatives of the parties in that WIPA shall meet for the purpose of determining each Party's initial BPI in each Tract within that WIPA as provided in Subsection 1.A of Exhibit "A".  Each such BPI, each Party's total BPI in that WIPA, and the effective date thereof shall be shown on Appendix "B".

9.4.    Redeterminations of WIPA and BPI.

A.    Specified Redeterminations.  Specified Redeterminations, referred to as First Redetermination, Second Redetermination, and Third Redetermination, respectively, of the WIPA and BPI of each WIPA, other than the Hemlock WIPA, shall be made effective as of one and one-half years, three years, and four and one-half years subsequent to the effective date of the initial determination of that WIPA.

B.    Subsequent Redeterminations.  Subsequent Redeterminations, including those of the Hemlock WIPA and BPI, shall be made thereafter not more than once each calendar quarter upon the joint request of two or more Parties to the Unit Operator and not more than once each twelve months if such request is made by a single party, and shall be made only if based upon information and data obtained from the Drilling, Deepening, or Plugging Back of a well subsequent to the last prior redetermination.  Only Parties in a WIPA shall be entitled to request a redetermination of the BPI in that WIPA.

C.    Effect of Change of Unit Area.  No change shall be made in any WIPA or BPI solely as the result of contraction of the Unit Area, and, as among the Parties hereto, any WIPA lands excluded from the Unit Area shall continue to be subject to the terms and conditions of this Agreement and as among the Parties hereto shall continue to be a portion of the WIPA and no redetermination of Acre Feet of WIPA Pay in any such lands shall be made except as the result of information and data obtained from the Drilling, Deepening or Plugging Back of a well in the then Unit Area.

9.5    Effective Date. Each initial determination and redetermination shall be effective as of 7:00 A.M. Alaska Standard Time on its effective date. Each initial determination and all Subsequent Redeterminations shall be effective as of such time the first day of the month of the request therefor.

9.6    Manner of Redetermination of WIPA and BPI.

A.    WIPA. Within thirty (30) days after each of the dates provided for in Sections 9.1, 9.4, and 9.5 for each Specified Redetermination and any Subsequent Redetermination of any WIPA, representatives of the Parties shall meet for the purpose of reviewing the information and data available as of the particular effective date and redetermining that WIPA in the same manner as provided for its initial determination in Section 9.2. Appendix "A" shall be revised to reflect any such redetermination and its effective date.

B.    BPI. Within thirty (30) days after each of the dates provided for in Sections 9.1, 9.4, and 9.5 for each Specified Redetermination and any Subsequent Redetermination of the BPI in a WIPA, representatives of the Parties in that WIPA shall meet for the purpose of reviewing the information and data available as of the particular redetermination date in order to redetermine such BPI. Such redetermination shall be made as provided in Subsection 1.B of Exhibit "A". Upon such redetermination Appendix "A" shall be revised to reflect such redetermination of each BPI in that WIPA, each Party's total BPI in that WIPA, and the effective date thereof, and appropriate adjustments will be made as provided in Article XI.

9.7    Arbitration. In the event the Parties fail, for a period of at least thirty (30) days after any meeting called pursuant to Sections 9.2, 9.3, or 9.6 has convened, to make any determination or redetermination for which that meeting has been called, any party who may be directly affected by the determination or redetermination may request in writing that the matter be submitted to arbitration, and, unless all such requests are withdrawn, such determination or redetermination shall be made by arbitration in accordance with the rules of the American Arbitration Association, and the award of the arbitrator, absent collusion or fraud, shall be conclusive and binding upon the Parties. The Parties shall choose, in accordance with the applicable voting procedure set forth for this Article IX, as arbitrator one of the following consulting firms, including successor firms, which continues in existence and accepts appointment hereunder as arbitrator; J. J. Araps, Babson & Burns, Core Laboratories, Inc., DeGolyer & McNaughton, H. J. Gruy & Associates, James A. Lewis Engineering, Inc., or any other mutually agreeable firm; provided, if the Parties are unable to select an arbitrator in accordance with the applicable voting procedure, or if no firm which is selected accepts appointment hereunder as arbitrator, then a consulting firm of appropriate professional acumen and integrity shall be appointed by the Senior Federal Judge resident in Anchorage, Alaska, from the names of

consulting firms supplied by the parties. The parties shall supply full and adequate information to the arbitrator acting hereunder, and the Parties and arbitrator shall cooperate and act expeditiously, time being of the essence of the reference to arbitration hereunder, to the end that the award of the arbitrator shall issue not later than sixty (60) days after it commences its duties under this Section 9.7.

The arbitration procedures hereinabove provided shall apply only to such parameters or factors as to which the Parties are unable to agree and such arbitrator shall make a decision on the matters submitted to it for arbitration which are within the scope of its authority.

All costs of arbitration shall be borne by the parties in the relevant WIPA, in proportion to their respective BPI thereby determined.

