recoup the full amount of its underlifted liquid production, such party shall have the right to recover or recoup its underlifted production out of ten percent (10%) of Available Production in addition to any Excess Capacity, as above provided, to the extent required for recovery or recoupment by the Underlifted Party.

If more than one Party elects to recover or recoup at the same time, they shall share the available Excess Capacity and/or the ten percent (10%) of liquid production in proportion to their respective BPI's. When an Underlifted Party has recovered or recouped the full amount of its liquid production underlift, that Party's share of liquid production shall thereupon be its BPI share.

No Party shall be deemed an Underlifted Party due to a reduction in its share of Available Production pursuant to this Subsection 18.2.

F.    Rate of Liquid Production. Unit Operator shall timely advise all parties of the nominations received for each quarter and shall establish a rate of liquid production equal to the total of the volumes so nominated, not to exceed the maximum efficient rate of production and each Party shall accept the volume nominated by it.

G.    Allocation of Costs. Each Underlifted Party shall bear its BPI share of all Costs, except Lease Burdens and taxes measured by production, as provided in Article XXII hereof.

Further in any calendar quarter during which a Party is recovering or recouping its underlifted liquid production out of the ten percent (10%) of Available Production, a percentage of all "Operating" costs as defined in Exhibit "C", equivalent to the percentage of liquid production taken for recovery or recoupment of underlifted liquid production out of said ten percent (10%) of Available Production shall be borne by each such Party in proportion to the volume of liquid production so taken by that Party for recovery or recoupment. No adjustment in Costs, except taxes measured by production, shall be made for the use of Excess Capacity. Lease Burdens shall be borne as provided for in Article XXI hereof. (Amended 1/1/70)

18.3    Underlifting or Balancing of Gas Production.

A.    General. Notwithstanding the ownership of Production set forth in this Agreement, in the event any Party fails to take or otherwise dispose of its share of natural gas (gas production), the other parties shall be entitled to take their own and such party's shares of gas production pursuant to this Section 18.3. These provisions shall be applicable to gas well gas and to casing head gas when such gas production is available; provided, however, an oil well shall not be produced

Conformed Unit Operating Agreement
#41015/76-216
Page 33 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 40 of 58

primarily to obtain gas production. Liquid production will not be taken into account in the balancing of gas production.

The procedures set forth in this Article XVIII for underlifting or balancing of underlifted gas production shall apply separately to each WIPA and shall be computed on the basis of volume without regard to the value thereof.

The term "accounting period" as used in this Section 18.3 shall mean a calendar quarter or such other period as may be otherwise agreed by the parties.

B.  Repressuring, Recycling or Other Secondary Recovery Operations. In the event gas production is available in any WIPA, and such gas production may be utilized in repressuring, recycling, or other secondary recovery operations in that WIPA or any other WIPA, it is agreed that the Parties owning such gas production shall give first consideration to the use of such gas production for such operations upon such terms as may be acceptable to the parties; provided, however, in the event more than one WIPA, other than the WIPA from which the gas production is obtained, desires such production, the Hemlock WIPA, if involved, shall have preference.

C.  Underlifted Party. In the event any Party fails to take or otherwise dispose of its proportionate share of gas production during any accounting period, said Party shall be deemed to have "underlifted" and such party shall be hereinafter referred to as an "Underlifted Party" during that period. Whenever any Party has not taken its share of gas production solely as a result of a Redetermination of BPI, as provided in Article XI hereof, that Party shall not be deemed to have "underlifted" and the provisions of this Article XVIII shall not affect the adjustment of Production under Article XI.

D.  Overlifted Party. In the event any Party fails to take or otherwise dispose of its proportionate share of gas production during any accounting period, the other Parties shall have the right, but not the obligation, during such period to take or otherwise dispose of such Party's proportionate share of gas production. Each such party taking more than its share of gas production shall be deemed to have "overlifted" and shall be hereinafter referred to as an "Overlifted Party" during that period. Each Party desiring to take more than its share of gas production shall be entitled to take the gas production not being taken by the Underlifted Party in the proportion that its BPI bears to the BPI of the Overlifted Party.

E.  Gas Production Account. Unit Operator or any party selected by the Parties shall maintain and furnish a statement of a gas production account which

Conformed Unit Operating Agreement
#41015/76-216
Page 34 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 41 of 58

shall show the amount each Party has underlifted or overlifted relative to the cumulative gas production from the WIPA.

F.   Balancing.  If an Underlifted Party desires to take more than its share of gas production in order to balance its gas production account, that party shall so advise Unit Operator, who shall use its best efforts to reduce the portion of gas production being taken by all Overlifted Parties to the extent necessary to enable the Underlifted Party to take such amounts sufficient to balance its gas production account within one year from the date of its request.

In the event an Underlifted Party is unable to balance its gas production account within said one year, then that Underlifted Party shall be entitled to increase its take of gas production up to ten percent (10%) of the Overlifted Parties' share of current gas production until its gas production account is in balance.

