SECOND SUPPLEMENTAL AGREEMENT

TO

UNIT OPERATING AGREEMENT

TRADING BAY UNIT

COOK INLET, ALASKA

THIS AGREEMENT, entered into as of the 26th day of May, 1969, by and between UNION OIL COMPANY OF CALIFORNIA, a California corporation; MARATHON OIL COMPANY, an Ohio corporation; ATLANTIC RICHFIELD COMPANY, a Pennsylvania corporation; PAN AMERICAN PETROLEUM CORPORATION, a Delaware corporation; PHILLIPS PETROLEUM COMPANY, a Delaware corporation; SKELLY OIL COMPANY, a Delaware corporation; and STANDARD OIL COMPANY OF CALIFORNIA, a Delaware corporation;

W I T N E S S E T H :

THAT WHEREAS, the Parties hereto as Working Interest Owners have executed or ratified an agreement entitled "Unit Agreement For The Development and Operation of the Trading Bay Unit Area, State of Alaska", herein referred to as "Unit Agreement" and an agreement entitled "Unit Operating Agreement, Trading Bay Unit, Cook Inlet, Alaska", herein referred to as "Operating Agreement"; and

WHEREAS, Section 16.3 of said Operating Agreement provides that upon use of a well, platform, or production facility (including a pipeline) for other than that upon which ownership thereof is based, a fair and equitable apportionment of risks and liabilities, investment, and operating and other costs shall be made; and

WHEREAS, the Parties hereto have executed as of August 27, 1967, an agreement entitled "First Supplemental Agreement To Unit Operating Agreement, Trading Bay Unit, Cook Inlet, Alaska", herein referred to as "First Supplemental Agreement", providing for the use of wells whose primary objective is the Hemlock

zone for concurrent exploration of other zones or Pools, and
providing for the use of drilling slots on the three platforms
which have been constructed for and are owned by the Parties
on the basis of their respective BPI in the Hemlock WIPA, for
the exploration, development and production of gas from the
Unit Area; and

WHEREAS, the Parties hereto desire to make provision for the use or purchase of drilling slots and other facilities owned by the Parties for the development of zones or Pools other than the Hemlock zone in addition to the use of facilities provided for by the First Supplemental Agreement.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, it is agreed as follows:

I. **Definitions.** The definitions contained in the Unit Agreement and the Operating Agreement are adopted for all purposes of this Second Supplemental Agreement. This Second Supplemental Agreement shall not be deemed to alter or revise the terms or provisions of said Unit Agreement or Operating Agreement or First Supplemental Agreement, nor shall this agreement have any application to the drilling and use of gas wells as provided for in the Letter Agreement For Drilling and Operation of Gas Wells for Hemlock WIPA Use, Trading Bay Unit, Cook Inlet, Alaska, dated July 9, 1969, entered into by and between the Parties hereto.

II. **Applicable Facilities.** This Second Supplemental Agreement shall apply only to the following categories of facilities, or portion thereof, which are determined by the owners to be either "Permanently Surplus" and are therefore available for purchase, or "Temporarily Surplus" and are therefore available for use on the rental basis herein provided, by a Party or Parties for the development of zones or Pools, and for the purpose of

-2-

this Second Supplemental Agreement only the following categories are deemed to be "facilities", to-wit: A. Drilling Slots, B. Platform Production Facilities, C. Water Injection Facilities, D. Gas Compression Facilities, E. Pipelines, and F. Onshore Production Facilities.

III. Purchase of Permanently Surplus Facilities

A. Basis of Purchase of Drilling Slots  The Parties electing to purchase a drilling slot which is determined to be Permanently Surplus by the WIPA owners shall pay to the owners thereof, on the basis of their respective interests, a sum of money equal to the total Cost, not including operating expenses, of the platform (on which the drilling slot determined Permanently Surplus and to be purchased is located) including rig up and rig down and all platform support systems and facilities (but excluding facilities categorized under B, C, D, and E in Paragraph II), divided by three-fourths (3/4ths) of the total number of slots on such platform. The purchasing Parties shall upon payment thereof own an undivided interest in such platform in said proportion and shall own such slot.

B. Share.  As used in Paragraph III of this agreement a "share" is that percentage of capacity of a facility which percentage has been determined to be Permanently Surplus and which percentage or portion thereof is elected to be purchased hereunder. The "capacity" of a facility shall be determined solely by the owners of such facility.

