Brewster H. Jamieson, ASBA No. 8411122
LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone:  907-277-9511
Facsimile:   907-276-2631
Email:         jamiesonb@lanepowell.com
Attorneys for Defendant Unocal

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| MARATHON OIL COMPANY,<br><br>                         Plaintiff,<br><br>v.<br><br>FOREST OIL CORPORATION; PACIFIC ENERGY ALASKA OPERATING LLC, UNION OIL COMPANY OF CALIFORNIA d/b/a UNOCAL ALASKA; and CHEVRON CORPORATION,<br><br>                         Defendants. | Case No. 3:06-cv-00102-TMB<br><br>**UNION OIL COMPANY OF CALIFORNIA'S MOTION FOR SUMMARY JUDGMENT** |

COMES NOW defendant Union Oil Company of California d/b/a UNOCAL Alaska ("UOCC"), by and through counsel, and hereby moves for summary judgment in UOCC's favor on all claims asserted by plaintiff Marathon Oil Company ("Marathon").  For the reasons set out below, and for the additional reasons expressed in co-defendant Forest Oil Corporation's ("Forest") motion for summary judgment (Docket No. 39) which are incorporated herein, the Court is respectfully requested to grant the respective summary judgment motions and dismiss all counts against the defendants.

### I.  FACTS

**1.  History of ownership in the Trading Bay Properties leading to Common Equity.**

Forest Oil Corporation owned (and UOCC currently owns) working interests in several offshore oil and gas leases located in Alaska's Cook Inlet, which were awarded by the State of Alaska to UOCC in the late 1960s, and which make up the Trading Bay Properties.  The four

agreements that govern the development and operation of the Trading Bay Properties ("the Trading Bay Agreements") are as follows:

    (a)    The Trading Bay Unit Operating Agreement ("TBUOA")[1];

    (b)    The Trading Bay Field Operating Agreement ("TBFOA")[2];

    (c)    The Unit Agreement for the Development and Operation of the Trading Bay Unit Area, State of Alaska ("TB Unit Agreement")[3];

    (d)    The Alignment Agreement Trading Bay Field / Trading Bay Unit (Alignment Agreement)[4].

The TBUOA and the TBFOA will be collectively referred to herein as the "Operating Agreements." UOCC was originally designated and has remained the Operator under the Trading Bay Agreements. As the Operator, UOCC is charged with "the exclusive right and duty to conduct operations according to plans and procedures as specified by the Parties and to do all things necessary and consistent therewith." *See* TB Unit Agreement, at ¶ 8; TBUOA, at Articles VII and VIII; and TBFOA, at Articles VI and VII.

The Trading Bay Agreements were negotiated and entered into by and among UOCC and Forest Oil (and/or their predecessors-in-interest) in the late 1960s, and have been amended several times over the years. Up until the 1990s, there were multiple working interest owners in the Trading Bay Properties and multiple parties to the Trading Bay Agreements. Additionally, the Trading Bay Properties were comprised of numerous working interest participating areas ("WIPAs"),[5] with ownership among the working interest owners in each WIPA being slightly different. In 1996, UOCC and Forest Oil became the sole working interest owners of the *oil* assets underlying the Trading Bay Properties including all oil WIPAs.

---

[1] *See* Exhibit A to Forest Oil's Motion for Summary Judgment.

[2] *See* Exhibit A hereto.

[3] *See* Exhibit B hereto.

[4] *See* Exhibit C hereto.

[5] A WIPA is essentially a pool or underground reservoir containing, or appearing to contain, a common accumulation of oil or gas, which is designated as such by the parties to the Agreements for purposes of allocating and apportioning costs and production for royalty purposes. *See* Article 3.18 and 3.28 of the TBUOA.

LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

By way of the Alignment Agreement dated January 1, 2002, UOCC and Forest Oil aligned their respective working interests in the Trading Bay Properties, including all WIPAs except for and excluding the Grayling Gas Sands WIPA.[6] Since the alignment of interests (otherwise referred to as "Common Equity")[7], UOCC maintains a 53.20% working interest ownership, and Forest's successors maintain a 46.80% working interest ownership, in all oil WIPAs comprising the Trading Bay Properties.

