OPERATING AGREEMENT
TRADING BAY FIELD
COOK INLET, ALASKA

## ARTICLE XX - INTERNAL REVENUE PROVISION

### 20.1   INTERNAL REVENUE PROVISION

Each of the Parties hereby elects to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1986, or such portion or portions thereof as may be permitted or authorized by the Secretary of the Treasury of the United States or his delegate insofar as such Subchapter or any portion or portions thereof may be applicable to the Parties. If any present or future income tax laws of the State of Alaska contain provisions similar to those contained in the Subchapter of the Internal Revenue Code of 1986 above referred to under which a similar election is permitted, each of the Parties hereby elects to be excluded from the application of such laws. Accordingly, each Party hereby authorizes and directs Operator to execute such an election or elections on its behalf and file the same with the proper administrative office or agency. If requested by Operator, each Party agrees to execute and join in such instruments as are necessary to make such elections effective.

## ARTICLE XXI - EFFECTIVE TERM

### 21.1   TERM

This Agreement is effective on the date first written above and shall continue in effect until:
A.   all wells have been plugged and abandoned or otherwise disposed of,
B.   all property acquired for the joint account has been disposed of in accordance with the instructions of the Parties, and
C.   there has been a final accounting.

## ARTICLE XXII - NON-DISCRIMINATION

### 22.1   NON-DISCRIMINATION

In connection with the performance of work under this Agreement, Operator agrees to comply with all of the provisions of Section 202(1) to (7), inclusive,

27

EXHIBIT A
Page 32 of 46

OPERATING AGREEMENT
TRADING BAY FIELD
COOK INLET, ALASKA

of Executive Order 11246, as amended (30 FR 12319), which are hereby incorporated by reference in this Agreement. Operator agrees to insert the foregoing provision in all contracts for standard commercial supplies or raw materials.

### ARTICLE XXIII - OTHER PROVISIONS

**23.1   AUDITS**

An audit shall be made of Operator's records and books of account pertaining to operations under this Agreement whenever the making of such audit is requested, except that Operator shall not be audited more often than once each year, except upon the resignation or removal of such Operator. Such audit shall be made by auditors in the employ of the Parties desiring to participate therein, and the allowance to be made to each Party furnishing an auditor shall be determined by the approval of such Parties, and paid by such Parties in proportion to their respective participation among themselves in Costs incurred during the period covered by the audit.

**23.2   LAWS AND REGULATIONS**

This Agreement shall be subject to all applicable laws and regulations, and shall be interpreted in accordance with the laws of the State of Alaska.

**23.3   ADDITIONAL BURDENS**

In the event that any Party has created or should subsequently create against its interest, any additional royalty, overriding royalty, production payment, or other burden or charge, the Party which has created or subsequently creates any such additional burden or charge shall hold the other Parties to this Agreement harmless from such additional burdens and charges out of its own funds. As security for the performance of the obligations created by this paragraph, the Parties entitled to be held harmless shall have a lien to secure the performance of the obligations created by this Section 23.3. Such lien shall exist upon the interests owned by the Party charged with performing such obligation.

OPERATING AGREEMENT
TRADING BAY FIELD
COOK INLET, ALASKA

### 23.4 SUCCESSORS AND ASSIGNS

The provisions of this Agreement shall be covenants running with the lands, leases, and interests covered hereby, and shall be binding upon and inure to the benefit of the legal representatives, successors and assigns of the Parties hereto.

### 23.5 ENTIRE AGREEMENT

This Agreement, including all exhibits attached here and made a party hereof, constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and superseded all prior agreements, understandings, negotiations and discussion, whether oral or written, of the Parties with respect to same. No supplement, amendment, alteration, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the Parties hereto.

### 23.6 WAIVER

No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

### 23.7 CAPTIONS

The captions in this Agreement are for convenience only and shall not constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

### 23.8 GOVERNING LAW

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Alaska without regard to conflict of law rules that would direct the application of the law of another jurisdiction.

OPERATING AGREEMENT
TRADING BAY FIELD
COOK INLET, ALASKA

### ARTICLE XXIV - EXECUTION

#### 24.1 COUNTERPARTS

This Agreement may be executed in counterparts and all such counterparts taken together shall be deemed to constitute one and the same instrument.

#### 24.2 RATIFICATION

This Agreement may be executed by the execution and delivery of a good sufficient instrument or ratification, adopting and entering into this Agreement. Such ratification shall have the same effect as if the Party executing it had executed this Agreement or a counterpart hereof.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be effective as of the date first herein written.

