Daniel T. Quinn (8211141)
Marc G. Wilhelm (8406054)
RICHMOND & QUINN, PC
360 "K" Street, Suite 200
Anchorage, Alaska 99501
Ph: (907) 276-5727
Fax: (907) 276-2953

Attorneys for Plaintiff Marathon Oil Company

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MARATHON OIL COMPANY, | ) |
| Plaintiff, | ) |
| v. | ) |
| FOREST OIL CORPORATION: PACIFIC ENERGY ALASKA OPERATING LLC, UNION OIL COMPANY OF CALIFORNIA, d/b/a UNOCAL ALASKA, | ) |
| Defendants. | ) |
| | ) Case No. 3:06-cv-00102 TMB |

## MARATHON OIL COMPANY'S OPPOSITION TO UNOCAL'S AND FOREST'S MOTIONS FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Marathon Oil Company, by and through counsel, Richmond and Quinn, opposes Forest Oil Company's and Union Oil Company of California's (Unocal) Motions for Summary Judgment because material issues of fact preclude summary judgment on defendants' claims. Marathon cross-moves for partial summary judgment on the grounds that the undisputed evidence in fact shows the cost allocation methodologies used by Unocal since 2002 are not "fair and equitable," as required by agreement. Nor did Unocal obtain Marathon's approval for the change in methodology, as required by the Operating Agreement and the COPAS accounting guidelines. Rather, Unocal unilaterally

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

adopted a cost allocation methodology based on value of production. Because such a value-based methodology bears no relationship to costs, it violates the basic principle that the allocation of costs must reflect the operational dynamics in place during the allocation period.

Accordingly, Marathon requests this court deny Forest and Unocal's Motions for Summary Judgment and grant Marathon's Cross Motion for partial summary judgment and rule that the Unocal allocation methodologies violated the operating agreement's requirement that the allocation of costs be "fair and equitable."

## I.    **Unidsputed Facts**

Four oil and gas companies are involved in this litigation:  Plaintiff Marathon Oil Company, Defendant Forest Oil Corporation, Defendant Union Oil Company of California, d/b/a Unocal Alaska (Unocal)[1], and Pacific Energy Alaska Operating LLC ("PEAO"), which purchased and succeeded to Forest Oil Corporation's assets in about November 2007.

The present litigation involves production from the Steelhead Platform in Cook Inlet.  Marathon and Unocal own working interests in offshore gas leases in Cook Inlet that are served by the Steelhead Platform.  Forest Oil (and its successor PEAO) and Unocal own working interests in oil leases in Cook Inlet that are served by the Steelhead Platform.  As discussed below, the facilities on the Steelhead Platform produce both oil and gas.  The platform was designed so that the oil and gas production share staffing and systems to create efficiency, and reduce costs for both sets of owners.  This lawsuit relates to how certain miscellaneous shared costs are to be allocated between the gas and oil owners.

Marathon and Unocal constructed the Steelhead platform in the 1980s.  In 1996, Marathon sold its oil leases underlying the Steelhead platform to Forcenergy, Inc. Forest Oil subsequently acquired Forcenergy in 2000.  Fischbach dep., Ex. 1 at 11.

[1] Union Oil Company of California was purchased by Chevron.  For purposes of convenience, all parties refer to this entity as "Unocal."

MARATHON OIL COMPANY'S OPPOSITION TO UNOCAL'S AND FOREST'S MOTIONS
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT
MARATHON v. FOREST OIL, ET AL., CASE NO. 3:06-cv-00102 TMB
PAGE 2

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

Although Marathon sold its oil interests at Steelhead, it retained its interest in gas leases in the Grayling Gas Sands underlying the platform. Marathon was operator of the platform until 1994, when Unocal took over those duties.

As of today, the various working ownership interests in oil and gas leases at the Steelhead platform are as follows: (1) Unocal owns a 53.2% interest in oil leases; (2) Forest Oil (and now PEAO) owns a 46.80% interest in oil leases; (3) Marathon owns a 51.20% interest in natural gas leases; and (4) Unocal owns a 48.80% interest in natural gas leases. There are 20 wells on the platform, seven dedicated to oil production and 13 to gas production.

The operation of the Steelhead platform is subject to a Unit Operating Agreement. See Forest Motion, Ex. A. Although the original agreement was entered into in 1967, it has been modified over the years by amendments and supplemental agreements. As a successor in interest to Forcenergy, Forest is bound by the agreement. Fischbach dep., Ex.1 at 13. As Forest's successor, PEAO is bound by the agreement as well.

The Trading Bay Unit Area is subdivided into a number of Working Interest Participating Areas, known as WIPAs, which are unitized interests (i.e., the combined interests of the owners of that field) in various oil or gas fields. At the Steelhead Platform, gas production comes from a WIPA known as the Grayling Gas Sands WIPA, and the oil from a number of separate oil WIPAs.

As the operator of the Steelhead platform, Unocal is subject to the provisions of the Unit Operating Agreement and the various incorporated amendments and exhibits, and certain other agreements. Unocal's rights and duties include incurring certain costs necessary to the operation of the platform, and allocating those costs to the owners served by the platform.

