```
                                                           1
1    Daniel T. Quinn (8211141)
     Richmond & Quinn, PC
2    360 "K" Street, Suite 200
     Anchorage, Alaska  99501
3    (907) 276-5727
     Attorney for Plaintiff Marathon Oil Company
4
5
6              UNITED STATES DISTRICT COURT
7                FOR THE DISTRICT OF ALASKA
8    _____
9    Case No.: 3:06-CV-00102 TMB
     _____
10
     MARATHON OIL COMPANY,
11
             Plaintiff,
12
     vs.
13
     FOREST OIL COMPANY and UNION OIL COMPANY OF
14   CALIFORNIA, d/b/a UNOCAL ALASKA,
15           Defendants.
     _____
16
                DEPOSITION OF MITCH FISCHBACH
17   _____
18              PURSUANT TO NOTICE, the
19   above-entitled deposition was taken on behalf of
20   the Plaintiff at the offices of Wheeler Trigg &
21   Kennedy, LLC, 1801 California Street, Suite 3600,
22   Denver, Colorado, on August 16, 2007, at 9:55 a.m.,
23   before Jana Mackelprang, Certified Realtime
24   Reporter, Registered Professional Reporter, and
25   Notary Public.
```

Exhibit 1

**Page 6**

```
 1         PROCEEDINGS
 2       WHEREUPON, the following proceedings were
 3  taken pursuant to the Federal Rules of Civil
 4  Procedure.
 5              * * * * *
 6            MITCH FISCHBACH,
 7  having been first duly sworn to state the whole
 8  truth, testified as follows:
 9              EXAMINATION
10  BY MR. QUINN:
11     Q.   Good morning, Mr. Fischbach. My name
12  is Dan Quinn. We met here briefly before the
13  deposition. As you know, I represent Marathon Oil
14  in a lawsuit involving allocation expenses on the
15  Steelhead Platform.
16          I usually ask people if they've ever
17  been deposed before, but in your case, I know you've
18  been deposed before, not too long ago in a related
19  lawsuit, because I've seen it. But let me ask you
20  that: Other than that wonderful experience, have
21  you ever been deposed before?
22     A.   Yes, two other times.
23     Q.   All right. Any relation to the
24  Steelhead Platform, those depositions?
25     A.   No.
```

**Page 7**

```
 1     Q.   Basically, this is our opportunity, as
 2  you know, to ask you questions, gather information
 3  about your knowledge with regard to this case. I'll
 4  try to be as clear in my questions as I can, but if
 5  you don't understand me -- and God knows there will
 6  be times you probably won't -- let me know that, and
 7  I'll try to clarify the question. That way, if you
 8  do answer, I'm going to assume that you've
 9  understood and we're more or less on the same page.
10         Is that fair enough?
11     A.   Fair enough.
12     Q.   We can take a break at any time. It's
13  not an endurance contest.
14         Then the other thing I tell people
15  that's helpful, and everybody forgets this,
16  including me, if you'll answer yes or no, it's
17  helpful to get an audible yes or no instead of a nod
18  of the head, because when this gets transcribed,
19  it's difficult for the court reporter. As I say,
20  everybody forgets that rule.
21         Tell me what your current position is.
22     A.   I'm director of joint venture audit.
23     Q.   For what company?
24     A.   Forest Oil.
25     Q.   I understand, with Forest Oil, there's
```

**Page 8**

```
 1  some kind of a sale going on. Is it just Alaska
 2  assets, or what's going on with that?
 3     A.   Yes, the assets were transferred, and
 4  I'm not sure of the exact company name. It's a
 5  Forest entity to be sold.
 6     Q.   To be sold?
 7     A.   Yes.
 8     Q.   But, in any case, you still hold this
 9  position, and you have oversight responsibilities
10  for the Steelhead Platform?
11     A.   That's correct.
12     Q.   How long have you held this position?
13     A.   I've been director since October of
14  2000.
15     Q.   And what was your position before that
16  time?
17     A.   Prior to that, I was manager of joint
18  venture audit.
19     Q.   And how long did you have that
20  position?
21     A.   That was November of '99.
22     Q.   So that was about a year or so --
23     A.   Yes.
24     Q.   -- you held that job 11 months?
25     A.   Yes.
```

