Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

MARATHON OIL COMPANY,          )
                               )
        Plaintiff,             )
                               )
vs.                            )
                               )
FOREST OIL COMPANY, UNION OIL  )
COMPANY OF CALIFORNIA, d/b/a    )
UNOCAL ALASKA, and CHEVRON      )
CORPORATION,                   )
                               )
        Defendants.            )
_____)

Case No. 3:06-cv-00102 TMB

30(b)(6) DEPOSITION OF UNION OIL COMPANY OF CALIFORNIA
DESIGNEE:  DONALD ALAN PAGE

Pages 1 - 195, inclusive

Thursday, August 9, 2007
10:00 a.m.

Taken by Counsel for Plaintiff
at
Richmond & Quinn
360 K Street, Suite 200
Anchorage, Alaska

Exhibit 2
Page 1 of 38 Pages

Page 26

1    What do you understand the operator's duty is with respect

2    to -- to the management of the oil field?

3         A    I believe the word is prudent is the --

4                   MR. JAMIESON:  Let me object to form,

5    calls for legal conclusion.  But go ahead and answer as

6    you understand it.

7                   THE WITNESS:  I believe the word is

8    prudent.  We are supposed to be a prudent operator, if I

9    can remember right.  I do not really get in -- involved

10   too much in the operating agreement itself.  I'm primarily

11   the section -- section C of the accounting procedures is

12   really my bailiwick, so to speak.  But our responsibility

13   was to be a prudent operator and attempt to operate in the

14   most efficient and effective manner possible as we see

15   fit, and also in a safe -- in a safe -- in a safe --

16   BY MR. WILHELM:

17        Q    And with respect to accounting to over -- to

18   safeguard the funds as we talked about earlier, to provide

19   accurate and correct accounting?

20        A    Yes, sir.

21        Q    And to -- and with respect to allocating costs

22   among owners, you have got an obligation to do that

23   accurately and correctly, to the best of your ability,

24   correct?

25        A    Yes, sir.  I believe the operating agreement

MARATHON OIL v. FOREST OIL                UNION OIL COMPANY OF CA
                                                        8/9/2007

Page 27

1    says it's supposed to be fair and equitable.

2          Q    And generally that's what you try to do.  I

3    mean, I'm -- let me back up so we -- one of your

4    obligations when you were working for Unocal up here

5    was -- was it to oversee the allocations between different

6    owners or the sharing of costs between different owners?

7          A    I oversaw them, but I have to say it was

8    really -- really when it came to the allocation of the

9    cost, the primary responsible parties associated with

10   that, it was our operations department.  I -- I would --

11   with -- although we were the ones who would make the

12   changes to the allocations, we were being given direction

13   about how to change the allocations from our operations

14   department, which would have a better understanding about

15   how the facility or the field was operating.

16         Q    But with respect to whether it was your personal

17   obligation or the obligation of the Unocal accounting

18   operations as a -- or Unocal as a whole, the obligation is

19   to do a fair and equitable allocation between the

20   different owners?

21         A    Yes, sir.

22         Q    Let me get myself a glass of water.  Hang on.

23              MR. JAMIESON:  We are off record.

24         (A break was taken.)

25         (Exhibit No. 2 marked.)

Exhibit  2
Page  3  of  38  Pages

MARATHON OIL v. FOREST OIL                UNION OIL COMPANY OF CA
                                                        8/9/2007

Page 30

1     procedures primarily tell you what is billable and what is

2     not billable.  It -- I'm trying to think if there is any

3     section in here that really deals with the allocation of

4     costs within the WIPAs.  I do not believe there is, but

5     there might be.  But the accounting procedures are

6     primarily used for what costs are billable and nonbillable

7     and also overhead calculations for Trading Bay Unit.

8          Q    They might also cover, for example, audits?

9          A    Yes, sir.

10         Q    But these are -- these procedures are dated

11    December 1994.  Do you see at the top there?

12         A    Yes, sir.

13         Q    Do you have an understanding whether these are

14    the ones that are currently in effect or not?

15         A    I believe they are.

16         Q    And these are made part of the agreement between

17    the owners because they are referenced or made part of the

18    Unit Operating Agreement.  Is that your understanding?

19         A    Can you restate that?

20         Q    Yes.  I'm -- are these COPAS procedures

21    incorporated or referenced in the Trading Bay Unit

22    Operating Agreement?

23         A    I think they are, yes.

24         Q    And made part of that agreement by reference;

25    that's at least your understanding?

Exhibit 2
Page 4 of 38 Pages

Page 31

1         A    Yes, sir.

2         Q    With respect to where the equitable allocation

3    principle comes from, what is your understanding?

4         A    Where it comes from?

5         Q    Yeah.

6         A    I believe it's section -- is it 16.3 of the

7    Joint Operating Agreement, and I believe that is

8    referenced in the second and third supplement as the

9    whereas sections in those two.  16.3 is.

10                  MR. WILHELM:  I want to have here in front

11   of me the second supplemental agreement.  Let's mark that

12   as the next exhibit.

13                  (Exhibit No. 3 marked.)

14   BY MR. WILHELM:

15        Q    You referred a second ago to a second and third

16   supplemental agreement to the Trading Bay Unit Operating

17   Agreement.  Is the October you have in front of you the

18   Second Supplemental Agreement to which you were referring?

19        A    Yes, sir.

20        Q    Okay.  Does that -- looking at that, does that

21   refresh your recollection whether 16.3 is, in fact, the

22   section that contains the language you were thinking

23   about?

24        A    Yes, sir.  This is -- this is kind of a

25   restatement from 16.3 of the original agreement.

