THIRD SUPPLEMENTAL AGREEMENT

TO

UNIT OPERATING AGREEMENT

TRADING BAY UNIT

COOK INLET, ALASKA

THIS AGREEMENT is entered into as of the 1st day of June, 1994, by and between UNION OIL COMPANY OF CALIFORNIA, a California corporation, and MARATHON OIL COMPANY, an Ohio corporation;

W I T N E S S E T H :

THAT WHEREAS, the Parties hereto as Working Interest Owners have executed or ratified an agreement, as amended, entitled "Unit Agreement For The Development and Operation of the Trading Bay Unit Area, State of Alaska" ("Unit Agreement") and an agreement, as amended, entitled "Unit Operating Agreement, Trading Bay Unit, Cook Inlet, Alaska" ("Operating Agreement"); and

WHEREAS, Section 16.3 of the Operating Agreement provides that upon use of a well, platform, or production facility (including a pipeline) for other than that upon which ownership thereof is based, a fair and equitable apportionment of risks and liabilities, investment, and operating and other costs shall be made; and

WHEREAS, the Parties hereto have executed as of August 27, 1967, an agreement entitled "First Supplemental Agreement To Unit Operating Agreement, Trading Bay Unit, Cook Inlet, Alaska" ("First Supplemental Agreement") providing for the use of wells whose primary objective is the Hemlock zone for concurrent exploration of

Exhibit 6
Page 1 of 10 Pages

other zones or Pools, and providing for the use of drilling slots on the three platforms which have been constructed for and are owned by the Parties on the basis of their respective BPI in the Hemlock WIPA, for the exploration, development and production of gas from the Unit Area; and

WHEREAS, the Parties hereto have entered into as of May 26, 1969, an agreement entitled "Second Supplemental Agreement to Unit Operating Agreement, Trading Bay Unit, Cook Inlet, Alaska" ("Second Supplemental Agreement"); and

WHEREAS, the Parties hereto desire to make provision for the future use or purchase of drilling slots and other facilities owned by the Parties on the Steelhead Platform for the development of Pools and zones other than the Grayling Gas Sands WIPA;

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, it is agreed as follows:

I.  **Definitions**.  The definitions contained in the Unit Agreement and the Operating Agreement are adopted for all purposes of this Third Supplemental Agreement. This Third Supplemental Agreement shall not be deemed to alter or revise the terms or provisions of said Unit Agreement, Operating Agreement, First Supplemental Agreement, or Second Supplemental Agreement.

The term "Steelhead owners" means those Parties which own the particular facility or portion thereof to be sold or rented to another Party pursuant to the terms and conditions of this Third Supplemental Agreement. In some cases, "Steelhead owners" means the owners of Grayling Gas Sands WIPA facilities; in other cases,

"Steelhead owners" means the owners of G-Zone WIPA facilities or West Foreland WIPA facilities.

II. <u>Applicable Facilities</u>. This Third Supplemental Agreement shall apply only to the following categories of Steelhead Platform facilities, or portions thereof, which are determined by the owners thereof to be either "Permanently Surplus" and are therefore available for purchase, or "Temporarily Surplus" and are therefore available for use on the rental basis herein provided, by a Party or Parties for the development of a Pool or zone other than the Grayling Gas Sands WIPA, and for the purpose of this Third Supplemental Agreement only the following categories are deemed to be "facilities", to-wit: A. Drilling Slots, B. Platform Production Facilities, C. Water Injection Facilities, D. Gas Compression Facilities, and E. Pipelines.

III. <u>Purchase of Permanently Surplus Facilities</u>

A. <u>Basis of Purchase of Drilling Slots</u>. The Parties electing to purchase a drilling slot which is determined to be Permanently Surplus by the Steelhead owners shall pay to the Steelhead owners, on the basis of the Parties' respective interests, a sum of money equal to the total Cost, not including operating expenses, of the Steelhead Platform, including rig up and rig down and all Steelhead Platform support systems and facilities (but excluding facilities categorized under B, C, D, and E in Paragraph II), divided by thirty-six (36). The purchasing Parties shall upon payment thereof own an undivided interest in the Steelhead Platform in said proportion and shall own such slot.

