## AGREEMENT RE: FUEL GAS

This Agreement is entered into this 27th day of November, 1996, by and between Union Oil Company

of California, a California corporation (herein "Unocal"), and Marathon Oil Company, an Ohio

corporation (herein "Marathon"). Unocal and Marathon are collectively referred to herein as the

"Parties" and sometimes individually as a "Party".

WHEREAS, ARCO Alaska, Inc. ("ARCO") and Marathon Oil Company entered into that certain

Agreement dated May 3, 1984 ("the 1984 Agreement");

WHEREAS, Section 2.3 of the 1984 Agreement provides, in relevant part, as follows:

> ARCO is a Working Interest Owner in the TBU Oil WIPAs. To continue oil production,
> each of the Working Interest Owners must supply its share of the necessary fuel gas. Each
> Working Interest Owner's share of the fuel gas requirement in excess of its share of produced
> casinghead gas is defined herein as Excess Fuel Gas. On ARCO's behalf and for ARCO's
> account to the TBU Oil WIPAs, Marathon agrees, commencing May 8, 1984, to supply in
> kind ARCO's Excess Fuel Gas required to continue production of oil from the TBU Oil
> WIPAs. ARCO shall not sell and shall make available to the TBU Oil WIPAs its working
> interest share of produced casinghead gas;

and

WHEREAS, Unocal and Marathon entered into that certain letter agreement dated December 27,

1988 ("the 1988 Letter Agreement"), which, inter alia, referenced the rights and/or obligations of

Marathon pursuant to Section 2.3 of the 1984 Agreement; and

AGREEMENT RE: FUEL GAS - Page 1

Exhibit 7
Page 1 of 10 Pages

WHEREAS, pursuant to that certain Exchange Agreement by and among ARCO Alaska, Inc. and Union Oil Company of California dated October 14, 1992 but effective as of December 15, 1992 (the "1992 Exchange Agreement"),  Unocal succeeded to certain rights and obligations of ARCO Alaska, Inc. pursuant to the 1984 Agreement; and

WHEREAS, a dispute has arisen between Unocal and Marathon respecting whether Section 2.3 of the 1984 Agreement continued in effect after the effective date of the 1992 Exchange Agreement; and

WHEREAS, Unocal and Marathon have disputed the amount by which Unocal has overlifted its share of gas produced from the Grayling Gas Sands ("GGS") WIPA of the Trading Bay Unit ("TBU") and the corresponding amount by which Marathon has overlifted its share of such GGS WIPA production; and

WHEREAS, Unocal and Marathon have disputed the methodology for accounting for fuel gas consumed for the TBU oil WIPA's, the Trading Bay Production Facility ("TBPF"), and the Trading Bay Field ("TBF"); and

WHEREAS, Unocal and Marathon desire to compromise and settle the claims respecting (i) the amount by which Unocal has overlifted its share of GGS WIPA production and by which Marathon has underlifted its share of GGS WIPA production as of December 1, 1996,  (ii) the proper

Exhibit 7
Page 2 of 10 Pages

methodology for accounting for fuel gas consumed at the TBU, the TBPF and the TBF, and (iii)

whether Section 2.3 of the 1984 Agreement continued in effect on and after December 15, 1992;

NOW, THEREFORE, in order to fully and finally compromise and settle certain claims and disputes

and in consideration of the mutual covenants, agreements and representations set forth herein, the

Parties agree as follows:

1.      As of December 1, 1996, Unocal will have overlifted its share of GGS WIPA production by

        fourteen billion (14,000,000,000) standard cubic feet of gas and that Marathon will have

        underlifted its share of GGS WIPA production by an identical amount.

2.      Marathon's obligations, if any, for all periods of time on and after December 15, 1992,

        pursuant to Section 2.3 of the 1984 Agreement, as such obligations may have been affected

        by the 1988 Letter Agreement and the 1992 Exchange Agreement, are forever extinguished

        by the crediting to Unocal's account, and debiting to Marathon's account, of four billion, nine

        hundred and nine million (4,909,000,000) standard cubic feet of gas under the terms of the

        Trading Bay Unit Grayling Gas Sands Gas Balancing Agreement and the Trading Bay Unit

        Joint Operating Agreement (the "Gas Balancing Provisions"). Therefore, after such crediting

        and debiting have occurred, the Parties' records will be adjusted to reflect their agreement

        that, as December 1, 1996, Unocal will have overlifted its share of GGS WIPA production

        by a total of nine billion and ninety-one million (9,091,000,000) standard cubic feet of gas and

AGREEMENT RE: FUEL GAS - Page 3

Exhibit 7
Page 3 of 10 Pages

that Marathon will have underlifted its share of GGS WIPA production by an identical amount.

3.    Effective as December 1, 1996, the fuel gas obligations of the TBU Hemlock WIPA working interest owners will reflect their proportionate TBU Hemlock WIPA ownership percentages. Currently, these percentages are 56.05% for Unocal and 43.95% for Marathon.

