

OGC CONSULTING
P.O. Box 130116
The Woodlands, TX 77393-0116
Ph: (936) 321-9431
Fax: (936) 321-3061
E-Mail: HBlunk@OgcConsulting.com

May 25, 2006

**Expert Report of Howard G. Blunk**
Case No: 3AN-05-09399 CI
**Superior Court for the State of Alaska**
**Third Judicial District at Anchorage**

**Nabors Alaska Drilling, Inc v. Forest Oil Corporation**

Introduction

I was retained by Nabors Alaska Drilling, Inc. (Nabors) to perform an analysis of two Alaska Drilling Contracts entered into with Forcenergy Inc. during 2000 which were later assumed by Forest Oil Corporation (Forest), and examine the provisions contained in these contracts which are subject to this litigation. I have been asked to provide opinions on the application and interpretation of the agreement provisions pertaining to the accounting for, as well as the billing, payment, and adjustment of drilling costs associated with the operations governed by these agreements. I have also been asked to provide opinions on the proper application and interpretation of the agreement provisions regarding audit rights and the performance of audits conducted by Forest, including the validity and appropriate resolution of any claims arising from Forest's audit of drilling costs incurred under these agreements. My opinions reflect my experience working with the various contracts used in the Oil and Gas Industry including the model form agreements published by the American Petroleum Institute (API), the American Association of Professional Landmen (AAPL), the International Association of Drilling Contractors (IADC), and related model form accounting procedures, related model form interpretations, and accounting guidelines published by the Council of Petroleum Accountants Societies (COPAS).

My focus was to evaluate Forest's payment practices and audit claims at issue in this litigation against COPAS and industry standards, customs, and practices, and to evaluate opinions offered by any experts retained by Forest in this case. This includes a determination of the validity of any exception amounts lodged as audit claims by the Defendants in this case, as well as appropriate audit procedures and resolution methods to be employed. A resume outlining my experience and qualifications as an expert in the area of Oil and Gas agreements and related accounting/auditing provisions, including the application of any COPAS interpretations and guidelines regarding such agreements, is attached as Exhibit A to this report. Included in that exhibit is a listing of the other cases where I have provided expert support, as is a listing of all publications I have authored in the past ten years. My compensation is $200 per hour plus actual expenses.

Materials Considered

A listing of the materials I have reviewed is attached to my report as Exhibit B. I reserve the right to supplement my report if I am asked to examine additional material pertinent to the issues in this case, including any expert reports or testimony given by Forest's experts.

Background

Nabors is an established drilling contractor with clients worldwide, including the Alaskan oil and gas fields. Forest is an operator of oil and gas wells in a variety of producing basins, including the Cook Inlet area of Alaska where Forest engaged Nabors to perform drilling services in 2000. The two contracts subject to this dispute are known as the Osprey Contract which was entered into effective March 7, 2000 for the purpose of drilling up to five wells for Forest, and the Rig 160 Contract which was entered into effective May 2, 2000 for the purpose of drilling one or more wells for Forest.

In late 2003 Forest conducted an audit of billings submitted by Nabors during the period January 2001 through December 2002 for drilling services performed under the terms of the subject drilling contracts. Forest issued their Audit Report on February 24, 2004, which contained ten (10) exceptions totaling $1,046,169.71. On April 12, 2004 Nabors advised Forest that work had commenced to research each of the audit exceptions, and on August 16, 2004 Nabors issued its formal Audit Response to each of the exceptions accepting $98,895.26, and denying $953,274.45.

While the Forest audit was being conducted, drilling operations under the subject contracts were in the process of being completed. Nabors issued its final three invoices, totaling $1,119,177.71, in December 2003 and January 2004. Forest withheld payment for these invoices (12229, 12288, and 12293, dated December 17, 2003, January 15, 2004 and January 16, 2004, respectively), and the invoices remain unpaid. Nabors attempted on several occasions to determine why payment had been withheld, and by letter dated June 2, 2004 formally notified Forest of the outstanding invoices, seeking assistance to close out the account which by then was nearly 150 days past due.

