Daniel T. Quinn (8211141)
Marc G. Wilhelm (8406054)
RICHMOND & QUINN, PC
360 "K" Street, Suite 200
Anchorage, Alaska 99501
Ph:  (907) 276-5727
Fax: (907) 276-2953

Attorneys for Plaintiff Marathon Oil Company

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MARATHON OIL COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>FOREST OIL CORPORATION: PACIFIC<br>ENERGY ALASKA OPERATING LLC,<br>UNION OIL COMPANY OF<br>CALIFORNIA, d/b/a UNOCAL<br>ALASKA,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 3:06-cv-00102 TMB<br>) |

## AFFIDAVIT OF W. PATRICK MARTINDALE

| | |
|---|---|
| STATE OF OKLAHOMA | ) |
| | ) ss. |
| OKLAHOMA COUNTY | ) |

I, W. PATRICK MARTINDALE, being first duly sworn upon oath, depose and state as follows:

1. I have been retained by Plaintiff Marathon Oil Company in this litigation. I have personal knowledge of the facts herein stated.

Exhibit 15
Page 1 of 19 Pages

2.    My   expert   report   stating   my   opinions   and qualifications   is   attached   to   this   Affidavit   as   Exhibit   1. Exhibit   1   is   a   true   and   accurate   copy   of   my   report   in   this matter.

3.    The   opinions   in   the   expert   report   are   my opinions   in   this   matter,   and   I   incorporate   the   report   by reference in this affidavit.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

W.  PATRICK MARTINDALE

SUBSCRIBED and SWORN TO before me this _15_ day of _July_, 2008.

_____
Notary Public in and for Oklahoma
My Commission Expires: _9/2/09_
# 04008005

**AFFIDAVIT OF W. PATRICK MARTINDALE**
MARATHON v. FOREST OIL, ET AL., CASE NO. 3:06-cv-00102 TMB
PAGE 2

Exhibit _15_
Page_ _2_ of _19_ Pages

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically served this _____ day of July, 2008 to:

Robert K. Stewart, Jr.
DAVIS WRIGHT TREMAINE LLP
701 W. 8th Ave., Ste. 800
Anchorage, Alaska 99501

Marc D. Bond
UNION OIL CO. OF CALIFORNIA
909 W. 9th Avenue
Anchorage, Alaska 99501-3339

Jeffrey M. Feldman
R. Scott Taylor
FELDMAN ORLANSKY & SANDERS
500 L Street, Suite 400
Anchorage, Alaska 99501

Brewster H. Jamieson
LANE POWELL
301 W. Northern Lights Blvd.,
Ste. 301
Anchorage, Alaska 99503

_____ s/ Marc G. Wilhelm _____
RICHMOND & QUINN

644\046\Pld\Affidavit of Wayman Gore

Exhibit _15_
Page _3_ of _19_ Pages



Martindale Consultants. Inc.

April 4, 2008

Marc G. Wilhelm, Esq.
Richmond & Quinn
360 K Street, Suite 200
Anchorage, AK 99501-2038

      RE:    Marathon Oil Co. v. Unocal and Forest Oil
             Case No. 3:06-cv-00102-TMB
             Expert Report of W. Patrick Martindale

Dear Mr. Wilhelm:

On behalf of Plaintiff Marathon Oil Company (Marathon), you asked me to review and respond to claims raised by Marathon and responded to by Unocal and Forest Oil (Forest) in this matter. Attached to this report is a listing of the specific documents I reviewed in connection with my work.

Background

Marathon and Unocal jointly constructed the Steelhead Platform in the Cook Inlet of Alaska and have used the platform to support their operations. Both oil wells and gas wells have been drilled and are producing from the platform. In 1996, Marathon sold its interests in the oil leases underlying the Steelhead Platform to Forcenergy, Inc, predecessor in interest to Forest Oil. Unocal owns approximately 53% and Forest Oil 47% in the oil leases; Unocal owns approximately 49% and Marathon 51% in the natural gas leases serviced by the Steelhead Platform. Unocal operates the platform, incurs all costs and bills the non-operating working interest owners an allocated share of all costs.