## ARTICLE X

## APPORTIONMENT OF COSTS AND OWNERSHIP OF PRODUCTION AND PROPERTY

10.1   Apportionment and Allocation of Production for Royalty Purposes. Production for royalty purposes shall be allocated to each Tract of Unitized Land on the basis provided in the Unit Agreement and shall be paid by the Unit Operator to the State of Alaska from Production received from the parties for this purpose pursuant to Subsection 10.2B.

10.2   Apportionment and Ownership Within a WIPA. For each WIPA the apportionment of Costs and ownership of Production and property among the Parties in that WIPA shall be upon the following bases:

A.   Costs. All costs incurred in the development and operation of that WIPA for or in connection with Production of Unitized Substances from the Pool for which that WIPA is established shall be borne by the Parties in that WIPA upon the basis of their respective total BPI in that WIPA, determined as of the time such Costs are incurred; subject, however, to adjustments in accordance with Subsections 11.1A and 11.2A.

B.   Production. The Production from a WIPA shall be allocated separately to the parties therein on the basis of their respective BPI within that WIPA. Each Party receiving such Production shall pay to the Unit Operator, who shall in turn pay to the State of Alaska that proportionate part thereof representing the Royalty Share, or the amount received from the sale thereof if the State elects not to take in kind, as defined and calculated in the manner set forth In Exhibit "A" to this Agreement. In agreeing to this method of allocation, it is intended and

Conformed Unit Operating Agreement
#41015/76-216
Page 17 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 24 of 58

agreed by the parties that any difference in the total royalty rate applicable to the Production from any WIPA as opposed to what the total royalty rate applicable to that Production would have been if the State had accepted the method of allocation (BPI) adopted by the Parties will accrue to the parties in that WIPA, as a burden or as a benefit, as the case may be in the same proportion in which Production is allocated to such parties on the basis of BPI.

    C.    Property. All material, equipment and other property, whether real or personal, the cost of which is chargeable as Costs and which are acquired in connection with the development and operation of that WIPA, or the proceeds from the sale thereof, shall be owned by the parties in that WIPA upon the basis of their respective total BPI within that WIPA; subject, however, to adjustments in accordance with Subsections 11.1C and 11.2C.

### ARTICLE XI

### INITIAL AND FUTURE ADJUSTMENTS OF COSTS, PRODUCTION AND PROPERTY

    11.1    Adjustments on Initial Determination and Specified Redeterminations of WIPA or BPI. Adjustments of Costs, Production and property on the initial determination and Specified Redeterminations of a WIPA or BPI shall be accomplished in the following manner:

    A.    Costs. Within sixty (60) days after the Parties in a WIPA have completed the initial determination, and within sixty (60) days after each Specified Redetermination of BPI as set forth in Article IX and Exhibit "A" to this Agreement, Unit Operator and each Sub-Operator shall furnish the Parties in that WIPA with revised billings showing all Costs incurred and paid by it in the development and operation of that WIPA prior to the effective date of that initial determination or Specified Redetermination. All such billings shall show the portion of these Costs to be borne by each Party upon the basis of its determined or redetermined BPI and the adjustment required between this amount and that actually paid by such Party. Upon receipt of each such billing, each Party who has paid less than its determined or redetermined BPI share shall promptly pay in cash the amount of the adjustment required, together with interest thereon at the rate of one-half of one per cent (1/2 of 1%) per month from the month during which each portion of the Costs was paid. Each such payment shall be made to Unit Operator who shall distribute the same to those Parties entitled thereto upon the basis of the advances made by such latter Parties for the account of the Parties who have paid less than their determined or redetermined BPI share.

Conformed Unit Operating Agreement
#41015/76-216
Page 18 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 25 of 58

B.    Production.  Within thirty (30) days after each such initial determination and within thirty (30) days after each Specified Redetermination, Unit Operator shall furnish each Party in the WIPA a statement which sets forth: (1) the amounts of the EPI and BPI shares of Production actually taken by each Party; (2) the amounts of the EPI and BPI shares of Production each Party was formerly entitled to take; and (3) the amounts of Production that each Party was entitled to take on the basis of the initially determined or redetermined EPI and BPI.  If, as a result of the revision of BPI, it is shown that a Party has been allocated more than its revised EPI share of Production, then that Party shall owe those Parties who have been allocated less than their revised EPI share of Production for the Production allocated in excess of such revised EPI share.  A Party's failure to take or otherwise dispose of its proportionate share of Production shall be disregarded in computing such adjustments.  Each owing Party shall have the option of making such adjustments immediately in cash or out of not less than twenty per cent (20%) of such Party's BPI share of future Production to the end that such adjustment shall be completed not later than three (3) years after the effective date of the relevant determination or redetermination.  Such adjustments shall be made solely on the basis of volume and any adjustment out of future Production not completed at that time shall be completed immediately in cash.  In the event such Party has no BPI as a result of such revision, such adjustment shall immediately be made in cash.  The amounts of each adjustment shall be distributed among the Parties with increased EPI's in proportion to their respective increases therein, so that each such Party will receive its EPI share of Production or the value thereof.

Whenever such adjustments are made in cash, the value shall be the Market Value of the Production as of the effective date of the relevant determination or redetermination.