If two or more of the Underlifted Parties desire to balance their gas production accounts at the same time, then each of such Underlifted Parties shall be entitled to take the proportion of such ten percent (10%) portion of the current gas production of the Overlifted Parties that their respective volumes of underlifted gas production bear to the total of such volume.

Without prior approval of the parties, no Sub-Operator shall produce any gas well in excess of the maximum efficient rate of gas production established for the wells in a WIPA by the Parties therein.

G.   Allocation of Costs.  Except as to Lease Burdens and taxes measured by production, no adjustment shall be made in Costs when a Party is underlifting or overlifting.  Lease Burdens shall be borne as provided in Article XXI hereof and taxes measured by production shall be borne by the parties in proportion to their respective gas production.

18.4   Indemnity.  In the event any Party or parties is underlifted and any such action causes the rate of production hereunder to be reduced, then said Party or Parties shall be solely responsible to the State of Alaska and any other royalty owner or overriding royalty owner for, and hold the other Parties harmless and indemnify them against any and all claims whatsoever which arise as a result of such failure to take.

## ARTICLE XIX

## UNIT EXPENSE

19.1   Basis of Charge to Parties.  All Costs incurred for the benefit of a WIPA initially shall be paid by Unit Operator or the Sub-Operator incurring same.  Each Party

Conformed Unit Operating Agreement
#41015/76-216
Page 35 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 42 of 58

shall reimburse Unit Operator or such Sub-Operator for its BPI share of such Costs except as otherwise provided in Articles XIII, XVII, and XVIII. All charges, credits and accounting shall be in accordance with Exhibit "C".

19.2   Budgets. Each Sub-Operator will submit a proposed program and a proposed budget of estimated costs for the next calendar year to the Unit Operator by August 1 of each year. The Unit Operator will, as soon as practical after receipt of the proposed programs and budgets, distribute the proposed programs and budgets to the Parties and give notice of a preliminary meeting to review the proposed programs and budgets. This meeting will be held by August 15. Following this preliminary meeting and upon at least thirty (30) days' advance written notice which shall include the agenda for the meeting, Unit Operator shall call a meeting to be held not later than November 15, of each year. At such meeting, the representatives of the Parties shall compare the current year's program and budget to actual performance and shall endeavor to agree on the next year's program and budget after making such modifications as may be necessary; provided, however, that such agreement shall not constitute authority for the making of such expenditures, which shall be made only in accordance with the remaining provisions of this Agreement. A budget shall not constitute authority for the making of such expenditures, which shall be made only in accordance with the remaining provisions of this Agreement. A budget shall set forth the estimated annual Costs by semi-annual periods. Budgets shall be estimates only, and shall be adjusted or corrected by the relevant Parties whenever an adjustment or correction is proper. A copy of each budget and adjusted budget shall promptly be furnished to each party. Each program shall show that portion of such program and budget applicable to or allocated to each WIPA. (Amended 1/1/90).

19.3   Advance Billings. Unit Operator and each Sub-Operator shall have the right to require the parties in each WIPA to advance their respective shares of estimated Costs by submitting to such Parties on or before the 15th day of any month, an itemized estimate thereof for the succeeding month, with a request for payment in advance. Within fifteen (15) days thereafter, each party shall pay to Unit Operator or Sub-Operators its share of such estimate. Adjustments between estimated and actual Costs shall be made by Unit Operator and Sub-Operators at the close of each calendar month, and the accounts of such Parties shall be adjusted accordingly.

19.4   Commingling of Funds. No funds received by Unit Operator or any Sub-Operator under this Agreement need be segregated or maintained by it as a separate fund, but may be commingled with its own funds.

19.5   Lien of Unit Operator and Sub-Operator. Each party grants to Unit Operator and the Sub-Operators a lien upon its oil and gas rights in each Tract, its share of production, and its interest in all Unit property, as security for payment of its share of Costs, together with interest thereon at the rate of six percent (6%) per annum. Unit

Conformed Unit Operating Agreement
#41015/76-216
Page 36 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 43 of 58

Operator and each Sub-Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien. In addition, upon default by any Party in the payment of its share of Costs, Unit Operator and each Sub-Operator shall have the right to collect from the purchaser the proceeds from the sale of such Party's share of Production until the amount owed by such Party, plus interest as aforesaid, has been paid. Each purchaser shall be entitled to rely upon Unit Operator's or Sub-Operators' written statement concerning the amount of any default.

## ARTICLE XX

## TITLES

20.1  Warranty and Indemnity. Each Party represents and warrants that it is the owner of the respective Working Interests set forth opposite its name in Exhibit "B" to the Unit Agreement, and hereby agrees to indemnify and hold harmless the other Parties from any loss due to failure, in whole or in part, of its title to any such interest, except failure of title arising out of Unit Operations; provided that such indemnity shall be limited to an amount equal to the net value that has been received from the sale or receipt of Unitized Substances attributed to the interest as to which title failed. Each failure of title will be deemed to be effective, insofar as this Agreement is concerned, as of the first day of the calendar month in which such failure is finally determined, and there shall be no retroactive allocation of Costs or retroactive allocation of Unitized Substances or the proceeds therefrom, as a result of title failure.