C. Basis of Purchase of Other Facilities.  WIPA owners of a facility (other than a drilling slot) may determine that such facility has Permanently Surplus capacity and upon such determination a Party

-3-

may elect to purchase such Permanently Surplus capacity, or portion thereof, on the following basis:

1. <u>Platform Production Facilities</u>. For each share to be purchased, the purchasing Parties shall pay to the owners thereof a sum of money equal to the total Cost, not including operating expenses, of the platform production facilities determined to have Permanently Surplus capacity multiplied by such share. The purchasing Parties shall upon payment thereof own an undivided interest in such production facilities equal to the percentage purchased.

2. <u>Water Injection Facilities</u>. For each share to be purchased, the purchase and ownership of water injection facilities determined to have Permanently Surplus capacity shall be on the same basis, mutatis mutandis, as the basis set forth in Paragraph III C 1.

3. <u>Gas Compression Facilities</u>. For each share to be purchased, the purchase and ownership of gas compression facilities determined to have Permanently Surplus capacity shall be on the same basis, mutatis mutandis, as the basis set forth in Paragraph III C 1.

4. <u>Pipelines</u>. For each share to be purchased, the purchase and ownership of pipelines determined to have Permanently Surplus capacity shall be on the same basis, mutatis mutandis, as the basis set forth in Paragraph III C 1.

5. <u>Onshore Production Facilities</u>. For each share to be purchased, the purchase and ownership.

-4-

1  of the onshore production facilities determined
2  to have Permanently Surplus capacity shall be
3  on the same basis, mutatis mutandis, as the
4  basis set forth in Paragraph III C 1.
5     D. <u>Space</u>. The Parties purchasing a Permanently
6  Surplus facility or a portion thereof shall have
7  the right to use such facility in conjunction with
8  any WIPA owners including the Hemlock WIPA owners.
9  Capacity, including any Permanently Surplus, shall
10 be shared and owned by the respective WIPA's in
11 accordance with the proportionate ownership of the
12 WIPA in each particular facility and such capacity
13 so owned by a WIPA shall not be sold or disposed of
14 without the approval of that WIPA.
15    If such a facility is owned by two or more
16 WIPAs, each WIPA has the right to sell all or a
17 portion of its individual interest therein.
18    E. <u>Additions to Facilities</u>. Provided the WIPA
19 owners have determined that space for installation
20 of additions to existing facilities exists, additions
21 to any existing facility may be made by any Party
22 or WIPA at the sole cost, risk, and expense of
23 such Party or WIPA, as the case may be; however,
24 the Cost, risk and expense of any such addition
25 to such facility which benefits such Party and any
26 such WIPA shall be borne in the proportion that the
27 interest of each participating Party in such ad-
28 dition bears to the total interest of all partici-
29 pating Parties. Any Party or WIPA, as the case may
30 be, not so participating in the cost of such addition
31 shall not have the right to use such addition.
32    F. <u>Withdrawal and Abandonment</u>. Any of the

-5-

| | |
|---|---|
| 1 | Parties owning a facility or portion thereof or any |
| 2 | WIPA, including the Hemlock WIPA, may withdraw |
| 3 | from further participation in the use, maintenance |
| 4 | and operation of such facility by giving the other |
| 5 | Parties or WIPAs, as the case may be, 30 days' |
| 6 | written notice of its intention so to do and |
| 7 | thereby be relieved of any further obligation |
| 8 | hereunder with respect to such facility, except |
| 9 | for cost or liability incurred or accruing prior to |
| 10 | the effective date of such withdrawal and except |
| 11 | for the cost of abandoning the facility upon the |
| 12 | abandonment thereof.  The withdrawing Party shall |
| 13 | have no further voice in determining any action |
| 14 | to be taken in connection with the facility from |
| 15 | the date of withdrawal to final abandonment of the |
| 16 | facility.  Contributions to the total investment |
| 17 | account by such withdrawing Party shall remain in |
| 18 | the total investment account until abandonment of |
| 19 | the facility, at which time any net credits result- |
| 20 | ing from the salvage of material in the facility |
| 21 | shall be apportioned between the Parties on a basis |
| 22 | proportionate to the contribution made by each to |
| 23 | the total investment account.  The cost of aban- |
| 24 | doning the facility shall be paid by the Parties |
| 25 | in the same proportions that they are entitled to |
| 26 | share in the salvage of materials therefrom. |
| 27 | IV.   Rental of Temporarily Surplus Facilities. |
| 28 | A.  Extent of Use.  Temporarily Surplus facilities |
| 29 | may be used for producing, treating, transporting, |
| 30 | processing and storing of fluids from any and all |
| 31 | zones within the Unit Area. |
| 32 | B.  Quarterly Review.  Such usage of Temporarily |