### 2. The Agreements At Issue In This Case.

Marathon's complaint is based in part on the TBUOA and supplements to that agreement, which are alleged to govern the relationship between the parties in regard to development and operation of the leases underlying the Steelhead platform. Complaint, ¶¶ 11-24. In addition, it is alleged by Marathon that Forest Oil succeeded to and is bound by the terms of the Purchase and Sale Agreement under which Marathon sold its interests in the Steelhead platform oil leases to Forest Oil's predecessor in interest, Forcenergy, Inc.[8] *Id.*, ¶ 45.

### 3. Forest Oil Has Transferred Its Oil And Gas Interests In The Trading Bay Unit to Pacific Energy Alaska Operating.

Forest Oil has transferred and assigned all of its interests in the Trading Bay Unit and now no longer owns or controls those interests. First, Forest Oil created Forest Alaska Holding LLC and Forest Alaska Operating LLC ("Forest Alaska") as subsidiary companies. Then, in October 2006, Forest Oil transferred its interests in the Trading Bay Unit leases to Forest Alaska Holding LLC, which then immediately transferred the same interests to Forest Alaska. Forest Oil and Forest

---

[6] UOCC and Forest Oil aligned their interests in all *oil* horizons underlying the Trading Bay Properties, excluding the gas, and more specifically, the Grayling Gas Sands (GGS) and the GGS WIPA, in which ownership is shared between UOCC (48.80%) and Marathon (51.20%).

[7] In general, the purpose of Common Equity was to create common assets, including all WIPAs (excluding the GGS WIPA), in which ownership would be shared by and between UOCC and Forest Oil according to a pre-negotiated working interest percentage that would apply to all production, revenue, and costs associated with the Trading Bay Properties. Thus, Common Equity dramatically reduced the administrative burden of breaking down production, revenue, and costs according to multiple WIPAs with varying percentages of ownership in each.

[8] *See* Exhibit G to UOCC's Motion to Join Forest Alaska Operating LLC as a Party Defendant (Docket 18).

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

Alaska Holding LLC retained "zero" percent of the interests assigned. The assignments were approved by the State of Alaska, Division of Oil and Gas, effective November 1, 2006.[9]

The November 1, 2006, Master Conveyance between Forest Oil Corporation and Forest Alaska Holding LLC, and November 1, 2006, Master Conveyance between Forest Alaska Holding LLC and Forest Alaska, effectuated the transfer and assignment of the Trading Bay Unit interests which eventually wound up in the hands of Forest Alaska.[10] Pursuant to the introductory paragraph of Article I and Section 1.1 under both Master Conveyances, Forest Oil and then Forest Alaska Holding LLC transferred and assigned to Forest Alaska "all of the right, title and interest" which had been owned by Forest Oil "in and to" the interests in the Trading Bay Unit leases.

Thereafter, Forest Oil sold its ownership interest in Forest Alaska, along with the interests in the Trading Bay Unit held by Forest Alaska, to Pacific Energy Resources Ltd. ("PERL"). PERL then renamed Forest Alaska as Pacific Energy Alaska Operating LLC ("PEAO"), now a party defendant. All of Forest Oil's interests in the Trading Bay Unit leases, including the interests in the oil leases underlying the Steelhead platform, are now owned by PEAO. Forest Oil's only current interest in this matter is as indemnitor of PEAO, not as a party to the Operating Agreements.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). One of the primary purposes of the summary judgment procedure is to "isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The U.S. Supreme Court has stated:

> . . . the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.*, 477 U.S. at 322.

---

[9] *See* Exhibits A through C to UOCC's Motion to Join Forest Alaska Operating LLC as a Party Defendant (Docket 18).

[10] *See* Exhibits D and E to UOCC's Motion to Join Forest Alaska Operating LLC as a Party Defendant (Docket 18).

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511   Facsimile 907.276.2631

As the movant, defendant has the initial burden of establishing the absence of a genuine issue of material fact. *Id.*, 477 U.S. at 323. All justifiable inferences of fact are to be drawn in the favor of the non-movant. *E.g. Dufay v. Bank of America N.T. & S.A. of Oregon*, 94 F.3d 561, 564 (9th Cir. 1996). However, once a properly supported motion for summary judgment is made by defendant, the burden shifts to plaintiff to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A mere "scintilla" of evidence will not be sufficient to defeat defendant's motion; instead, plaintiff must introduce some "significant probative evidence" tending to support the complaint. *Id.*, 477 U.S. at 249, 252; *Summers v. A. Teichert & Sons, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997). If plaintiff's evidence is merely colorable or not significantly probative, summary judgment should be entered for defendants. *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288 (9th Cir. 1987). Moreover, plaintiff's evidence must be admissible in order to defeat summary judgment. *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181-82 (9th Cir. 1988).