Operator/ and Party
Union Oil Company of California

_____
Kevin A. Tabler
Attorney-in-fact
Date: June 12, 1996

Party
Marathon Oil Company

_____
D. T. Perkins
Production Manager
Date: 6/12/96

30

OPERATING AGREEMENT
TRADING BAY FIELD
COOK INLET, ALASKA

CORPORATION ACKNOWLEDGMENT

State of Alaska )
)ss
Third Judicial District )

The foregoing instrument was acknowledged before me this 12th day of June, 1996 by D.T. Perkins, Production Manager of Marathon Oil Company an Ohio corporation, on behalf of the corporation.



Notary's Signature
My commission expires: 10/17/98

CORPORATION ACKNOWLEDGEMENT

State of Alaska )
)ss
Third Judicial District )

The foregoing instrument was acknowledged before me this 12th day of June, 1996 by Kevin A. Tabler, Attorney-in-Fact, Union Oil Company of California, Delaware corporation, on behalf of the corporation.



Notary's Signature
My commission expires: 10/17/98

31

EXHIBIT A
Page 36 of 46



Exhibit "A" — Trading Bay Field Joint Operating Agreement, Cook Inlet, Alaska

# Exhibit "B"
## Trading Bay Field Joint Operating Agreement
## Cook Inlet, Alaska

ADL Lease Description:

<u>S13-5-55</u>

<u>T. 9N., R. 13W., S.M.</u>

| | | | | | | |
|---|---|---|---|---|---|---|
| Sec. 3: | All | 640 | | Sec. 8 | All | 640 |
| Sec. 4: | All | 640 | | Sec. 9 | All | 640 |
| Sec. 5: | All | 640 | | Sec. 10 | All | 640 |

Containing 3,840 Acres, more or less

*[Handwritten annotations: 300573.0201 / Uracil 132.004-4 / 00573-000005]*

# EXHIBIT "C"

Attached to and made a part of ............................................
..................TRADING BAY FIELD..................
..............EFFECTIVE DECEMBER 1, 1996..............

# ACCOUNTING PROCEDURE
# OFFSHORE JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **Definitions**
   "Joint Property" shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached.
   "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.
   "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.
   "Operator" shall mean the party designated to conduct the Joint Operations.
   "Non-Operators" shall mean the Parties of this Agreement other than the Operator.
   "Parties" shall mean Operator and Non-Operators.
   "First Level Supervisors" shall mean those employees whose primary function in the operation of Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.
   "Technical Employees" shall mean those employees either permanently or temporarily assigned in Alaska who have special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property. See attached Statement of Clarification and Intent.
   "Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.
   "Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.
   "Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.
   "Shore Base Facilities" shall mean onshore support facilities that during drilling, development, maintenance and producing operations provide such services to the Joint Property as receiving and transshipment point for supplies, materials and equipment; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.
   "Offshore Facilities" shall mean platforms and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

2. **Statements and Billings**
   Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits, summarized by appropriate classifications of Investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**
   A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.
   B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at Chase Manhattan Bank, New York _____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws of the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**
   Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

5. **Audits**
   A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, and shall be
   
   An audit report will be released to the Operator no later than 90 days following the audit closing conference. The Operator shall then have 90 days to respond to the audit report. If any claims are disallowed, Non-Operators will have 60 days to rebut the reply to resolve the disputed claims by a telephone poll. If agreement still cannot be reached, the claims will be referred to the Owners Committee for resolution and settlement.

   Accounting Procedure and if the agreement to which this Accounting Procedure is attached is silent in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

   COPYRIGHT© 1987 by the Council of Petroleum Accountants Societies.

   — 1 —

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Rentals and Royalties**
   Lease rentals and royalties paid by Operator for the Joint Operations.

2. **Labor**
   A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Operations.
      (2) Salaries and wages of Operator's employees directly employed on Shore Base Facilities or other Offshore Facilities serving the Joint Property if such costs are not charged under Paragraph 7 of this Section II.
      *See attached Statement of Clarification and Intent.*
      (3) Salaries of First Level Supervisors in the field.
      (4) Salaries and wages of Technical Employees either permanently or temporarily assigned and directly employed in the Operation of the Joint Property if such charges are excluded from the Overhead rates. See attached Statement of Clarification and Intent.

   B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2A of this Section II. Such costs under Paragraph 2B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2A of this Section II. If percentage assessment is used, rate shall be based on the Operator's cost experience.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II.

   D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph ___ of this Section II.