Under the Unit Operating Agreement, costs that relate specifically to a WIPA are to be apportioned to the owners within a WIPA. Thus, "all cost incurred in the development and operation of . . . that WIPA . . . shall be borne by the parties in that

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

WIPA upon the basis of their respective [ownership] in that WIPA." Forest Ex. A at ¶
10.2A. Costs allocated to any specific WIPA are not at issue in this litigation. However,
where, as here, there is a sharing of a platform between different WIPAs, and in the
absence of a more specific agreement to the contrary, shared costs for use of the platform
or production facility are to be fairly and equitably apportioned among the owners.
Paragraph 16.3 of the Unit Operating Agreement provides as follows:

> Use of Wells, Platforms, or Production Facilities. No well, platform,
> or production facility (including pipeline) shall be used for other than that
> upon which ownership thereof is based without the approval of the Parties
> owning such well, platform, or production facility . . . . Upon such use, **a
> fair and equitable apportionment of risks and liabilities, investment,
> and operating and other costs shall be made between the Parties
> therefor.** Such use shall include but not be limited to Drilling of wells,
> multiple completion of wells and the production, transportation and
> handling of Unitized Substances.

See Forest Ex. A at 35 (emphasis added).

Finally, Section 19.1 of the Unit Operating Agreement which addresses
Unit Expenses and costs incurred for the benefit of a WIPA states:

> Basis of Charge to Parties. All Costs incurred for the benefit of a
> WIPA initially shall be paid by Unit Operator or the Sub-Operator incurring
> same. Each Party shall reimburse Unit Operator or such Sub-Operator for
> its BPI share of such Costs . . . . all charges, credits and accounting shall be
> in accordance with Exhibit 'C'.[2]

See Forest Ex. A at 43.

Historically, when Marathon was operator of the Steelhead Platform, costs
were allocated to a specific oil or gas center to the maximum extent possible. Page dep.,

---

[2] Exhibit C to the Unit Operating Agreement provided the accounting procedure for the
determination of costs and expenses incurred in the conduct of operations under the
Agreement. The accounting procedures are known within the industry as the COPAS
provisions or COPAS procedures. Specifically, COPAS refers to "Council of Petroleum
Accountants Societies."

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

Ex. 2 at 34-35. For the personnel working on the platform, the operator allocated the costs to oil and gas by use of labor prorates, i.e., the operator would make a determination of the percentage of the time for each position that was chargeable to oil or gas, and thereby allocate labor costs between gas and oil operations. Certain miscellaneous costs, such as catering and transportation, which could not otherwise be allocated strictly to oil and gas, were assigned to a cost center for miscellaneous costs. These expenses were then allocated between the oil and gas WIPAs according to a methodology agreed to by the parties, i.e., total fluids. Page dep., Ex. 2 at 117-118.

This dispute relates to the allocations of these miscellaneous costs. Unocal unilaterally changed the methodology for allocating miscellaneous costs in January 2002 from total fluids to a "BOE" methodology. Marathon challenges that change as being adopted without its consent and as being contrary to the agreement of the parties.

Total fluids measures the volume of production from the gas and oil wells respectively, and thus allocates costs based on well production. Under the total fluids methodology, the volume of gas is converted to a barrel of oil equivalent (BOE), based on energy content. A certain volume of gas is considered the equivalent of a barrel of oil. Page dep., Ex. 2 at 117-118. The total fluids methodology includes not only the volume of oil and gas, referred to as Barrel of Oil Equivalent or BOE, but also the water that is naturally produced as a by-product along with the oil and gas. In other words, water produced from a well is added to the BOE to create total fluids.[3]

Use of the total fluids allocation method had been discussed between, agreed to, and accepted by both Marathon and Unocal. This agreement is reflected by the fact that Unocal and Marathon incorporated the total fluids methodology into (1) the Second Supplemental Agreements to Unit Operating Agreement, in 1969; (2) the Third

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

---

[3] The rationale of the total fluids method is that it takes the same amount of work to produce a barrel of water as to produce a barrel of oil. Witnesses for both Unocal and Forest agreed the percentage of oil vs. water in the fluid produced does not affect the cost of producing a barrel of fluid. Hall dep. Ex. 3 at 43-44; Payment dep. Ex. 4 at 38.

**MARATHON OIL COMPANY'S OPPOSITION TO UNOCAL'S AND FOREST'S MOTIONS FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**
MARATHON v. FOREST OIL, ET AL., CASE NO. 3:06-cv-00102 TMB
PAGE 5

Supplemental Agreements to Unit Operating Agreement, in 1994 (which required the use of the total fluids methodology for surplus Steelhead Platform facilities that were rented or sold); and (3) an agreement for sharing costs related to gas use on the platform, in 1996. See Exs. 5-7. By agreement and course of performance, on the Steelhead Platform, the "total fluids" method was applied to shared costs that could not be directly allocated to either oil or gas operations.

When Unocal become operator of the platform in 1994, it continued using the accounting methodology that Marathon had used, including using the total fluids methodology for allocation of miscellaneous shared costs. Unocal, however, unilaterally changed this accepted methodology in 2002 to BOE, or Barrel of Oil Equivalent. Page dep., Ex. 2 at 118-119; Fischbach dep., Ex. 1 at 21. BOE is not a measure of production, but a measure of the value of production. Fischbach dep., Ex.1 at 21.

The amount of water involved varies substantially depending upon whether oil or gas is being produced. Oil pumped at the Steelhead platform includes large amounts of water. Nevertheless, because gas production from the platform substantially exceeded oil production, use of the total fluids methodology historically allocated the significant majority of shared platform costs to the gas owners.

In the late 1990s, and in the early part of this decade, gas production declined. Moreover, as the oil field matured, the oil wells produced a greater percentage of water. When Unocal and Forest installed Electronic Submersible Pumps (ESPs) during 1999-2001, oil production increased, but so did associated water production, since the oil wells were producing a large percentage of water together with the oil.[4]

In general, the ESP's on the platform pump both water and oil, and some gas is mixed in as well. The pumps are required to pump both the oil and water, as it comes up in one undifferentiated stream. Hall dep., Ex. 3 at 35. Once this stream is

---

[4] While water as a percentage of oil has been increasing, the increase is not due to the installation of the ESP's but is a function of reservoir design. Bindon dep. Ex. 8 at 58-59.