**Page 9**

```
 1     Q.   And prior to that?
 2     A.   Prior to that, I was supervisor of
 3  joint venture audit.
 4     Q.   How long were you in that position?
 5     A.   That was September of 1999.
 6     Q.   Two months?
 7     A.   No, September of '99 -- or, I'm sorry,
 8  '94.
 9     Q.   '94, all right. And then prior to
10  that?
11     A.   Operations auditor.
12     Q.   And how long did you have that
13  position?
14     A.   That's when I started with Forest, and
15  that was July of 1989.
16     Q.   So you've been with Forest since 1989?
17     A.   That's correct.
18     Q.   That's a pretty long tenure, then.
19  Tell me what you did before going to work for
20  Forest.
21     A.   Prior to Forest, I worked for Texaco.
22     Q.   Doing the same type of auditing work?
23     A.   Basically joint venture audit, yes.
24     Q.   How long did you work for those guys?
25     A.   1986, and I'm not sure of the exact
```

Page 10

1  month.
2  Q. So you were with them for roughly
3  eight years?
4  A. Three years, '86 --
5  Q. Oh, to '89. I'm sorry. I was going
6  up to '94. '86 to '89, that's correct.
7     And prior to that?
8  A. I worked for Ensource, and I started
9  there in December of 1983.
10 Q. Doing auditing work there?
11 A. I started out the first year as a
12 revenue accountant, and then after that I became a
13 joint venture auditor.
14 Q. During your tenure with Forest as a
15 joint venture auditor, what kind of -- I'm trying to
16 get a sense of how many different projects or
17 platforms or production sites you have joint venture
18 auditing responsibility for -- maybe I'll just ask
19 you that -- currently. We know that you have joint
20 venture auditing responsibilities over Steelhead.
21 Where else does Forest have projects?
22 A. We have operations in Texas,
23 Louisiana, Oklahoma, New Mexico, Wyoming, North
24 Dakota, Montana, Canada. We have operated stuff in
25 Italy, Gabon.

Page 11

1  Q. And are there joint venture
2  relationships in all of those places?
3  A. Some of the areas are 100 percent
4  owned by Forest, but the majority of the places do
5  have owners. Some will be nonoperated ownership by
6  Forest and others are operated.
7  Q. All right. Now, Steelhead is one of
8  those instances where the platform is operated by
9  someone other than Forest; is that correct?
10 A. Correct.
11 Q. In this case, it's Unocal. Is it okay
12 if I use the term "Unocal"? I know we've gone
13 through this in the past. I know they have merged
14 with Chevron, but for shorthand, let's just use the
15 term "Unocal."
16    Tell me when it was that Forest Oil
17 first obtained an interest in the Steelhead
18 Platform.
19 A. I believe it was -- I might not have
20 the exact effective date, but I think it was
21 December of 2000, we acquired Forcenergy, and they
22 had an ownership in the Steelhead.
23 MS. CRACRAFT: That's
24 F-o-r-c-e-n-e-r-g-y, one word. I say that because
25 it's been wrong in all the depos.

Page 12

1  Q. (By Mr. Quinn) What's your
2  understanding of how Forcenergy obtained an interest
3  in Steelhead?
4  A. I believe they -- and I'm not sure of
5  the exact time again; it was the end of '96, I
6  believe -- they obtained their interest from
7  Marathon.
8  Q. And that was Marathon's interest in
9  the oil production; is that right?
10 A. In everything in the Steelhead, yes,
11 other than the Grayling Gas Sands.
12 Q. Now, is it your understanding that
13 operating agreements that existed -- well, let me
14 back up even before that.
15    Before that sale by Marathon to
16 Forcenergy, is it your understanding that the
17 Steelhead interests were owned by Marathon and
18 Unocal?
19 A. At that time, I believe that's
20 correct. I think -- I mean, prior to that, there
21 were a whole bunch of people involved.
22 Q. Right. So at least as of '96, when
23 Forcenergy became an owner of Steelhead interests,
24 it was Marathon and Unocal. Am I correct that as of
25 '96, there were several -- there was an operating

Page 13

1  agreement that was in place signed by Marathon and
2  Unocal?
3  A. Yes.
4  Q. All right. And Forcenergy, as part of
5  its purchase, became bound by that same operating
6  agreement?
7  A. Yes, as a successor in interest, we
8  inherited that agreement, yes.
9  Q. So Forcenergy first inherited it, and
10 then in turn you inherited it?
11 A. That's right.
12 Q. So those agreements are still in place
13 despite the change in ownership?
14 A. That's correct.
15 Q. Now, we're here about a dispute
16 concerning allocation of, I think, what's sometimes
17 called unallocated expenses. There's a certain cost
18 center -- and I forget the number -- do you remember
19 what that cost center number is?
20 A. I think it's 1007096000. I might have
21 missed a zero, but I think that's right.
22 MR. JAMIESON: The record should
23 reflect applause.
24 MR. QUINN: That's all the questions I
25 have. Thank you.