MARATHON OIL v. FOREST OIL

UNION OIL COMPANY OF CA
8/9/2007

Page 34

1    but there is a number of different accounts or accounting

2    centers, correct?

3        A    Yes, sir.

4        Q    And one thing that's done is those accounts or

5    accounting costs are allocated between the oil owners and

6    the gas owners, correct?  Costs -- operating costs for the

7    Steelhead Platform are allocated between the oil owners

8    and the gas owners?

9        A    Yes and no.  Yes and no.

10            MR. JAMIESON:  If you ask him how are they

11    allocated, he can tell you.

12    BY MR. WILHELM:

13        Q    Explain why you are saying yes and no, and maybe

14    you can go on and explain how they are allocated.

15        A    There is approximately post common equity 16 or

16    17 cost centers associated with the Steelhead Platform,

17    along with, oh, nine to ten labor prorate cost centers,

18    also.  And there are cost centers that are associated with

19    oil owners, and there are cost centers that are solely

20    associated with gas owners.  Then there are cost centers

21    that are associated with both that serve common

22    facilities.  And I believe this lawsuit is all about the

23    third item, the cost centers that serve both -- both

24    operations.

25            So if we are able to -- if we are able to say that a

Page 35

1    widget or what have you is associated with gas, we charge

2    it to the gas cost center.  If we can say it's associated

3    with oil, we charge it to the oil cost center.  If the

4    widget supports both oil and gas, then we have to allocate

5    it to the owners.

6        Q    So to the extent something can be allocated

7    specifically to the gas operations, that would be

8    allocated to the gas operations?

9        A    Yes, sir.  That procedure was -- to my

10   knowledge, it was implemented by Marathon when they were

11   the operator of Steelhead.

12       Q    Marathon was operator through about 1994, is

13   that correct?

14       A    Yes, sir.

15       Q    At which point Unocal took over?

16       A    Yes, sir.  They were also the operator of

17   Trading Bay Production Facility that has a similar issue

18   between gas and oil ownership allocations.

19       Q    And the Trading Bay facility, the oil and gas

20   from the Steelhead Platform go through the Trading Bay

21   facility?

22       A    Yes.

23       Q    Okay.  Now with respect to procedures that

24   Marathon had in place when it was operating the platform

25   and allocating costs, is it your understanding that Unocal

MARATHON OIL v. FOREST OIL

UNION OIL COMPANY OF CA
8/9/2007

Page 36

1    kept that procedure in place when it became operator of

2    the Steelhead Platform?

3         A    Yes, sir, of the Steelhead Platform along with

4    Trading Bay Production Facility.

5         Q    Okay.  And in general terms, that procedure was

6    to have a number of different cost centers for the

7    Steelhead Platform?

8         A    Uh-huh.

9         Q    Some of those operating centers related solely

10   to oil?

11        A    Yes, sir.

12        Q    Some of those cost centers related only to gas?

13        A    Yes, sir.

14        Q    And some of those cost centers were for joint

15   costs?

16        A    Or shared.

17        Q    Shared.  Okay.  Give me an example of a cost

18   center that would relate solely to the gas operations.

19        A    Solely to the gas operations, the two big

20   compressors out on the Steelhead Platform, C12 and C13,

21   primarily they were built and operated solely for the

22   benefit of the gas owners.  Sometimes when we lose ESP,

23   the oil owners might get a benefit from that when they go

24   into a gas lift operation, but those compressors primarily

25   support the Grayling Gas Sands.  So they were built,

MARATHON OIL v. FOREST OIL

UNION OIL COMPANY OF CA
8/9/2007

Page 37

1    funded, solely for the gas owners.

2        Q    So costs related to those are allocated solely

3    to the GGS owners?

4        A    Fundamentally yes, sir.  That's what you hope.

5    You might catch an error every once in a while, but that's

6    what the audit process is supposed to catch.

7        Q    That is the intent?

8        A    That is the intent.

9        Q    For example, if there was a repair to those

10   compressors or maintenance on those compressors, that

11   would be charged to the GGS owners?

12       A    Yes, sir.  That is our -- that is --

13       Q    That's the intent?

14       A    That's the intent.

15       Q    Give me an example of a cost center that's

16   allocated 100 percent to the oil owners.

17       A    Oh, lube for the ESPs or the electric

18   submersible pumps.  They are solely only used by the oil

19   owners.

20       Q    And the --

21       A    And I'm thinking of costs.  I'm not thinking of

22   assets here, by the way because I'm trying think of

23   maintenance or operating costs which is what I believe

24   this lawsuit is about.

25       Q    And let me represent I understand this lawsuit

Page 38

1      likewise is about operating costs.

2              A    Yes, sir.

3              Q    So to the extent we can focus on costs --

4              A    Yes, sir.

5              Q    But, for example, when ESP is purchased, that

6      would be allocated -- that was allocated to the oil

7      owners?

8              A    Yes, sir.

9              Q    Okay.  And then there is -- and how many cost

10     centers are there on the Steelhead Platform that would be

11     shared cost centers?

12             A    Well, you have the labor prorates.  Now, the

13     labor prorates are -- there is probably eight to ten of

14     them.  Those are what I would call a zero sum cost center.

15     And with the labor prorates, the primary costs that we are

16     talking about on the Steelhead, the most expensive costs

17     are the people.  I refer to labor, followed by

18     transportation.  And that will take out probably 70, 80

19     percent of all the expenses I believe we are referring to

20     in this lawsuit.  But those costs -- those costs are then

21     allocated to both the oil and gas owners based on

22     operations inputs about how the -- what the employees are

23     actually working on.  So you have those.