B.  **Share**.  As used in this Paragraph III, a "share" is that percentage of capacity of a facility which percentage has been determined to be Permanently Surplus and which percentage or portion thereof is elected to be purchased hereunder. The "capacity" of a facility shall be determined solely by the owners of such facility.

C.  **Basis of Purchase of Other Facilities**.  The owners of facilities on the Steelhead Platform may determine that a facility (other than a drilling slot) has Permanently Surplus capacity and upon such determination a Party may elect to purchase such Permanently Surplus capacity, or portion thereof, on the following basis:

1.  **Platform Production Facilities**.  For each share to be purchased, the purchasing Parties shall pay to the owners thereof a sum of money equal to the total Cost, not including operating expenses, of the platform production facilities determined to have Permanently Surplus capacity multiplied by such share. The purchasing Parties shall upon payment thereof own an undivided interest in such production facilities equal to the percentage purchased.

2.  **Water Injection Facilities**.  For each share to be purchased, the purchase and ownership of water injection facilities determined to have Permanently Surplus capacity shall be on the same basis, mutatis mutandis, as the basis set forth in Paragraph III C 1.

-4-

3. **Gas Compression Facilities.** For each share to be purchased, the purchase and ownership of gas compression facilities determined to have Permanently Surplus capacity shall be on the same basis, mutatis mutandis, as the basis set forth in Paragraph III C 1.

4. **Pipelines.** For each share to be purchased, the purchase and ownership of pipelines determined to have Permanently Surplus capacity shall be on the same basis, mutatis mutandis, as the basis set forth in Paragraph III C 1.

D. **Space.** The Parties purchasing a Permanently Surplus facility or a portion thereof shall have the right to use such facility in conjunction with all other owners of the facility. Capacity, including any Permanently Surplus, shall be shared and owned by the respective WIPA's in accordance with the proportionate ownership of the WIPA in each particular facility and such capacity so owned by a WIPA shall not be sold or disposed of without the approval of that WIPA.

If such a facility is owned by two or more WIPA's, each WIPA has the right to sell all or a portion of its individual interest therein.

E. **Additions to Facilities.** Provided the WIPA owners have determined that space for installation of additions to existing facilities exists, additions to any existing facility may be made by any Party or WIPA at the sole cost, risk, and expense of such Party or WIPA, as the case may be; however, the Cost, risk and expense of any such addition to such

-5-

facility which benefits such Party and any such WIPA shall be borne in the proportion that the interest of each participating Party in such addition bears to the total interest of all participating Parties. Any Party or WIPA, as the case may be, not so participating in the cost of such addition shall not have the right to use such addition.

F. <u>Withdrawal and Abandonment</u>. Any Party owning a facility or portion thereof or any WIPA may withdraw from further participation in the use, maintenance and operation of such facility by giving the other Parties or WIPA's, as the case may be, 30 days' written notice of its intention so to do and thereby be relieved of any further obligation hereunder with respect to such facility, except for costs or liabilities incurred or accruing prior to the effective date of such withdrawal and except for the cost of abandoning the facility upon the abandonment thereof. The withdrawing Party shall have no further voice in determining any action to be taken in connection with the facility from the date of withdrawal to final abandonment of the facility. Contributions to the total investment account by such withdrawing Party shall remain in the total investment account until abandonment of the facility, at which time any net credits resulting from the salvage of material in the facility shall be apportioned between the Parties on a basis proportionate to the contribution made by each to the total investment account. The costs of abandoning the facility shall be paid by the

Parties in the same proportions that they are entitled to share in the salvage of materials therefrom.

IV. <u>Rental of Temporarily Surplus Facilities</u>.

    A. <u>Extent of Use</u>. Temporarily Surplus facilities may be used for producing, treating, transporting, processing and storing of fluids from any and all zones within the Unit Area.

    B. <u>Quarterly Review</u>. Such usage of Temporarily Surplus facilities shall be subject to quarterly review and approval by the Steelhead owners on a calendar quarter basis in conjunction with the forecast of Available Production.