4.    Effective as of December 1, 1996, Unocal and Marathon will employ the accounting provisions set forth in Attachment "A", which is attached hereto and incorporated by reference.

5.    In consideration of the provisions of this Agreement, Unocal and Marathon, for themselves and their respective successors, heirs and assigns, do each hereby fully release, discharge and forever acquit each other and their respective parents, subsidiaries, affiliates, predecessors, successors, related entities and assigns, as well as their respective past and present officers, directors, employees, agents and attorneys, from any and all claims, demands, causes of action, obligations, offsets, rights and/or liabilities of any nature, whether anticipated or unanticipated, known or unknown, past or present, contingent or fixed, in connection with the claims and disputes respecting (i) the GGS volumes overlifted by Unocal and underlifted by Marathon as of December 1, 1996, (ii) the accounting methodology for TBU, TBPF and TBF fuel gas allocations prior to December 1, 1996 and (iii) Marathon's obligations, if any, pursuant to Section 2.3 of the 1984 Agreement after the effective date of the Exchange Agreement.

6.    This Agreement and the releases, consideration, and other terms provided for herein are made, executed, given and accepted as part of a compromise and settlement of disputed

AGREEMENT RE: FUEL GAS - Page 4

Exhibit 7

Page 4 of 10 Pages

claims. No provision of this Agreement, nor any acceptance of the benefits hereof by or on behalf of either of the Parties hereto, shall be construed or deemed to be evidence of an admission of any fact, matter, thing or liability of any kind to the other Party. Each of the Parties hereto denies any liability of any kind to the other Party for any purpose, and this settlement is made solely and entirely as a compromise and for the purpose of fully and finally resolving the dispute matters referred to herein. Neither this Agreement nor any term hereof shall be offered or received as evidence in any proceeding in any form as an admission of any liability on the part of either of the Parties hereto or by their respective officers, directors, employees, or agents.

7.    This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective representatives, successors and assigns.

8.    This Agreement shall be governed by and construed in accordance with the substantive law of the State of Alaska.

9.    This Agreement constitutes the entire agreement between Unocal and Marathon with respect to the subject matter hereof, and supersedes all prior oral or written agreements, commitments or understandings with respect thereto. No amendment of this Agreement shall be binding on the Parties unless in writing and signed by the authorized representatives of both Parties hereto. Any waiver of any breach or any term or condition of this Agreement shall not operate as a waiver of any other breach of such term or condition or of any other term or condition of this Agreement.

10.    In the event that any one or more of the provisions of this Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement.

Exhibit 7
Page 5 of 10 Pages

11.     Each Party has reviewed this Agreement and understands the contents thereof. Each Party has been represented by counsel of its own selection and has received independent legal advice from attorneys of its choice with respect to the advisability of making the settlement and release provided herein and of executing this Agreement.


IN WITNESS WHEREOF, the Parties have executed this Agreement this 27th day of November, 1996.


UNION OIL COMPANY                          MARATHON OIL COMPANY
   OF CALIFORNIA

By: _____                By: _____
      Kevin A. Tabler                                David T. Perkins
      Attorney-In-Fact                               Alaska Region Manager

Exhibit___7___
Page___6___of__10__ Pages

THIS UNITED STATE OF AMERICA   )

                                   )     ss.

STATE OF <u>ALASKA</u>              )

This certifies that on the ___ day of ___ , 1996, before me, a notary public in and for the state of <u>Alaska</u>, duly commissioned and sworn, personally appeared <u>Kevin A. Tabler, Attorney-in-Fact for Union Oil Company of California</u>, to me known and known to me to be the person described in, and who executed the foregoing assignment, who then after being duly sworn according to law, acknowledged to me under oath that he executed same freely and voluntarily for the uses and purposes therein mentioned. Witness my hand and official seal the day and year in this certificate first above written.

Notary Public

My Commission expires ___

THIS UNITED STATE OF AMERICA   )

                                   )     ss.

STATE OF <u>ALASKA</u>             )

This certifies that on the ___ day of ___ , 1996, before me, a notary public in and for the state of <u>Alaska</u>, duly commissioned and sworn, personally appeared <u>DAVID T. PERKINS</u>, to me known and known to me to be the person described in, and who executed the foregoing assignment, who then after being duly sworn according to law, acknowledged to me under oath that he executed same freely and voluntarily for the uses and purposes therein mentioned. Witness my hand and official seal the day and year in this certificate first above written.