On January 27, 2005 Forest issued a formal rebuttal to the Nabors August 16, 2004 Audit Response agreeing with the denial of $46,993.61 of the amounts originally taken exception to, and requested that credit memos be issued for the remaining $906,280.84 representing amounts for the three (3) of the original ten (10) exceptions Forest still considered to be open. No mention is made in the January 27, 2005 Forest reply of the $1,119,177.71 being held by Forest. On May 9, 2005 Forest sent a letter to Nabors offering to pay Nabors $320,000 in settlement of both the outstanding invoices and the exceptions still considered open by Forest, In July of 2005, Nabors filed its original complaint to the Court which initiated this litigation.

In total, ten (10) audit exceptions were presented in Forest's Audit Report. Nabors agreed to grant full or partial credit for all but two (2) of the exceptions. Forest agreed with the Nabors response except for two exceptions dealing with Obnoxious Fluid Bonus Pay (exceptions 3 and 8), and the charging of Overtime Pay During Safety Meetings (exception 9). The disputed amounts are $11,646.85, $134,770.77, and $759,863.22 respectively.

Agreements

While the starting point in determining billing and payment obligations and audit rights under a Model Form Drilling Contract such as those published by the IADC is the base agreement itself, particular attention must be given by accountants and auditors to the contract exhibits commonly attached to and made part of these agreements. Examples include what are generally known as the Drilling Order, Special Rates, and Rig Inventory exhibits. The Drilling Contract provides general terms and conditions under which services are to be provided as well as general invoicing and payment requirements. The Drilling Order, Special Rates, and Rig Inventory exhibits contain the specific drilling procedures to be followed, rates to be charged and the terms and conditions under which these rates can be charged, as well as what equipment is to be provided. The Drilling

Contracts at issue in this case are not model form agreements, but do follow industry convention in that each contain Drilling Order, Special Rates, and Rig Inventory exhibits which provide the detailed rates and costs for each activity involved in the drilling operation.

The Osprey Contract contains several provisions related to billings and payments which are relevant to this case in determining how to apply the accounting for and the auditing against this agreement.

- Regarding Invoicing and Payments, Article 7.5 of the Osprey Contract states *"In the event Company disputes one or more items in an invoice, Company shall, within four (4) business days of receipt of such invoice notify Contractor of the item or items under dispute and the reasons therefor. Payment of any such items may be withheld by Company (without accruing interest thereon) until settlement of the dispute."*

- Regarding rates charged, Article 3.0 of the Osprey Contract states *"As sole consideration for all work performed, services rendered, Rig Mobilization, and demobilization of the rig and material, equipment, supplies, and personnel furnished by Contractor during the performance hereof, Company agrees to pay Contractor those sums computed at the applicable respective rates and fees as specified in Exhibits A and B hereof."*

- Regarding Audit Rights, Article 8.1 of the Osprey Contract states *"Contractor shall maintain a complete, correct and confidential set of records and accounts pertaining to all aspects of the Contract including the performance hereof by Contractor and its subcontractors."*

- Article 8.1 further states *"All amounts paid for Contractor's services are subject to justification and audit during the course of the Contract and up to twenty-four (24) months subsequent to the end of the calendar year in which the final invoice was paid. During the time period mentioned above, Company shall have the right to inspect and audit the records and accounts of contractor for all activities related to the performance of the contract. Company's claims for errors may be presented to Contractor anytime within the time mentioned above."*

- Regarding resolution of Audit Exceptions, Article 8.2 of the Osprey Contract states *"In the event that any such audit(s) reveals any discrepancy or error, a written response to Company's claim shall be made by Contractor as soon as practical, but in no event later than sixty (60) days from the date that contractor receives written notification of such claims. Any payment determined to be due either Company or Contractor will be promptly paid by the Party from whom payment is due."*

- The only other Audit Provision contained in the Osprey Contract is Article 8.3 which states *"A breach of the Contract will be deemed to have occurred ( and the appropriate statute of limitations period shall be to run) on the sixtieth (60th) day after Contractors receives written notification of Company's claim, unless Contractor has either made any payment due to Company or has responded to Company's satisfaction."*

- Regarding Obnoxious Fluids Bonus Pay ($1.50/hr/man), which involves two (2) of the three (3) audit exceptions Forest still considers to be open, Exhibit B (Special Rates) of the Osprey Contract states *"This bonus is not included in the day rates or the Hourly Rates and is charged to Company only if experienced. When the Contractor's employees*