There were five oil wells and two associated water injection wells and 13 gas wells in operation during the period from 2002 through 2007.

Corporate Office  •  4242 N. Meridian  •  Oklahoma City, OK 73112
(405) 728-3003  •  solutions@marticons.com

Oklahoma City, OK • Lafayette, LA • Houston, TX • Dallas, TX • Bartlesville, OK

Exhibit 15
Page 4 of 19 Pages

From 1996 through 2001, certain common costs for the Steelhead Platform were allocated between the oil and gas leases based on the relative ratio of total fluids. Certain costs that related directly to operations of the oil leases and directly to operations of the gas leases were accumulated into cost centers by Unocal that were charged to the oil leases or the gas leases accordingly. However, costs such as labor, transportation, catering and other costs which could not be attributed solely or primarily to either oil or to gas operations were accumulated and allocated on the basis of total fluids produced. To accomplish this, gas production was converted to its barrel of oil energy equivalent. Thus, the liquid equivalent of gas plus any water produced from the gas leases was compared to oil and water produced by the oil leases and a ratio developed which was then applied to those accumulated platform costs common to both the oil or gas wells.

Beginning in 2002, Unocal began allocating the common costs on the basis of Barrel of Oil Equivalent (BOE) which does not consider the water volume produced from each formation. This change took place after Unocal installed several electronic submersible pumps (ESPs) on the oil wells, which resulted in increased oil and water production. The effect of this change in allocation methodology was to significantly increase the amount of common costs that were allocated to the gas leases and reduce the amount of common costs allocated to the oil leases. In 2006, Unocal changed the allocation method to a hybrid method of using well count and BOE.

It is this change of allocation methodology of the Steelhead Platform common costs and its effect on charges billed to the oil leases versus the gas leases that is at issue in this case.

Review and Opinion

While the parties bring up many points and counterpoints in their complaints and answers, I focused my review on two primary questions. First, does the method of allocation in question provide an appropriate allocation of costs that meets the requirements of the governing agreement and industry practice? Secondly, should Unocal have both noticed and obtained approval from Marathon when changing their allocation methodology?

## Appropriateness of Allocation Methodologies

The Council of Petroleum Accountants Societies (COPAS) provides guidelines and interpretations relative to the Accounting Procedure model forms, such as the Accounting Procedure attached to the Unit Operating Agreement governing the activities of Steelhead Platform and the associated oil and gas leases. COPAS addresses the issue of allocations in more than one publication but has included a "Litmus Test for Allocation Methodologies" in Model Form Interpretation 46 – Shorebase Facilities and Offshore Staging Areas (MFI 46). MFI 46, which was approved by COPAS in April 2000 and remains the current guideline on the subject as of the date of this report, states:

> To aid an Operator or Non-Operator in determining whether the allocation method is acceptable, the following litmus test should be applied in which **all of the following four questions must be answered in the affirmative:**
>
> **Litmus Test for Allocation Methodologies**
>
> A. Does the allocation method reflect the operational dynamics in place during the allocation period?
> B. Is the allocation method reviewed periodically with operations personnel?
> C. Is the allocation method equitable over the audit period?
> D. Is the allocation method systematically and consistently applied?

I applied these questions to the situation described in the case at hand, with the following results:

A. <u>Does the allocation method reflect the operational dynamics in place during the allocation period?</u>

The only change in operational dynamics that coincided with the change in allocation methodology was the installation of the ESPs on the oil leases and the resultant increase in oil and water production associated with those leases. The change in methodology resulted in a 91% allocation of costs to the gas leases and an 9% allocation to the oil leases. Since the costs in questions are not those that are easily assigned solely to oil or gas operations but are common to both, an allocation methodology that allocates 91% to 13 gas wells and 9% to seven oil-related wells does not reflect the operational dynamics in place during the period. Even when Unocal changed to the hybrid method of well count and BOE, the BOE portion of the allocation skews the results in a manner that does not reflect the operational activities taking place on the platform.