C.    Property.  As of each of the effective dates of the initial determination and of each Specified Redetermination, all materials, equipment and other property, whether real or personal, the cost of which was chargeable as Costs and which were acquired in connection with the development or operation of that WIPA, or the proceed from the sale of any such materials, equipment or other property, shall be owned by the Parties upon the determined or redetermined basis, subject to adjustment as provided in this Agreement.

11.2    Adjustments on Subsequent Redeterminations.  Adjustment of Costs, Production, and property on any Subsequent Redeterminations of a WIPA or BPI shall be accomplished in the following manner:

A.    Costs.  Within sixty (60) days after the Parties in a WIPA have completed a Subsequent Redetermination of BPI, Unit Operator and each Sub-

Conformed Unit Operating Agreement
#41015/76-216
Page 19 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 26 of 58

Operator involved shall furnish the Parties in that WIPA with a billing showing all Costs incurred and paid by it in the development of that WIPA prior to the effective date of that Subsequent Redetermination, less the Costs of any well which has been abandoned, and not including "Operating" costs as defined in Exhibit "C". All such billings shall show the portion of such costs to be borne by each Party upon the basis of its redetermined BPI and the adjustment required between this amount and that actually paid by such Party, adjusted for depreciation as provided in this Subsection 11.2A. Upon receipt of each such billing, each Party who has paid less than its redetermined BPI share shall promptly pay in cash the amount of the adjustment required. Depreciation on such costs classified as tangible and intangible (in conformity with accounting procedures generally accepted in the industry) shall be computed at the following rates for each month from the month during which the property represented by such costs was usable:

> (1) one-half of one per cent (1/2 of 1%) per month for a cumulative total of one hundred (100) months, and (2) zero per cent (0%) per month in excess of said cumulative total.

Each such payment shall be made to Unit Operator who shall distribute the same to those Parties entitled thereto upon the basis of the advances made by such latter Parties for the account of the Parties who have paid less than their redetermined BPI share.

     B.   <u>Production</u>. There shall be no adjustment of Production prior to the effective date of any Subsequent Redetermination as a result of such redetermination. Production subsequent to the effective date of each Subsequent Redetermination shall be adjusted in the manner provided for adjustments after the initial determination or Specified Redeterminations in Subsection 11.1B. Statements relating to Production which Unit Operator is required to furnish shall be limited to the period subsequent to the effective date of the relevant Subsequent Redetermination.

     C.   <u>Property</u>. As of the effective date of any Subsequent Redetermination, all materials, equipment and other property, whether real or personal, the cost of which was chargeable as Costs and which were acquired in connection with the development or operation of that WIPA, or the proceeds from the sale of any such materials, equipment or other property made subsequent to the effective date of that Subsequent Redetermination, shall be owned by the Parties upon the redetermined basis, subject to adjustment as provided in this Agreement.

Conformed Unit Operating Agreement
#41015/76-216
Page 20 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 27 of 58

## ARTICLE XII

## PLANS OF DEVELOPMENT

12.1    Wells and Projects Included.  Each plan for the development and operation of the Unit Area which is submitted by Unit Operator to the Director in accordance with the Unit Agreement shall make provision only for such Drilling, Deepening and Plugging Back operations and such other projects as have been approved by the parties as provided herein.

12.2    Notice of Proposed Plan.  At least thirty (30) days before submitting any such proposed plan to the Director, Unit Operator shall give each party written notice thereof, together with a copy of the proposed plan.  Within fifteen (15) days after receipt of the notice and plan, each Party shall advise Unit Operator of its approval or suggested revisions in those portions of the plan as to which it is entitled to vote pursuant to Article V of this Agreement.  If the plan receives the vote of approval required in Article V of this Agreement, then Unit Operator shall file the plan with the Director.  If the plan fails to obtain approval, Unit Operator will endeavor to make revisions that meet with approval of the parties.

12.3    Cessation of Operations under Plan.  If any such plan as approved by the Director provides for the cessation of any Drilling or other operations therein provided for on the happening of a contingency and if such contingency occurs, Sub-Operator shall promptly cease such Drilling or other operations and shall not incur any additional costs in connection therewith unless and until such Drilling or other operations are again authorized in accordance with this Agreement by the Parties chargeable with such Costs.

## ARTICLE XIII

## DRILLING, DEEPENING, PLUGGING BACK OR ABANDONMENT OF EXPLORATORY, DEVELOPMENT AND INJECTION WELLS

13.1    General Provisions for Exploratory, Development and Injection Wells.

A.    General.  The Drilling, Deepening, Plugging Back or abandoning of a well within the Unit Area shall be conducted only in accordance with the provisions of this Article XIII, except as provided in Article XIV and Article XVI. For the purposes of this Article XIII, reference to Parties shall mean all Parties to this Agreement in the case of Exploratory Wells and all parties in the relevant WIPA in the case of Development and Injection Wells.