20.2  Failure Because of Unit Operations. The failure of title to any Working Interest in Tract by reason of Unit operations, including non-production from such Tract, shall not change the BPI of the Party whose title failed in relation to the BPI of the other Parties at the time of the title failure.

## ARTICLE XXI

## RENTALS AND LEASE BURDENS

21.1  Rentals. Each Party shall be obligated to pay, or cause to be paid, any and all rentals and other sums (other than Lease Burdens) payable upon or in respect of its Working Interests, subject, however, to the right of each Party to surrender any of its Working Interests in accordance with Article XXIV. Upon request, each Party shall furnish to Unit Operator satisfactory evidence of the making of such payments. However, no Party shall be liable to any other Party for unintentional failure to make any such payments provided it has acted in good faith.

21.2  Lease Burdens. Each party entitled to receive a share of Production shall make, or cause to be made, payments for that portion of the Lease Burdens constituting

Conformed Unit Operating Agreement
#41015/76-216
Page 37 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 44 of 58

the Royalty Share due the State of Alaska in respect of Production or the proceeds thereof allocated under the Unit Agreement to each Tract in each RIPA in which it owns a Working Interest, in accordance with Article X. Each Party shall be obligated to pay, or cause to be paid, all other Lease Burdens as to each Tract in which it owns a Working Interest, and shall be liable for any additional Costs occasioned thereby. Each Party entitled to receive the Production from a well completed as a producer but not included in a RIPA shall pay, or cause to be paid, all Lease Burdens payable in respect of such Production.

21.3    Payments to be Borne by Parties. All payments made pursuant to this Article XXI shall be borne by the Party responsible for such payments in accordance with this Agreement, except payments made by Unit Operator or a Sub-Operator acting in that capacity.

ARTICLE XXII

TAXES

22.1    Taxes Upon Unit Property and Operations. All taxes assessed or levied upon Unit property or operations under this Agreement, except income taxes, taxes measured by Production and taxes upon Lease Burdens which are payable by the owners thereof, shall be paid by Unit Operator or each Sub-Operator as and when due and payable.

All such taxes shall be charged to and borne by the Parties in proportion to their respective BPI's.

22.2    Other Taxes. Each Party shall pay or cause to be paid all taxes imposed upon or in respect of the production or handling of its share of Unitized Substances.

22.3    Transfer of Interests. In the event of a transfer by one Party to another under the provisions of this Agreement of any Working Interest, or of any interest in any well or in the materials and equipment in any well, or of any interest in platforms, pipelines or other facilities, or in the event of the reversion of any relinquished interest as in this Agreement provided, the taxes above mentioned assessed against the interest transferred or reverted for the taxable period in which such transfer or reversion occurs shall be apportioned between such Parties so that each shall bear the percentage of such taxes which is proportionate to that portion of the taxable period during which it owned such interest.

22.4    Notices and Returns. Each Party shall promptly furnish Unit Operator or the applicable Sub-Operator with copies of notices, assessments, levies or tax statements received by it pertaining to the taxes to be paid by Unit Operator or that Sub-Operator.

Conformed Unit Operating Agreement
#41015/76-216
Page 38 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 45 of 58

Unit Operator and each Sub-Operator shall make such returns, reports and statements as may be required by law in connection with any taxes above provided to be paid by it, shall furnish copies to the Parties upon request, and shall notify the Parties of any tax which it does not propose to pay before such tax becomes delinquent.

## ARTICLE XXIII

### INSURANCE

23.1   Required Insurance. As to all operations hereunder, Unit Operator, or Sub-Operators where applicable, shall carry, for the benefit and protection of the parties hereto, Workmen's Compensation Insurance in accordance with all applicable laws, rules and regulations, or shall, at its option, self-insure under applicable statutes. Unit Operator or Sub-Operators, where applicable, shall also procure and maintain such other insurance as shall be required by law. The net premiums of such insurance shall be charged to the joint account. The Unit Operator or Sub-Operators shall not carry physical damage insurance on jointly owned property for the benefit of the other parties hereto. The liability, if any, of the parties hereto in damages for claims growing out of personal injury to or death of third persons or injury or destruction of property of third persons resulting from the operation and development of the Trading Bay Unit shall be borne by the parties hereto in proportion to their respective Unit participation interest at the time the act creating the damage claim occurred. **(Amended 8/25/69, 8/30/72)**

23.2   Individual Insurance. Any Party may procure and maintain at its own cost and expense such other insurance as it shall determine and any such insurance shall inure solely for the benefit of such Party procuring the same; provided, however, that each such insurance policy shall contain a waiver on the part of the insurance carrier of all rights, by subrogation or otherwise, against each Party not named as an insured in such policy or if such waiver is not secured the insured shall indemnify and hold harmless each Party not named as an insured in such policy against any claim of the insurance carrier arising against such Party by subrogation or otherwise. **(Amended 8/30/72)**

23.3   Contractors' Insurance. Unit Operator or Sub-Operators, where applicable, shall require any contractor employed by it, to obtain, maintain and pay for insurance with a reputable company or companies in amounts not less than that needed to protect the interests of the Unit Operator or Sub-Operators, where applicable, and Non-Operator predicated upon the exposure to risk of the work to be performed by the contractor.