-6-

1  Surplus facilities shall be subject to quarterly
2  review and approval by the owners thereof on a
3  calendar quarter basis in conjunction with the
4  forecast of Available Production.
5      C.  Compensation.  For each unit of volume of
6  total fluids (i.e., MCF or BBLs.) produced or
7  transported or handled through or by means of
8  a Temporarily Surplus facility during a month,
9  the Parties so using such Temporarily Surplus
10 facility shall pay to the owners thereof a sum
11 equal to the proportion that such renting
12 Party's volume of fluids produced or transported
13 or handled through or by means of such Temporar-
14 ily Surplus facility during such month bears
15 to the total volume of fluids produced or
16 transported or handled through or by means of
17 such Temporarily Surplus facility during such
18 month multiplied by a fraction having as its
19 numerator the total investment in such facility
20 and having as its denominator the figure "240".
21     D.  Rental Credit.  In the event a Party
22 utilizes Temporarily Surplus facilities hereunder
23 and subsequently purchases such facilities or a
24 portion thereof pursuant to Paragraph III hereof,
25 such Party may deduct from the purchase price any
26 and all sums paid under this Paragraph IV for
27 such facilities or a portion thereof, as the case
28 may be, so purchased; provided, however, in the
29 event the owners of a facility give written
30 notice to a Party or WIPA then renting such
31 facility or a portion thereof, as the case may
32 be, that such owners have determined such

-7-

1  facility or portion thereof, as the case may be,
2  Permanently Surplus and that such owners desire
3  to sell same to such renting Party or WIPA on
4  the applicable basis as provided in Paragraph
5  III hereof, then such renting Party or WIPA shall
6  have ninety (90) days following receipt of such
7  notice to elect to purchase such facility or
8  portion thereof, as the case may be, on such
9  applicable basis, and if such renting Party or
10  WIPA does not elect to so purchase such facility
11  or portion thereof, as the case may be, then
12  such Party or WIPA shall thereupon forfeit and
13  waive the right to make any deduction whatsoever
14  in the event of a later purchase of such rented
15  facility or portion thereof, as the case may be,
16  which such Party or WIPA would otherwise be
17  entitled to make pursuant to this Paragraph IV.
18      V.    <u>Purchase or Rental of Facility Gives No Control</u>
19  <u>Over Other Facilities</u>.  The purchase hereunder of a Per-
20  manently Surplus facility or rental hereunder of a Temporarily
21  Surplus facility by a Party or WIPA shall not affect the
22  interest of any Party in any other WIPA in such facility or
23  any other facility insofar as the right to use or determine
24  the use of such facility or such other facility is concerned.
25      VI.   <u>Operating Expenses</u>.  Operating expenses of a
26  facility shall be borne and paid on a thru-put basis, i.e.,
27  each owning or renting Party or WIPA, as the case may be,
28  shall bear and pay monthly the proportion of such operating
29  expenses which the total volume of fluids produced or trans-
30  ported or handled through or by means of such facility
31  bears to the total volume of all such fluids produced or
32  transported or handled through or by means of such facility

-8-

1  by all Parties or WIPAs, as the case may be. Each Party
2  and WIPA jointly using any such facility shall be responsible
3  for proper determination of thru-put by measuring production
4  and/or injection in a manner acceptable to the State of
5  Alaska.
6      VII.  <u>Risks and Liabilities</u>.  All Costs, risks and
7  liabilities incurred as the result of the development of a
8  zone or Pool other than the Hemlock zone not covered by
9  existing insurance carried in connection with unit oper-
10 ations shall be borne by the Parties in proportion to their
11 respective obligations for the Costs of such operations,
12 and such Parties hereby agree to indemnify and hold harmless
13 the Hemlock WIPA Parties and any other Parties against any
14 and all loss or damage or claims or demands for loss or
15 damage which may arise from such development of such other
16 zone or Pool.  All Costs, risks and liabilities incurred
17 by the Hemlock WIPA Parties as the result of the development
18 of the Hemlock zone not covered by existing insurance carried
19 in connection with unit operations shall be borne by the
20 Hemlock WIPA Parties, on the basis of the Hemlock WIPA
21 Parties' respective BPI in the Hemlock WIPA, and the Hemlock
22 WIPA Parties hereby agree to indemnify and hold harmless
23 the other Parties against any and all loss or damage or
24 claims or demands for loss or damage which may arise from
25 such development of the Hemlock zone.
26     VIII.  Accounting.  Sub-Operators shall invoice the
27 Parties on a monthly basis for all payments, operating ex-
28 penses and other charges coming due hereunder.  All costs and
29 expenses chargeable under this Second Supplemental Agreement
30 shall be charged on the cost and expense basis provided for
31 in Exhibit "C", Accounting Procedure, to the Operating Agree-
32 ment; provided, however, if there is any conflict between