### III. <u>ARGUMENT</u>

**1.** <u>**Count I Should Be Dismissed As A Matter Of Law.**</u>

Marathon's Count I alleges: "Unocal breached contractual obligations to Marathon by abandoning the use of the total fluids methodology in 2002, and by containing the use of unauthorized allocation methodology up to and after the filing of this complaint." Complaint, ¶ 38. Marathon also alleges a breach of the implied covenant of good faith and fair dealing on the same grounds. *Id.*, ¶ 39. Count I's breach of contract claims present pure questions of law regarding contract interpretation, and so are subject to summary dismissal. *See Estate of Polushkin ex rel. Polushkin v. Maw,* 170 P.3d 162, 166 (Alaska 2007) ("Questions of contract interpretation are generally questions of law").

UOCC's argument is elementary: UOCC cannot have breached a term of the Operating Agreements which does not exist. The Unit Operating Agreement (TBUOA) provides in relevant part at Section 16.3:

> No well, platform, or production facility ... shall be used for other than that upon which ownership thereof is based without the approval of the Parties owning such well, platform, or production facility as provided in Subsection 5.3D. Upon such use, ***a fair and equitable apportionment*** of risks and

301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631
**LANE POWELL LLC**

liabilities, investment, and operating and other costs shall be made between the Parties therefor. .... (emphasis added)

In arguing that UOCC must use the total fluids methodology, Marathon is not asking the court to enforce a term actually in the Operating Agreements, it is asking the court to imply a term that is most certainly not in the Operating Agreements. Nowhere in any of the Operating Agreements is it required that the Operator, i.e., UOCC, must use the total fluids methodology. That is, the Operating Agreements do not restrict the cost allocation method to any one single, particular method which must be used to the exclusion of all other methods. Instead, the use of the broad term "fair and equitable apportionment" clearly gives UOCC the discretion to pick that cost allocation method it feels accomplishes the objectives of Section 16.3, as long as that method satisfies the "fair and equitable apportionment" standard. Because the "Barrels of Oil Equivalent" ("BOE") methodology now used by UOCC is "fair and equitable" as a matter of law, as demonstrated in Forest's motion for summary judgment, as a matter of law UOCC could not have breached the Operating Agreements.

There is no ambiguity in the language of Section 16.3. "Fair and equitable" must be interpreted according to the ordinary meaning of those terms. *See Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1001 n. 3 (Alaska 2004) ("In interpreting contracts ... 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'"). Marathon will not be able to submit any evidence that "fair and equitable" can only mean the total fluids methodology, and that no other method may ever be used under the circumstances in this matter. Summary judgment is required because the Operating Agreements are not "reasonably susceptible" of being interpreted as Marathon would have it, that is, that only the total fluids methodology is contractually allowed. *See Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004).

Further, the Operating Agreements are standardized agreements which have been used in the industry for decades, and were negotiated by extremely sophisticated and well-funded companies. If the parties to the Operating Agreements had intended that the total fluids methodology, and *only* that methodology, should have been used for cost accounting relating to platforms, they had the ability to make sure that the Operating Agreements so provided. That was not the case.

Marathon cannot create an issue of fact by merely disagreeing about the interpretation of the Operating Agreements. *Nelson v. Progressive Cas. Ins. Co.*, 162 P.3d 1228, 1234 (Alaska 2007) ("The mere fact that the parties disagree about the proper interpretation of the contract does not mean that the contract is ambiguous."). Nor can Marathon create a genuine issue of material fact by arguing that the total fluids methodology had to be used because it is the best—i.e., the most fair and equitable—method of cost allocation under the circumstances. Section 16.3 does not require UOCC as the Operator to make a value judgment as to what is the best cost allocation method under each and every circumstance. Again, it is sufficient that whatever method UOCC picks satisfies the "fair and equitable" standard. Marathon also cannot argue that use of anything other than the total fluids methodology was in breach of the contract because that methodology had been used by UOCC prior January 1, 2002. Nothing under the Operating Agreements required UOCC to continue to the use the total fluids methodology in any event, much less in light of the changed circumstances resulting from the installation on the Steelhead Platform of the electric submersible pumps ("ESPs") discussed in Forest's motion.