3. **Employee Benefits**
   Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 2A and 2B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

4. **Material**
   Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

5. **Transportation**
   Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:
   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.
   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.
   C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available if the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

6. **Services**
   The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph __ Section II and Paragraphs i and ii of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel directly engaged in the operation of the Joint Property shall be charged to the Joint Account if such charges are excluded from the overhead rates.

7. **Equipment and Facilities Furnished by Operator**
   A. Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including Shore Base and Offshore Facilities, at rates commensurate with costs of ownership and operation. Such rates may include maintenance, repairs, other operating expense, insurance, taxes, depreciation and interest on gross investment accumulated depreciation not to exceed _Twelve_ percent ( _12_ %) per annum. In addition, for platforms only, the rate may include an element of the estimated cost of platform dismantlement. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.
   B. In lieu of charges in Paragraph 7A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less twenty percent (20%). For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

8. **Damages and Losses to Joint Property**
   All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other causes, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

9. **Legal Expense**
   Expense of handling, investigating and settling litigation or claims, discharging of liens, payments of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the Agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph __.

10. **Taxes**
    All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the value generated by each party's working interest.

— 2 —

EXHIBIT A
Page 40 of 46

11. **Insurance**
    Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. I_ event Joint Operations are conducted at offshore locations in which Operator may act as self-insurer for Workers' Comp_ tion and Employers' Liability, Operator may include the risk under its self-insurance program in providing coverage u_ State and Federal laws and charge the Joint Account at Operator's cost not to exceed manual rates.

12. **Communications**
    Costs of acquiring, leasing, installing, operating, repairing and maintaining communication systems including radio microwave facilities between the Joint Property and the Operator's nearest Shore Base Facility. In the event communic_ facilities systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provid_ Paragraph 7 of this Section II.

13. **Ecological and Environmental**
    Costs incurred on the Joint Property as a result of statutory regulations for archaeological and geophysical surveys rel_ to identification and protection of cultural resources and/or other environmental or ecological surveys as may be req_ by the Bureau of Land Management or other regulatory authority. Also, costs to provide or have available pollution con_ ment and removal equipment plus costs of actual control and cleanup and resulting responsibilities of oil spills as req_ by applicable laws and regulations.

14. **Abandonment and Reclamation**
    Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory auth_

15. **Other Expenditures**
    Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and whi_ of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the _ Operations.

## III. OVERHEAD

As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge the Joint Acc_ in accordance with this Section III.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or w_ plus applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expen_ services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving gov_ mental agencies shall be considered as included in the overhead rates provided for in this Section III unless such cost and exp_ are agreed to by the Parties as a direct charge to the Joint Account.

i. Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Tech_ Employees and/or the cost of professional consultant services and contract services of technical personnel dir_ employed on the Joint Property; in the operation of
   (   ) shall be covered by the overhead rates.
   ( X ) shall not be covered by the overhead rates.

ii. Except as otherwise provided in Paragraph 2 of this Section III, the salaries, wages and Personal Expenses of Tech_ Employees and/or costs of professional consultant services and contract services of technical personnel either tempor_ or permanently assigned to and directly employed in the operation of the Joint Property:
   (   ) shall be covered by the overhead rates.
   ( X ) shall not be covered by the overhead rates.

1. **Overhead – Drilling and Producing Operations**
   As compensation for overhead incurred in connection with drilling and producing operations, Operator shall charge on ei_
   (   ) Fixed Rate Basis, Paragraph 1A, or
   ( X ) Percentage Basis, Paragraph 1B

   A. Overhead – Fixed Rate Basis
      (1) Operator shall charge the Joint Account at the following rates per well per month:
          Drilling Well Rate $ _____ (Prorated for less than a full mo_
          Producing Well Rate $ _____
      (2) Application of Overhead – Fixed Rate Basis for Drilling Well Rate shall be as follows:
          (a) Charges for drilling wells shall begin on the date when drilling or completion equipment arrives on location terminate on the date the drilling or completion equipment moves off location or rig is released, which_ occurs first, except that no charge shall be made during suspension of drilling operations for fifteen (15) or m_ consecutive calendar days.
          (b) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive _ days or more shall be made at the drilling well rate. Such charges shall be applied for the period from _ workover operations, with rig or other units used in workover, commence through date of rig or other _ release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecu_ calendar days.
      (3) Application of Overhead – Fixed Rate Basis for Producing Well Rate shall be as follows:
          (a) An active well either produced or injected into for any portion of the month shall be considered as a one-_ charge for the entire month.
          (b) Each active completion in a multi-completed well in which production is not commingled down hole shal_ considered as a one-well charge providing each completion is considered a separate well by the govern_ regulatory authority.
          (c) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shal_ considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.
          (d) A one-well charge shall be made for the month in which plugging and abandonment operations are complet_ any well. This one-well charge shall be made whether or not the well has produced except when drilling _ rate applies.
          (e) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allows_ transferred allowable, etc.) shall not qualify for an overhead charge.
      (4) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreemen_ which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate current_ use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Product_ Workers for the last calendar year compared to the calendar year preceding as shown by the index of average we_ earnings of Crude Petroleum and Gas Fields Production Workers as published by the United States Departmen_ Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applic_ The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