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

brought to the surface, the fluid is run through a separator to remove casing head gas; the fluids are then pumped to a shore-based facility, where the majority of the water/fluid separation takes place. Id. at 36.

In 2001, the total fluids methodology allocated about 45% of miscellaneous costs to the oil owners. Although Forest never suggested that the total fluids methodology was improper,[5] Unocal unilaterally chose to change the method of allocation from total fluids to BOE. It made this change without advising Marathon that it was doing so; indeed Unocal has not produced a single document showing discussions with Marathon of the change. It goes without saying that Unocal adopted this change without Marathon's consent, despite its knowledge that the change would have a significant effect on Marathon's share of operating costs. As discussed below, under the Operating Agreement consent of the other owners is required prior to burdening an owner with such significant additional costs.

By excluding water production from the methodology, this modification shifted the allocation from a roughly 50/50 split in 2002 and 2003 to a situation where almost all (about 92%) of the miscellaneous costs were borne by the gas owners. In the first year alone, this change constituted a reallocation of over $700,000 in costs to the gas owners. Over the first four years, the change allocated almost $5 million in additional costs to the gas owners, Marathon and Unocal. Thus, as of 2006, Marathon had paid in excess of $2.5 million of costs that should have been allocated to the oil owners. Given that Unocal continues to misallocate costs, these damages continue to grow at a rate of $750,000/year.

Unocal continued to employ the BOE allocation methodology adopted in 2002 through December 31, 2005. In response to Marathon complaints, Unocal again

---

[5] Mr. Mitch Fischbach was the director of Joint venture audit for Forest oil. Fischbach dep. Ex. 1 at 7-8. While Forest was aware of total fluids being used as a methodology prior to receiving the Marathon audit exception in December 2004, it made no objection to the use of that methodology relating to its use prior to 2002. Id. at 19-21.

**MARATHON OIL COMPANY'S OPPOSITION TO UNOCAL'S AND FOREST'S MOTIONS FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**
MARATHON v. FOREST OIL, ET AL., CASE NO. 3:06-cv-00102 TMB
PAGE 7

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

unilaterally changed the accounting methodology beginning January 1, 2006, to a hybrid approach based on both well count and BOE. Under this methodology, the allocation is based 50% on "well count," i.e., the number of oil and gas wells respectively (there are 7 wells dedicated to oil production and 13 wells dedicated to gas production). The other 50% is based on the prior BOE methodology. Neither Unocal methodology fairly and adequately allocates platform costs, as required by contract. Accordingly, Unocal has allocated an excessive share of the Steelhead miscellaneous costs to Marathon since January 1, 2002.

It is undisputed that Unocal's unilateral change of allocation methodology shifted a significant amount of Steelhead production costs from Forest Oil (oil producer) and Unocal (oil and gas producer) to Marathon (gas producer). The parties also do not dispute that Forest Oil greatly benefited from the change in the allocation methodology. As a result of the change, Unocal has billed the oil owners (Forest and Unocal) several million dollars less, and the gas owners (Marathon and Unocal) commensurately more than under the total fluids methodology, or indeed under any fair and equitable methodology.

## II.    Standard Of Law

Summary judgment is appropriate when there are no genuine issues of material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant has the initial burden of establishing the absence of a genuine issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). All justifiable inferences are to be drawn in favor of the non-movants. Dufay v. Bank of America N.T. & S.A. of Oregon, 94 F.3d 561, 564 (9th Cir. 1996). However, once a properly supported motion for summary judgment is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2036
(907) 276-5727
FAX (907) 276-2953

**III.    Unocal's Choice Of BOE And BOE/Well Count Breach The Requirements Of The Operating Agreement And COPAS That Allocation Of Costs Must Be Fair And Equitable**

Forest's and Unocal's arguments are based on the fundamentally flawed assumption that allocation of costs based on value of production is fair and equitable. All parties agree that, for the allocation of costs to be "fair and equitable," the allocation formula should reflect the costs that are actually incurred on the platform. Unocal's choice of a BOE formula, which is based on value of production, fails to reflect the nature of the costs incurred. To the contrary, the Unocal BOE formula bears no correlation with the miscellaneous shared costs on the platform, which benefit gas and oil production on the platform equally. Accordingly, because Unocal's methodology is not fair and equitable, it violates the agreement as a matter of law.

The parties do not dispute, in general, that in the absence of agreement to the contrary the obligation of the operator is to allocate costs on a "fair and equitable" basis. See Expert Report of Wayman Gore, Ex. 9 at 6; Forest Summary Judgment Motion at 5; Page dep., Ex. 2 at 26-27, 30-31 (Mr. Page was Unocal's appointed spokesperson under Civil Rule 30(b)(6)).

A fair and equitable distribution of costs requires more than an arbitrary selection of a methodology.[6] As Unocal's Don Page testified, the methodology must reflect the actual expenses that are occurring on the platform. Page dep., Ex. 2 at 150-151. Similarly, Marathon expert, Wayman Gore concludes in his report that the BOE

---

[6] In a related proceeding in this district, Judge Beistline held (in an unpublished decision) that Unocal, as operator, was contractually bound to charge Forest, as owner, for waste disposal from another Cook Inlet platform, in the manner specified in the applicable operating agreement, which in turn incorporated the COPAS Procedures. Its failure to do so constituted a breach of contract as a matter of law. The court rejected Unocal's contention that it could be found in breach only for "gross negligence or willful misconduct," pursuant to an exculpatory clause in the operating agreement. The court held that the clause, which granted the operator considerable discretion, applied to operational decisions, but did not extend to matters of accounting. Forest Oil Co. v. Union Oil of America, 2006 WL 905345 (D. Alaska 2006).