**Page 18**

1  Q. What's his --
2  A. I'm not sure of his exact title. I
3  believe he's an engineer.
4  Q. With Forest?
5  A. Yes. And Ted Kramer was also an
6  engineer with Forest.
7  Q. Now, this dispute, at least I gather,
8  became formalized when Marathon issued an audit
9  exception; is that correct?
10 A. That's when I first really became, you
11 know, fully aware of it, yes, we received a copy of
12 the exception.
13 Q. That was going to be one of my
14 questions. Prior to that exception, this issue
15 really wasn't on your radar screen?
16 A. No.
17 Q. All right. And these discussions that
18 you're talking about, at least that you've heard may
19 have gone on with Leonard Gurule, Ken Griffin, and
20 Ted Kramer, were those prior to Marathon's audit
21 exception or after that, or do you know?
22 A. I'm not sure of the timing that the
23 discussions were going on between Unocal and Forest,
24 no.
25 Q. All right. If there was

**Page 19**

1  dissatisfaction on the part of Forest about an
2  allocation issue like that, is that something that
3  would come to your attention as a person involved in
4  joint venture auditing?
5  A. Eventually, yes, they would ask for my
6  input.
7  Q. All right. But at least up to the
8  point that Marathon issued this audit exception,
9  that had never happened?
10 A. Not specifically, no.
11 Q. All right. I'm trying to remember --
12 let me look at my notes again -- actually, maybe
13 someone -- do you know what the date of that audit
14 exception was?
15 A. The specific date, no. I know the
16 first time I received a copy, I believe, was in
17 December of 2004.
18 Q. 2004?
19 A. Yes.
20 Q. All right. So by that time, you were
21 the director of joint venture auditing for Forest?
22 A. Yes.
23 Q. All right. And you guys had been on
24 that platform for four years at that point, right?
25 A. We don't -- we had an ownership in it,

**Page 20**

1  yes.
2  Q. I understand. You weren't operating
3  it. All right. So, in any case, during those four
4  years, this was not an issue that ever came to the
5  attention of joint venture auditing?
6  A. The four years being 2000 through
7  2004?
8  Q. Right.
9  A. That's correct.
10 Q. Were you aware of the fact that that
11 total fluids methodology was being used by the
12 operator?
13 A. I believe so, yes, at some point in
14 time prior to the exception, I knew that.
15 Q. All right. So prior to this
16 exception, and I guess prior to the change,
17 Marathon's exception had to do with a change in the
18 allocation methodology; is that right?
19 A. That's correct.
20 Q. In any case, prior to the change in
21 methodology that Unocal adopted, you guys -- "you"
22 meaning Forest Oil -- were aware that the total
23 fluids methodology was being used, and you didn't
24 have any objection to that?
25 A. No. Like I say, we have ownership in

**Page 21**

1  multiple platforms in the Trading Bay Unit, not just
2  the Steelhead. So when we looked at the things, we
3  looked at all the platforms and saw the allocations.
4  So one specific -- like I say, knowing that that was
5  total fluids was one thing. Whether we focused on
6  it or not is another issue.
7  Q. In any case, you never focused on it,
8  and you certainly never filed any exceptions to it?
9  A. That's correct.
10 Q. Now, at some point -- and you can tell
11 me this; I think it was beginning in January of
12 '02 -- Unocal changed the unit methodology from
13 total fluids to what?
14 A. BOE.
15 Q. Tell me what BOE means just for the
16 record.
17 A. Barrel of oil equivalent.
18 Q. So, essentially, this is kind of a
19 production measure. You compare how much oil is
20 being produced versus how much gas is being
21 produced, and unitize that by using the
22 barrel-of-oil measure and allocating it in that
23 ratio?
24 A. Yes. I believe they divide the MCF,
25 meaning cubic feet of gas, by 6 to write it to a

Page 30

1  ESPs, was to cut the costs, because without them,
2  they cost more, the operating expenses.
3      Q.   Was it your understanding -- again, if
4  you don't know, that's fine, just tell me that --
5  was it your understanding that, prior to the
6  installation of ESPs, the relative labor demands of
7  an oil versus a gas well in Steelhead were roughly
8  equivalent, or as Mr. Page here seems to suggest,
9  "may require a disproportionate amount of effort"
10 for oil?  What was your understanding?
11          MS. CRACRAFT:  Objection.  You can
12 answer.
13          THE DEPONENT:  My understanding was
14 that the oil wells were probably more expensive to
15 operate than the gas wells prior to the ESPs.
16     Q.   (By Mr. Quinn)  All right.  How did
17 you garner that information or that opinion?
18     A.   Well, normal oilfield operations.  I
19 mean, a gas well is typically cheaper than an oil
20 well.
21     Q.   Did you have any discussions
22 specifically with your folks in Alaska on this issue
23 on Steelhead, or was this just more general
24 knowledge?
25     A.   In regard to an oil well being more