24             Then there is what we call the genset, genset cost

25     center, and that was the cost center for the generation

Page 39

1    set, electrical generation set on the Steelhead Platform.

2    And that was allocated at -- it was really a -- the genset

3    supports both the gas owners and the oil owners, and our

4    facility engineer, he would come up with the allocation

5    basis about how we are supposed to break that down on a

6    year to year -- on a basis throughout the year.

7        Then there is the cost center referring to this

8    lawsuit, which I think this lawsuit is all about which I

9    believe it is 1007096000.  It's either 096 or 097.  It's

10   been a while since I've checked out my cost center file.

11   That's the one this lawsuit is about.  And so you have --

12   you have costs that you can earmark throughout the

13   platform, and then you have this last piece of the pie

14   that is a shared cost that you are -- you are attempting

15   to allocate that one fair and equitable between the gas

16   owners and the oil owners.

17       And by the way, from our perspective of Union Oil

18   Company of California, we pretty much own 50 percent of

19   the oil assets and 50 percent of the gas assets, so when

20   it comes to cost on this, we were fairly indifferent on

21   this entire process.

22       Q    Okay.  So there is a number of cost centers that

23   relate to labor prorates, correct?

24       A    Yes, sir.

25       Q    Let me just -- one of the things I was looking

MARATHON OIL v. FOREST OIL                     UNION OIL COMPANY OF CA
                                                           8/9/2007

Page 40

1    at as I was getting ready for this deposition was costs

2    related to the platform foreman.

3         A   Yes, sir.

4         Q   Is that a separate cost center, or is that a

5    cost -- or his costs going into this general shared costs

6    cost center?

7         A   In our terminology of Oracle, it's a separate

8    cost center, but its allocations -- once again, the

9    production foreman cost center of this labor prorate, it's

10   a zero sum cost center.  So the costs come in, then they

11   are allocated based on what operations is telling us to

12   allocate.  So some of his costs would go to the oil

13   owners; some of his costs would go to the gas owners

14   directly.  Some of them would go to the cost center that I

15   believe this lawsuit is all about, the -- what we call the

16   miscellaneous facility and crane maintenance cost center.

17   And some of it might go to that genset cost center.  And

18   for all I know without having my allocation book here in

19   front of me, there might be one or two other cost centers.

20        And the same thing would be held true for a lead

21   operator, utility men, electrician, roustabout.  All of

22   them have similar type allocation procedures.  Each one of

23   those labor prorates is set up for the classification of

24   employee out there.

25        Q   Okay.  Let's focus on the production foreman.

Page 41

1       A   Yes, sir.

2       Q   So cost -- labor cost rate of the production

3   foreman go into a cost center?

4       A   Yes, sir.

5       Q   There is then an allocation, then, of those

6   costs between a number of other cost centers, maybe --

7   maybe genset, maybe something else that's oil only, maybe

8   something else that's gas only.  And whatever is left

9   over, then, would go into this crane and facility cost

10  center?

11      A   Well, it's probably a little unfair of a

12  statement saying whatever is left over.  Really the

13  production foremen are the people who have -- I believe

14  the guy out there who did the last one has 30 plus years

15  with the company, and a lot of these guys have worked 20

16  plus years on the Steelhead.  And some of these guys were

17  actually former Marathon employees out there.

18      But in any event, what they would do is they would

19  come to us and say I'm a production foreman or I'm the

20  production foreman.  And quite often the field

21  superintendent, who the production foreman works for, they

22  would get together and say I'm spending this amount of my

23  percentage of time on this set of assets, which would be

24  gas, this amount on oil, this amount of my percentage of

25  time on the shared cost center and this amount of my time

MARATHON OIL v. FOREST OIL                    UNION OIL COMPANY OF CA
                                                      8/9/2007

Page 42

1    on the genset.  And once again, there might be one or two

2    cost centers that I'm missing here without having my labor

3    prorate allocations here with me today.

4           Q    But just so I understand this, at least with

5    respect to the production foreman, those costs aren't

6    necessarily going to be allocated directly to GGS,

7    Grayling Gas Sands or oil, but it sort of -- then it's

8    kind of allocated into different cost centers based on the

9    type of work he's doing?

10          A    That's probably a fair statement, if I

11   understand what you are asking.  So the cost --

12          Q    Maybe you could put it in your own words so --

13          A    The costs kind of go into a pot to start with,

14   if you just kind of reviewed that.  So the costs

15   originally start off into a pot, and then based on the

16   expert -- the experts are actually out in the facilities.

17   I don't work on the Steelhead Platform, but based on the

18   guys who work out there, they'll determine how -- what

19   assets they are actually working on and give us those

20   percentage breakdowns.  Then we will allocate it to each

21   one of those cost centers:  Gas, oil, this cost center

22   that we are referring to in the lawsuit, and maybe a

23   genset or one or two cost centers.

24          At that point, they get there, they get to those cost

25   centers, and then -- those what we call the joint account

Exhibit 2
Page 14 of 38 Pages

Page 43

1      cost centers, and then they are billed -- our working

2      interest is billed to us where we get paid and then we

3      bill out on the joint interest billing system to our

4      partners, which would be Marathon and Forest Oil.

5           Q    Okay.  So there is something that's called a

6      joint interest cost center?

7           A    Yes, sir.

8           Q    Okay.  Would a cost center for the platform

9      foreman be a joint interest cost center or is there some

10     other terminology for that?