    C. <u>Compensation</u>. For each unit of volume of total fluids (i.e., MCF or BBLs.) produced or transported or handled through or by means of a Temporarily Surplus facility during a month, the Parties so using such Temporarily Surplus facility shall pay to the owners thereof a sum equal to the proportion that such renting Party's volume of fluids produced or transported or handled through or by means of such Temporarily Surplus facility during such month bears to the total volume of fluids produced or transported or handled through or by means of such Temporarily Surplus facility during such month multiplied by a fraction having as its numerator the total investment in such facility and having as its denominator the figure "180".

    D. <u>Rental Credit</u>. In the event a Party utilizes Temporarily Surplus facilities hereunder and subsequently purchases such facilities or a portion thereof pursuant to Paragraph III hereof, such Party may deduct from the purchase

price any and all sums paid under this Paragraph IV for such facilities or a portion thereof, as the case may be, so purchased; provided, however, that in the event the owners of a facility give written notice to a Party or WIPA then renting such facility or a portion thereof, as the case may be, that the owners of the facility have determined such facility or portion thereof, as the case may be, Permanently Surplus and that the owners of the facility desire to sell same to such renting Party or WIPA on the applicable basis as provided in Paragraph III hereof, then such renting Party or WIPA shall have ninety (90) days following receipt of such notice to elect to purchase such facility or portion thereof, as the case may be, on such applicable basis, and if such renting Party or WIPA does not elect so to purchase such facility or portion thereof, as the case may be, then such Party or WIPA shall thereupon forfeit and waive the right to make any deduction whatsoever in the event of a later purchase of such rented facility or portion thereof, as the case may be, which such Party or WIPA would otherwise be entitled to make pursuant to this Paragraph IV.

V.   <u>Purchase or Rental of Facility Gives No Control Over Other Facilities</u>.  The purchase hereunder of a Permanently Surplus facility or rental hereunder of a Temporarily Surplus facility by a Party or WIPA shall not affect the interest of any Party in any other WIPA in such facility or any other facility insofar as the right to use or determine the use of such facility or such other facility is concerned.

VI. <u>Operating Expenses</u>.  Operating expenses of a facility shall be borne and paid on a through-put basis, <u>i.e.</u>, each owning or renting Party or WIPA, as the case may be, shall bear and pay monthly the proportion of such operating expenses which the total volume of fluids produced or transported or handled through or by means of such facility bears to the total volume of all such fluids produced or transported or handled through or by means of such facility by all Parties or WIPA's, as the case may be.  Each Party and WIPA jointly using any such facility shall be responsible for the proper determination of through-put by measuring production and/or injection in a manner acceptable to the State of Alaska.

VII. <u>Risks and Liabilities</u>.  All Costs, risks and liabilities incurred as the result of the development of Pools and zones other than the Grayling Gas Sands WIPA not covered by existing insurance carried in connection with unit operations shall be borne by the Parties in proportion to their respective obligations for the Costs of such operations, and such Parties hereby agree to indemnify and hold harmless the Steelhead owners and any other Parties against any and all loss or damage or claims or demands for loss or damage which may arise from such development of such Pools and zones.  All Costs, risks and liabilities incurred by the Steelhead owners as the result of the development of the Grayling Gas Sands WIPA not covered by existing insurance carried in connection with unit operations shall be borne by the Steelhead owners on the basis of the ownership (as of December 31, 1993) of the Steelhead Platform, and the Steelhead owners hereby agree to indemnify and hold harmless the other Parties against any and all loss or damage or

-9-

claims or demands for loss or damage which may arise from such development of the Grayling Gas Sands WIPA.

VIII. **Accounting**. The Sub-Operator shall invoice the Parties on a monthly basis for all payments, operating expenses and other charges coming due hereunder. All costs and expenses chargeable under this Third Supplemental Agreement shall be charged on the cost and expense basis provided for in Exhibit "C", Accounting Procedure, to the Operating Agreement; provided, however, that if there is any conflict between this agreement and said Exhibit "C", this agreement shall govern.

IN WITNESS WHEREOF, the Parties hereto have caused this Third Supplemental Agreement to be executed as of the date first herein written.

UNION OIL COMPANY OF CALIFORNIA

By _____

Its Attorney-in-Fact

MARATHON OIL COMPANY

By _____

Its Production Manager

h:\wp\94exp7\mh202.bgp

-10-     3RD SUPP. to TBUOA

Exhibit L
Page 10 of 10 Pages