Notary Public

My Commission expires ___

AGREEMENT RE: FUEL GAS - Page 7

Exhibit 7

Page 7 of 10 Pages

ATTACHMENT "A"

TRADING BAY UNIT
FUEL GAS ACCOUNTING AND ALLOCATION METHODOLOGY
AGREEMENT RE: FUEL GAS
Dated November 27, 1996

1.  Each month, casinghead gas produced and consumed at each platform will be allocated back to each oil Working Interest Participating Area (WIPA) at that platform based upon the prior month's total fluids allocation (TFA). Allocations will be based upon that platform's total casinghead gas consumed, not upon the total casinghead gas produced. If an individual platform's casinghead gas exceeds the platform fuel requirements and the excess gas is used at Trading Bay Production Facility (TBPF), it will be allocated per paragraph # 2 below.

2.  All TBPF fuel (including crude oil vapor's (COV's) recovered at TBPF, any excess casinghead gas that is not consumed on the platform at which it is produced, and any Grayling Gas Sands (GGS)gas consumed for fuel) will be allocated back to each platform based upon each platform's prior month's total fluids

    TBPF fuel will be allocated among each of the oil WIPA's of the Trading Bay Unit (TBU) and Trading Bay Field (TBF). At present, there will be no TBPF fuel allocation to the GGS WIPA since there is no fuel consumption at TBPF that supports the GGS gas production and sales activities (ie-- currently there are no onshore compression facilities, line heaters, or gas processing).

    Allocations of TBPF fuel to the TBF must be recorded as a sale on the TBPF allocation report and on the AOGCC Producer's Report of Gas Disposition (Form 10-422).

3.  Fuel gas required for any non-consent well shall be allocated 100% to the consenting party only, based upon the given well's total fluid production as a percentage of total platform fluid production. Such allocation shall be made for the duration of the non-consent penalty period as defined in the Trading Bay Unit Joint Operating Agreement (JOA) or the TBF Joint Operating Agreement, as applicable. Such allocations shall be performed in the case of any non-consent well work on any platform which results in a non-consent penalty as defined in the applicable JOA.

    A special calculation must be performed for any and all special agreements between the parties which result in differences to the working interest percentage of ownership, costs, or revenues than would normally apply to any WIPA of the TBU or to the TBF. Any required accounting corrections will be made retroactive to the date of the beginning of the non-consent penalty, or to the date of any special agreement.

4.  GGS gas consumed as fuel on the platforms will be allocated to the WIPA for which it was used on a platform basis. All fuel consumed on a given platform will be charged to that platform. If an individual platform's GGS fuel production exceeds the platform requirements

Exhibit___7____

Page____8_of_10___Pages

and the excess gas is used at TBPF, it is allocated per paragraph # 2. Allocations to each platform will be based upon the total fuel consumed on each platform, not upon the total fuel produced.

Allocations to the oil WIPA's of the TBU and TBF, on each platform, will include:

(a)    all casinghead gas and COV's produced and consumed as fuel and flare on that platform.

(b)    all GGS gas produced and consumed as fuel and flare on that platform.

(c)    all casinghead gas, COV's, and GGS gas delivered for use by an oil WIPA on that platform from TBPF.

(d)    all casinghead gas, COV's and GGS gas consumed as fuel and flare at TBPF allocated per #2 above.

5.    Casinghead gas and all COV's at TBPF will be excluded when calculating and reporting volumes of fuel to be allocated between GGS owners for the purpose of the GGS gas balancing statement. The GGS gas balancing statement will include only volumes of GGS gas produced and consumed or transported to market. Casinghead gas and COV's are not GGS sourced.

6.    Individual platform allocations will be established and documented for fuel and flare to ensure that the oil WIPA's and gas WIPA's are charged properly. This " individual platform allocation" is intended to properly split fuel and flare between oil and gas owners. Such allocation is required to ensure that any portion of the GGS production that is consumed as fuel or flare in support of any oil WIPA is charged to the appropriate oil WIPA. An individual platform allocation will be required for each platform that produces and sells both oil and gas. Each individual platform allocation will be reviewed annually by the Operator and adjusted as necessary.

7.    On a monthly basis, Operator will provide calculations and/or spreadsheets which are utilized for all fuel, flare, COV, and casinghead gas allocations, by facility, by WIPA. The intent of this requirement is to promote open exchange of information and allow for early identification of any potential problems or errors. Any discrepancies will be promptly reported to the Operator.

8.    Prior month production will be used as the basis for current month fuel allocation.

9.    Any future proposed changes to fuel and flare allocation methods must be documented and mutually agreed upon by the parties prior to implementation by the operator.

Exhibit  7
Page_____ of /0 ___ Pages




L. C. Ihde

11/25/96





Overlift.xls

# UNOCAL GGS OVERLIFT

CUMULATIVE BCF

NOTE: Imbalance volume on 12/1/96 adjusted to 9.091 BCF in negotiated Hemlock fuel gas settlement, 11/25/96.

Includes 755,115 MCF addition to UOC overlift equal to 110% of Unocal's CLU imbalance, transferred 12/94; and 700,000 MCF addition to imbalance equal to SRF settlement on 4/95.

Exhibit ___7___
Page ___10___ of ___10___ Pages