*are required to work with such obnoxious fluids (as defined by the API) as directed by the Company, only those employee(s) directly affected shall receive a bonus per hour for the total shift worked. Such bonus shall be inclusive of any Contractor-incurred additional cost to cover payroll burden and benefits associated with said bonus. Company shall not be charged nor will Company pay any charges for administrative overhead in such cases."*

- Regarding Safety Meetings, the subject of the other audit exception Forest still considers to be open, Article 9.6.6 of the Osprey Contract states *"Contractor shall inform Company in writing of any unique hazards that may be encountered in performing the work hereunder. Contractor shall take all reasonable precautions necessary to protect Contractor's personnel, the employees of Company and any other persons who are at any time directly or indirectly affected by the operations of Contractor."*

- Also regarding Safety Meetings Article 9.6.7 of the Osprey Contract states *"Contractor shall comply with and be responsible for the enforcement of Company's safety rules and regulations including, but not limited to, the Facility Policies and Procedures Manual, and the Safety Handbook of Production Operations. Company's safety rules and regulations are subject to change upon notice. Contractor shall enforce strict discipline to ensure compliance as aforesaid."*

- Further as to Safety Meetings, Article 9.6.8 of the Osprey Contract states *"Contractor further agrees to comply with and cause Contractor's Personnel to comply with any and all local state, and federal safety and health laws, rules, regulations, and guidelines. Additionally, Contractor shall cooperate fully and comply with any directions from Company's Representative(s) or a regulatory authority."*

The Rig 160 Contract contains the same provisions cited above.

COPAS Model Forms, Interpretations, and Guidelines

COPAS is the recognized authority in the highly specialized field of accounting and auditing for oil and gas operations in the United States. I am familiar with and knowledgeable of the various accounting procedures, interpretations, and accounting guidelines published by COPAS. These publications are designed to aid accountants and auditors in accounting for, interpreting and auditing against a variety of oil and gas operations. The various accounting procedures issued by COPAS over the years pertaining to joint interest operations have influenced the design of many other contracts used in the oil and gas industry. The various COPAS publications, which include nearly 80 different interpretations and accounting guidelines, address specific issues and topic areas arising from difficulties and/or controversies in the oil and gas industry, including the handling of protested billings, payment terms and requirements, and the conduct of audits all of which are the subject of this dispute. One such publication is COPAS Accounting Guideline (AG) 9, *Guidelines for Contractor Audits in the Petroleum Industry.* Not only do these COPAS publications provide guidance to oil and gas accountants and auditors, but are reflective of the commonly accepted accounting and auditing practices used in the United States, and provide evidence of industry customs and standards.

Issues and Opinions

Nabors filed suit in this case over the non-payment of $1,119,177.71, representing the final three invoices submitted for drilling services provided under the Osprey and Rig 160 contracts. Nabors

argues that none of the individual charges contained in the three invoices in question were ever disputed as provided for in the payment provisions contained in these contracts. Nabors also takes issue with the three audit exceptions that Forest still considers open and appears to believe the demand for credit contained in Forest's January 27, 2005 rebuttal is not supportable and inappropriate. Nabors has expressed the position that Forest improperly withheld payment of the final three invoices for the purpose of leveraging settlement of the audit exceptions in its favor.

It appears Forest believes audit exceptions reflect funds not properly invoiced by Nabors and which Forest should not have paid to Nabors. It further appears that Forest believes any audit exceptions regarding funds previously paid by Forest can be used to effectively satisfy later charges properly owed by Forest to Nabors. This appears to be based on Forest's belief that its audit exceptions are correct and supportable under the terms of the agreement, and by the information provided in their February 24, 2004 Audit Report and January 27, 2005 rebuttal. The documents I have reviewed do not provide any reasoning from Forest as to any contract provision which supports this position.

It is my opinion that Forest improperly withheld payment of the final three invoices submitted by Nabors for services provided under the Osprey and Rig 160 Drilling Contracts. These contracts do allow for protesting specific charges for specific reasons and withholding payment for these disputed amounts, but only if Forest were to notify Nabors it was protesting a specific charge(s) within four days of receipt. It does not appear Forest has ever taken the position that the three unpaid invoices contained any charges they believed were inappropriate, If Forest believed these final three invoices contained inappropriate charges, the correct accounting treatment would have been to so notify Nabors, which it did not. Further, it is my opinion that audit exceptions by themselves do not represent amounts improperly billed and improperly paid, audit exceptions simply represent the expression of a questioned charge which requires cooperative research by both parties to an audit to resolve. Withholding funds because there are open audit exceptions is not an audit resolution methodology provided for in the subject Drilling Contracts, and not reflective of COPAS guidelines, or industry customs, practices, or standards.