B. <u>Is the allocation method reviewed periodically with operations personnel?</u>

No evidence was presented that Unocal operations personnel reviewed this allocation method until the Marathon auditors brought their concerns to Unocal through the audit of 2002 costs charged to its Joint Account.

C. <u>Is the allocation method equitable over the audit period?</u>

This question is designed for the reviewer to look beyond a single month when evaluating the equitable nature of an allocation method. Since any allocation method can create variances in any given month from the charges each property would receive if specific use for each property could be ascertained, it is important to view the allocation results

over more than one month to allow offsetting over and under-allocations to affect the evaluation of equity. In the case of the Steelhead Platform, the BOE methodology consistently allocates an inordinate amount of costs to the gas wells.

## D. Is the allocation method systematically and consistently applied?

An allocation based on the total fluids produced by the oil wells versus the gas wells method was consistently applied by Unocal through 2001. Additionally, the parties entered into two supplemental agreements to the Unit Operating Agreement in 1969 and 1994 both of which established using the total fluids methodology for allocation of common costs. In 1996, the parties entered another supplemental agreement regarding fuel gas usage on the platform that established total fluids as the agreed-upon allocation basis. Unocal's decision to replace the long-standing practice of total fluids with the ratio of BOE violates this fourth litmus test of an acceptable allocation methodology.

That is not to say that an allocation methodology should never be changed. The method should be evaluated from time to time in light of the underlying operational dynamics to ensure that the method reasonably reflects the amount each group of wells would receive if the specific use for each could be ascertained.

Summary:

COPAS guidelines suggest that all of the four litmus test questions be answered in the affirmative when evaluating the appropriateness of any allocation methodology. As discussed above, the BOE method or the hybrid method does not satisfy the criteria established by any of the four questions, indicating it is not a method that would satisfy industry practice and protocol when applied to the situation in this case.

Therefore, it is appropriate to ascertain whether the operational changes incurred with the installation of the ESPs and the resultant increased water and oil production should dictate a change from the existing methodology. The total fluids allocation method,

Corporate Office  •  4242 N. Meridian  •  Oklahoma City, OK 73112
(405) 728-3003  •  solutions@marticons.com
Oklahoma City, OK • Lafayette, LA • Houston, TX • Dallas, TX • Bartlesville, OK

Exhibit 15
Page 8 of 19 Pages

which had been in place for most of the life of this platform, unquestionably would cause an increase in the amount of common costs allocated to the oil-related wells from the portion they had previously been charged. An assessment must then be made as to whether or not that increase reasonably reflects an increased use in those common costs.

Since platform and other costs directly or primarily related to the oil-related wells and the gas wells are already assigned based on their assessed and estimated use, the remaining common costs at question are those that are necessary for both the oil and gas operations. Based on testimony reviewed in this case, these costs consist primarily of items that are equally needed for both sets of wells; labor, supervision, catering, transportation of common goods and personnel, etc. These are not the type of costs that increase with increased gas or oil or water production. They would be necessary if there were only gas wells operated from the platform or if there were only oil wells operated from the platform.

Additionally, the labor "prorates" established by Unocal allocate several categories of labor based on estimates of time directly associated with oil-related wells and gas related wells. While the percentages vary somewhat, 35% - 40% of direct labor platform labor is charged to the oil-related wells and 20% to the gas wells. Most of the remaining labor costs are included in a general pool of costs that are allocated 91% to gas wells and 9% to oil wells when using the BOE method. It is an indication that the BOE method does not reflect the underlying dynamics when a thoughtful, direct assessment allocates 40% of labor to the oil wells and 20% to gas wells and the majority of the remaining costs are allocated 9% to oil and 91% to gas.