B.    Sub-Operator to Conduct Operations.  All Drilling, Deepening, Plugging Back, and abandoning operations shall be conducted by the designated Sub-Operator; provided, however, if such operations are to be conducted from a

Conformed Unit Operating Agreement
#41015/76-216
Page 21 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 28 of 58

facility for which no Sub-Operator has been designated, the Parties participating in the Costs thereof shall designate the Sub-Operator.

C.    Notice of Proposed Operations.  Any Party may propose the Drilling, Deepening or Plugging Back or abandoning of a well by giving each of the other Parties written notice which, except in the case of abandoning operations, shall specify the surface location, bottom hole location (which location shall conform to any applicable spacing pattern theretofore adopted or then being followed or an authorized exception thereto), depth and estimated cost of the proposed well.  No Party shall propose the Drilling of a well hereunder the Drilling of which requires the construction of a permanent platform.

D.    Response to Notice.  Within thirty (30) days after receipt of such notice, each Party shall advise all other Parties, in writing, whether or not it approves and desires to participate in such operations.  If the Parties approve such operations, then the proposed operations shall be conducted by the designated Sub-Operator.  If any Party fails to respond to such notice within said thirty (30) day period, it shall be deemed to have failed to approve such proposed operation and to have elected not to participate therein.

Notwithstanding the provisions of the foregoing paragraph, if a drilling rig has suspended operations awaiting approval of redrilling, Deepening, Plugging Back or abandoning of a well, then the Parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturdays, Sundays and legal holidays) after receipt thereof within which to notify the Parties giving such notice whether they approve and desire to participate in the proposed operations.  All such notices given under this paragraph shall be by telephone, telegraph or telewriter.

E.    Fewer Than All Parties.  Whenever all parties entitled to participate in approved operations fail to agree to participate, then within fifteen (15) days after expiration of said thirty (30) days' notice period or within twenty-four (24) hours (exclusive of Saturdays, Sundays and legal holidays) after expiration of said forty-eight (48) hour notice period, each such party who desires to participate in the approved operations shall give to the other Parties written notice (or in the case of the twenty-four (24) hour notice period, by telephone, telegraph, or telewriter) of election to participate in such approved operations.  Failure to give such notice shall be deemed an election not to participate.

Unless otherwise agreed by the parties, the entire cost, risk, liability and expense of the Drilling, Deepening, or Plugging Back of a Development or Exploratory Well by fewer than all the Parties shall be borne by the parties comprising the Drilling party in proportion to their respective interests in such operation as hereinafter provided.

Conformed Unit Operating Agreement
#41015/76-216
Page 22 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 29 of 58

No operations by fewer than all parties shall be conducted in such a manner as to interfere or conflict with any other Unit operations, except as provided in Article XIV.

F. <u>Abandonment of Non-Productive Well</u>. In the event the proposed operation is the abandonment of a non-productive well other than a Hemlock WIPA well, then the notice required in Subsection 13.1C shall also be given to the Parties in the Hemlock WIPA. If the Parties in the Hemlock WIPA give notice of election, in the manner provided in Subsection 13.1D, to take over said well and if the parties participating in the Costs of said well approve the proposed abandonment, then the Parties in the Hemlock WIPA shall take over said well upon such terms and conditions as may be agreed, otherwise said well shall be abandoned as provided in Subsection 13.1D.

G. <u>Use of Equipment</u>. In the case of any Plugging Back or Deepening operation, the Drilling Party shall purchase, at salvage value, all casing, tubing and other equipment in the well.

13.2  <u>Exploratory Wells</u>.

A. <u>Right to Drill</u>. If any party desires to Drill, Deepen or Plug Back a well as an Exploratory Well, the it shall have the right to do so under the provisions of this Article XIII.

B. <u>Drilling from Floating Platforms</u>. The Drilling of an Exploratory Well from a floating platform or drilling barge shall be outside the scope of this Agreement, but except as provided in the last paragraph of Subsection 13.1E, nothing herein contained shall be deemed to prevent the Drilling of such a well on a Tract by a Party owning a Working Interest therein.

C. <u>Operations and Participation</u>. The Drilling, Deepening or Plugging Back of an Exploratory Well from any facility other than a floating platform or drilling barge shall be accomplished in the following manner:

In the event the proposed operation receives the approval of the Parties as provided in Subsection 13.1D or 13.1E, then each owner of a Working Interest in the Tract in which such operation is to be conducted shall have the right to participate in proportion to its Working Interest in that Tract. Unless one or more of the Owners of Working Interests in that Tract elect to conduct such operations at its sole cost, risk and expense as provided in Subsection 13.1E, all Parties shall have the right to participate in such operations in proportion to their respective BPI in the Hemlock WIPA, in accordance with the provisions of Subsection 13.1E.

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 30 of 58

Notwithstanding the provisions of this Subsection 13.2C, no approval of the Parties shall be required for the Drilling, Deepening or Plugging Back of an Exploratory Well from a location on land if such operation is to be conducted by a Party owning a Working Interest in the Tract in which the bottom hole location is proposed.