Unit Operator or Sub-Operators, where applicable, shall require any contractor, employed by it, to submit to it property executed certificates of insurance as issued by approved insurers before work contemplated in any contract is begun. **(Amended 8/30/72)**

Conformed Unit Operating Agreement
#41015/76-216
Page 39 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 46 of 58

23.4   Notice of Losses and Claims.  Unit Operator or Sub-Operators shall notify the other Parties as soon as practicable after the occurrence of any accident involving either damage to property or injuries to or death of persons.  **(Amended 8/30/72)**

## ARTICLE XXIV

## RELEASE FROM OBLIGATIONS AND SURRENDER

24.1   Surrender or Release Within a WIPA.  A Working Interest in a WIPA shall not be surrendered except with the consent of all parties in such WIPA.  However, a Party who owns a Working Interest in a WIPA and who is not at the time committed to participate in the Drilling, Deepening or Plugging Back of a Well in such WIPA may be relieved of further obligations with respect to such WIPA as then constituted by executing and delivering to Unit Operator an assignment conveying to all other Parties in such WIPA, proportionately to such other Parties' respective BPI's as among themselves, all Working Interests owned by such Party in the WIPA, together with the entire interest of such Party in any and all wells, materials, equipment and other property in or pertaining to such WIPA.

24.2   Procedure on Surrender Outside a WIPA.  Whenever a Party desires to surrender a Working Interest in any tract which is not in a WIPA, such Party shall give to all other Parties written notice thereof describing such Working Interest.  The Parties receiving such notice, or any of them, shall have the right at their option to take from the Party desiring to surrender an assignment of such Working Interest by giving to the Party desiring to surrender written notice of election so to do within thirty (30) days after receipt of the notice of the desire to surrender.  If such election is made as above provided, the Party or Parties taking the assignment (which shall be taken by them in proportion to the Surface Acreage of their Working Interests among themselves in the Unit Area) shall pay to the assigning Party its share of the salvage value of any wells owned by the Parties and then located on the land covered by such Working Interest, which payment shall be made on receipt of the assignment.  If no Party elects to take such assignment within such thirty (30) day period, then the Party or Parties owning such Working Interest may surrender the same if surrender thereof can be made in accordance with the Unit Agreement.

24.3   Accrued Obligations.  A Party making an assignment or surrender in accordance with Section 24.1 or 24.2 shall not be relieved of its liability for any obligation accrued hereunder at the time the assignment or surrender is made, or of obligation to bear its share of the Costs incurred in any Drilling, Deepening or Plugging Back operation in which such Party has elected to participate prior to the making of such assignment or surrender, except to the extent that the Party or Parties receiving such assignment shall assume, with the approval of the Parties, any and all obligations of the assigning Party hereunder and under the Unit Agreement.

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 47 of 58

## ARTICLE XXV

## FORCE MAJEURE

25.1    Force Majeure. The obligations of Unit Operator and each Sub-Operator hereunder shall be suspended to the extent that, and only so long as, performance thereof is prevented, in whole or in part, by acts of God, fire, action of the elements, weather or natural phenomena, including, but not limited to, ice within the Unit Area rendering continued operations hazardous to life or property, strikes or other differences with workmen, unavoidable accidents, acts of civil or military authorities, acts of the public enemy, restrictions or restraints imposed by law or by regulation or order of governmental authority, whether Federal, state, or local, inability to obtain necessary rights of access, uncontrollable delays in transportation, inability to obtain necessary materials in open market, or any other cause reasonably beyond control of Unit Operator and Sub-Operators whether or not similar to any cause above enumerated. No Party shall be required against its will to adjust or settle any labor dispute. Whenever performance of obligations is prevented by any such cause, Unit Operator and each Sub-Operator shall give notice thereof to the other Parties as promptly as reasonably possible.

## ARTICLE XXVI

## NOTICES

26.1    Giving and Receipt. Except as otherwise specified herein, any notice, consent, or statement herein provided or permitted shall be deemed to have been properly served when sent by mail (air mail if out of state), facsimile transmission, or telegram to the address of the representative of each Party as furnished to Unit Operator in accordance with Article V and received by the Party. A notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, except that any notice given by United States certified or registered mail, or facsimile transmission, or by telegram, properly addressed to the Party to whom given with all postage and charges prepaid, shall be deemed given to and received by the Party to whom directed seventy-two (72) hours after such notice is deposited in the United States mails or upon confirmation of receipt of facsimile transmission, or forty-eight (48) hours after such notice if filed with an operating telegraph company for immediate transmission by telegraph, exclusive of Saturdays, Sundays and legal holidays in each case, and also except that a notice to Unit Operator or any Sub-Operator shall not be deemed given until actually received by it. (Amended 1/1/90)

26.2    Proper Addresses. Each Party's proper address shall be deemed to be the address of that Party's representative furnished to the Unit Operator in accordance with Article V.