-9-

this agreement and said Exhibit "C", this agreement shall govern.

IN WITNESS WHEREOF, the Parties hereto have caused this Second Supplemental Agreement to be executed as of the date first herein written.

UNION OIL COMPANY OF CALIFORNIA

By _*John R. Fraser*_
(Its) Attorney in Fact
JOHN R. FRASER

MARATHON OIL COMPANY

By _*Thomas G. Challacombe*_
DIVISION OPERATIONS MANAGER

By _____

ATLANTIC RICHFIELD COMPANY

By _*Howard A. Slack*_
ATTORNEY-IN-FACT

By _____

PAN AMERICAN PETROLEUM CORPORATION

By _*signature*_
Its Attorney in Fact

By _____

PHILLIPS PETROLEUM COMPANY

By _*signature*_
Attorney in Fact

By _____

SKELLY OIL COMPANY

By _*signature*_
ATTORNEY-IN-FACT

By _____

STANDARD OIL COMPANY OF CALIFORNIA

By _*Geo. H. English*_
Contract Agent

By _*A. Hansen*_
Assistant Secretary

-10-

STATE OF CALIFORNIA } ss.
County of...........................

On this............day of......................, A. D., 19......, before me,..............................

STATE OF CALIFORNIA ) ss
City and County of San Francisco )

On _____ 16 1970 _____, before me, the undersigned, a Notary Public in and for the City and County of San Francisco, State of California, duly commissioned and sworn, personally appeared GEO. D. ENGLISH and E. A. HANSEN to me known to be the Contract Agent and Assistant Secretary, respectively, of STANDARD OIL COMPANY OF CALIFORNIA, the corporation that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that they were authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

[SEAL: EDMOND LEE KELLY NOTARY PUBLIC - CALIFORNIA CITY AND COUNTY OF SAN FRANCISCO My Commission Expires January 22, 1972]

EDMOND LEE KELLY
Notary Public in and for the City and County of San Francisco, State of California
residing at San Francisco

(Wash.)

33

STATE OF ALASKA )

The foregoing instrument was acknowledged before me this _16TH_ day of _SEPTEMBER_, 19_70_, by Howard A. Slack, Attorney-in-Fact for Atlantic Richfield Company.

My Commission Expires
November 21, 1972

Notary Public in and for the State of Alaska

[SEAL: OFFICIAL SEAL EDGAR A. GILLETT NOTARY PUBLIC - CALIFORNIA PRINCIPAL OFFICE IN LOS ANGELES COUNTY]

Notary Public in and for said County and State
My Commission Expires Jan. 20, 1971

STATE OF _CALIFORNIA_ } ss.
County of _LOS ANGELES_

On this _5th_ day of _September_, A. D., 19_70_, before me, KATHRYN ALICE KELM a Notary Public in and for said County and State, personally appeared JOHN R. FRASER known to me to be the person whose name is subscribed to the within Instrument, as the Attorney-in-Fact of UNION OIL COMPANY OF CALIFORNIA, and acknowledged to me that he subscribed the name of UNION OIL COMPANY OF CALIFORNIA thereto as principal and his own name as Attorney-in-Fact.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

[SEAL: OFFICIAL SEAL KATHRYN ALICE KELM NOTARY PUBLIC - CALIFORNIA PRINCIPAL OFFICE IN LOS ANGELES COUNTY My Commission Expires May 26, 1972]

Notary Public in and for said County and State

STATE OF CALIFORNIA }ss.
County of..................