There can be no issue of fact where the plain language of the Operating Agreements unambiguously allows UOCC the discretion to change cost allocation methods as long as the method chosen is "fair and equitable." As such, for the reasons stated above and in Forest's motion, Count I should be dismissed as a matter of law.

### 2. Count II Should Be Dismissed As A Matter Of Law.

Marathon's Count II alleges that UOCC has been unjustly enriched by its failure to continue to use the total fluids methodology. Under Alaska law, "unjust enrichment is a judicially created quasi-contract remedy meant to prevent injustice where gaps in the law preclude recovery at law on a contract theory." *Reeves v. Alyeska Pipeline Service Co.*, 56 P.3d 660, 667 (Alaska 2002). However, Marathon has an adequate remedy at law in the express contract claims which are at the heart of its unjust enrichment claim. As such, Marathon is not entitled to rely on an unjust enrichment claim.

Count II is based on the very same claim of express breach of the Operating Agreement as the contract claim in Count I; i.e., UOCC's change in cost allocation methodology to the BOE method from the total fluids methodology. *See* Complaint, ¶ 52 (alleging unjust enrichment "[a]s a

result of the [sic] Unocal/Chevron's 2002 change in the costs allocation methodology"). Consequently, the resolution of Count II will depend, as will the resolution of Count I, on whether the Operating Agreements can be interpreted to allow UOCC to use the BOE method under the circumstances. As a matter of law, UOCC's BOE cost allocation method is "fair and equitable" and thus satisfies the contractual requirements for cost allocation. Therefore, also as a matter of law, UOCC has not breached the Operating Agreements by its use of the BOE method. Marathon cannot try and sneak around that fact by trying to shoehorn an improper unjust enrichment claim where there has been no breach of the express contract on which Marathon bases Count II. After all, without a breach of contract, how can UOCC be "unjustly" enriched in this situation?

Therefore, for the reasons stated above and in Forest's motion, Count II should be dismissed as a matter of law.

### 3. Counts V And VI Should Be Dismissed As A Matter Of Law.

Count V requests an "accounting of the amounts Marathon has overpaid, and Forest Oil and Unocal/Chevron have underpaid" as a result of UOCC's use of the BOE method. Complaint, ¶ 55. Count VI seeks a declaration that "the proper methodology for allocation of costs" on the Steelhead Platform is the "'total fluids' methodology." *Id.*, ¶ 59. These counts presuppose that there is an actual controversy under the Operating Agreements regarding whether UOCC's use of the BOE method, instead of the total fluids methodology, is proper. However, as a matter of law, (1) the BOE cost allocation method is "fair and equitable," and thus (2) UOCC has not breached the Operating Agreements by its use of the BOE method. The lack of a breach of contact by use of the BOE method completely undercuts Counts V and VI. Because there is no breach of the Operating Agreements, Marathon cannot have "overpaid" by the mere use of the BOE method, and so there is nothing for UOCC to account for. Because there is no breach of the Operating Agreements—that is, because UOCC is adhering to the Operating Agreements by the use of the BOE method—there is nothing for the Court to declare about the rights and obligations of the parties under those agreements.

Therefore, for the reasons stated above and in Forest's motion, Counts V and VI should be dismissed as a matter of law.

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511   Facsimile 907.276.2631

## CONCLUSION

For the reasons stated above, and for the additional reasons stated in Forest's motion for summary judgment, the Court is respectfully requested to grant the respective summary judgment motions and dismiss the complaint against the defendants in its entirety and with prejudice.

DATED this 26th day of February, 2008.

> LANE POWELL LLC
> Attorneys for Defendant Union Oil Company of California d/b/a UNOCAL Alaska
>
> By  s/ Brewster H. Jamieson
>   301 West Northern Lights Boulevard, Suite 301
>   Anchorage, Alaska  99503-2648
>   Tel:  907-277-9511
>   Fax:  907-276-2631
>   Email:  jamiesonb@lanepowell.com
>   ASBA No. 8411122

I certify that on February 26, 2008, a copy of the foregoing was served by ECF on:

Daniel T. Quinn  dquinn@richmondquinn.com
R. Scott Taylor  taylor@frozenlaw.com
Robert K. Stewart  bobstewart@dwt.com

 /s/ Brewster H. Jamieson
017351.0041/163570.1

**LANE POWELL LLC**
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska  99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631