— 5 —

EXHIBIT A
Page 41 of 46

B. **Overhead - Percentage Basis**
  (1) Operator shall charge the Joint Account at the following rates:
    (a) Development
       __THREE__ Percent ( 3 %) of cost of Development of the Joint Property exclusive of costs provided under Paragraph 9 of Section II and all salvage credits.
    (b) Operating
       __SIX__ Percent ( 6 %) of the cost of Operating the Joint Property exclusive of costs provided under Paragraphs 1 and 9 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.
  (2) Application of Overhead - Percentage Basis shall be as follows:      or permanent abandonment
    For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, or deepening of any or all wells, and shall also include any remedial operations requiring a period of five (15) consecutive work days or more on any or all wells; also preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as Operating except that catastrophe costs shall be assessed overhead as provided in Section III, Paragraph 3.

2. **Overhead - Major Construction**        or environmental cleanup
    To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for Overhead based on the following rates for any Major Construction project in excess of $ _____ .
    ~~A. If the Operator absorbs the engineering, design and drafting costs related to the project:~~
       ~~(1) _____ % of total costs if such costs are more than $ _____ but less than $100,000; plus~~
       ~~(2) _____ % of total costs in excess of $100,000 but less than $1,000,000; plus~~
       ~~(3) _____ % of total costs in excess of $1,000,000.~~
    B. If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:
       (1) __3__ % of total costs if such costs are ~~more than $ _____ but~~ less than $500,000; plus
       (2) __2__ % of total costs in excess of $500,000 but less than $1,000,000; plus
       (3) __1__ % of total costs in excess of $1,000,000.
    Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.
    On each project, Operator shall advise Non-Operator(s) in advance which of the above options shall apply. In the event of any conflict between the provisions of this paragraph and those provisions under Section II, Paragraph 2 or Paragraph 6, the provisions of this paragraph shall govern.

3. **Overhead - Catastrophe**
    To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:
       (1) __3__ % of total costs through $500,000; plus
       (2) __2__ % of total costs in excess of $500,000 but less than $1,000,000; plus
       (3) __1__ % of total costs in excess of $1,000,000.
    Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.
    ~~4. Amendment of Rates~~
    ~~The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.~~

IV. **PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS**
Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**
    Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**
    Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:
    A. New Material (Condition A)
       (1) Tubular Goods Other than Line Pipe
          (a) Tubular goods, sized 2½ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.
          (b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

— 4 —

EXHIBIT A
Page 42 of 46

(c) Special and finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Te[xas] plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the rail[way] receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2½ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weigh[t of] tubing transferred, to the railway receiving point nearest the Joint Property.

2) Line Pipe
   a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or m[ore] shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Fre[ight] charges shall be calculated from Lorain, Ohio.
   (b) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 po[unds] shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragr[aph] A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.
   (c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufactur[e at] current new published prices plus transportation cost to the railway receiving point nearest the Joint Proper[ty].
   (d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be pr[iced] at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed [to by] the Parties.

3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable su[pply] store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the rail[way] receiving point nearest the Joint Property.

4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new p[rice] in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufac[ture] plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tub[ing] will be priced as provided above in Paragraph 2 A (1) and (2).

B. Good Used Material (Condition B)
Material in sound and serviceable condition and suitable for reuse without reconditioning:
  (1) Material moved to the Joint Property
    At seventy-five percent (75%) of current new price, as determined by Paragraph A.
  (2) Material used on and moved from the Joint Property
    (a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was origi[nally] charged to the Joint Account as new Material or
    (b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was origi[nally] charged to the Joint Account as used Material.
  (3) Material not used on and moved from the Joint Property
    At seventy-five percent (75%) of current new price as determined by Paragraph A.
The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material
  (1) Condition C
    Material which is not in sound and serviceable condition and not suitable for its original function until after re[con]ditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The co[st of] reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditio[ning] does not exceed Condition B value.
  (2) Condition D
    Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shal[l be] priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures norm[ally] used by Operator without prior approval of Non-Operators.
    (a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of compar[able] size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.
    (b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil li[nes,] shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods sha[ll be] priced on a non-upset basis.
  (3) Condition E
    Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures norm[ally] utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material
Material which is serviceable and usable for its original function but condition and/or value of such Material is [not] equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. [Such] price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions
  (1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hun[dred] weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking p[oint.] The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same perce[nt] increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(4). Each year, the rate calcul[ated] shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such [rate] shall be published each year by the Council of Petroleum Accountants Societies.
  (2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of [new] Material.