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

methodology selected by Unocal is not fair and equitable because there is no correlation between shared costs and the volume or value of oil and gas produced. Report of Wayman Gore, Ex. 9 at 10. Marathon expert Patrick Martindale concludes that under the COPAS guidelines incorporated into the agreement by reference, an operator must consider the factors contained in a document entitled "Litmus Test for Allocation Methodologies." Martindale report, Ex. 10 at 4. The first of these factors is: "does the allocation method reflect the operational dynamics in place during the allocation period?" Id.

In general, it was Marathon's practice when it was operator, and now Unocal's proclaimed practice, that to the extent costs can be specifically identified with gas or oil production, those costs are allocated to gas or oil cost centers respectively. Where costs cannot be so identified, they are allocated to shared cost centers. Thus, some cost centers relate solely to oil or gas production (which in turn are paid for by the oil and gas owners, respectively), and some cost centers are associated with common costs. Page dep., Ex. 2 at 34-37. Thus, if certain equipment is associated with gas production, a gas cost center will be charged with the cost of that equipment; if the equipment benefits both oil and gas, then the cost goes into a shared, or common, cost center. Id. at 35. Similarly, labor attributable to gas production, such as installation or repair of a gas-related system, would be charged solely to a gas cost center; and a cost that relates to oil production is charged solely to oil owners. Id. at 37.

The cost centers for labor are intermediate cost centers, i.e., the costs that are collected in these centers are not charged directly to the owners, without more analysis of the charges. Id. at 38. Instead, the costs from these cost centers are in turn allocated to oil and gas cost centers, based on what the employees are actually working on. Id. at 38, 40. These labor cost centers are called labor prorate cost centers, and the allocation to other cost centers are called "labor prorates." Id. at 43. This reallocation to other cost centers is based on reports by the Unocal managers of the platform as to how those costs should be allocated. Id. at 40-43. There is also a cost center for the generators on the

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

**MARATHON OIL COMPANY'S OPPOSITION TO UNOCAL'S AND FOREST'S MOTIONS FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**
MARATHON v. FOREST OIL, ET AL., CASE NO. 3:06-cv-00102 TMB
PAGE 10

platform, which is a shared expense. The costs from this center are allocated respectively to the gas and oil owners based on the relative use of power by gas and oil production, i.e., 85% oil and 15% gas. Id. at 38-39.

As noted above, this lawsuit relates to the miscellaneous cost center for the Steelhead Platform, also known as cost center 1007096000 or the "facility and crane cost center." This is an intermediate center for costs that are shared and otherwise not allocated to more specific cost centers. Id. at 39, 43-44. This lawsuit relates to how those miscellaneous costs should be further allocated between the oil and gas owners. An examination of the costs that fall into to this center is required to understand the dispute.

A portion of the costs in this center relate to transportation of personnel to the platform. Thus, helicopter transportation of regular crew is part of the miscellaneous cost center. Id. at 50-51, 54-55. Catering costs for the platform are similarly included in this category, as are costs related to the supply boat that serves the platform. Id. at 51-52, 56-58. Certain labor costs are also allocated to the miscellaneous cost center pursuant to labor prorates, as well as certain roustabout services. Id. at 53, 58-59, 69. Thus, the great bulk of costs in the miscellaneous cost center are "people" costs, including shared labor and the transportation and catering support needed for the entire platform crew. See id. at 60.

Because the costs in the miscellaneous center are primarily labor-related costs, in determining what allocation of the costs would be fair and equitable it is important to see who benefits from the expenditures. As discussed above, the Steelhead Platform is efficiently designed to produce both oil and gas, as the oil and gas production processes complement each other. Kramer dep., Ex. 11 at 27-28. Thus, costs are lower for each side, as compared to a platform where the gas and oil production were operated separately.

As one example, the same labor costs for the platform, at least as to operating crew, would be incurred if Steelhead were a gas only platform, or an oil only

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

platform. This is because such an operating crew is needed to monitor both the oil and gas operations on the platform. As noted by Marathon's expert, Mr. Gore,

> These employees would be required if the platform was 100% oil production or 100% gas production. These personnel are present for the equal benefit of both the oil and gas sides of the platform. As a result, an allocation procedure that results in an allocation that is biased toward one side of the platform (in this case 92% gas and 8% oil) in my opinion does not represent a fair and equitable apportionment of the costs.

Gore Report, Ex 9, at 7. Thus, by sharing an operational crew, there is considerable cost saving to both sides.

Ted Kramer, a production engineer and production manager for Forest Oil, agreed that there were economies of scale in having both oil and gas operated from one platform. A single person in the control room can monitor both oil and gas production at the same time, whereas if this were an oil platform or a gas platform only, this same person would still be needed. Kramer dep., Ex. 11 at 31-32. Glenn Payment of Unocal similarly agreed that, if this were not a joint platform, a similar crew would be required for both the oil and gas side of the platform. Payment dep., Ex. 4 at 37. Thus, the catering and transportation cost of the crew, and otherwise unallocated labor prorates that fall into this shared cost center, are of equal benefit to oil and gas.