Page 31

1  expensive than a gas well?
2      Q.   Yes.
3      A.   No specific until, like I say, the
4  issue arose.  Then I had the discussions; and I did
5  not have the knowledge that ESPs, you know, were
6  that much less to operate prior to talking to them.
7      Q.   Let me ask you this:  In terms of the
8  -- let's focus on after the ESPs were installed.
9  What you're telling me is that you understand that,
10 at that point, the labor demands drop for an oil
11 well, and at that point it may require more labor to
12 operate a gas well than an oil well on the Steelhead
13 Platform?  Is that what you're telling me?
14     A.   I was told it was a like or less cost.
15 And that was the whole purpose behind us installing
16 ESPs and spending the millions of dollars.  And the
17 problem, which I was also told by the engineering
18 types, is that by installing the ESPs, you're
19 increasing your fluids levels significantly with
20 water.
21     Q.   All right.  On this issue of relative
22 labor demand for an oil well versus a gas well, I
23 think what you've told me is that once the ESPs were
24 installed, the labor demand was equal or perhaps
25 slightly less for an oil well versus a gas well?

Page 32

1  Did I hear you correctly?
2      A.   That's what I was told by the
3  technical people, yes.
4      Q.   In terms of any more specific
5  quantification of that, did they ever come up with a
6  percentage number or anything like that?
7      A.   No specific percentage, no.
8      Q.   But it was sort of equal or slightly
9  less labor demand on an oil well than a gas well
10 following installation of these submersible pumps?
11     A.   That's what I was told, equal or less
12 than to operate the oil wells versus the gas wells.
13          (Exhibit 2 was marked for
14 identification.)
15     Q.   (By Mr. Quinn)  What I'm going to do
16 is I'm going to try to go through documents that
17 involve this issue that have your name on them.
18 What I've tried to do is pull these out
19 chronologically.  You know, I may have failed
20 somewhat, but this Exhibit 2, which is a letter to
21 you from Don Page -- I'm sorry, a letter from you to
22 Don Page of March 14, '05, I think is the first time
23 we see your name in connection with this issue.
24          Let me just ask you a question, and
25 that is, are you aware of any prior documents that

Page 33

1  either you authored or received?  And I certainly
2  assume you received a copy of the audit, but
3  something that would have your name on the
4  distribution list or anything like that, are you
5  aware of anything prior to this May 14 letter that
6  you wrote?
7      A.   As far as documents from Unocal or
8  Marathon?
9      Q.   Right.
10     A.   No.
11     Q.   How about in-house documents, are
12 there in-house documents that you would have that
13 would predate this?
14     A.   There could be.  I know -- like I say,
15 prior to this being issued, I had discussions with
16 the people in our Alaska office.
17     Q.   All right.  This letter of March 14 of
18 '05 is, as I understand it, sort of a formal
19 response to Marathon Oil's exception?
20     A.   Yes, this was -- well, this was kind
21 of out of the norm of the normal joint venture
22 audit, because typically the operator responds to
23 the nonoperator.  I wasn't a party to Unocal's audit
24 of Marathon, but because of Unocal's interest in
25 both the oil and the gas, I was requested to write

**Page 38**

1  MS. CRACRAFT: He is Mitch. You mean
2  Terry?
3  MR. QUINN: Yes.
4  MR. JAMIESON: It would be a lot
5  easier if it were just Mitch and Mitch.
6  Q. (By Mr. Quinn) So Mr. Page is saying:
7  We can't seem to work out this audit exception
8  No. 16. Typically what an operator tries to do when
9  they get an exception is try to resolve it?
10  A. Yes, you try to resolve it, yes.
11  Q. And so that's what Mr. Page is trying
12  to do. As I understand it, Unocal, since they owned
13  both oil and gas, were not certainly as financially
14  affected by these issues as Marathon or Unocal; is
15  that right?
16  A. As Marathon and Forest.
17  Q. Marathon and Forest, yes.
18  MS. CRACRAFT: You need to answer the
19  question.
20  THE DEPONENT: Yes.
21  Q. (By Mr. Quinn) You need to correct
22  the question and then answer it. All right.
23  So he's saying he's setting up an
24  accounting subcommittee meeting June 25, at
25  8 o'clock, which I gather was going to consist of