11          A    It's called a labor prorate.

12          Q    Okay.  With respect to -- let's just talk about

13     the joint interest cost center that's the subject of this

14     lawsuit.  I'm not getting into specific numbers.

15          A    Okay.

16          Q    It's generally known as a facility and crane

17     cost center?

18          A    Yeah.

19          Q    How would you refer to it?

20          A    I always called it the miscellaneous facility

21     and crane maintenance cost center.

22                    MR. JAMIESON:  Is that your shorthand for

23     it?

24     BY MR. WILHELM:

25          Q    So if we refer to it either as miscellaneous or

MARATHON OIL v. FOREST OIL                UNION OIL COMPANY OF CA
                                                    8/9/2007

Page 44

1    facility and crane, can we have an understanding we are

2    talking about that cost center?

3         A    Yes.

4         Q    So once the costs go to that cost center, there

5    is an allocation that's made between the oil owners and

6    the gas owners?

7         A    Yes, sir.

8         Q    And the methodology is what we are disputing in

9    this lawsuit.

10        A    I believe it is.

11        Q    Once it goes over to the oil owners, between the

12   two oil owners there is simply an allocation based on

13   their percentage of ownership, is that correct?

14        A    Once it goes to the oil owners?

15        Q    Yes.

16        A    Yes.

17        Q    Once a certain percentage is allocated to the

18   oil side --

19        A    And then certain goes to gas.

20        Q    -- it's divvied up between Unocal and Forest

21   based on the percentage ownership of the WIPAs or -- or of

22   the oil field assets?

23        A    Yes, sir.

24        Q    And same thing, once it goes -- once there has

25   been an allocation to the gas side as between Marathon and

Page 50

1    allocated to the oil side or gas side, it will be?

2         A    It will be to the best of the ability.  But then

3    you get into items like transportation costs, like, for

4    instance, you are bringing out -- for the shore-based

5    facility you are bringing out the helicopter.  It lands on

6    the pad.  Those individuals on that helicopter are getting

7    ready to jump off and start working on the Steelhead.  How

8    do you allocate them between gas and oil?  We really don't

9    know, so that cost will drop into this 100709 because they

10   are supporting both.

11        Q    And that's the helicopter transportation itself

12   you were just talking about?

13        A    Yes, sir.  Helicopter and boats is a similar

14   type issue.

15        Q    Helicopter transportation out of the platform

16   falls -- generally fall into this miscellaneous category?

17        A    Yes, sir.  And our -- our -- the people who do

18   the allocations out there, they do understand, though, if

19   they are bringing out a crew to go work on oil an well or

20   a gas well, they are supposed to allocate it to that AFE

21   directly.  But if they are just bringing -- doing a crew

22   change-out on the Steelhead Platform -- which would be

23   great if you guys made a trip to the Steelhead is -- when

24   you make the trip to the Steelhead, are you supporting oil

25   or are you supporting gas?  The person doing the

MARATHON OIL v. FOREST OIL                    UNION OIL COMPANY OF CA
                                                              8/9/2007

Page 51

1    allocation has absolutely no idea.

2          So this is where [sic] I think this whole dispute is

3    all about, how do you allocate those costs.  For a generic

4    person coming out there who is going to support both

5    assets, how do you allocate that.

6          Q    And in your opinion, it's probably unrealistic

7    and unfeasible to do it on a trip-by-trip or

8    person-by-person basis.

9          A    It would literally be impossible.

10         Q    So the idea is to come up with a fair and

11   equitable --

12         A    Yes.

13         Q    -- formula, in your view?

14         A    Yes, it is.  On the cost, like say when we start

15   bringing the drilling crews out or a facility engineering

16   group -- for instance, if we had a drilling crew coming

17   out to swap out an ESP like we had an ESP failure, 100

18   percent oil project; we will charge that helicopter or

19   boat trip to the oil owners.  But if you had just the

20   normal crew change-out because these guys are working

21   seven and seven, they support both.  So that

22   transportation cost will generally hit this miscellaneous

23   allocation cost center.

24         Q    Same thing, the catering costs for the platform

25   will hit this miscellaneous cost certify?

MARATHON OIL v. FOREST OIL                    UNION OIL COMPANY OF CA
                                                          8/9/2007

Page 52

1          A    Perfect example, because, you know, the food out

2    there, how do you divvy up that between the gas owners and

3    the oil owners.  Technically the food and the catering --

4    Eurest is the company that does our catering out there --

5    how do you divvy up that bill?  They are supporting both.

6          Q    Okay.

7          A    That's -- I believe it's E-U-R-E-S-T.

8               MR. WILHELM:  Let me hand you this as the

9    next exhibit.

10              (Exhibit No. 5 marked.)

11   BY MR. WILHELM:

12         Q    Okay.  I'm handing you what I understand to be a

13   runout of costs that were allocated to the miscellaneous

14   cost center.  I'm guessing it's for the year 2003.  And

15   when you -- and on the left side it says source cost

16   center.  You see that column on the left?

17         A    Yes, sir.  That's the 1007096 cost center.

18         Q    And that's the miscellaneous cost center we were

19   talking about?

20         A    Yes, sir.  This appears to be a JADE run that

21   our joint -- our joint interest audit group would have

22   provided probably to Marathon, I believe, during the audit

23   process.  I might have seen this in the past, but this

24   isn't my preferred method to display this type of data, so

25   I probably have never seen this before.

MARATHON OIL v. FOREST OIL                UNION OIL COMPANY OF CA
                                          8/9/2007

Page 53

1       Q    You are familiar with what a JADE run is in

2   general?