In addition, it is my opinion that audits conducted in the oil and gas industry, regardless of the type of contract, are intended to be both a compliance review and a curative review that is to be conducted in a cooperative fashion for the sole purpose of making the accounts correct. They are not to be used for any other purpose such as negotiating tools to mitigate the final billings under a contract. In my opinion, the internal Forest documents provided for my review indicate the audit was used as a device by Forest to negotiate a reduction, or discount, in charges it had previously paid to Nabors. Finally, it is also my opinion that the three audit exceptions Forest still considers open are not supportable under the terms of the subject drilling contracts, the reasoning used by Forest, or reflective of the nature of the operations in question. These open exceptions appear to simply be the expression of opinions by auditors who to my knowledge never visited or observed the drilling operations in question, or provided any facts to dispute the operational and contractual appropriateness of how Nabors conducted these drilling operations. The amounts already granted by Nabors in response to the audit, $98,895.26, represent the appropriate resolution amount due as a result of the audit. In my opinion, the audit exceptions considered open by Forest, and the audit itself, should be considered closed with no further amounts due Forest.

My detailed opinions, and the bases for those opinions, are set forth further in the discussions below.

Do the Drilling Contracts allow Forest to withhold funds from undisputed invoices ? - **No**

Neither the Osprey nor the Rig 160 Drilling Contract provide for the withholding of funds as a means to resolve audit exceptions. While these contracts do call for timely response to audit exceptions, they contemplate the usual industry custom of parties working together to resolve discrepancies. In addition, none of the audit exceptions deal with charges contained in the three invoices Forest withheld payment on, the exceptions considered open by Forest deal with charges incurred and paid between one and two years earlier and are contained in invoices subject to the 2001-2002 audit period. There is simply no accounting or audit relationship between the funds being withheld, and the prior period charges questioned by Forest.

Did Forest ever notify Nabors of any disputed amounts on the final three Drilling invoices ? - **No**

The Osprey and Rig 160 Drilling Contracts require notification of any disputed charge within four days of the receipt of an invoice. Forest has produced no evidence of any correspondence that any single charge contained in the three unpaid invoices was ever disputed by Forest. In fact, Forest internal e-mail indicates the invoices were likely correct (See Bates - FOC/Nabors 00154), that Forest as late as March of 2004 was discussing internally whether Forest had made any notification to Nabors regarding the unpaid invoices from December of 2003 and January of 2004 (See Bates – FOC/Nabors 01454), and that even before the invoices were received, Forest was planning to withhold payment (See Bates – FOC/Nabors 01462). The contracts are clear on the proper procedure to dispute charges, Forest never disputed these invoices in question, and show through their own internal correspondence they had no intention other than to withhold payment on current invoices for audit claims from prior periods, claims for which an audit report had not yet even been issued to Nabors.

Did Forest personnel agree the Drilling Contracts allowed withholding these funds ? - **No**

Documents produced by Forest in fact show that the Vice President of Drilling for Forest, stated in a December 11, 2003 e-mail *"We are "maybe" looking at the last days of Nabors 429 on the Osprey Platform. What is the status of the audit and should we start holding invoices? The de-mob is covered under the contract with a "turnkey" cost of around $850,000. I'm not sure if the monies could be held as part of our audit claim?"* (See Bates – FOC/Nabors 01462).

Did Forest wait to issue its Audit Report before withholding payment to Nabors ? – **No**

The unpaid invoices are dated December 17, 2003, January 15, 2004 and January 16, 2004. The Forest Audit Report is dated February 24, 2004. Even if the subject contracts were to allow for the withholding of funds for open audit exceptions, no exceptions had been issued at the time Forest choose to withhold payment. As a result, Nabors was not even given an opportunity to resolve any potential disputes before the monies were withheld. In fact, other internal Forest correspondence, in addition to the e-mail cited immediately above, shows Forest was planning to withhold payment even before the Audit Report was issued. These include comments from a December 10, 2003 e-mail which stated *"How do you want to proceed on the audit claims? Hold invoices?"* (See Bates - FOC/Nabors 00168), and a January 29, 2004 e-mail which stated *"I understand from Cecil that you are holding over $1 million in audit exceptions on Nabors Alaska. I wanted to let you know that we have two more invoices in the "Hold" bin down here that total another $1.8 million, which can be sent to accounting whenever you or Cecil wish to do so."* (See Bates - FOC/Nabors 01458).