These results are not compliant with Article 16.3 of the Unit Operating Agreement that requires with respect to use of the platform, "...a fair and equitable apportionment of risks and liabilities, investment, and operating and other costs shall be made between the Parties therefor." When costs such as these are pooled, the generally accepted allocation methodology is well count, since each well has an equal need of those services. This

Corporate Office    •    4242 N. Meridian    •    Oklahoma City, OK 73112
(405) 728-3003    •    solutions@marticons.com
Oklahoma City, OK • Lafayette, LA • Houston, TX • Dallas, TX • Bartlesville, OK

Exhibit _15_
Page___9___of _19_ Pages

method would result in 65% of these common costs charged to the gas wells and 35% charged to the oil leases, rather than 91% and 9%, respectively. This method, while a change from the method used in the past, meets both criteria 1 and 3 under the COPAS litmus test for equity; it is reflective of the underlying operational dynamics and provides consistent results from month to month.

## Revision in Allocation Method without Notice or Approval of Marathon

Of concern to any Non-Operator in a Joint Venture is exposure to unplanned and un-budgeted costs. Most Unit Operating Agreements contain provisions designed to protect the Non-Operator from unexpected increases in costs. In the Unit Agreement governing the oil and gas leases operated from the Steelhead Platform, Provision 4.2. - J. and K provide that any single expenditure in excess of $ 100,000 must be approved by 80% of the working interests, as well as the disposition of any surplus equipment whose new price is $ 5,000 or more. Provision 5.3. - E. provides that a single expenditure of $ 1,500,000 or more must be approved by 85% of the working interests. Provision 8.3. - D. requires the Operator to submit an AFE to all the Non-Operators for projects estimated to cost more than $ 25,000 but less than $ 100,000, even though approval for the project is at the discretion of the Operator.

These provisions protect the Non-Operator from being charged unexpected and unplanned costs in excess of only $ 25,000 without notice and, if in excess of $ 100,000, approval from the Non-Operator. It is logical that a change in allocation methodology that results in $ 700,000 additional costs billed to Marathon in 2002 falls in the same category of notification and approval. While it is not a "single expenditure" as described in Provision 4.2, it is a single action on the part of the Operator that resulted in charges far exceeding the $ 25,000 notification threshold and the $ 100,000 approval threshold. Over the five-year period from 2002 through 2007, the single change in allocation methodology resulted in charges that exceed the $ 1,500,000 threshold requiring an 85% working interest approval. Such a drastic change in costs billed to a Non-Operator

Exhibit _15_

Corporate Office   •   4242 N. Meridian   •   Oklahoma City, OK 73112     Page__10_ of _19_ Pages
(405) 728-3003   •   solutions@marticons.com

Oklahoma City, OK • Lafayette, LA • Houston, TX • Dallas, TX • Bartlesville, OK

should have been communicated to the Non-Operator and approval for the change sought and received.

## Additional Work

It is my understanding that at this point in time the parties are engaged in discussions designed to resolve their differences in this dispute. Should those discussions fail, I may be asked to respond to specific findings and opinions of experts or other witnesses testifying on behalf of Unocal or Forest. I understand that discovery in this matter is ongoing at this time which may extend or revise my opinions. I may prepare exhibits for trial presentation that relate to my opinions and offer rebuttal testimony or other calculations as instructed by counsel.

## Professional Experience

I began my career in internal audit at Kerr-McGee Corporation's corporate headquarters in Oklahoma City. After four years, I left the position of audit supervisor to develop an internal audit department at Texas International Petroleum Corporation. In July 1982, I formed Martindale Consultants, Inc. In addition to building Martindale Consultants into a major oil and gas consulting service, I have served in various capacities in the Council of Petroleum Accountants Societies (COPAS) during the last twenty–five years. COPAS positions include President of COPAS – Oklahoma City, Chairman of the National Audit Committee, six years on the National Board of Directors, Chair of the Publications Committee, and participation on other committees, liaisons, and task forces.