13.3   Development Wells.

A.    Right to Drill.  If any Party desires to Drill, Deepen, or Plug Back a well as a Development Well, then it shall have the right to do so under the provisions of this Article XIII.

B.    Operations and Participation.  The Drilling, Deepening or Plugging Back of a Development Well shall be accomplished in the following manner:

In the event the proposed operation receives the approval of the Parties as provided in Subsection 13.1D or 13.1E, each Party in that WIPA shall have the right to participate therein in proportion to its BPI in that WIPA.

13.4   Relinquishment and Reversion of Interests.

A.    Operations by Less than All Parties.  In Order for the Drilling Party to receive the benefits of this Section 13.4, the proposed operations shall be commenced within one hundred twenty (120) days after the expiration of the notice period provided in Subsection 13.1D or 13.1E, whichever is the later date. Each Drilling Party shall participate in the proposed operations in the proportion that its BPI bears to the total BPI of all Drilling Party in the relevant WIPA.

B.    Relinquishment of Interest by Non-Drilling Party.  When a well which is Drilling, Deepening or Plugged Back by less than all Parties entitled to participate therein, is completed as a producer of Unitized Substances, each Non-Drilling Party shall be deemed to have relinquished to the Drilling Party all of its operating rights and Working Interest in and to such Well, and Drilling Party shall make, or cause to be made, payments for Lease burdens in respect of Production from said well, in accordance with Section 21.2.

C.    Reversion of Relinquished Interest.  The operating rights and Working Interests relinquished by a Non-Drilling Party shall revert to it at such time as the Market Value of that Non-Drilling Party's EPI share of the Production obtained from the well after such relinquishment (after deducting from such Market Value all taxes upon or measured by Production and all Lease Burdens other than the State's Royalty Share on said portion thereof) shall equal the total of the following:

Conformed Unit Operating Agreement
#41015/76-216
Page 24 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 31 of 58

(1)     One hundred per cent (100%) of that portion of the Costs incurred in operating the well (including the portion of costs of acquisition or use of platforms, pipelines or other facilities attributable to such operations by less than all Parties, but excluding the Costs provided for in Subsection 13.4C(2)) that would have been charged to such Non-Drilling Party had all Parties entitled thereto participated therein; and

(2)     Six hundred per cent (600%) in the case of an Exploratory Well, or four hundred per cent (400%) in the case of a Development Well, of that portion of the Costs incurred by Drilling Party in the Drilling, Deepening, or Plugging Back of said well, through and including the wellhead connections, that would have been chargeable to such Non-Drilling Party had all Parties entitled thereto participated therein.

D.     Effect of Reversion. From and after reversion to a Non-Drilling Party of its relinquished interest in a well, such Non-Drilling Party shall share in the ownership of the well, the operating rights and Working Interest therein, the materials and equipment in or pertaining to the well, the Production therefrom and the Costs of operating the well as otherwise provided in this Agreement.

13.5    Abandonment of Production Wells. No well which is producing or has once produced, shall be abandoned without approval of the Parties then owning a Working Interest therein. If such approval is not obtained, then the Parties not desiring to abandon shall pay to such other Party the latter Party's proportionate share of the fair market value of the salvable material and equipment in and on such well determined at the time such abandonment is proposed, less such latter Party's estimated share of the cost of abandonment. Upon receipt of said sum, the Party desiring to abandon said well shall assign to the other Parties, without warranty of title, all of its operating rights and Working Interest in the well and all subsequent Production therefrom, as to the Pool from which said well is then producing, or has once produced, but not as to any other Pool and all of its interest in the material and equipment in and on said well. If such assignment or conveyance shall run in favor of more than one Party hereto, the interest covered thereby shall be shared by such Parties in the proportion that the interest of each Party assignee bears to the interest of all Parties assignee.

In the event the abandonment is of a well other than a Hemlock WIPA well, the Party proposing such abandonment shall give the notice required in Subsection 13.1C to the Parties in the Hemlock WIPA. If the Parties in the Hemlock WIPA give notice of election, in the matter provided in Subsection 13.1D, to take over said well and if the Parties then owning a Working Interest in said well approve the proposed abandonment, the Parties in the Hemlock WIPA shall take over said well upon such terms and conditions as may be agreed. Unless at the direction of the Parties the well is to be taken

Conformed Unit Operating Agreement
#41015/76-216
Page 25 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 32 of 58

over for use in Unit operations, the Sub-Operator shall plug and abandon the well for the account of the parties owning a Working Interest therein.

As used in this Section 13.5, "well" shall be deemed to apply separately to each Pool from which that well is then producing or has produced, and the value of the salvable material and equipment therein shall be attributed in proportion to the ownership thereof.

13.6   Injection Wells.  The Costs of Drilling, Deepening or Plugging Back, abandoning, or taking over a well as an Injection Well shall be borne by all the parties in the WIPA for which the well is to be used for the purpose of disposal or pressure maintenance or secondary recovery operations. All parties in the relevant WIPA shall bear such Costs according to their respective BPI in that WIPA.