Conformed Unit Operating Agreement
#41015/76-216
Page 41 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 48 of 58

## ARTICLE XXVII

## LIABILITY, CLAIMS AND SUITS

27.1    Individual Liability.   The duties, obligations, and liabilities of the Parties shall be several and not joint or collective; and nothing herein contained shall ever be construed as creating a partnership of any kind, joint venture, association, trust, or other legal entity among the Parties.

27.2    Settlements.   Unit Operator and Sub-Operators may settle any single damage claim or suit involving Unit operations but not involving an expenditure in excess of Two Thousand Five Hundred Dollars ($2,500.00) provided the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds the above specified amount, the Parties shall assume and take over the further handling of the claim or suit unless such authority is expressly delegated to Unit Operator or a Sub-Operator. All costs and expense of handling, settling, or otherwise discharging such claim or suit shall be an item of Costs.  If a claim is made against any Party or if any Party is sued on account of any matter arising from Unit operations and over which such Party individually has no control because of the rights given the Parties, Unit Operator and Sub-Operators by this Agreement and the Unit Agreement, the Party shall immediately notify the Parties and the claim or suit shall be treated as any other claim or suit involving Unit operations.

## ARTICLE XXVIII

## INTERNAL REVENUE PROVISIONS

28.1    Internal Revenue Provisions.   Each of the Parties hereby elects to be excluded from the application of Subchapter K of Chapter t of Subtitle A of the Internal Revenue Code of 1954, or such portion or portions thereof as may be permitted or authorized by the Secretary of the Treasury of the United States or his delegate insofar as such Subchapter or any portion or portions thereof may be applicable to the Parties.  If any present or future income tax laws of the State of Alaska contain provisions similar to those contained in the Subchapter of the Internal Revenue Code of 1954 above referred to under which a similar election is permitted, each of the Parties hereby elects to be excluded from the application of such laws.  Accordingly, each Party hereby authorizes and directs Unit Operator to execute such an election or elections on its behalf and file the same with the proper administrative office or agency. If requested by Unit Operator, each Party agrees to execute and join in such instruments as are necessary to make such elections effective.

Conformed Unit Operating Agreement
#41015/76-216
Page 42 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 49 of 58

## ARTICLE XXIX

### EFFECTIVE DATE AND TERM

29.1    Effective Date. This Agreement shall be effective as of the effective date of the Unit Agreement.

29.2    Term. This Agreement shall continue in effect so long as the Unit Agreement remains in effect and thereafter until: (a) all wells have been plugged and abandoned or otherwise disposed of, (b) all Unit property acquired for the joint account has been disposed of in accordance with the instructions of the Parties, and (c) there has been a final accounting.

## ARTICLE XXX

### NON-DISCRIMINATION

30.1    Non-discrimination. In connection with the performance of work under this Agreement, Unit Operator and Sub-Operators agree to comply with all of the provisions of Section 202(1) to (7), inclusive, of Executive order 11246, as amended (30 FR 12319), which are hereby incorporated by reference in this Agreement.

Unit Operator and Sub-Operators agree to insert the foregoing provision in all subcontracts hereunder, except subcontracts for standard commercial supplies or raw materials.

## ARTICLE XXXI

### OTHER PROVISIONS

31.1    Audits. An audit shall be made of Unit Operator and Sub-Operator's records and books of account pertaining to operations under this Agreement whenever the making of such audit is requested by any two or more Parties in the affected WIPA, except that neither Unit Operator nor a Sub-Operator shall be audited more often than once each year, except upon the resignation or removal of such Unit Operator or Sub-Operator. Such audit shall be made by auditors in the employ of the Parties desiring to participate therein, and the allowance to be made to each Party furnishing an auditor shall be determined by the approval of such Parties, and paid by such Parties in proportion to their respective participations among themselves in Costs incurred during the period covered by the audit.

31.2    Laws and Regulations. This Agreement shall be subject to all applicable laws and regulations, and shall be interpreted in accordance with the laws of the State of Alaska.

Conformed Unit Operating Agreement
#41015/76-216
Page 43 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

**Exhibit A**
**Page 50 of 58**

31.3   Additional Burdens.  In the event that any Party has created or should subsequently create against its interest as shown in Exhibit "B" to the Unit Agreement, any additional royalty, overriding royalty, production payment, or other burden or charge, the Party which has created or subsequently creates any such additional burden or charge shall hold the other Parties to this Agreement harmless from such additional burdens and charges, and shall satisfy and discharge such burdens and charges out of its own funds. As security for the performance of the obligations created by this paragraph, the Parties entitled to be held harmless shall have a lien to secure the performance of the obligations created by this Section 31.3.  Such lien shall exist upon the interests shown in said Exhibit "B" to be owned by the Party charged with performing such obligation.