On this............day of...................., A. D., 19......, before me,......................,
a Notary Public in and for said County and State, personally appeared....................,
known to me to be the..............President, and...................., known to me to be
the................Secretary of....................,
the Corporation that executed the within Instrument, known to me to be the persons who executed the within Instrument, on behalf of the Corporation herein named, and acknowledged to me that such Corporation executed the same.
  IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public in and for said County and State


STATE OF..................}ss.
County of..................

On this............day of...................., A. D., 19......, before me,......................,
a Notary Public in and for said County and State, personally appeared....................,
known to me to be the..............President, and...................., known to me to be
the................Secretary of....................,
the Corporation that executed the within Instrument, known to me to be the persons who executed the within Instrument, on behalf of the Corporation herein named, and acknowledged to me that such Corporation executed the same.
  IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public in and for said County and State


STATE OF CALIFORNIA }ss.
County of Los Angeles

On this............day of...................., A. D., 19......, before me,......................,
a Notary Public in and for said County and State, personally appeared....................,
known to me to be the person whose name is subscribed to the within Instrument, as the Attorney-in-Fact of..............
...................., and acknowledged to me that he subscribed the name of..............
....................thereto as principal and his own name as Attorney-in-Fact.
  IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public in and for said County and State


STATE OF *Colorado* }ss.
County of *Denver*

On this *6th* day of *November*, A. D., 19*70*, before me, *Geraldine B. Beck*,
a Notary Public in and for said County and State, personally appeared *H. T. Hunter*
known to me to be the person whose name is subscribed to the within Instrument, as the Attorney-in-Fact of *Pan American Petroleum Corp.* and acknowledged to me that he subscribed the name of *Pan American Petroleum Corp.* thereto as principal and his own name as Attorney-in-Fact.
  IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____*Geraldine B. Beck*_____
Notary Public in and for said County and State

My Commission expires Apr. 22, 1972

FORM 231-A 5-55 5M

STATE OF CALIFORNIA } ss.
County of..................

On this.............day of........................., A. D., 19........, before me,..............................................,
a Notary Public in and for said County and State, personally appeared........................................................,
known to me to be the........................President, and........................................................, known to me to be
the....................Secretary of........................................................
the Corporation that executed the within Instrument, known to me to be the persons who executed the within Instrument, on behalf of the Corporation herein named, and acknowledged to me that such Corporation executed the same.
   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public in and for said County and State

---

STATE OF.................. } ss.
County of..................

On this.............day of........................., A. D., 19........, before me,..............................................,
a Notary Public in and for said County and State, personally appeared........................................................,
known to me to be the........................President, and........................................................, known to me to be
the....................Secretary of........................................................
the Corporation that executed the within Instrument, known to me to be the persons who executed the within Instrument, on behalf of the Corporation herein named, and acknowledged to me that such Corporation executed the same.
   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public in and for said County and State

---

STATE OF CALIFORNIA } ss.
County of Los Angeles

On this.............day of........................., A. D., 19........, before me,..............................................,
a Notary Public in and for said County and State, personally appeared........................................................,
known to me to be the person whose name is subscribed to the within Instrument, as the Attorney-in-Fact of........................
........................................................, and acknowledged to me that he subscribed the name of........................
........................................................thereto as principal and his own name as Attorney-in-Fact.
   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public in and for said County and State

---

STATE OF _Colorado_ } ss.
County of _Denver_

On this _16th_ day of _November_, A. D., 19_72_, before me _Helen J. Nevins_,
a Notary Public in and for said County and State, personally appeared _C. W. Corlett_
known to me to be the person whose name is subscribed to the within Instrument, as the Attorney-in-Fact of _Phillips_
_Petroleum Company_, and acknowledged to me that he subscribed the name of _Phillips_
_Petroleum Company_ thereto as principal and his own name as Attorney-in-Fact.
   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_Helen J. Nevins_
Notary Public in and for said County and State

My commission expires: 9-16-73

FORM 231-A 6-53 CM

```
STATE OF OKLAHOMA  )
                   ) ss.
COUNTY OF TULSA    )
```

Before me, _Doris L. Allen_, a Notary Public in and for said State, on this _20th_ day of _November_, 1970, personally appeared _J. H. Qualls_, to me known to be the identical person who executed the within and foregoing instrument as attorney-in-fact of SKELLY OIL COMPANY, and acknowledged to me that he executed the same as his free and voluntary act and deed and as the free and voluntary act and deed of SKELLY OIL COMPANY, for the uses and purposes therein set forth.

My commission expires _My Commission Expires May 31, 1971_.

_Doris L. Allen_
Notary Public