3. Premium Prices
Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or o[ther] unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Mat[erial] at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the [Joint] Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Oper[ators] for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after re[ceiv]ing notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptabl[e to] Operator.

4. Warranty of Material Furnished By Operator
Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the J[oint] Account until adjustment has been received by Operator from the manufacturers or their agents.

— 5 —

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

   At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

   Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories

   Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. Expense of Conducting Inventories

   A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.
   B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

## STATEMENT OF CLARIFICATION AND INTENT

To clarify the provisions of Section II, Paragraph 2, and Section III of the Accounting Procedure attached, the following has been agreed upon by the parties with respect to the chargeability of certain expenditures which may be incurred thereunder:

1. All salaries, wages and payroll burden of technical employees, either permanently or temporarily assigned in Alaska, performing services for the benefit of the joint account shall be charged direct.

   a. Such employees shall consist of Operator's Exploration, Producing, and Environmental Departments' technical employees, including geologists, geophysicists, engineers, technologists, engineering assistants, technicians, draftsmen, engineering clerks and field communications technicians performing technical services within the technical organization. Charges to the joint account for any technical employees in job categories other than those stated above would require prior written approval of Non-Operators.

   b. The time of said employees shall be charged direct only when such time involves at least one day or more per month devoted to the joint operation.

   c. All charges for technical employees will be based on actual salary and burden. Documentation for audit purposes shall be the same as for Paragraph 1(a).

2. Gross charges to the Joint Account for technical labor outside Alaska, over $50,000 per project must be specifically approved prior to charging the Joint Account. Prior approval must be in writing in either an AFE or letter agreement. Salaries, wages and payroll burden of technical employees (as defined in 1.a. above) working outside of Alaska and performing services for the benefit of the joint operations shall be charged direct if:

   - the services can be performed as cost-effectively outside of Alaska as inside of Alaska;
   - the services cannot be performed by the Operator's normal Alaskan district, division, or regional office technical employees.;
   - the gross cost is less than $50,000 per project;

   All technical labor shall be charged at salary and burden. Time sheets documenting charged employees must be provided for audit purposes.

3. Services performed by an entity related to the operator shall be charged at the entity's actual salary, wages, labor, payroll burden and up to 15% for the entity's overhead. The operator shall add percentage-based overhead to this sum as provided in the Accounting Procedure attached. Actual charges, including overhead, from the entity shall not exceed commercial rates for similar services in the immediate area.

4. All salaries, wages and payroll burden of fire and safety employees, material expediter(s), warehousemen and dispatchers either permanently or temporarily assigned in Alaska, performing services for the direct benefit of the joint account shall be charged direct.

5. Shore Base Facilities and offices in the Kenai-Nikiski Area will allocate a portion of their office expenses, when they directly benefit the joint account. The allocated expenses will be charged direct and include, but not be limited to, secretarial/clerical labor, rent (or depreciation in lieu thereof), utilities, materials and supplies, operating and maintenance costs and other related expenses. Employees supporting accounts payable and purchasing agents located in the Kenai-Nikiski area office will not be charged to the Joint Account.

6. The salaries, wages, payroll burden and related costs of area, district, division and regional office employees, except those charged direct under paragraphs 1 through 5 above, shall be considered as

covered by Operator's overhead rates. These non-chargeable costs shall include Area or Field Superintendent, stenographic, clerical, purchasing, landmen, industrial relations, accounting, EDP, departmental management, top technical managers and other services personnel and all district, division and regional office costs including, but not limited to, rent (or depreciation in lieu thereof), interest on investment, utilities, janitorial, materials and supplies, operating and maintenance costs and other related costs applicable to the Exploration, Producing, and Environmental Departments.

7. Overhead - Major Construction is hereby further defined to include any single non-Development project AFE, whether capital or expense, with actual gross costs which exceed $100,000.

8. Legal fees over $25,000 must be approved by the parties prior to charging to the Joint Account.

9. The overhead rates as defined in the Trading Bay Field (Non-Pooled) Accounting Procedure will apply to all costs billed to the Joint Account after December 1, 1994, regardless of the date of service or purchase.

EXHIBIT A
Page 46 of 46