In connection with this dispute, Mr. Kramer traveled to and inspected the Steelhead platform on behalf of Forest. Mr. Kramer was tasked with determining how labor intensive each system on the platform was. He testified that Unocal's Mr. Glenn Payment reported to him that "the oil side was no more labor intensive than the gas side." Kramer dep., Ex. 11 at 30-31. He thus placed in his post-visit report: "Mr. Payment indicated that there is virtually no additional labor required to operate the oil side of operation relative to the gas side." Id. at 31.

Forest understood that prior to the installation of ESP's, oil wells were probably more expensive to operate than the gas wells. Fischbach dep., Ex. 1 at 30. This is normal; in the industry, a gas well is generally cheaper to operate than an oil well. Id.

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

Unocal's technical staff informed Mr. Fischbach of Forest that after the installation of the ESPs, the expense of operating the oil and gas wells on the Steelhead would be about equal, or perhaps oil would be slightly less, versus a gas wells. Id. at 31. From Mr. Gore's inspection of the platform, however, he determined the oil wells remained more expensive to operate than the gas well. Wayman Gore Report, Ex.9 at 9.

Unocal has not produced a single document reflecting that it studied the best allocation method before adopting the radical switch to the BOE approach. Thus, while COPAS requires that an operator consider a number of factors prior to selecting a proper methodology, including the operational dynamics in place during the allocation period, Unocal submits no evidence that it did so. To the contrary, Unocal's Don Page was fully aware that operating an oil well takes an equal amount of labor as a gas well, if not more, and that at least 50% of the labor on the platform related to oil operations. In a draft letter addressing this dispute (that his management directed him not to send), Mr. Page stated: "on the other hand, oil may require a disproportionate amount of effort and staffing and operating activity." Page dep., Ex.2 at 173-74, 177. He explained that this reference to disproportionate activity concerned "how much work either party is doing on either gas versus oil." Id. at 178. Thus, when Unocal selected the BOE methodology, it was Unocal's and Mr. Page's understanding that oil production in fact required effort and staffing beyond that reflected by the BOE methodology. Id.

The best evidence of the relative efforts made by Unocal's employees working on the platform as between gas and oil production are perhaps the labor prorates Unocal developed. As noted above, expenses in the labor cost centers (which relate to various positions needed to staff the platform) are prorated to different destination cost centers, in relation to the amount of effort expended supporting each such cost center. These labor prorates, developed by Unocal management familiar with platform operations, show that oil operations in fact require a greater percentage of labor than the gas operations on the platform. Wayman Gore Report, Ex. 9 at 8.

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

**MARATHON OIL COMPANY'S OPPOSITION TO UNOCAL'S AND FOREST'S MOTIONS FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**
MARATHON v. FOREST OIL, ET AL., CASE NO. 3:06-cv-00102 TMB
PAGE 13

Unocal's labor prorates for May 2003, for example, allocate far more labor costs to oil than to gas cost centers. See Exhibit 12, page 2. The allocation of expenses for the lead operator cost center showed that 40% of this time was allocated to oil cost centers, 25% to gas cost centers, 5% to the generator system, and 30% to the miscellaneous cost center. For Field Operator No. 1, 45% of these labor expenses were allocated to oil cost centers, 25% to gas cost centers, 10% to the generator cost center, and 20% to the miscellaneous cost center. And while, after May 2003, Unocal allocated 100% of the time for the Production Foreman to the miscellaneous cost center, according to earlier labor prorates, only 32% of his time was dedicated to the gas wells, 10% to the generator system, and 10% to the miscellaneous cost center. By process of elimination, the foreman thus in fact spent 48% of his time on oil-related activities. Id. at page 4.

The Unocal labor prorates for January 2004 again allocated a greater percentage of costs to oil cost centers than to gas cost centers. Ex. 13. These allocations make clear that the oil operations (and the generator system, which primarily supports oil), require a disproportionate share of labor as compared to gas. Given that the non-labor component of the miscellaneous cost center (e.g., transportation and catering) supports all the regular operational crews on the platform, a reasonable conclusion is that these costs should be shared in proportion to the allocation of the labor they supported. Such an allocation would require at least an equal share be allocated to oil. With respect to the labor portion of the miscellaneous costs, these serve both oil and gas equally, and should be shared equally. Wayman Gore Report, Ex. 9 at 7.

Unocal has attempted to, post hoc, support its BOE allocations scheme with a number of rationales that do not withstand scrutiny. See, e.g., Forest Motion at 7. Unocal's arguments in large part rely on the fact that gas wells on the platform are more profitable than the oil wells, and that Steelhead was originally built by the owners of the Grayling Gas Sands. Neither of these factors reflects the actual origin and basis of the costs being allocated, as required for any "fair and equitable" analysis. These are therefore not factors Unocal may properly consider in allocating costs for the Steelhead

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

platform. There is no rational relationship between the factors and the reason for the costs being incurred on the platform. See Reports of Wayman Gore and Pat Martindale.

Forest's witnesses agree that the goal of a "fair and equitable allocation" is to reflect the actual cost allocation between oil and gas. Fischbach dep., Ex. 1 at 45. Thus, Mr. Fischbach admitted if the BOE approach, which followed value of production, did not accurately reflect platform costs, it would not be a fair and equitable approach. Id. at 46. Mr. Fischbach further agreed that well count would be a fair allocation method, assuming the cost to operate a gas and oil well was approximately equal, and further that this is an accepted method in the industry. Id. at 52. Indeed, after discussions regarding an appropriate methodology with Marathon representatives, Mr. Fischbach reported to Forest management that a fair and equitable standard would likely be somewhere between total fluids and BOE. Id. at 40 and deposition Ex. 5. And as noted above, Unocal representative Don Page also agreed that a fair and equitable allocation must reflect how the expenses are actually incurred on the platform. Page dep., Ex. 2 at 150-151.