**Page 39**

1  you three gentlemen?
2  A. That's correct.
3  Q. To your knowledge, at least during
4  your tenure, have you ever been on an accounting
5  subcommittee like this before?
6  A. Not to my knowledge.
7  Q. All right.
8  (Exhibit 5 was marked for
9  identification.)
10  Q. (By Mr. Quinn) This is dated
11  June 23rd, and it looks like you are updating
12  Leonard Gurule -- am I pronouncing that close
13  enough, anyway?
14  A. Gurule.
15  Q. -- in a phone call you had on the
16  20th. So was there a conference call that you had
17  on the 20th with Mr. Page and Mr. McMurray?
18  A. Yes.
19  Q. All right. And was this in
20  preparation for the more formal accounting
21  subcommittee meeting -- or that was the subcommittee
22  meeting, I guess?
23  A. That was considered an accounting
24  subcommittee meeting.
25  Q. All right. Tell me what happened at

**Page 40**

1  that meeting. This seems to summarize it, but
2  essentially Marathon was saying: We think we should
3  go back to total fluids and do it retroactively.
4  And Unocal was saying: No, we need to stay with
5  BOE. Is that --
6  A. Basically, yeah, Marathon was, at this
7  point in time, I believe, was still saying: It
8  should be total fluids. And Forest was basically
9  saying: BOE is equitable.
10  Q. All right. Did you raise issues about
11  going back in time with the BOE methodology?
12  A. At this point in time, I don't believe
13  so.
14  Q. Let me ask you about this sentence, it
15  says, "Terry and I both agreed that we did not know
16  what the right allocation was, that it was probably
17  somewhere between total fluids and BOE."
18  Is that correct, that is, did you and
19  Terry both agree to that during this conference
20  call?
21  A. We agreed to the fact that no one knew
22  what the right number was. I mean, when you have
23  allocations, no one knows what's right. That's why,
24  if you can't do it direct to a gas or an oil, then
25  there's going to be some allocation; and some

**Page 41**

1  invoices would make sense at some percent and some
2  at others. So you have to come up with a method.
3  Q. So it sounds like, at this point, what
4  you were saying was: I can live with some kind of a
5  compromise between those two numbers, and that in my
6  mind would be fair and equitable?
7  MS. CRACRAFT: Objection, form. You
8  can answer.
9  THE DEPONENT: At that point in time,
10  we were having -- it was basically a negotiation,
11  trying to resolve the issue. I mean, if I didn't go
12  in with an open mind to try to do that, nothing
13  would have gotten done.
14  Q. (By Mr. Quinn) Is that still your
15  view, that is, the right allocation should be
16  somewhere between total fluids and BOE?
17  A. The current method is 50 percent BOE
18  and 50 percent well count. I'm not overly thrilled
19  about it, but I really have no indication that I can
20  demonstrate that it's not fair and equitable.
21  Q. Does Forest plan to file an exception
22  to the current methodology, which is that hybrid
23  approach?
24  MS. CRACRAFT: Objection, form.
25  THE DEPONENT: No. We've already

Page 42

1  audited and have not issued an exception.
2      Q.   (By Mr. Quinn) So the dispute is
3  really the retroactive, whether something should be
4  done retroactively?
5      A.   Retroactively being 2002 forward, up
6  until '06?
7      Q.   Right. Let me ask you this: Do you
8  understand Marathon to be agreeable to the current
9  methodology?
10          MS. CRACRAFT: Objection, form. You
11 can answer.
12     Q.   (By Mr. Quinn) If you know?
13     A.   I'm not sure of their position, no.
14          MR. JAMIESON: Isn't that a question
15 that you should be asking one of your own --
16          MR. QUINN: There's helpful
17 intelligence to know what the other guy thinks.
18          (Exhibit 6 was marked for
19 identification.)
20     Q.   (By Mr. Quinn) Exhibit 6 is a
21 June 28, 2005, letter from Don Page, again to you
22 and Terry McMurray; and it's a follow-up to this
23 subcommittee meeting, which I gather was a
24 conference call, right, the subcommittee meeting?
25     A.   The June 20th one, yes, was a