3       A    Yes, sir.

4       Q    And if you go -- looking at the vendors here,

5   does that appear to be the type of vendor invoices that

6   would be allocated to the miscellaneous cost center?

7       A    Vendor invoices, among other items.

8       Q    Okay.  Would you expect to see the costs from

9   the production foreman that are allocated to this cost

10  center somewhere on this list?

11      A    Yes, sir.  I could only speculate here, but

12  without having the details probably these entries right

13  here that just say JIB with no vendor name on it.  This

14  run right here has left out all the source code for the

15  journal entry, and they are missing a little bit of -- of

16  detail out here.  But probably these -- these sections

17  right in here where you see no vendor name right here

18  (indicating) that's where you would see the production

19  foreman, the utility man, the roustabout, the shore-based

20  facilities, among other things, that weren't -- any type

21  of costs that were not generated by a third-party invoice.

22      Q    Okay.  Let's just focus from your primary

23  third-party invoices.  There is a -- I'm looking for

24  anything that's above $10,000 and there is --

25      A    You have got an Ocean Marine.

MARATHON OIL v. FOREST OIL                    UNION OIL COMPANY OF CA
                                                        8/9/2007

Page 54

1        Q    What sort of service does Ocean Marine provide?

2        A    I could only guess, but I believe that is our

3    boat.  That's the contractor who handles all of our boat

4    services.

5        Q    When I see ESS Support Services, that's the

6    Eurest?

7        A    That's Eurest.

8        Q    And that's the catering?

9        A    Yes, sir.

10       Q    With respect to helicopter services, that would

11   be, for example, Era Aviation?

12       A    Yes, sir.

13       Q    So if I'm looking about --

14       A    Era Aviation.  And also you would have

15   miscellaneous costs between -- we lease a site over there

16   from Ocean Marine, also, or -- they are known by OSI.

17   There are a number of different companies over there.

18       Q    I'm looking at six or seven pages in.  There is

19   a charge from Era Aviation, which has a source amount of

20   about 26,700.

21       A    I see the 28,200 one.  I don't see that one.

22       Q    Which are page are you on?

23       A    One, two, three, four, five, sixth page back,

24   six up from the bottom or seven up from the bottom.

25       Q    Okay.  28,000.  Just to make sure I'm reading

Page 55

1    correctly, that would be the bill that came in from Era

2    Aviation with respect to trips that weren't specifically

3    allocated to oil or gas, for example, for crew

4    changeovers?

5        A    Yes, sir.  The bill from Era is much bigger than

6    this.  So the bill from Era could be upwards of 500-,

7    600-, $700,000.  Then what we would have done is allocated

8    it to each one of our facilities that benefited, and

9    ultimately what happened is the allocation procedure had

10   said 28,200.23 belonged to the Steelhead Platform for

11   miscellaneous costs, and that's what hit this.

12       Q    And then there is a destination -- next-to-last

13   column, there is a destination percentage.  You see that?

14       A    Yes, sir.

15       Q    And that destination -- that refers to the oil

16   versus gas percentage allocation?

17       A    Yes, sir.  That's the destination.  In this

18   case, we're doing a BOE equivalent.  92 percent of the

19   Steelhead Platform production for the previous years on a

20   BOE basis was 92 percent.

21       Q    So for that 28,200 of Era's charges that were

22   allocated to miscellaneous, about 25,900 was allocated to

23   the gas side?

24       A    Yes, sir.

25       Q    Okay.  And your understanding is that these Era

MARATHON OIL v. FOREST OIL                     UNION OIL COMPANY OF CA
                                               8/9/2007

Page 56

1    costs would relate for things such as crew changeovers?

2         A    Crew changeovers, yes, sir.

3         Q    Do you know what else might fall within the Era

4    bill that would go to this cost center?

5         A    Under the Era bills, that's the only thing I can

6    think of.  You might have the Eurest guys, for instance,

7    who were going out there and, you know, you have the

8    catering company that goes out there and provides the food

9    services out there, but anything that you couldn't

10   allocate for, like, a project team -- if you had a project

11   team going out there or, say, for instance, if I decided

12   to go out there, you wouldn't charge my bill to the

13   Steelhead Platform.  At least I would not hope.

14   Hopefully, it would hit my own accounting cost center

15   because why would I be -- I'm overheard.  I can't be

16   charged to the joint account.

17        So primarily I'd have to say on the 80/20 rule, I'm

18   probably fairly confident probably the -- 80 percent

19   confident that that bill would primarily be the crew

20   changeouts and the miscellaneous people who are not

21   project related.

22        Q    Going on to the next page, close to the top

23   there is Ocean Marine Services.  Do you see that?

24        A    Yes, sir.

25        Q    About $11,785?

Page 57

1          A   Yep.  Yes, sir.  OMSI, yes.

2          Q   What sorts of services does Ocean Marine

3     Services provide to the Steelhead Platform?

4          A   I'm pretty sure that's our boat.

5          Q   What does the boat do?

6          A   The boat -- shipping equipment, items that are

7     in bulk out to the platform.  That's the boat that goes

8     back and forth.

9          Q   Okay.

10                  MR. JAMIESON:  Groceries.

11                  THE WITNESS:  Anything you can't get on

12     the helicopter or you can't get out there safely on the

13     helicopter.

14     BY MR. WILHELM:

15          Q   Would go out on the boat?

16          A   The boat.

17          Q   If it was a trip for the boat that was solely

18     for bringing out equipment for the oil side, such as --

19     let's say there is one trip solely to bring out an

20     electric submersible pump, that would get allocated to the

21     oil side?