Do COPAS Guidelines support withholding funds to resolve Audit Exceptions ? - **No**

No single COPAS model form, interpretation, or accounting guideline recommends or supports this practice, including COPAS AG-9 which specifically addresses audits of service contractors. The reason for this is that most audit exceptions require cooperative research to confirm the validity an exception, or provide support of a denial. This is the nature of auditing in the oil and gas industry, many claims are dropped along the way, both during the audit (assuming the auditors follow the accepted best practice and courtesy of providing draft exceptions to facilitate early review), or during the resolution process as the parties exchange information and engage in a dialogue to discuss the issues surrounding each exception. It does not appear Forest ever attempted to do either, and simply chose to withhold funds based on un-tested, un-validated audit exceptions.

Did Forest provide any factual evidence to support their Obnoxious Fluids exceptions ? - **No**

There were two such claims lodged by Forest. The first, exception # 3, took issue with the fact this bonus was being paid during time the rig crews were engaged in safety meetings away from the rig itself. Nabors agreed to this exception in part, but also noted that Forest had provided a calculation schedule that contained an erroneous assumption. The January 27, 2005 Rebuttal issued by Forest fails to address this fact and contains an assumption that such billings continued, which has not been established by Forest. Lacking any further information from Forest, the balance of this exception is appropriately denied.

The essence of the larger of the two Obnoxious Fluids Bonus Pay exceptions (number 8, valued at $134,770.77) is that the Forest auditors took the position that some members of the rig crew would not be exposed to Obnoxious Fluids during operations. There is no evidence the Forest auditors ever visited the rig to observe conditions on the platforms, or made written inquiry to determine who, if any, on the rig/platform would not be exposed when such fluids are being used. Lacking any factual argument as to how the Forest auditors concluded that any of Nabor's rig crew members would not be "directly affected" by the use of such fluids, it is difficult as an auditor to understand the basis for Forest to lodge such a claim. I would also note "directly affected" is not a defined term in these agreements, this term is used elsewhere in the contracts, and does not appear to take on any special meaning. My experience in auditing drilling contractors and auditing rig invoices during joint interest audits is that when such fluids are in use, all crew members receive these bonuses, and these charges are routinely accepted in industry. It is a known and commonly understood operational and practical matter that when such fluids are being used these fluids impact everyone on the rig. Standard audit tests of these type of charges usually center on how many hours such bonuses are paid and whether these hours conform to information on the daily drilling reports and rig tour sheets, and are not intended to be an expression of operational "opinions" for which the auditors are generally not in a position to express.

The audit exceptions lodged by Forest are unique, not common in the industry, and appear to presume that an auditor in an administrative office has some better operational knowledge than the workers conducting the physical operation. My experience is that charging of such bonuses is driven by an operational and practical reality of how work is conducted on a drilling rig. It is possible that internal Forest correspondence can explain how the Forest auditors choose to take such a position since on October 8, 2003, more than four months before the Audit report was issued, Forest's Vice-President of Drilling sent an e-mail to Forest's Director of Joint Venture Audit which states" *"How do you feel about asking Nabors to give us back the monies, since inception, for "safety/tour meetings" overtime and for the over bill for "obnoxious" fluids? I*

*agree we probably will not get anything without going to court, however I'd like to hit them hard then scream and yell."* (See Bates - FOC/Nabors 01463).

This exception is appropriately denied by Nabors.

<u>Did Forest ever dispute any invoices containing Obnoxious Fluid Bonus pay ? -</u> **No**

Evidence provided shows that in fact Forest routinely paid for these charges which were clearly identified on the invoices, which were submitted by Nabors and paid by Forest between one and two years prior to audit, for the 2001 -2002 period.