My experience includes performing or overseeing hundreds of audits on thousands of properties during the last 25 years either as an individual or as President of Martindale Consultants, Inc. These properties were located in almost every oil producing state in the United States, the Gulf of Mexico, Alaska, Canada, and various overseas locations, including Egypt, Australia, Indonesia, and South America. Additionally, during the last 18 years, I have reviewed, modified, and executed exploration agreements, joint operating agreements, and COPAS accounting procedures on behalf of myself and Martindale

Consultants covering non-operated interests in oil and gas properties in Texas, North Dakota, Kansas, and Oklahoma. I have sold my interest in blocks of properties and participated in the acquisition of producing properties. I have testified as an expert witness in state and federal court and at the Oklahoma Corporation Commission on subjects including joint venture and revenue audit claims, gas balancing, royalty disputes, and custom and practice in applying terms of exploration agreements and joint operating agreements in the oil and gas industry. My hourly billing rate in this matter is $ 225.00 per hour plus reimbursement for any travel related costs.

A summary of prior expert testimony is attached.

Sincerely,

W. Patrick Martindale

President

Exhibit _15_

Corporate Office   •   4242 N. Meridian   •   Oklahoma City, OK 73112   Page_12_of_19_Pages
(405) 728-3003   •   solutions@marticons.com

Oklahoma City, OK • Lafayette, LA • Houston, TX • Dallas, TX • Bartlesville, OK

## Documents Reviewed by W. Patrick Martindale

1.   Complaint and Answers of Forest Oil and Unocal;

2.   Forest Oil's Initial Disclosures and related documents;

3.   Forest Oil's Responses to Marathon's First Set of Discovery and related documents;

4.   Forest Oil's Responses to Marathon's Second Set of Discovery and related documents;

5.   Forest Oil's Supplemental Responses to Marathon's Second Set of Discovery;

6.   Unocal's Initial Disclosures and related documents;

7.   Unocal's Responses to Marathon's First Set of Discovery and related documents; and

8.   Unocal's First Supplemental Disclosures and related documents;

9.   Marathon's Initial Disclosures and related documents;

10.  Deposition transcript of Glenn Payment taken on 5/23/07;

11.  Deposition transcript of Phillip Bindon taken on 5/23/07;

12.  Deposition transcript of Ted Kramer taken on 5/24/07;

13.  Deposition transcript of David Hall taken on 5/24/07;

14.  Deposition transcript of Donald Page taken on 8/16/07;

15.  Deposition transcript of Mitch Fischbach taken on 8/16/07;

16.  Folder named "Various Audit Related Documents."  This folder includes 11 documents related to the audit exception.

17.  Organizational Chart relating to Steelhead-Grayling Platform; and

18.  Letter dated 9/5/03 from Unocal to Alaska Department of Natural Resources regarding Trading Bay Unit, Grayling Gas Sands PA Assignments: ADL's 17594, 18729, 18730 and 18772;

Exhibit _15_

Page _13_ of _19_ Pages

19.    Letter from Marathon auditors to Unocal dated 12/12/05 regarding Audit Period 2003-2004 of Steelhead-Grayling Gas Sands, with exceptions totaling $388,995.88, Marathon Audit No. 2005-7008;

20.    Email dated 2/14/06 from Ted Kramer to Leonard Gurule and Mitch Fischbach re: 2/8/06 Shut Down on the Steelhead platform ;

21.    Document **2hl21ft.pdf**, dated 5/19/03, Marathon Information Request on Steelhead-Grayling Gas Sands re: 2002 Steelhead Alloc %; Audit Period 2001-2002; Audit Number 2003-7857, with emails to parties;

22.    Document **2hl20zfx.pdf**, dated 5/23/03, Marathon Information Request on Steelhead-Grayling Gas Sands re: 2002 Alloc %; Audit Period 2001 -2202 (sic); Audit Number 2003-7857, with spreadsheet;

23.    Document **2hj03x2q.pdf**, Spreadsheet re: Allocations Cost Center Analysis for Audit Period 2003-2004; Audit Number 2005-7008 dated 7/13/05;

24.    Document **2hh-l-03.pdf**, Marathon Information Request on Steelhead GGS re: Allocation Costs Centers; Audit Period 2003-2004; Audit Number 2005-7008; dated 7/14/05, with spreadsheet and emails;