ARTICLE XIV

REQUIRED WELLS

14.1   Definition.  For the purposes of this Article, a well shall be deemed a required well if the Drilling thereof is required by the final order of an authorized representative of the Department of Natural Resources. Such an order shall be deemed final upon expiration of the time allowed for appeal therefrom without the commencement of appropriate appeal proceedings, or, if such proceedings are commenced within said time, upon the final disposition of the appeal. Whenever a Party receives any such order, it shall promptly mail a copy thereof to each of the other Parties; if any such order is appealed, the Party appealing shall give prompt written notice thereof to each of the other Parties, and upon final disposition of the appeal, Unit Operator shall give each of the Parties prompt written notice of the results thereof.

14.2   Election to Drill.  Any Party desiring to Drill, or participate in the Drilling of, a required well shall give to the other Parties written notice thereof as provided in Subsection 13.1C or within such lesser time as may be required by the order. If such notice is given, the Parties electing to participate as provided in Subsections 13.1D or 13.1E shall designate a Sub-Operator in the manner provided in subsection 13.1B for the Drilling of that well. Subject to the provisions of Section 16.3, the designated Sub-Operator shall Drill the required well for the account of such Parties, who shall bear all Costs incurred therein; provided, however, that if the required well is a Development Well, it shall not be drilled unless it receives the approval of the parties in the relevant WIPA. The rights and obligations of such Parties with respect to the ownership of such well, the operating rights therein, the Production therefrom and the bearing of Costs incurred therein shall be the same as if the well had been Drilled for the account of such Parties under Article XIII either as a Development Well or Exploratory Well, as the case may be.

Conformed Unit Operating Agreement
#41015/76-216
Page 26 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 33 of 58

14.3  Alternatives to Drilling.  If no Party elects to Drill a required well within the period allowed for such election or if such election is made but approval to drill is not obtained from the parties as provided under Section 14.2, and if any of the following alternatives is available, the first such alternative which is available shall be followed:

A.    Compensatory Royalties.  If compensatory royalties may be paid in lieu of Drilling the well and if payment thereof receives, within said period, the approval of the Parties who would be chargeable with the Costs incurred in Drilling the well, if the well were Drilled as provided in Section 14.4, Unit Operator shall pay such compensatory royalties for the account of said Parties; or

B.    Contraction.  If the Drilling of the well may be avoided, without other penalty, by contraction of the Unit Area, Unit Operator shall make a reasonable effort to effect such contraction with the approval of the Director in the manner provided in numbered Paragraph 2 of the Unit Agreement.

14.4  Required Drilling.  If none of the foregoing alternatives is available, the required well shall be drilled under whichever of the following provisions is applicable:

A.    Development Well.  If the required well is a Development Well, it shall be Drilled by the Sub-Operator designated in the manner provided in Section 14.2 for the account of all Parties in the WIPA in which the well is Drilled; or

B.    Exploratory Well.  If the required well is an Exploratory Well, it shall be drilled by the Sub-Operator designated by and for the account of the parties in proportion to their respective Surface Acreage in the Unit Area.

ARTICLE XV

ESTABLISHMENT, REVISIONS AND CONSOLIDATION
OF ROYALTY INTEREST PARTICIPATING AREAS

15.1  General.  All RIPA shall be established, revised or consolidated from time to time as provided in numbered Paragraph 11 of the Unit Agreement and in accordance with the procedure set forth in this Article XV.

15.2  Procedure.  Whenever a Sub-Operator obtains information which may cause the establishment, revision or consolidation of a RIPA, then Sub-Operator shall promptly advise Unit Operator and furnish the data applicable thereto.  Unit Operator, in turn, shall furnish all available data as it may have relative thereto, along with Unit Operator's proposal as to such establishment, revision or consolidation, to each of the Parties in the applicable WIPA.  Within fifteen (15) days following receipt of such data and proposal, each Party shall advise Unit Operator in writing of its approval or objections to such proposal.  If the proposal receives the approval of such Parties, then Unit Operator shall

promptly prepare and file with the Director the necessary documents and data supporting such establishment, revision or consolidation. The failure of any party to advise Unit Operator of its position shall be regarded as a vote against the proposal submitted. If the proposal does not receive the approval of such Parties, then Unit Operator shall submit to the Parties a revised proposal taking into consideration the written comments made as to the initial proposal. If such revised proposal fails to receive the approval of such Parties, then Unit Operator shall file with the Director a proposal that reflects the position of the greatest percentage of interest of the Parties within the applicable WIPA.

15.3   Revised Proposal. If any such proposal filed by Unit Operator with the Director is rejected or requested to be revised, then Unit Operator shall submit a revised proposal to the Parties in the WIPA involved for their approval in accordance with the procedure set forth above. any Party may submit its objections or comments to the Director as to any proposal filed by the Unit Operator with the Director.

## ARTICLE XVI

## PLATFORMS AND PRODUCTION FACILITIES

16.1   Prior Commitments. Prior to the effective date of this Agreement, the parties have agreed to the design, construction and installation of the platforms, pipelines and production facilities referred to in Section 7.2 for the primary purpose of the development and operation of the Hemlock WIPA. The Parties further agreed that the Costs thereof would be initially shared on the basis provided in appendix "B-1", subject to the right to audit and adjustments as herein provided.