31.4   Successors and Assigns.  The provisions of this Agreement shall be covenants running with the lands, leases, and interests covered hereby, and shall be binding upon and inure to the benefit of the legal representatives, successors and assigns of the Parties hereto.

## ARTICLE XXXII

## EXECUTION

32.1   Counterparts.  This Agreement may be executed in counterparts and all such counterparts taken together shall be deemed to constitute one and the same instrument.

32.2   Ratification.  This Agreement may be executed by the execution and delivery of a good and sufficient instrument of ratification, adopting and entering into this Agreement.  Such ratification shall have the same effect as if the party executing it had executed this Agreement or a counterpart hereof.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first herein written.

UNIT OPERATOR, SUB-OPERATOR and PARTY

UNION OIL COMPANY OF CALIFORNIA

By_____

By_____

SUB-OPERATOR and PARTY

MARATHON OIL COMPANY

Conformed Unit Operating Agreement
#41015/76-216
Page 44 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

Exhibit A
Page 51 of 58

By_____

By_____

SUB-OPERATOR and PARTY

ATLANTIC RICHFIELD COMPANY

By_____

By_____

PARTIES

PAN AMERICAN PETROLEUM CORPORATION

By_____

By_____

PHILLIPS PETROLEUM COMPANY

By_____

By_____

Conformed Unit Operating Agreement
#41015/76-216
Page 45 of 46 Pages

Motion for Summary Judgment
Case No. 3:06-cv-00102-TMB

**Exhibit A**
**Page 52 of 58**

RECEIVED  606  SCA 600
TULSA, OK 74101
*Tracy's copy
from Jim A. 1/06/2000*
Council of Petroleum
Accountants Societies
COPI

EXHIBIT "C-1994"

Attached to and made a part of  UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

# ACCOUNTING PROCEDURE.
# OFFSHORE JOINT OPERATIONS

### I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this Agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision in the operation of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees either permanently or temporarily assigned in Alaska who have special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property. See attached Statement of Clarification and Intent.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

"Shore Base Facilities" shall mean onshore support facilities that during drilling, development, maintenance and producing operations provide such services to the Joint Property as receiving and transshipment point for supplies, materials and equipment; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.

"Offshore Facilities" shall mean platforms and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

**2. Statements and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3. Advances and Payments by Non-Operators**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Chase Manhattan Bank, New York _____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws of the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4. Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**5. Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have _____

An audit report will be released to the Operator no later than 90 days following the audit closing conference. The Operator shall then have 90 days to respond to the audit report. If any claims are disallowed, Non-Operators will have 60 days to rebut the reply to the audit claim. If no agreement is reached at that time, the disputed claims will be placed on the agenda of the next Accounting Subcommittee meeting for handling. If the Accounting Subcommittee has no other reasons to schedule a meeting in the foreseeable future, the Operator and Non-Operators accounting representatives will attempt to resolve the disputed claims by a telephone poll. If agreement still cannot be reached, the Accounting Subcommittee will the refer the matter to the Unit Owners Committee for resolution and settlement.

_____ receipt of such report.

**Approval by Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

COPYRIGHT© 1987 by the Council of Petroleum Accountants Societies.

— 1 —

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. Rentals and Royalties

Lease rentals and royalties paid by Operator for the Joint Operations.

2. Labor

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joi Operations.

(2) Salaries and wages of Operator's employees directly employed on Shore Base Facilities or other Offshore Faciliti See attached Statement of Clarification and intent.

(3) Salaries of First Level Supervisors in the field.

(4) Salaries and wages of Technical Employees either permanently or temporarily assigned and directly employed in the Operation of the Joint Property if such charges are excluded from the Overhead rates. See attached Statement of Clarification and intent.

the operation of the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employe whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under th Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salari and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, th rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable t Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2. of this Section II.

3. Employee Benefits

Operator's current . . . . . . . . . . . . . . .
Notwithstanding the foregoing, benefit recovery shall be increased by 0.5% of salaries and wages of employees. This increase is before adjustment for vacation/sick pay and will not be affected by the burden limitations set forth in this Paragraph II.3 . . . . . . . . . . . . . . . . . . Operator's actual cost not to exceed the percent most recent recommended by the Council of Petroleum Accountants Societies.

4. Material

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Materia shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practica and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. Transportation

Transportation of employees and Material necessary for the Joint Operations subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be mad to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material i normally available or railway receiving point nearest the Joint Property.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Accoun for a distance greater than the distance to the nearest reliable supply store where like material is normally available, o railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Join Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available whe the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recentl recommended by the Council of Petroleum Accountants Societies.

6. Services

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 9 c Section II and Paragraphs i and ii of Section III. The cost of professional consultant services and contract services of technica personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost e professional consultant services or contract services of technical personnel directly engaged in the operation of the Join Property shall be charged to the Joint Account if such charges are excluded from the overhead rates.