The testimony of Forest's and Unocal's witnesses also shows the absence of any relationship between BOE, a measure of the volume of energy production and thus a proxy for value, and costs, because there is no relationship between the productivity of a well and the costs necessary to operate that well.

Forest's Mr. Hall, who had considerable experience with other Cook Inlet platforms, agreed that the percentage of oil vs. water in the fluids produced may affect profit, but does not affect costs. Hall dep., Ex. 3 at 43-44. Accord, Kramer dep., Ex. 11 at 40. Moreover, whether a well produced 4000 or 5000 barrels a day of oil (or BOE) would not affect manpower costs at all, because the well needs the same people on the platform to monitor the well, regardless of the level of productivity. Hall dep. at 45; Kramer dep. at 41.

Unocal's witnesses, petroleum engineer Philip Bindon and platform foreman Glenn Payment, also agreed there is no natural correlation between the production level of a well (either oil or gas) and the labor required to operate it. Bindon

dep., Ex. 8 at 62, 68. Indeed oil production costs would be similar regardless whether the fluids being produced were 90% water (as is currently the case) or 90% oil. Payment dep. Ex. 4 at 38. It follows that allocation of shared costs on a BOE methodology lacks any rational or factual basis, and cannot be characterized as either fair or equitable.

Unocal's BOE approach (and current hybrid BOE/well count approach) breach and violate the fair and equitable requirement by allocating costs based on value of production, and ignoring (or post 2006, minimizing) the actual costs related to each well. While the oil owners would like to argue that they should be subsidized by the more productive gas wells, such a subsidy is contrary to the concept of "fair and equitable" allocation.

In sum, neither the BOE methodology, nor the hybrid methodology adopted in 2006 (which still incorporates the BOE methodology) qualifies as fair and equitable. Marathon's expert, Wayman Gore, a qualified petroleum engineer who has substantial familiarity with gas and oil facilities, concludes that "the allocation methodologies employed by Unocal since January 2002 have not provided for a fair and equitable apportionment of the Steelhead shared costs." As he explains,

> [An allocation] formula should reflect how the costs were actually being incurred on the ground. In my opinion Unocal has failed in this regard. The BOE methodology is biased toward the oil side of the platform as evidenced by the fact that under such an approach, approximately 92% of the shared platform costs are allocated to gas. Since these shared costs have no correlation with the volume produced or the value of such production, an allocation methodology should be chosen that is not biased towards oil or gas.

Gore Report, Ex. 9 at 10. Marathon expert Patrick Martindale similarly concludes that the BOE (and BOE/Well Count) methodologies are improper because they do not reflect the operational dynamics in place during the allocation period. Martindale Report, Ex. 10 at 4.

In sum, Unocal's BOE and BOE/well count hybrid approach are not fair and equitable as required by the agreement between the parties. In fact, all the witnesses deposed, from both Forest and Unocal, including Unocal's 30(b)(6) corporate

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

representative Don Page, agree that a proper methodology must reflect the actual nature and basis of the costs during the allocation period. The methodologies Unocal selected do not follow this principle, but instead are based on value. And as discussed above, all witnesses, including Marathon's experts, concurred that there is no correlation between costs and value of production. Because there are at a minimum issues of material fact, defendants' motions for summary judgment seeking to establish that Unocal's BOE methodology was proper must be denied.

## IV.    Marathon Is Entitled To Partial Summary Judgment That Unocal's Allocation Methodologies Violated The Operating Agreement

For the reasons stated above, Marathon also requests partial summary judgment in its favor on the limited issue that Unocal's methodologies were improper. Marathon is entitled to summary judgment because Unocal (through its 30(b) witness Don Page), and Forest, through its witnesses, admitted that a proper methodology must reflect costs being incurred on the ground. In testifying that costs would not vary significantly with value of production, the witnesses further implicitly agreed that the Unocal methodologies, based on BOE, did not fairly reflect the nature and basis of costs incurred, in that the miscellaneous costs benefited the gas and oil sides of the platform equally. Because the methodologies were neither fair nor equitable, Unocal breached the operating agreement.

## V.    The Operator Had A Contractual Obligation To Allocate Costs Based On The Total Fluids Methodology; Unocal Breached The Operating Agreement By Failing To Obtain Marathon's Approval Prior To Changing Allocation Methodologies

Not only did Unocal select an inappropriate and unreasonable methodology, it did so without obtaining the approval of Marathon, as required by the Operating Agreement and the COPAS guidelines that are part of that agreement. The change from the Total Fluids to the BOE approach caused a shift in costs to the gas owners of about

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

$750,000 in the first year, and over $5 Million between 2002 and 2005 alone. The cost to Marathon of this misallocation through 2005 thus exceeded $2.5 million.