Page 43

1  conference call.
2      Q.   It says at this point that "Unocal
3  agreed to develop a couple hypothetical allocation
4  suggestions to allocate Steelhead costs that can't
5  be directly associated with the GGS or Oil WIPAs."
6  In other words, he's trying to come up with some
7  alternative approaches to resolve this dispute about
8  the cost center that we've identified; is that
9  right?
10     A.   That's correct.
11     Q.   He comes up with four different
12 approaches: "Continue to use the gross production
13 BOE allocation." And am I right that that would be
14 the most favorable to Forest?
15     A.   Most favorable compared to what?
16     Q.   Of the four options. Why don't we go
17 through them. No. 2: "Include water production in
18 the allocation methodology." That would be
19 something that would be less favorable to Forest,
20 right?
21     A.   That would be less favorable, yes.
22     Q.   No. 3: "Use well-count to allocate
23 cost that can't be directly associated with GGS or
24 Oil WIPAs." And that would be less favorable to
25 Forest, right, than continuing to use the gross BOE

Page 44

1  allocation?
2      A.   It would depend on the production of
3  the wells over time. I mean, if your gas wells
4  started to decline significantly quicker than the
5  oil, then under BOE the oil would start getting a
6  higher percentage, and somewhere it would probably
7  pass a well count.
8      Q.   And No. 4 is: "Allocate costs that
9  can't be directly associated with GGS or Oil WIPAs
10 based upon a weighted average of current Steelhead
11 labor Prorates." That's the fourth.
12          Let me just ask you about these four
13 approaches. Let me back up. Your view is that the
14 goal here is to come up with a fair and equitable
15 approach to this allocation; am I right about that?
16     A.   At this point in time, I was involved.
17 As I put in my letter, my feeling on the matter was
18 always that Unocal is the operator. They implement
19 the process or allocation methodology that's going
20 to be used. And then if we have a problem with it,
21 it's our responsibility to document it and show why
22 it's not fair and equitable.
23     Q.   Good enough. So part of your job is
24 to evaluate whether a certain approach is fair and
25 equitable, but, really, your job is to react to what

Page 45

1  Unocal does?
2      A.   Yes, if there's something wrong with
3  what they do, the burden is on me to demonstrate why
4  it's not fair and equitable.
5      Q.   Good enough. So at least this
6  analysis of whether something is fair and equitable
7  is part of your job?
8      A.   When we're looking at costs, yes.
9      Q.   Let me ask you this: In terms of
10 allocating this cost center, is fair and equitable
11 trying to best approximate the actual allocation of
12 expenses to oil and gas? Is that what Unocal should
13 be trying to do, to sort of get it as accurately as
14 possible, realizing that down to the penny is not
15 going to be possible, or at least there's going to
16 be gray areas, but the objective is to try to
17 reflect actual cost as between oil and gas?
18     A.   At the end of the day, that's what
19 you're trying to accomplish, but like I say, when
20 you're using allocations, it's very difficult to
21 determine what that right number is.
22     Q.   All right. Let's talk about the first
23 one: "Continue to use gross production BOE
24 allocation." So, essentially, this is one that
25 says -- sort of an implicit assumption in using this

```
                                                46
 1   approach is that unallocated costs rise or fall in
 2   relation to production; is that right?
 3       A.   Basically, in allocating, yes, the
 4   costs are following the production.
 5       Q.   All right. Is that accurate to your
 6   knowledge?
 7       A.   Once again, what's accurate? It's an
 8   accepted method in the industry.
 9       Q.   All right. If there was evidence to
10   suggest that this implicit assumption in the BOE
11   approach was not accurate, would you agree that that
12   would not be a fair and equitable approach, at least
13   on this platform?
14           MS. CRACRAFT: Objection, form. You
15   can answer.
16           MR. JAMIESON: The same objection.
17           THE DEPONENT: If I was provided
18   information that demonstrated that the BOE was not
19   fair and equitable, yes.
20       Q.   (By Mr. Quinn) All right. Have you
21   at any time reviewed the deposition of Glenn Payment
22   taken in this case?
23       A.   No, I haven't.
24       Q.   Let me ask you this: Have you ever
25   been to the Steelhead Platform?
```

```
                                                47
 1       A.   No, I have not.
 2       Q.   All right. Do you have an
 3   understanding of the ratio of oil to water that is
 4   typically produced at Steelhead on the oil side?
 5       A.   No.
 6       Q.   All right. And do you have any
 7   knowledge -- obviously, the higher the oil ratio,
 8   the more production, right, the more BOEs are being
 9   produced? That is, if you have a 50-50 split on oil
10   and water, you're going to have a much higher BOE
11   than if you're producing 6 percent oil and
12   94 percent water? Am I right about that?
13           MR. JAMIESON: Object to form.
14           THE DEPONENT: No.
15       Q.   (By Mr. Quinn) Why am I not right?
16       A.   Because BOE doesn't include water.
17       Q.   I understand that. That's what I'm
18   saying: If the ratio is higher oil than water, in
19   other words, the higher the percentage of oil, the
20   higher the BOE, right?
21       A.   The higher the production of oil. I
22   mean, the water wouldn't matter in your BOE. You're
23   going to take your oil production divided by -- it's
24   going to be the barrel.
25       Q.   Well, do you know if it costs any more
```

```
                                                48
 1   to produce at a higher water-to-oil ratio than at a
 2   lower water-to-oil ratio? Do you have any knowledge
 3   of that?
 4           MR. JAMIESON: Are you saying on the
 5   Steelhead Platform?
 6           MR. QUINN: Yes.
 7           MR. JAMIESON: With this formation?
 8           MR. QUINN: Yeah.
 9           THE DEPONENT: The water is processed
10   on shore at TBU, at the facility. So the additional
11   water really shouldn't have any effect on additional
12   costs at the Steelhead.
13       Q.   (By Mr. Quinn) But if you're
14   producing -- let me just use a hypothetical. Let's
15   say one year your ratio is 50 percent water and
16   50 percent oil, and the next year it drops to
17   25 percent oil and 75 percent water. So that year
18   you produce half as much oil. Are costs on the
19   platform any different in those two years?
20       A.   Some of the costs probably would be.
21       Q.   Who would you want to ask to find that
22   out?
23       A.   The operators on the platform.
24       Q.   And have you made any inquiries of
25   them about this issue?
```

```
                                                49
 1       A.   What issue specifically?
 2       Q.   The issue that I just asked, that is,
 3   whether costs in a year that you produce twice as
 4   much oil are higher than costs in the year that you
 5   produce half that amount.
 6       A.   No, I've had no reason to ask such a
 7   question.
 8       Q.   And if the answer to that question
 9   were no, that the costs were the same, then doesn't
10   it follow that the BOE approach is not fair and
11   equitable?
12           MS. CRACRAFT: Objection to form.
13           MR. JAMIESON: Objection to form.
14           THE DEPONENT: Not specifically, no.
15       Q.   (By Mr. Quinn) Because wouldn't -- so
16   in one year, you would have twice the BOE and
17   therefore twice the allocation than the second year;
18   but, at least under my hypothetical, the costs would
19   be the same both years? So there's a problem,
20   right, in using the BOE approach, if my hypothetical
21   is correct?
22           MS. CRACRAFT: Objection, form. You
23   can answer.
24           MR. JAMIESON: Join the objection.
25           THE DEPONENT: I don't have any
```