22          A   The thought process -- and I can't say that 100

23     percent of the time -- hopefully that would be picked up

24     in the audit process if that did not happen, but it should

25     hit in that case the ESP pump changeover AFE, which would

MARATHON OIL v. FOREST OIL                    UNION OIL COMPANY OF CA
                                                        8/9/2007

Page 58

1    be allocated to the oil owners.

2         Q    That would be the intent, anyway?

3         A    That is the intent.

4         Q    Same thing if it was a trip that went out, say,

5    solely with the replacement parts for the gas compressors.

6    That should go -- the intent is that that trip would get

7    allocated to a gas cost center --

8         A    Yes, sir.

9         Q    -- related to those compressors?

10        A    Yes, sir, directly 100 percent allocated to the

11   gas owners.

12        Q    And to the extent where trips can't be allocated

13   specifically to one project specifically, what would

14   happen is the boat trip would get allocated to this

15   miscellaneous cost center, is that correct?

16        A    Yes, sir.

17        Q    Okay.  Going down maybe ten lines, there are

18   some charges from an oil field service company Udelhoven.

19   Do you see that?

20        A    Yes, sir.

21        Q    What kind of work does Udelhoven do on the

22   Steelhead, if you know?

23        A    I'm going to go ahead and say I have absolutely

24   no idea what Udelhoven is doing out there.  They are an

25   oil field services company, so in this case I'd have

MARATHON OIL v. FOREST OIL                    UNION OIL COMPANY OF CA
                                                          8/9/2007

Page 59

1    absolutely no idea what they were doing.

2         Q    Okay.  Same thing if I see some invoices later

3    on from Peak Oilfield; do you know what they were doing

4    out there?

5         A    Peak is similar to Udelhoven.  That's a

6    miscellaneous contractor we use out there.  I assume it's

7    picking up a miscellaneous roustabout, welder, or

8    something like that.  Once again, without pulling off the

9    invoice and checking out the timesheet and what the person

10   was performing of the duties and services, I have no idea.

11        Q    Okay.  Food to feed the employees on the

12   platform, is that included in the ESS invoices, or does

13   that show up separately somewhere?

14        A    I believe it could be both.  You know, for

15   instance, you might see a Three Bears invoice or a

16   Carrs/Safeway invoice coming in here, too.  You might see

17   a number of those items.  I think it might be a little bit

18   of both where, you know, with -- with any field service

19   company -- and you can go back from an attorney the same

20   way an attorney would be is the last thing you want to do

21   is have that entity -- like if you are dealing with a

22   third party -- go out and buy the supplies directly

23   because then they charge a markup on top of that.  So what

24   you liken this is buying the food or the supplies directly

25   from the entity itself.  So if Eurest bought it, they

MARATHON OIL v. FOREST OIL

Page 60

1  would charge you a markup on top of what Carrs or --

2  because they are just going to go to Carrs and Safeway and

3  buy the stuff themselves.  So usually, I believe, they try

4  to avoid that.  But it could happen.  It could happen.

5      Q    From your experience in dealing with Steelhead

6  accounting issues, what other types of costs would fall

7  into this miscellaneous category?

8      A    Once again, I think the bulk of the costs that

9  were going into the miscellaneous category are the people.

10  It's people costs.  It's the people working on this.  And

11  you know, this is -- this little file of a breakdown which

12  kind of shows you salaries and wages and --

13              MR. JAMIESON:  Referring to Exhibit 4?

14              THE WITNESS:  4.  Sorry about that.  And

15  transportation represent the -- are your 800-pound gorilla

16  of the costs out there.  So for the most part, you have

17  people, the people based on the platform that support both

18  oil and gas, and you have transportation which, once

19  again, supports both oil and gas.  Then you are going to

20  have a whole bunch of different miscellaneous --

21  miscellaneous items as they order that support both oil

22  and gas.

23      And hopefully through the audit process, which I

24  know -- I'm -- I'm fairly confident with -- in my

25  recollection I didn't -- I didn't host the joint venture

                                                        Page 69
1    allocations between different cost centers for the

2    Steelhead Platform, whether it should go to -- to, say,

3    something that was oil only or oil and gas or any other

4    kind of cost allocation.

5             MR. JAMIESON:  So you are talking about

6    the decision of what cost is appropriate to which as

7    opposed to the physical act of making an accounting entry

8    in one or the other?

9             MR. WILHELM:  Right.  Or the supervision

10   of that.

11            MR. JAMIESON:  All right.

12   BY MR. WILHELM:

13       Q   Can you go ahead -- can you give an answer?

14       A   I'll do my best I can on this one.  Overall, the

15   system did the allocations.  At no point did we as the

16   accounting department ever make up the allocation

17   procedures.  We were usually receiving data from

18   operations who would tell us how to break up the costs.

19   And so, you know, they would tell us -- like, say, for the

20   production foreman -- I think I kind of gave that example.

21   The production foreman would say I'm spending 30 percent

22   of my time on the oil, 45 percent of my time on the gas,

23   and the remaining is going to the miscellaneous cost

24   center.  So that's how it would work.  He would give us

25   our input, and then we would process the transaction

MARATHON OIL v. FOREST OIL                UNION OIL COMPANY OF CA
                                                      8/9/2007

Page 117

1       Q    But we have talked about the formula that's

2   used.

3       A    Yes, yes.

4       Q    And we have talked about the basis and the

5   formula -- we haven't actually talked about the basis and

6   formula for allocating the nine percent oil, 91 percent to

7   gas.  Let's go there a little bit.

8       A    Okay.

9       Q    And the facility that -- was the allocation

10  methodology that was in place in 2001, what was that?