<u>Are charges for routine Rig Crew Safety meetings barred under the Drilling Contracts ? –</u> **No**

In fact, the Drilling Contracts require Nabors to operate in a manner that complies with safety requirements of both Forest and Nabors, as well as any regulatory agency with oversight of drilling operations in Alaska. From an accounting and auditing perspective it is a known and accepted industry custom and practice to hold routine safety meetings for rig crews before they begin their shift, or "Tour", and for drilling contractors to bill and for operators of oil and gas properties to pay for such meetings. Such charges are common and accepted and not the subject of audit exceptions, unless the time expended has been incorrectly calculated. It has also been my experience that even if an operator were to refuse payment for pre-tour time devoted to safety meetings, the operator would pay for this time anyway through lost drilling time expended to conduct such meetings which are a simple operating and safety necessity given the hazardous nature of well drilling operations. Further, from a practical standpoint lost drilling rig time is far more costly than the labor cost expended to conduct such meetings. This exception is not supportable contractually, through accepted industry custom and practice, or logically.

<u>Did Forest dispute any invoices for routine Rig Crew Safety meetings ? -</u> **No**

Forest presented exception number 9, in the amount of $759,863.22, for labor costs incurred to conduct routine pre-tour safety meetings. Evidence provided shows that in fact Forest routinely paid for these charges which were clearly identified on the invoices from inception of the drilling operations through October 5, 2003. Evidence provided also shows that Forest did notify Nabors that effective at midnight on October 5, 2003 it would no longer pay for such meetings. However, this was a prospective change to billing and payment practices instructed by Forest, and not a notification of any demand for a retroactive adjustment to billing and payment practices (See – Bates PLTF-00141). The audit exception lodged by Forest fails to acknowledge that Nabors ceased billing for pre-tour safety after the instructions from Forest. These claims deal only with costs incurred before October 5, 2003. This audit exception is not supportable by the known accounting for, and billing and payment of pre-tour safety meetings conducted before October 5, 2003. In addition, it appears from internal correspondence that Forest has failed to recognize their instruction caused Forest to likely incur more, not less overall cost.

<u>Did Forest follow accepted industry custom and practice in conducting the audit ? -</u> **No**

Audit findings can result in claims for credit, or additional charges to an account. The audit is to be performed objectively, and findings should be issued without regard to the potential impact on any particular party to the contract. The audit is an opportunity for the service contractor and operator to work together to validate the accounting for the drilling operation. The audit can be a vehicle to highlight concerns and work toward resolution on both a past and prospective basis. The proper conduct of an audit is totally dependent on cooperation and mutual respect by all of

· 8

the parties involved. The proper conduct of an audit is not to be prejudiced by preconceived notions of overpayment or decisions made in advance of the audit to take exception to billing practices, after-the-fact, that had been previously accepted by Forest during the performance of the contracts subject to this litigation (See again Bates - FOC/Nabors 01463).

<u>Is Forest due any additional amounts arising from the audit of Nabors ? - **No**</u>

The original justifications for audit exceptions 3, 8, and 9 were not supportable under the applicable terms of the Drilling Contracts, or by any operational facts, and do not conform to accepted industry customs, practices, or standards. As discussed above, the January 27, 2005 Rebuttal issued by Forest provides no new information or contractual/factual arguments to support the three exceptions Forest still considers open.

<u>Other Issues</u>

My work on this matter is continuing, I have been advised that I may be asked to provide my opinion on other issues as additional information/documents are provided by Forest, including any possible expert reports prepared on behalf of Forest, during the course of my engagement. I reserve the right to amend my report to address any such issues as they arise.

Respectfully,

*[signature: Howard G. Blunk]*

Howard G. Blunk

**HOWARD G. BLUNK**
P.O. Box 130116
The Woodlands, Texas 77393-0116
Ph: (936) 321-9431 Fax: (936) 321-3061
E-mail: HBlunk@OgcConsulting.com

**Professional Objective:**

To provide quality accounting/audit services focusing on the full range of Oil and Gas Contract negotiations, analysis and development of overhead recovery rates, compliance reviews, and dispute resolution.