25.    Document **2hh-kpgd.pdf**, Marathon Information Request on Steelhead GGS re: Labor Prorate Percentages; Audit Period 2003-2004; Audit Number 2005-7008; dated 7/22/05 with spreadsheet and emails;

26.    Document **2hh-jtjm.pdf**, Marathon Information Request on Steelhead GGS re: Pressure Vessel Allocation Percentages; Audit Period 2003-2004; Audit Number 2005-7008; dated 7/25/05, with spreadsheet and emails;

27.    Document **2hh_rb93.pdf**, containing various emails and spreadsheet;

28.    Document **2hh_q41g.pdf**, containing various emails and spreadsheet;

29.    Document **2hh_sx8x.pdf**, containing various emails;

30.    Document **2hh_s7w4.pdf**, containing various emails and spreadsheet;

- 2 -

Exhibit _15_
Page_ _14_ of _19_ Pages

31.    Document **2hh_zvb5.pdf**, containing various emails and spreadsheet;

32.    Document **2hh_m_ng.pdf**, containing various emails and spreadsheet;

33.    Allocations for 2003 Audit File A (spreadsheet);

34.    Allocations for 2003 Audit File B (spreadsheet – very large);

35.    Allocations for 2002 – 2006 (spreadsheet);

36.    Cost Center Analysis spreadsheet re: Audit Period 2003-2004; Audit Number 2005-7008;

37.    2003 Allocation to Cost Center 100709600;

38.    2004 Allocation to Cost Center 100709600;

39.    Allocation Rate Calculation 2005 & All Allocation Entries 1007096000 & Associate Entries on Jade;

40.    Allocation Rate Calculation 2006 & All Allocation Entries 1007096000 & Associate Entries on Jade;

41.    Audit Report Issued to Unocal 2005 (with Preliminary Exception);

42.    Documentation re: Allocation Divider #69;

43.    Emails and correspondence re: Initial Audit #2003-7857;

44.    Gross Amounts Into Facility Allocations (Jan. 2004 – Dec. 2004);

45.    Initial Audit Report Issued to Unocal (Audit #2003-7857);

46.    PE 16 Allocation File Support;

47.    Steelhead Fluid Production re: 2000 to 2005 (spreadsheet);

48.    COPAS Model Form Interpretation 46;

49.    Other COPAS Publications generally.

Exhibit _15_
Page _16_ of _19_ Pages



Martindale Consultants, Inc.

## W. PATRICK MARTINDALE

Background and Experience

### Education:

Earned a Bachelor of Science degree in Accounting from the University of Central Oklahoma

### Career History:

- Kerr-McGee Internal Audit Department: 1976 - 1980.
- Texas International Petroleum Corporation: 1980 - 1982 - Internal Audit Manager
- Martindale Consultants, Inc.: President, January 1982 - current.

  Martindale Consultants provides domestic and international audit and accounting services to the oil and gas industry, serving both majors and independents, governments and royalty owners. It also holds working interests in oil and gas properties in Texas and Oklahoma.

### COPAS (Council of Petroleum Accountants Societies) History:

- COPAS Oklahoma City member since 1980.
- COPAS Oklahoma City Board member: 1988 - 1991, President in 1989.
- Attended COPAS Presidents Leadership Conference – 1989 through 2002.
- COPAS Oklahoma City Audit Committee Chairman from 1989 through 1992.
- COPAS National Audit Committee:
  - Secretary, 1992
  - Vice-Chairman 1993 - 1994
  - Chairman, 1995 - 1996
- COPAS National Board of Directors: 1997 - 2002
  - Secretary 1999
  - Treasurer 2001
  - COPAS Publications Committee Chair 1998 – 2002

- Subcommittee Participation:
  - COPAS Audit Committee / Institute of Internal Auditors Liaison Committee
  - Bulletin 24, Producer Gas Imbalances
  - Bulletin 3, Audit Protocol and Procedures Guidelines - Chairman
  - Interpretation No. 21, Adequate Documentation
  - COPAS By-laws Committee, 1994, 1995, and 1996
  - Chairman, COPAS By-laws Committee, 1997 – 1998