16.2   Costs. All costs and expenses incurred in connection with the design, construction and installation of the said platforms, pipelines and production facilities to the extent that said production facilities are used solely for or allocated to the Trading Bay Unit, shall be deemed Costs for the purposes of this Agreement.

16.3   Use of Wells, Platforms, or Production Facilities. No well, platform, or production facility (including a pipeline) shall be used for other than that upon which ownership thereof is based without the approval of the Parties owning such well, platform, or production facility, as provided in Subsection 5.3D. Upon such use, a fair and equitable apportionment of risks and liabilities, investment, and operating and other costs shall be made between the Parties therefor. Such use shall include but not be limited to the Drilling of wells, multiple completion of wells and the production, transportation and handling of Unitized Substances. (See **First, Second and Third Supplemental Agreements to Unit Operating Agreement**)

Conformed Unit Operating Agreement
#41015/76-216
Page 28 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 35 of 58

## ARTICLE XVII

## CONSTRUCTION OF CERTAIN PLATFORMS, PIPELINES AND OTHER FACILITIES

17.1 <u>General</u>. The construction of any platforms, pipeline, or other facilities not provided for in Section 16.1 and not related to secondary recovery or pressure maintenance programs, the cost of which exceeds One Million Five Hundred Thousand Dollars ($1,500,000.00), referred to in this Article XVII as "Such Construction", shall be conducted in or for the benefit of the Unit Area only in accordance with the provisions of this Article XVII. For the purposes of this Article XVII, reference to parties shall mean all parties in the WIPA to be served by the proposed platform, pipeline, or other facility.

17.2 <u>Sub-Operator to Conduct Operations</u>. Such Construction shall be conducted by the Sub-Operator designated by the parties participating in the Costs thereof.

17.3 <u>Notice of Proposed Construction</u>. Any Party may propose Such Construction by giving each of the other Parties written notice specifying the location, contemplated service, design, specifications, proposed Sub-Operator, and estimated Costs of Such Construction.

17.4 <u>Response to Notice</u>. Within sixty (60) days after receipt of such notice each Party shall advise all other parties, in writing, whether or not it approves Such Construction and whether or not it desires to participate in Such Construction. If any Party fails to respond to such notice within said sixty (60) day period, it shall be deemed to have failed to approve such construction and to have elected not to participate therein.

If the Parties approve Such Construction in the manner provided in Subsection 5.3E, then Such Construction shall be conducted by the designated Sub-Operator.

17.5 <u>Participation</u>. In the event Such Construction receives the approval of the Parties as provided in Section 17.4, each Party shall have the right to participate therein in proportion to its BPI in the WIPA to be served. Unless otherwise agreed by the Parties, the entire cost, risk, liability and expense of Such Construction by fewer than all of the Parties shall be borne by the Parties comprising the Participating Party (as hereinafter defined) in proportion to their respective interests in Such Construction as hereinafter provided. The Party or Parties electing to participate in such Construction shall be referred to in this Article XVII as "Participating Party".

17.6 <u>Relinquishment and Reversion of Interests</u>.

A. <u>Such Construction By Less Than All Parties</u>. In order for the Participating Party to receive the benefits of this Section 17.6, Such Construction

Conformed Unit Operating Agreement
#41015/76-216
Page 29 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 36 of 58

shall be commenced with one (1) year after the expiration of the period provided in Section 17.4. Each Participating Party shall participate in Such Construction in the proportion that it's BPI of all Participating Parties in the relevant WIPA.

B.    Non-Ownership and Relinquishment of Interest. When any Party who is entitled to participate in Such Construction elects not to participate therein, such Party referred to in this Article XVII as "Non-Participating Party", it shall be deemed to have no interest in and shall not be entitled to the use of the platform, pipeline, or other facility constructed and, in the case of a platform, to have relinquished all of its operating rights and Working Interest in and Production from all wells drilled from that platform and completed in the WIPA for which that platform was constructed.

C.    Acquisition of an Interest and Reversion of Relinquished Rights. Within thirty (30) days after the pipeline or other facility is put into service or, in the case of a platform, within thirty (30) days after all well logs and data from the first well Drilled from that platform are mailed to Non-Participating Party, Sub-Operator shall furnish each Non-Participating Party a statement of the estimated Costs of Such Construction and Drilling. Within sixty (60) days after receipt of such statement, each Non-Participating Party may elect to pay to the Sub-Operator who conducted Such Construction an amount of money equal to the total of the following:

(1)    One hundred per cent 100% of that portion of the Costs incurred in operating the pipeline, other facility, or platform and well thereon that would have been charged to such Non-Participating Party had it participated in Such Construction;

(2)    One hundred thirty-five percent (135%) of that portion of the Costs incurred and committed in Such Construction and the Costs of Drilling a well or wells, if Drilled from the facility that would have been charged to such Non-Participating Party had it participated therein; and

(3)    Interest at the rate of one-half of one percent (1/2 of 1%) per month on such amounts computed from the month during which each portion of such Costs was paid.