7. Equipment and Facilities Furnished by Operator

A. Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including Shore Base and/o Offshore Facilities, at rates commensurate with costs of ownership and operation. Such rates may include labor maintenance, repairs, other operating expense, insurance, taxes, depreciation and interest on gross investment les accumulated depreciation not to exceed _____ Twelve _____ percent ( 12 %) per annum. In addition, for platform only, the rate may include an element of the estimated cost of platform dismantlement. Such rates shall not excee average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediat area of the Joint Property less twenty percent (20%). For automotive equipment, Operator may elect to use rates publishe by the Petroleum Motor Transport Association.

8. Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losse incurred by fire, flood, storm, theft, accident, or other causes, except those resulting from Operator's gross negligence o willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicabl after a report thereof has been received by Operator.

9. Legal Expense

Expense of handling, investigating and settling litigation or claims, discharging of liens, payments of judgements an amounts paid for settlement of claims incurred in or resulting from operations under the Agreement or necessary to prote or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outsid attorneys shall be made unless previously agreed to by the Parties. All other legal expenses is considered to be covered by th overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

J. Taxes

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereo or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valore taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anythin to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the ra value generated by each party's working interest.

— 2 —

Exhibit A
Page 54 of 58

. Insurance

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the ·event Joint Operations are conducted at offshore locations in which Operator may act as self-insurer for Workers' Compensa-ion and Employers' Liability, Operator may include the risk under its self-insurance program in providing coverage under state and Federal laws and charge the Joint Account at Operator's cost not to exceed manual rates.

Communications

Costs of acquiring, leasing, installing, operating, repairing and maintaining communication systems including radio and microwave facilities between the Joint Property and the Operator's nearest Shore Base Facility. In the event communication facilities systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in · Paragraph 7 of this Section II.