Under the Unit Operating Agreement, changes in operations or operation methodologies that have such a significant effect on non-operators require agreement by the parties. As discussed by Marathon's accounting expert Patrick Martindale:

> Most Unit Operating Agreements contain provisions designed to protect the Non-Operator from unexpected increases in costs. In the Unit Agreement governing the oil and gas leases operated from the Steelhead Platform, Provision 4.2. J. and K provide that any single expenditure in excess of $100,000 must be approved by 80% of the working interest, as well as the disposition of any surplus equipment whose new price is $5,000 or more. Provision 5.3. E. provides that a single expenditure of $1,500,000 or more must be approved by 85% of the working interests. Provision 8.3. D. requires the Operator to submit an AFE [Authority for Expenditure] to all the Non-Operators for projects estimated to cost more than $25,000 but less than $100,000, even though approval for the project is at the discretion of the Operator.
>
> These provisions protect the Non-Operator from being charged unexpected and unplanned costs in excess on only $25,000 without notice and, if in excess of $100,000, approval from the Non-Operator. It is logical that a change in allocation methodology that results in $700,000 additional costs billed to Marathon in 2002 falls in the same category of notification and approval. While it is not a "single expenditure" as described in Provision 4.2, it is a single action on the part of the Operator that resulted in charges far exceeding the $25,000 notification threshold and the $100,000 approval threshold. Over the five-year period from 2002 through 2007, the single change in allocation methodology resulted in charges that exceed the $1,500,000 threshold requiring an 85% working interest approval. Such a drastic change in costs billed to a Non-Operator should have been communicated to the Non-Operator and approval for the change sought and received.

Report of Patrick Martindale, Ex. 10 at 7-8.

Because Unocal did not obtain the approval of the owners, as required by the Operating Agreement, change in the allocation methodology was in breach of the agreement. Marathon is therefore entitled to have the prior total fluids methodology

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

**MARATHON OIL COMPANY'S OPPOSITION TO UNOCAL'S AND FOREST'S MOTIONS FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**
MARATHON v. FOREST OIL, ET AL., CASE NO. 3:06-cv-00102 TMB
PAGE 18

reinstated retroactively until such time as Unocal complies with the approval provisions of the Operating Agreement.

## VI.    Other Issues

Forest's other arguments, relating to appropriate remedies, are premature. Forest admits that it has the obligation to pay costs and expenses based on a proper methodology. Once it is established that Unocal's BOE methodology is improper, and a proper methodology is established, each party will a have a contractual obligation to pay its share of operating costs based on that methodology, under Section 19.1 of the Operating Agreement.[7]  See Forest brief at 15.

Moreover, there is no dispute that the outcome of this lawsuit directly affects Forest's obligation to pay operating costs during the time it was the owner of the oil properties underlying the Steelhead platform, and thus Forest is a real party in interest. See Fed. R. Civ. P. 19(a).  Forest claims an interest relating to the subject matter of the action; and if it is not a party to this action, other parties such as Unocal and PEAO to whom Forest may be liable may be subject to inconsistent obligations. See also Unocal's Motion to Add Forest Operating LLC as a Party Defendant (Docket 18).  Thus, whether Forest is directly liable to Marathon, or indirectly liable, the obligation to pay damages is, in greatest part, Forest's obligation.  Indeed, Forest only disputes that its obligation to Marathon is not direct, but indirect.

Given there is no doubt that a major portion of the obligation to pay operating costs will fall on Forest, Forest's arguments as to the form of remedy are premature and advisory at this point.  What is crucial at this stage of the litigation, however, is that Forest remains a party to this lawsuit so that it is bound by the result, and any judgment can be enforced efficiently and without dispute.

### A.    Forest Is Contractually Liable To Pay Operating Expenses

---

[7]  It may be that the obligation of Forest will be indirect, as an indemnitor of PEAO.  See Unocal Motion at 4.  Regardless, the obligation to pay damages ultimately will fall on Forest.

MARATHON OIL COMPANY'S OPPOSITION TO UNOCAL'S AND FOREST'S MOTIONS FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT
MARATHON v. FOREST OIL, ET AL., CASE NO. 3:06-cv-00102 TMB
PAGE 19

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

In addition to paying operating expenses under the Operating Agreement, Forest owes an additional direct contractual obligation to Marathon to pay its share of operating expenses. Under the Forcenergy purchase agreement, which Forest admits is binding on it, Forest promised Marathon that it would "be responsible for all necessary and reasonable expenses incurred for the operation of the property from and after the effective date." Forest further promised to "assume and agree[] to perform, pay for and comply with the obligations and liabilities (express or implied) of Seller relating to the Property." See Unocal's Motion to Add Forest Operating LLC as a Party Defendant (Docket 18), Ex. G at pages 22, 24. Thus, once Forest is obligated to pay operating expenses under the Operating Agreement, a parallel obligation directly to Marathon arises under the purchase agreement.

Forest's argument is that there is no breach of this obligation unless it fails to pay expenses due under the operating agreement. In effect, Forest argues that Marathon is not entitled to plead an unliquidated debt. No rule of pleading, however, prohibits a cause of action on an unliquidated debt, or a contingent claim. And indeed the court frequently allows similar contingent claims, as for contribution or indemnity.

## B.    Equitable Relief Against Forest

"Unjust enrichment exists where the defendant received a benefit from the plaintiff and it would be inequitable for defendant to retain the benefit without compensating plaintiff for its value." Ware v. Ware, 161 P.3d 1188, 1197 (Alaska 2007); Sparks v. Gustafson, 750 P.2d 338, 342 (Alaska 1988)(Unjust enrichment exists where the defendant has received a benefit from the plaintiff and it would be inequitable for defendant to retain the benefit without compensating plaintiff for its value). A party seeking to recover for unjust enrichment must show (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance and retention by the defendant of such benefit under such circumstances that it

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727,
FAX (907) 276-2953

would be inequitable for him to retain it without paying the value thereof. <u>Ware</u>, 161 P.3d at 1197.

Here, assuming Marathon is correct that Unocal used an improper allocation methodology, clearly Marathon conferred a benefit on Unocal and Forest by paying for operating costs that should have been allocated to them. Moreover, it would be unfair to allow Forest and Unocal to retain the fruits of the improper methodology.