**Page 50**

1  specific knowledge of the operators and how their
2  time is being allocated versus higher or lower
3  production and whether it takes more time or not.
4      Q.   (By Mr. Quinn) But wouldn't you need
5  to know that to find out whether BOE is fair and
6  equitable?
7      A.   Once again, from my perspective, the
8  only thing I'm required to do from an audit
9  perspective, which is where I'm involved, is to look
10 at what the exception was. I looked at the
11 exception, and it had no basis. And they
12 implemented BOE, and I've seen nothing from Marathon
13 to indicate that BOE is unequitable.
14     Q.   It sounds like what you're saying is
15 you've never really done an analysis as to whether
16 BOE is fair and equitable?
17          MS. CRACRAFT: At the Steelhead
18 Platform?
19          MR. QUINN: At the Steelhead Platform.
20     Q.   (By Mr. Quinn) All you've done is
21 respond to Marathon's objection?
22     A.   We did the same analysis as we did
23 when it was total fluids. And like I say, we didn't
24 take exception to total fluids. At the time we
25 didn't take exception to BOE.

**Page 51**

1      Q.   Item No. 2 says, "Include water
2  production in the allocation methodology." Would it
3  be fair and equitable in your mind to include water
4  production as part of the methodology?
5      A.   In regards to Steelhead, it makes no
6  sense to me.
7      Q.   Why is that?
8      A.   Because the water is processed at the
9  TBU, at the facility, not on the Steelhead Platform.
10     Q.   So what you're saying is that the
11 costs are not tied to water production, and
12 therefore shouldn't be a factor?
13     A.   Right. Increased water -- like I say,
14 when you install the ESPs, you know you're going to
15 have increased water production. And if the intent
16 in installing the ESPs is to cut your costs, it
17 makes no sense that you would include it to increase
18 your costs.
19     Q.   So if the amount of water production
20 isn't really a variable, it isn't fair and equitable
21 to use it?
22     A.   I think if you use it, the oil gets a
23 proportionate share of the costs.
24     Q.   Isn't that true under BOE? In other
25 words, if BOE production is not truly a variable