11      A    I believe it was a gross throughput percentage

12  based on the Steelhead Platform prior to 1/1 of '02.

13      Q    I've heard that called a total fluids

14  methodology.

15      A    Yes.  Yes, sir.  That would be your BOE

16  equivalent of gas, oil, and water.

17      Q    So gas would be allocated -- the BOE equivalent

18  of the gas that was produced --

19      A    Divide the MCF equivalent or 1,000,000 cubic

20  feet a day, divide that by six, and that created [sic]

21  into a BOE equivalent, and then add the oil and add the

22  water, and that's your number.

23              MR. JAMIESON:  Is that for a BOE or is

24  that for gross throughput?

25              THE WITNESS:  That would be -- well, you

MARATHON OIL v. FOREST OIL                UNION OIL COMPANY OF CA
                                                        8/9/2007

Page 118

1    still have to get the gas into a BOE equivalent in order

2    to get the gross throughput.  Gross throughput just

3    included water.

4    BY MR. WILHELM:

5        Q    Okay.  So the water that was produced in the oil

6    wells or gas wells was included in the formula for

7    dividing these costs?

8        A    Yes, sir.  Very little of the gas wells.

9        Q    And the oil comes primarily or almost totally

10   from the oil wells, is that your understanding?

11       A    You mean the water?

12       Q    The water.

13       A    Yes, sir.

14       Q    There was, then, a change in 2002 to a different

15   methodology, correct.

16       A    Yes, sir.

17       Q    What was that change?

18       A    That change we went into a BOE equivalent to

19   allocate cost center 1007096000 or, the miscellaneous

20   facility and crane maintenance cost center.

21       Q    So you took the BOE equivalent from gas and the

22   BOE from oil and compared them to come up with this --

23   this split between oil and gas?

24       A    Yes, sir.

25       Q    So if 91 percent of the BOE that's produced on

Page 119

1    the platform is gas, then gas would get 91 percent of the

2    costs in this cost center?

3         A    Of the miscellaneous costs on the Steelhead

4    Platform, yes, sir.

5         Q    Who was involved in the decision to make that

6    change in 2002?

7         A    First person who brought it to my attention

8    would have been Mr. Martin Morell.

9         Q    Why don't you walk me through the history on how

10   that change came about.

11              MR. JAMIESON:  You got a half an hour?

12              THE WITNESS:  You are going to need longer

13   than that, probably.  Okay.  Tell me when to stop at any

14   time.

15              MR. JAMIESON:  Stop.

16              THE WITNESS:  Back in January of 2000, I

17   was -- I was summoned to our operations manager, our

18   general manager's office to discuss myself transitioning

19   and taking over the accounting group.  I was assigned five

20   items to take a look at Trading Bay Unit.  One of the

21   items I was supposed to take a look at was how do you

22   allocate miscellaneous costs in Steelhead.  And the

23   individual I was talking about was Mr. Martin Morell.  I

24   was called in.

25        And what had happened at this point is that Martin

MARATHON OIL v. FOREST OIL                    UNION OIL COMPANY OF CA
                                                        8/9/2007

Page 120

1    was aware of the -- of the fair and equitable method of

2    how to allocate costs in the TBU Operating Agreement.  He

3    was also aware of what was written in the operating

4    agreement regarding the throughput basis.  However --

5    however, we were in the middle of starting to convert the

6    Steelhead platform to an all ESP platform.  And when this

7    would happen -- when this would happen, the ESPs would

8    start producing a whole lot more water than they had in

9    the past.  And if you use that method -- and the ESPs were

10   also going to be much more efficient and effective, but it

11   didn't make -- he didn't believe it was all that fair and

12   equitable that somebody who was investing tens of millions

13   of dollars in the platform to be more efficient and

14   effective would then basically be allocated more expenses.

15        Also on top of that was the fact that the water

16   wasn't really being processed at the platform.  It was

17   being processed at the on-shore facility which the oil

18   owners were paying for all of it.  So he asked me to take

19   a look into it because we were now having a -- call it a

20   paradigm shift.  We were having a shift in the facilities

21   out there and we were converting all of the oil wells from

22   gas lift on to ESPs.

23        Q    These factors you just talked about, are these

24   things that were actually discussed between you and

25   Mr. Morell at the time?

Page 150

1    be fair and equitable.

2        A    Fair and equitable, rational.

3        Q    Okay.  And when it says rational there, would

4    you agree that it has to be -- it's another way of saying

5    fair and equitable?

6        A    That's a fair statement.  I believe the way I

7    was always trained is as long as it's fair and rational

8    and easy to explain, you can do it.  That was always kind

9    of the basis of an allocation.

10       Q    Okay.  So the first word was fair?

11       A    Uh-huh.

12       Q    Second -- when you say it has to be rational,

13   what do you mean by that?

14       A    You want to be -- maybe that's kind of a cross

15   between fairness and the word rational is you have to have

16   some type of a basis to rationalize why you are using it.

17   You would have to have some type of a thought process out

18   there.  You just can't necessarily --

19       Q    You can't come up with something out of thin

20   air?

21       A    Yeah.  I couldn't allocate it, for instance, for

22   the number of trucks that are going to go across the

23   bridge out there in Anchorage because there is no -- there

24   is no rational reason for it in association to the

25   Steelhead, so --

                                                    Page 151

1          Q    Or whether the first of January falls on a

2    Tuesday or Wednesday?

3          A    Yes.

4          Q    It has to relate to the actual expenses that are

5    occurring on the platform?