**Oil and Gas Accounting/Auditing Experience:**

Over thirty years of experience in Oil and Gas Accounting and Auditing, over twenty-seven of those years in supervisory or management positions involving all aspects of Exploration, Land and Producing activities. Highlights are provided below:

OGC Consulting (The Woodlands, Texas) – Founder/Owner

Provides a variety of accounting/audit services focusing on the full range of Oil and Gas Contract negotiations, analysis and development of overhead recovery rates, compliance reviews, and dispute resolution. Client base includes both operators and non-operators, and purchasers and sellers of oil and gas production. Primary emphasis is on joint venture agreements and related COPAS Accounting procedures, interpretations and guidelines; has personally helped develop many of their publications. Is currently a member of the COPAS Board of Directors, is also a past Audit Committee Chair for COPAS, and has also chaired their Emerging Issues and Internal Review Sub-Committees. Has made a number of presentations to industry groups including COPAS, the American Association of Professional Landmen (AAPL), and the American Petroleum Institute (API) on joint venture auditing, and oil and gas contract activities. Also spoken at several universities on oil and gas auditing, and made presentations at various industry "education days". Course instructor for the Professional Development Institute at the University of North Texas (PDI), and author of the course book used in PDI's National Accounting and Auditing School for Joint Interest Operations.

Chevron Corporation (Houston, Texas) - Manager, Non-Operated Joint Ventures
Responsibilities included development and execution of annual audit plan for Chevron's non-operated properties in the United States and Canada. Managed a twelve person staff that generated annual claims of $8-10 million, achieving a 75 percent recovery rate.

Chevron Corporation (London, England) - Assistant Manager, Middle East and Africa
Oversaw full range of audit department activities including internal controls, joint venture agreements, and contractor/vendor reviews. Responsibilities involved all company activities (Upstream, Downstream, and Chemicals) in the host countries.

Chevron Corporation (Two Locations) - Regional Audit Supervisor
Annual planning and staff supervision for all Upstream audit activities including internal control audits, joint ventures, and contractor/vendors in Denver, Colorado and then in Houston, Texas after the Chevron merger with Gulf Oil.

Chevron U.S.A Inc (Concord, California) –Supervisor, Central Region Gas Accounting
Responsible for volume determination, well allocations, and application of gas pricing regulations, to perform the monthly accounting for all gas production and gas plant operations for one of three Business Units in the company.

Chevron U.S.A, Inc. (La Habra, California) - Division Accounting Specialist
Served as Finance Department liaison to the Production Staff in Division Headquarters. Provided on-sight accounting support to resolve discrepancies in production, operating cost, and project reporting. Also served as on-sight advisor and trainer for the Division.

Chevron U.S.A, Inc. (Walnut Creek, California) – Production Accountant
Gathering, recording, and development of monthly accounting entries to recognize gas and oil production income, royalty and tax obligations, and prepare monthly local, state, and federal regulatory reports. Also responsible for monthly revenue recognition of company owned pipelines, calculations of loss allowance, preparation of invoice for pipeline movements in accordance with published tariffs.

Chevron Oil Company - Western Division. (Denver Colorado) – Production Accountant
Gathering, recording, and development of monthly accounting entries to recognize gas and oil production income, royalty and tax obligations, and prepare monthly local, state, and federal regulatory reports. Also responsible for monthly revenue recognition of company owned pipelines, calculations of loss allowance, preparation of invoice for pipeline movements in accordance with published tariffs.

Petro-Search Corporation (Denver Colorado) – Tax Intern
Preparation of Partner Tax Returns associated with interests in Limited Partnerships for Oil and Gas Drilling and Production activities. Responsible to assemble relevant revenue and expenditure data in order to perform profit and loss calculations, identification of tangible and intangible drilling costs, and determination of partner share in accordance with the underlying agreements.

**Professional Associations:**
Petroleum Accountants Society of Houston (PASH):
Audit Committee Chair – 1997-1998
Board of Directors – 1996 and 1999 to 2002
Secretary – 1999-2000
Treasurer – 2000-2001
Society President – 2001-2002

Council of Petroleum Accountants Societies (COPAS):
Internal Review Sub-Committee Chair – 1994-1995
Emerging Issues Sub-Committee Chair – 1995-1998
Audit Committee Chair – 1999 – 2001
Board of Directors – 2003 to present
Treasurer – 2003
Vice-President – 2004
President – 2005
Ex-Officio - 2006

**Education:**
Western State College of Colorado, Gunnison, Colorado
BA in Political Science with minor in English
Colorado Teaching Certificate
Graduated: December, 1972