General Experience:

My experience includes performing or overseeing hundreds of audits on thousands of properties during the last 25 years as an individual or as President of Martindale Consultants, Inc. These properties were located in almost every oil producing state in the United States, the Gulf of Mexico, Alaska, Canada, and various overseas locations, including Egypt, Australia, Indonesia, and South America. Additionally, during the last 18 years, I have reviewed, modified, and executed exploration agreements, joint operating agreements, and COPAS accounting procedures on behalf of myself and Martindale Consultants, covering non-operated interests in oil and gas properties in Texas, North Dakota, Kansas, and Oklahoma. I have sold my interest in blocks of properties and participated in the acquisition of producing properties.

Litigation:

Certified as an expert witness in Oklahoma State Court, Texas State Court, Colorado State Court, various Federal Courts and at the Oklahoma Corporation Commission.

See attached sheet for litigation listing.

Rates

$225 per hour plus expenses

Exhibit _15_____
Page___18__of _19__ Pages

W. Patrick Martindale
History of Expert Testimony – 1996 through 2007

| Year | Activity | Company | Law Firm | Contact | Description | Areas of Testimony |
|---|---|---|---|---|---|---|
| 1996 | Deposition | Chevron | Chevron | Howard Blunk | Chevron v. Flores & Rucks | Offshore lease operating costs |
| 1997 | Testified | CoEnergy | Spradling, Alpern, Friot, & Gum | Bob Gum | CoEnergy v. Headington | Lease producing in paying quantities |
| 1998 | Deposition | NNG | Bracewell & Patterson | Thomas Cook | Northern Natural Gas v. Bearpaw | Gas deliveries allocation, balancing |
| 1999 | Deposition | Yale Oil Assn | | Kit Green | Yale v. Samson | Gas Balancing |
| 1998 | Deposition | Chaparral Energy | Chaparral Energy | Ron Frangione | Chaparral v. Beck Pump & Supply | Valuation of Lease Equipment |
| 1999 | Deposition | Commodore Resources | Elias, Books, Brown, Peterson, and Massad | Bob Costello | Commodore v. Stauros | Payout of Non-Consent |
| 2000 | Deposition | State of MI | Natural Resources Division | Robert P Reichel | State of MI v. Terra Resources/CMS Nomeco | Royalty and Post-Production Costs |
| 2001 | Deposition | Exxon | Baker and Hosteller, LLP | Ray Whitman | Exxon v Nuevo | Applicability of costs to slot rentals offshore |
| 2001 | Deposition | Chevron | | Mark Cervanka | Chevron v. Wexpro | Applicability of First level supervisions under 1968 COPAS |
| 2002 | Deposition | Mangum Resources | Monet, Bullis, Hayes | Jim Peters | Mangum v. Newfield | Allocation of well costs between oil and gas production |
| 2003 | Testified | Preston Reynolds | Jacobs Chase Frick Kleinkopf & Kelley, LLC | Lawrence Katz | Redstone v. Preston Reynolds | Accounting for payout under Exploration Agreement |
| 2003 | Deposition | Glen D. Sacket | Robert Gum | Bob Gum | Glen D. Sacket v. Great Plains Pipeline Company (formerly Magic Circle Energy Corporation) | Royalty valuation and legitimacy of deductions |
| 2003 | Arbitration | Oxy – Elk Hills | Munger, Tolles & Olson LLP | John W. Spiegel | Chevron v. Occidental of Elk Hills | Applicability of drilling and operating costs under Unit Operating Agreement |
| 2004 | Deposition | Unocal | Fulbright & Jaworski, LLP | Gerard G. Pecht | Unocal v. Nuevo | Applicable deductions to revenue for calculating specific valuation trigger |
| 2007 | Deposition | Bank of New York | | Craig Stahl | Mosh Holdings LP v. JP Morgan Chase Bank, NA | Accounting for revenue and expenses of oil and gas trust |

Exhibit 15
Page 19 of 19   Page