If a Non-Participating Party has elected to make the payment hereinabove provided, and does so within thirty (30) days after such election, such Non-Participating Party shall immediately have that interest in that platform, pipeline or other facility as it would have had if it had participated in the construction thereof, and the operating rights and Working Interests which it relinquished by failing to participate in Such Construction shall at that time revert to such Party.

Conformed Unit Operating Agreement
#41015/76-216
Page 30 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 37 of 58

D.    Payment by Sub-Operator.  All payments received by Sub-Operator from a Non-Participating Party pursuant to Subsection 17.6C shall be paid promptly to the Participating Parties in the proportions in which they shared the Costs of Such Construction and Drilling.

## ARTICLE XVIII

## RIGHT TO TAKE IN KIND AND FAILURE
## TO TAKE IN KIND - UNDERLIFTING

18.1   Taking in Kind.  Each Party shall currently take in kind or separately dispose of its share of Production (and only its share, but its share shall include any Production said Party is then making up as the result of its underlift pursuant to this Article XVIII). Each such Party shall have the right to construct, maintain, and operate all necessary facilities for that purpose, provided that they are so constructed, maintained, and operated as not to interfere with Unit operations.  Any extra expenditures incurred by reason of the delivery in kind of any portion of the Production shall be borne by the receiving party.  If a royalty owner has the right to take in kind a share of Production and fails to do so, those parties taking Production shall take the Royalty Share of Production in the manner provided in Article X.  On all purchases or sales each Party shall execute any division order or contract of sale pertaining to its interest.

18.2   Underlifting of Liquid Production.

A.    General.  Notwithstanding the ownership of Production set forth in this Agreement, in the event any Party fails to take or otherwise dispose of its share of oil or other liquid hydrocarbons (liquid production), the other Parties shall be entitled to take their own shares of liquid production pursuant to this Section 18.2.  These provisions shall be applicable to liquid production from gas wells when such liquid production is available; provided, however, a gas well shall not be produced primarily to obtain liquid production.  Gas production will not be taken into account in the recovery or recoupment of liquid production.

The procedures set forth in this Article XVIII for underlifting and for the recovery or recoupment of underlifted liquid production shall apply separately to each WIPA and shall be computed on the basis of volume without regard to the value thereof.

B.    Underlifted Party.  In the event any party fails to take or otherwise dispose of its proportionate share of "Available Production" (as defined in Subsection 18.2C hereof) during any calendar quarter, said Party shall be deemed to have "underlifted" and such Party shall be hereinafter referred to as an "Underlifted Party."  Whenever any Party has not taken its share of liquid

production solely as a result of a Redetermination of BPI, as provided in Article XI hereof, that Party shall not be deemed to have "underlifted" and the provisions of this Article XVIII shall not affect the adjustment of Production under Article XI.

    C.    Available Production. Not less than forty-five (45) days prior to the beginning of each calendar quarter, Unit Operator shall advise in writing those Parties in the applicable WIPA of the total estimated quantity of liquid production therefrom which can be delivered to the Parties during the next calendar quarter. Such estimated quantity of liquid production for each such particular period of time is referred to herein as "Available Production". The amount of Available Production shall not exceed the maximum efficient rate of liquid production for that period of time as established for the particular WIPA by the Parties therein, in accordance with sound petroleum engineering practice. When none of the Parties takes its full share of Available Production as originally determined by Unit Operator for any calendar quarter, the total Available Production for such quarter shall be reduced retroactively to such amount as would allow the party taking the highest percentage of its share to receive credit for having taken 100% of its share. Unit Operator, by notice to the Parties, shall revise the amount of Available Production in the event unforeseen physical occurrences alter the WIPA's capacity to produce.

    D.    Nominations. Within fifteen (15) days after receipt of notification of Available Production for a given period, each Party in that WIPA shall nominate in writing to Unit Operator the quantity of liquid production equivalent to all or any part of its share of Available Production which it desires to take during such period. Any Underlifted Party desiring to make up a portion or all of the volume it is underlifted, shall also nominate the volume it wants to make up during the next succeeding calendar quarter. A Party failing to nominate shall be deemed to have nominated zero quantity.

    E.    Recovery or Recoupment of Underlifted Liquid Production. Excess productive capacity (herein sometimes referred to as "Excess Capacity") is defined as the amount by which the Available Production exceeds the total amount of liquid production (excluding any being recovered or recouped as provided in this subsection) nominated by all Parties for each quarter.

    Whenever there is Excess Capacity and when an Underlifted Party is able to utilize that Excess Capacity, such capacity will be allotted to that Party as herein provided.

    In the event an Underlifted Party has nominated to utilize any Excess Capacity and during the two succeeding calendar quarters period Excess Capacity did not exist or was insufficient to permit that Underlifted Party to recover or

Conformed Unit Operating Agreement
#41015/76-216
Page 32 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 39 of 58