Ecological and Environmental

Costs incurred on the Joint Property as a result of statutory regulations for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Bureau of Land Management or other regulatory authority. Also, costs to provide or have available pollution contain-ment and removal equipment plus costs of actual control and cleanup and resulting ~~~~~~~~~~. 
Engineering Committee Established by the Parties
A charge for the services provided by the Engineering Committee will be made to the Joint Account. The charge will be
determined in accordance with the Fifth Amendment to the Unit Operating Agreement.                    ity.
~~~~~~~~~~~~~~~~~~~~ ~~~~~~~~ ~~~~~~~~ ~~~~~~ ~~~~~~~ costs required by governmental or other regulatory authority.

Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

compensation for administrative, supervision, office services and warehousing costs, Operator shall charge the Joint Account ccordance with this Section III.

ess otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expense of ices from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving govern-agencies shall be considered as included in the overhead rates provided for in this Section III unless such cost and expense d to by the Parties as a direct charge to the Joint Account.

i. Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed in the Joint Property:    in the operation of
(    ) shall be covered by the overhead rates.
( X· ) shall not be covered by the overhead rates.

ii. Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:
(    ) shall be covered by the overhead rates.
( X ) shall not be covered by the overhead rates.

Overhead – Drilling and Producing Operations

As compensation for overhead incurred in connection with drilling and producing operations, Operator shall charge on either:
(    ) Fixed Rate Basis, Paragraph 1A, or
( X ) Percentage Basis, Paragraph 1B

~~1.~~ ~~Overhead~~ ~~Fixed~~ ~~Rate~~ ~~Basis~~

(1) Operator shall charge the Joint Account at the following rates per well per month:
Drilling Well Rate $ _____
Producing Well Rate $ _____ (Prorated for less than a full month)

(2) Application of Overhead – Fixed Rate Basis for Drilling Well Rate shall be as follows:
(a) Charges for drilling wells shall begin on the date when drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or more consecutive calendar days.
(b) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead – Fixed Rate Basis for Producing Well Rate shall be as follows:
(a) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.
(b) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.
(c) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.
(d) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.
(e) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 3 —

COPY

COPAS

B. Overhead – Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

  (a) Development

    _THREE_ Percent ( 3 %) of cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.

  (b) Operating

    _SIX_ Percent ( 6 %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead – Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development ~~or permanent abandonment~~ shall include all costs in connection with drilling, redrilling, or deepening of any or all wells, and shall also include any remedial operations requiring a period of five (5) consecutive work days or more on any or all wells; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating except that catastrophe costs shall be assessed overhead as provided in Section III, Paragraph 3.

2. Overhead – Major Construction ~~or environmental cleanup~~

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $_____

~~A. If the Operator absorbs the engineering, design and drafting costs related to the project:~~

  ~~(1) ____ % of total costs if such costs are more f_____ but less than $100,000; plus~~

  ~~(2) ____ % of total costs in excess of $100,000 but less than $1,000,000; plus~~

  ~~(3) ____ % of total costs in excess of $1,000,000.~~

If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

  (1) _3_ % of total costs if such costs are ~~more than f____ but less than $500,000~~; plus

  (2) _2_ % of total costs in excess of $500,000 but less than $1,000,000; plus

  (3) _1_ % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

On each project, Operator shall advise Non-Operator(s) in advance which of the above options shall apply. In the event of any conflict between the provisions of this paragraph and those provisions under Section II, Paragraph 2 or Paragraph 6, the provisions of this paragraph shall govern.

Overhead – Catastrophe

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

(1) _3_ % of total costs through $500,000; plus

(2) _2_ % of total costs in excess of $500,000 but less than $1,000,000; plus

(3) _1_ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. Unit Operator's Fee

The Unit Operator shall receive a fee each month to cover the additional duties performed in that capacity and not as Sub-Operator. Said fee shall be $4,200 each month during the period January 1, 1981 through March 31, 1982. Thereafter, said fee shall be adjusted annually on the first day of April, to reflect annual changes in the Council of Petroleum Accountants Societies Wage Index. For the sake of clarification, the following formula shall be employed for determining the new adjusted monthly charge.

Adjusted Monthly Rate = $\frac{\$4,200 \times \text{Index Figure}}{\$351.50 \ (1981 \ \text{Index Figure})}$

"Index Figure" as used herein, shall be the current index as shown in the Council of Petroleum Accountants Societies Wage Index (1962 = 100) and which is published and made effective annually on the first day of April.

5. Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

6. Statement of Clarification and Intent

See statement attached hereto and made a part of this Accounting Procedure.

...aterial furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, ...less otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

New Material (Condition A)

(1) Tubular Goods Other than Line Pipe

  (a) Tubular goods, sized 2½ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement, plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

  (b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

– 4 –

## STATEMENT OF CLARIFICATION AND INTENT

To clarify the provisions of Section II, Paragraph 2, and Section III of the Accounting Procedure attached, the following has been agreed upon by the parties with respect to the chargeability of certain expenditures which may be incurred thereunder:

1. All salaries, wages and payroll burden of technical employees, either permanently or temporarily assigned in Alaska, performing services for the benefit of the joint account shall be charged direct.

   a. Such employees shall consist of Operator's Exploration, Producing, and Environmental Departments' technical employees, including geologists, geophysicists, engineers, technologists, engineering assistants, technicians, draftsmen, engineering clerks and field communications technicians performing technical services within the technical organization. Charges to the joint account for any technical employees in job categories other than those stated above would require prior written approval of Non-Operators.

   b. The time of said employees shall be charged direct only when such time involves at least one day or more per month devoted to the joint operation.

   c. All charges for technical employees will be based on actual salary and burden. Documentation for audit purposes shall be the same as for Paragraph 1(a).

2. Gross charges to the Joint Account for technical labor outside Alaska, over $50,000 per project must be specifically approved prior to charging the Joint Account. Prior approval must be in writing in either an AFE or letter agreement. Salaries, wages and payroll burden of technical employees (as defined in 1.a. above) working outside of Alaska and performing services for the benefit of the joint operations shall be charged direct if:

   • the services can be performed as cost-effectively outside of Alaska as inside of Alaska;
   • the services cannot be performed by the Operator's normal Alaskan district, division, or regional office technical employees.;
   • the gross cost is less than $50,000 per project;

   All technical labor shall be charged at salary and burden. Time sheets documenting charged employees must be provided for audit purposes.

3. Services performed by an entity related to the operator shall be charged at the entity's actual salary, wages, labor, payroll burden and up to 15% for the entity's overhead. The operator shall add percentage-based overhead to this sum as provided in the Accounting Procedure attached. Actual charges, including overhead, from the entity shall not exceed commercial rates for similar services in the immediate area.

4. All salaries, wages and payroll burden of fire and safety employees, material expediter(s), warehousemen and dispatchers either permanently or temporarily assigned in Alaska, performing services for the direct benefit of the joint account shall be charged direct.

5. Shore Base Facilities and offices in the Kenai-Nikiski Area will allocate a portion of their office expenses, when they directly benefit the joint account. The allocated expenses will be charged direct and include, but not be limited to, secretarial/clerical labor, rent (or depreciation in lieu thereof), utilities, materials and supplies, operating and maintenance costs and other related expenses. Employees supporting accounts payable and purchasing agents located in the Kenai-Nikiski area office will not be charged to the Joint Account.

6. The salaries, wages, payroll burden and related costs of area, district, division and regional office employees, except those charged direct under paragraphs 1 through 5 above, shall be considered as

covered by Operator's overhead rates. These non-chargeable costs shall include Area or Field Superintendent, stenographic, clerical, purchasing, landmen, industrial relations, accounting, EDP, departmental management, top technical managers and other services personnel and all district, division and regional office costs including, but not limited to, rent (or depreciation in lieu thereof), interest on investment, utilities, janitorial, materials and supplies, operating and maintenance costs and other related costs applicable to the Exploration, Producing, and Environmental Departments.

7.  Overhead - Major Construction is hereby further defined to include any single non-Development project AFE, whether capital or expense, with actual gross costs which exceed $100,000.

8.  Legal fees over $25,000 must be approved by the parties prior to charging to the Joint Account.

9.  The overhead rates as defined in the 8th Amendment will apply to all costs billed to the Joint Account after December 1, 1994, regardless of the date of service or purchase.