While Marathon certainly hopes that its legal remedies are adequate, it is premature at this stage of the litigation to determine that with certainty. Forest, for example, argues that Marathon has no legal remedy, or contract claim against it, while nevertheless claiming that Marathon's legal obligations are adequate. Forest cannot have it both ways. As noted by one treatise: "equity jurisdiction is not precluded by a legal remedy unless the latter is clear and certain, and the remedy at law, in order to be considered adequate, must be obtainable as of right. The mere existence of a possible remedy at law is not sufficient to warrant the denial of equitable relief." 27A Am. Jur.2d, Equity § 29 (2008).

Rather than decide this issue in a vacuum, the better course would be first to determine the legal arguments. As noted above, the question of whether an equitable remedy should be allowed is premature. Thus in light of the fact that Forest has not acknowledged a contractual obligation to pay damages, Marathon is entitled to retain its claims for equitable relief, which it pled in the alternative. This is particularly the case since Marathon has paid obligations that should have been paid by Forest.

In addition, case law suggests that equitable relief is appropriate in multiparty cases, such as this one. For example, the case of <u>Knaebel v. Heiner</u>, 663 P.2d 551, 553 (Alaska 1983), cited by Forest, states that equitable relief is available "when a legal remedy would require that the plaintiff bring more than one lawsuit." This case now has a significant number of parties, with the defendants having potential cross and third-party claims for indemnity for any judgment. While the multiple lawsuits in this action would be actions between Unocal and PEAO, PEAO and Forest, and/or Unocal and

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

Forest, certainly an equitable remedy allocating expenses to the appropriate parties, without a multiplicity of actions, appears appropriate.

### C.   Accounting

In general, it is well accepted that an action for accounting lies to determine damages for breach of a contract. See Day v. A & G Const. Co., 528 P.2d 440 (Alaska 1974)(action for accounting was brought for purpose of proper calculation of damages under contract). Here, Forest's request to dismiss the accounting action is also premature. As discussed above, the primary issue is this case is the proper allocation methodology to be applied to miscellaneous Steelhead costs. Once that issue is determined, it is expected the parties can apply that methodology without dispute. Here, Marathon filed a contingent claim for accounting in the event that court involvement is required in the application of the methodology that is adopted as a result of this lawsuit. Forest's request to dismiss the contingent claim for accounting is not well founded and premature.

### VII.   Conclusion

Forest's and Unocal's Motions for Summary Judgment should be denied because, at a minimum, there are issues of material fact based on the testimony of the party witnesses and Marathon's experts regarding whether the methodologies Unocal selected are fair and equitable, as required under the Operating Agreement. The facts, viewed from a perspective most favorable to Marathon, establish that Unocal breached the operating agreement, as well as the COPAS guidelines, by the use of the BOE and BOE/Well Count methodologies. In addition, defendants' summary judgment motions should be denied on the grounds that Unocal breached the operating agreement by switching methodologies without Marathon's consent.

Moreover, Marathon is entitled to partial summary judgment on its cross-motion. Unocal's BOE and BOE/Well Count methodologies are neither fair nor equitable, as required by the operating agreement and COPAS, but rather are based on improper factors as a matter of law. Although Don Page and the other witnesses admitted

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

that a fair and equitable methodology must reflect the basis of the costs during the allocation period, the actual methodologies Unocal selected failed to do so. Rather, Unocal's methodologies were based on a number of inappropriate factors, such as the relative profitability of the oil and gas operations, none of which bear any correlation to actual costs.

Accordingly, for the reasons outlined above, Marathon respectfully requests that Unocal's and Forest's motions for summary judgment be denied, and that Marathon's cross-motion for partial summary judgment be granted.

DATED this 7th day of April, 2008, at Anchorage, Alaska.

> RICHMOND & QUINN
> Attorneys for Plaintiff
> MARATHON OIL COMPANY

By:     s/Daniel T. Quinn
RICHMOND & QUINN
360 K Street, Suite 200
Anchorage, AK 99501
Ph: 907-276-5727
Fax: 907-276-2953
dquinn@richmondquinn.com
ABA #8211141

By:     s/ Marc G. Wilhelm
RICHMOND & QUINN
360 K Street, Suite 200
Anchorage, AK 99501
Ph: 907-276-5727
Fax: 907-276-2953
mwilhelm@richmondquinn.com
ABA #8406054

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953

**MARATHON OIL COMPANY'S OPPOSITION TO UNOCAL'S AND FOREST'S MOTIONS FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**
MARATHON v. FOREST OIL, ET AL., CASE NO. 3:06-cv-00102 TMB
PAGE 23

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically served this 7th day of April, 2008 to:

Robert K. Stewart, Jr.
DAVIS WRIGHT TREMAINE LLP
701 W. 8th Ave., Ste. 800
Anchorage, Alaska 99501

Marc D. Bond
UNION OIL CO. OF CALIFORNIA
909 W. 9th Avenue
Anchorage, Alaska 99501-3339

Jeffrey M. Feldman
R. Scott Taylor
FELDMAN ORLANSKY & SANDERS
500 L Street, Suite 400
Anchorage, Alaska 99501

Brewster H. Jamieson
LANE POWELL
301 W. Northern Lights Blvd., Ste. 301
Anchorage, Alaska 99503

s/ Marc G. Wilhelm
RICHMOND & QUINN

644\046\PLD\SUMMARY JUDGMENT (OPPOSITION)

LAW OFFICES
RICHMOND & QUINN
A PROFESSIONAL CORPORATION
360 K STREET, SUITE 200
ANCHORAGE, ALASKA 99501-2038
(907) 276-5727
FAX (907) 276-2953