**Page 52**

1  that affects costs, it's not true and accurate to
2  use that?
3      A.   Like I say, I've never been provided
4  any documentation to look at that supports that BOE
5  is not fair and equitable.
6      Q.   Theoretically, if BOE is not truly a
7  variable that affects costs, then that would not be
8  a fair and equitable variable to use?
9          MR. JAMIESON: Object to form.
10         THE DEPONENT: Theoretically, any of
11 these methods may not be fair and equitable. It
12 depends on the circumstances. And, once again, the
13 burden falls on the auditor.
14     Q.   (By Mr. Quinn) No. 3 is well count.
15 Now, if it costs roughly the same to operate a gas
16 well as it does to operate an oil well, then well
17 count would be a pretty reasonable way to go,
18 wouldn't it?
19     A.   It was a method that was discussed,
20 yes.
21     Q.   And what's your view on whether it's a
22 good or bad idea?
23     A.   Well count is, like I say, another
24 accepted method in the industry.
25     Q.   So you wouldn't have an objection if

**Page 53**

1  Unocal adopted well count as -- and that's in fact
2  what they've done, haven't they, at least as part of
3  the formula?
4      A.   They did 50 percent well count,
5  50 percent BOE. From a straight well count
6  perspective, the problem I have is that, like I say,
7  Marathon picks one specific allocation out of
8  numerous, and it happens to be the one that would
9  have the most effect. The other ones, which would
10 be labor costs and associated costs, they've never
11 said, "Let's do a well count over there."
12     Q.   No. 4 is Steelhead labor prorates. To
13 the extent that this cost center is really a labor
14 -- at least primarily labor, this makes some sense,
15 doesn't it?
16     A.   It's another potential method. But,
17 like I say, the costs -- there's other prorates in
18 labor prorates than what he's talking about. And
19 the costs that ultimately go into the crane and
20 maintenance facility, I'm not sure that it's the
21 same people month to month.
22     Q.   But at least this would reflect a
23 variable that is relevant to this cost center
24 because it is primarily a labor cost center, isn't
25 it, 70 or 80 percent labor?

# Mitch Fischbach

**From:** Mitch Fischbach
**Sent:** Thursday, June 23, 2005 9:54 AM
**To:** Leonard Gurule
**Cc:** Ted Kramer; Mitch Fischbach
**Subject:** Accounting Sub-Committee Phone Call

Leonard,

Thought I would give you a quick update on the conference call that was held on Monday, June 20, 2005 at 10:00 A.M. mountain time. The only people involved in the call were Don Page with Unocal, Terry McMurray - Joint Interest Audit Manager for Marathon and myself. Don indicated that he could not located evidence that an Accounting Sub-Committee meeting had ever been held previously. Don indicated that the issue was basically between Forest and Marathon and that we were unable to resolve the issue and therefore the Accounting Sub-Committee had to be called. I indicated to Don that if Forest and Marathon agreed to an allocation method that Unocal would also have to agree as they would be the party implementing and administering the allocation. The discussions only centered around the allocation of expenses on the Steelhead Platform. That was Marathon requesting the allocation be based on total fluids and Forest maintaining that the allocation being based on BOE (beginning in January 2002) was equitable. Don Page indicated that adjusting the past 3 1/2 years from BOE to total fluids would result in charges of $187,000 to Unocal and $1,996,000 to Forest and a credit to Marathon of $2,184,000. I believe he indicated that the allocation between the oil and gas WIPA's on the Steelhead changed from 65% and 35% to 92% and 8%.

Terry and I both agreed that we did not know what the right allocation was that it was probably somewhere between total fluids and BOE. It was brought up that Marathon previously Operated the Steelhead Platform that they had a good knowledge of the Platform. Terry said that he would ask one of their technical people who had a working knowledge of the Steelhead to come up with a method of allocation that they feel would more reflect the actual operation of the Platform. I said that I did not have a problem with that and that after they come up with a method that Forest would be willing to review it and meet with Unocal and Marathon to discuss it and ultimately come up with an allocation procedure that is acceptable by all parties. So we should be hearing from Unocal in the future to set up another meeting to discuss this issue.

The measurement issue was never raised and discussed. If you have any questions give me a call. Thanks,

Mitch

EXHIBIT
Fischbach
Calderwood-Mackelprang
303 477 - 3500

FOC 000333

Exhibit 1
Page 10 of 10 Pages