6          A    Yes, sir.

7          Q    With respect to COPAS, it says here, "COPAS

8    recognizes several different methodologies."

9          A    Uh-huh.

10         Q    Based on your knowledge of COPAS, when we

11   discussed COPAS earlier today, we seem to think that the

12   COPAS guidelines really didn't talk about methodologies?

13         A    No, I don't -- you know, I've never really

14   thought of that until you asked me that question today.

15   And I'd have to go back through and read the Exhibit C to

16   see if it actually does.  But I can't remember something

17   in there that says, hey, this is how you are going to go

18   out and allocate costs.  Really what that's telling you is

19   how do you allocate direct and indirect costs and

20   overhead, material and supplies and inventory, but not how

21   do you allocate between various owners of the property.

22   That's the -- I -- it might be in there; I just don't

23   remember it right now.

24         Q    Okay.  At least as you sit here today you can't

25   think of any --

Page 173

1              (Exhibit No. 15 marked.)

2              MR. WILHELM:  We are getting -- I'll be

3    done by 4:30, at the latest.  If anybody needs a break,

4    let me know; otherwise, I'll just go on through.

5              THE WITNESS:  No problem.  Take your time.

6              MR. JAMIESON:  No problem.

7    BY MR. WILHELM:

8         Q    Exhibit 15.

9         A    Here is a letter I referred to earlier.

10        Q    It's a letter you wrote, correct?

11        A    And -- yes.  Not sent to partners.  This was the

12   letter I was told not to send.

13        Q    The letter you were told not to send?

14        A    Yes, sir.

15        Q    But you sent it?

16        A    I don't know how you got this.

17        Q    Okay.  Actually, there is a note that says, "Not

18   sent to partners."

19        A    That is my writing.

20        Q    That's your writing?

21        A    This is the premanagement letter, not sent to

22   partners.

23        Q    So it's something that you wrote, but --

24             MR. JAMIESON:  Yes, it's not privileged.

25   BY MR. WILHELM:

MARATHON OIL v. FOREST OIL                UNION OIL COMPANY OF CA
                                                      8/9/2007

Page 174

1        Q   But your understanding is this wasn't sent out?

2        A   It was not sent out.  I was told not to send it.

3        Q   Okay.

4            MR. JAMIESON:  If you would have said per

5    legal team, I would have held it.

6            THE WITNESS:  No.  Once again -- and it

7    was in my previous testimony here today when the

8    conversation was between Mr. Mark Bond who was our

9    in-house counsel was present during some of the

10   conversations -- but once again, it was Mr. Chuck Pierce.

11   And Mr. Chuck Pierce, who was our VP, was in communication

12   with Mr. Leonard Gurule and Mr. John Barnes, and it was

13   his understanding this was really an issue between Forest

14   and Marathon and they were attempting to settle this issue

15   without our input, so there was no reason to send this

16   letter.

17       Q   One of the things you put down in this letter

18   was that there appears to be no right or wrong approach.

19   Do you see that in the third paragraph?

20       A   Yes.  Where are you at?

21       Q   Third paragraph.  "When reviewing the

22   correctness of either methodology, there appears to be no

23   right or wrong approach."

24       A   Yep, you are correct.

25       Q   You wrote that, correct?

Page 177

1    parties were arguing the opposite side.

2        Q    Unocal is the umpire calling the balls and the

3    strikes?

4        A    Yeah.  You know, and the irony behind all this

5    is the last conversation we just had is that Mr. Leonard

6    Gurule, in his -- his agreement to settle that, he was not

7    happy about it, and obviously Marathon wasn't happy about

8    it, either.  So in this case neither party was happy about

9    the end result about what happened.  So --

10       Q    Then going on to the fourth paragraph of this

11   letter, you go on to say, "Certainly, this being a

12   gas-oriented platform, a significant portion of the charge

13   distribution should reflect that reality."

14       A    Yes, sir, and I've stated that multiple times

15   during this --

16       Q    So certainly in your mind a basis for changing

17   the allocation from total fluids to BOE, one justification

18   was that this was a gas-oriented platform?

19       A    Absolutely.

20       Q    Okay.  Then you go on to say, "On the other

21   hand, oil may require a disproportionate amount of effort

22   and staffing and operating activity," correct?

23       A    Yes, sir.

24       Q    So when you talk about disproportionate, that

25   means disproportionate in amount -- in proportion to the

MARATHON OIL v. FOREST OIL                UNION OIL COMPANY OF CA
                                                       8/9/2007

Page 178

1    amount of energy being produced or dis --

2         A    I think that -- I believe that what you are

3    referring to there is how much on disproportionate is

4    regarding to how much work either party is doing on either

5    gas versus oil.  I think that's what we are trying to

6    refer to there.

7         Q    So that oil requires effort and staffing beyond

8    what would strictly be suggested by BOE production?

9         A    That could be the case in this case.

10        Q    Was there something else you were referring to

11   besides that?

12        A    Can't remember at the time.  Can't remember.

13   I'd have to go back and kind of think about this for a

14   while, what I was thinking on that sentence.

15        Q    And then in the next paragraph you talk about

16   the -- about the, "primacy of gas production."  Correct?

17        A    Uh-huh.  And I already mentioned that today

18   during today's conversation.

19        Q    Again, so the fact that with respect to -- BOE

20   output solely is far more BOE -- there is for more gas

21   production than oil production, and that was correct?

22        A    There is --

23        Q    BOE gas -- from the gas production is far

24   greater than the BOE from the oil production?

25        A    On a BOE basis.  That's somewhat of a

Exhibit  2
Page  38  of 38  Pages