Mitch Fischbach

1

1   Daniel T. Quinn (8211141)
    Richmond & Quinn, PC
2   360 "K" Street, Suite 200
    Anchorage, Alaska  99501
3   (907) 276-5727
    Attorney for Plaintiff Marathon Oil Company

4

5

6           UNITED STATES DISTRICT COURT
7            FOR THE DISTRICT OF ALASKA
8   _____
9   Case No.: 3:06-CV-00102 TMB

10  _____

    MARATHON OIL COMPANY,
11

            Plaintiff,
12

    vs.
13

    FOREST OIL COMPANY and UNION OIL COMPANY OF
14  CALIFORNIA, d/b/a UNOCAL ALASKA,
15          Defendants.

16  _____

          DEPOSITION OF MITCH FISCHBACH
17  _____

18          PURSUANT TO NOTICE, the
19  above-entitled deposition was taken on behalf of
20  the Plaintiff at the offices of Wheeler Trigg &
21  Kennedy, LLC, 1801 California Street, Suite 3600,
22  Denver, Colorado, on August 16, 2007, at 9:55 a.m.,
23  before Jana Mackelprang, Certified Realtime
24  Reporter, Registered Professional Reporter, and
25  Notary Public.

Mitch Fischbach

18

1    Q.    What's his --
2    A.    I'm not sure of his exact title. I
3    believe he's an engineer.
4    Q.    With Forest?
5    A.    Yes. And Ted Kramer was also an
6    engineer with Forest.
7    Q.    Now, this dispute, at least I gather,
8    became formalized when Marathon issued an audit
9    exception; is that correct?
10    A.    That's when I first really became, you
11    know, fully aware of it, yes, we received a copy of
12    the exception.
13    Q.    That was going to be one of my
14    questions. Prior to that exception, this issue
15    really wasn't on your radar screen?
16    A.    No.
17    Q.    All right. And these discussions that
18    you're talking about, at least that you've heard may
19    have gone on with Leonard Gurule, Ken Griffin, and
20    Ted Kramer, were those prior to Marathon's audit
21    exception or after that, or do you know?
22    A.    I'm not sure of the timing that the
23    discussions were going on between Unocal and Forest,
24    no.
25    Q.    All right. If there was

19

1    dissatisfaction on the part of Forest about an
2    allocation issue like that, is that something that
3    would come to your attention as a person involved in
4    joint venture auditing?
5    A.    Eventually, yes, they would ask for my
6    input.
7    Q.    All right. But at least up to the
8    point that Marathon issued this audit exception,
9    that had never happened?
10    A.    Not specifically, no.
11    Q.    All right. I'm trying to remember --
12    let me look at my notes again -- actually, maybe
13    someone -- do you know what the date of that audit
14    exception was?
15    A.    The specific date, no. I know the
16    first time I received a copy, I believe, was in
17    December of 2004.
18    Q.    2004?
19    A.    Yes.
20    Q.    All right. So by that time, you were
21    the director of joint venture auditing for Forest?
22    A.    Yes.
23    Q.    All right. And you guys had been on
24    that platform for four years at that point, right?
25    A.    We don't -- we had an ownership in it,

20

1    yes.
2    Q.    I understand. You weren't operating
3    it. All right. So, in any case, during those four
4    years, this was not an issue that ever came to the
5    attention of joint venture auditing?
6    A.    The four years being 2000 through
7    2004?
8    Q.    Right.
9    A.    That's correct.
10    Q.    Were you aware of the fact that that
11    total fluids methodology was being used by the
12    operator?
13    A.    I believe so, yes, at some point in
14    time prior to the exception, I knew that.
15    Q.    All right. So prior to this
16    exception, and I guess prior to the change,
17    Marathon's exception had to do with a change in the
18    allocation methodology; is that right?
19    A.    That's correct.
20    Q.    In any case, prior to the change in
21    methodology that Unocal adopted, you guys -- "you"
22    meaning Forest Oil -- were aware that the total
23    fluids methodology was being used, and you didn't
24    have any objection to that?
25    A.    No. Like I say, we have ownership in

21

1    multiple platforms in the Trading Bay Unit, not just
2    the Steelhead. So when we looked at the things, we
3    looked at all the platforms and saw the allocations.
4    So one specific -- like I say, knowing that that was
5    total fluids was one thing. Whether we focused on
6    it or not is another issue.
7    Q.    In any case, you never focused on it,
8    and you certainly never filed any exceptions to it?
9    A.    That's correct.
10    Q.    Now, at some point -- and you can tell
11    me this; I think it was beginning in January of
12    '02 -- Unocal changed the unit methodology from
13    total fluids to what?
14    A.    BOE.
15    Q.    Tell me what BOE means just for the
16    record.
17    A.    Barrel of oil equivalent.
18    Q.    So, essentially, this is kind of a
19    production measure. You compare how much oil is
20    being produced versus how much gas is being
21    produced, and unitize that by using the
22    barrel-of-oil measure and allocating it in that
23    ratio?
24    A.    Yes. I believe they divide the MCF,
25    meaning cubic feet of gas, by 6 to write it to a

6 (Pages 18 to 21)

**Exhibit 1**
**Page 2 of 9 Pages**

Mitch Fischbach

22

1  barrel of oil, BOE, equivalent.
2      Q.    This changed the allocation percentage
3  in a way that favored Forest and disfavored
4  Marathon; is that right?
5      A.    I wouldn't categorize it as favoring,
6  no.
7      Q.    Well, certainly, the bottom line was
8  that Marathon's -- the gas interests are paying a
9  higher percentage and the oil interests are paying a
10 lower percentage than under the prior methodology?
11     A.    Under the prior methodology, yes. But
12 after the change, after I got involved, you know, my
13 personal feeling was that it was more equitable.
14     Q.    Okay. When did you first become aware
15 that Unocal was contemplating this change?
16     A.    Like I say, when I started receiving
17 -- when I received copies of the exception and was
18 requested basically to respond to it, that's when I
19 started looking into it more.
20     Q.    All right. So this would have been
21 sometime after the change was made, that is, it
22 sounds like this issue really became a point of
23 focus for you when the exception was issued by
24 Marathon?
25     A.    For me personally, yes.

23

1      Q.    And so it wasn't really a focus of
2  your attention at the time the change was made in
3  January of 2002?
4      A.    No. As an auditor, we typically live
5  in the past.
6      Q.    Fair enough. Do you have any
7  knowledge of the extent, if any, to which Unocal
8  consulted with people at Forest concerning this
9  change, before they made it?
10     A.    I don't really have any direct
11 knowledge, no.
12     Q.    All right. Have you seen any e-mails
13 or letters or paperwork that predate the
14 January 2002 change that somebody had?
15     A.    Not that I recall specifically.
16     Q.    In any case, it sounds like what
17 you're saying is you didn't know about the change,
18 but that's not a surprise; you wouldn't expect to be
19 in the loop on this, necessarily, as an auditor?
20     A.    Not typically, like say -- we usually
21 audit two years behind; and that's when we would --
22 like I say, that's when I typically would get
23 involved.
24     Q.    All right. In terms of these audit
25 exceptions, I may be oversimplifying this, and maybe

24

1  you can help me out, but as I understand it, there
2  are time deadlines by which an owner has to issue an
3  exception or else it's sort of gone, it's waived.
4  Am I right about that?
5      A.    The typical audit provision is that
6  you have two calendar years from the point that the
7  cost is incurred.
8      Q.    All right. Let me ask you this: As
9  to those years that Unocal utilized the total fluids
10 methodology, am I correct that you, Forest, have
11 never issued an exception with regard to those two
12 years?
13     A.    Which two years?
14     Q.    I guess this would be 2000 and 2001.
15 Those are the two years that Forest was on board
16 before Unocal made the change.
17     A.    We never issued an exception.
18     Q.    All right. Under the accounting
19 protocols, is it too late to make those?
20         MR. JAMIESON: Object to form.
21         THE DEPONENT: You would be precluded
22 from going and writing an exception right now.
23     Q.    (By Mr. Quinn) As to those two years?
24     A.    As to those two years.
25     Q.    All right. I'm going to start filing

25

1  through some of these documents. Some of these have
2  been marked as exhibits in other cases.
3         MR. QUINN: Do you want to just use
4  the same numbers on these?
5         MR. JAMIESON: I had proposed that
6  before, but since we have started numbering each
7  deposition separately, it would be like the Tower of
8  Babel to do it differently.
9         MR. QUINN: I think everyone agreed to
10 it and promptly forgot it.
11         Let's mark this as Exhibit 1. And for
12 the record, this also happens to be Exhibit 16 to
13 Mr. Page's deposition.
14         (Exhibit 1 was marked for
15 identification.)
16     Q.    (By Mr. Quinn) I'm handing you what's
17 been marked as Exhibit 1. This is a September 22nd,
18 2004, letter to Mr. McMurray at Marathon to Donald
19 Page from Unocal?
20         MR. JAMIESON: It's co-addressed,
21 actually.
22         MR. QUINN: Who else is this addressed
23 to?
24         MR. JAMIESON: Fischbach.
25         THE DEPONENT: This is actually from

7 (Pages 22 to 25)

**Exhibit 1**
**Page 3 of 9 Pages**

Mitch Fischbach

**26**

1  Don Page.
2       MR. QUINN: Where are you on this?
3       MR. JAMIESON: It's that red eye.
4       THE DEPONENT: It looks like you're
5  looking at a different document.
6       MR. JAMIESON: It's the red eye
7  effect.
8       MR. QUINN: Look on the bottom of your
9  pile and see if you have this letter. This is
10  September 22 of '04.
11       MS. CRACRAFT: Yes.
12       (Exhibit 1 was re-marked for
13  identification.)
14       Q. (By Mr. Quinn) I apologize for the
15  confusion on the first exhibit. This is a
16  September 22, '04, letter. It's only to
17  Mr. McMurray at Marathon from Don Page. It says, on
18  the top: "Letter not sent to partners." I'm not
19  quite sure what that means.
20       MR. JAMIESON: It was not sent.
21       Q. (By Mr. Quinn) It may not have gone
22  out at all. Let me ask you this: Have you ever
23  seen this letter?
24       A.  No.
25       Q.  I'm going to ask you some questions

**27**

1  about this letter, even though it was not sent, and
2  I just want to get your thoughts.
3       Mr. Page says in this letter, in this
4  letter not sent, the third paragraph, "When
5  reviewing the correctness of either methodology" --
6  and the two methodologies that are being discussed
7  are the BOE and the total fluids method -- "there
8  appears to be no right or wrong approach. Unocal
9  agrees that there is merit in the accounting
10  principle of consistency. Marathon's exception
11  notes discussions between MOC and Unocal around
12  December 12, 1996, which pertain to the prorate."
13       Let me ask you this as to that first
14  sentence: "There appears to be no right or wrong
15  approach," do you agree with Mr. Page on that, that
16  is, that either of these approaches are defensible?
17       MS. CRACRAFT: I'm going to object as
18  to form. You can answer.
19       THE DEPONENT: Personally, I mean,
20  looking at the sentence, BOE and total fluids I
21  would say are methods that can be used. It depends
22  on the circumstances surrounding it whether it would
23  be equitable and fair.
24       Q.  (By Mr. Quinn) All right. Is it your
25  understanding that both of these methods are used in

**28**

1  the industry?
2       A.  I've seen them used in the industry,
3  yes.
4       Q.  Okay. Then in the next paragraph,
5  Mr. Page says this: "Certainly, this being a gas
6  oriented platform, a significant portion of the
7  charge distribution should reflect that reality. On
8  the other hand, oil may require a disproportionate
9  amount of effort in staffing and operating activity.
10  There are legitimate reasons for applying either
11  approach, but as far as Unocal can see, there are no
12  compelling arguments either way."
13       Let me just ask you this: As to his
14  comment that oil may require a disproportionate
15  amount of effort in staffing and operating activity,
16  is that something that you, in your position as an
17  auditor, can comment on? In other words, do you
18  agree or disagree on that, or is it something that's
19  outside of your bailiwick?
20       MS. CRACRAFT: I object as to form.
21  You can answer.
22       THE DEPONENT: As far as direct
23  knowledge, it's outside of my bailiwick, but I did
24  have discussions with engineers whose bailiwick it
25  is in; and from what I was told, I was able to

**29**

1  formulate an opinion on that.
2       Q.  (By Mr. Quinn) Let me ask you this:
3  Who did you talk to?
4       A.  It would have probably been the people
5  I told you before, Leonard Gurule and Ted Kramer.
6       Q.  And how did they gather their
7  information, do you know?
8       A.  I know they asked one of our field
9  engineers up there, or field people; I'm not sure
10  who it was. I also, in our June '05 -- no, November
11  of '05 meeting, when we went to Unocal's office with
12  the representatives from Marathon to try to settle
13  this, Unocal had two engineers from the field
14  involved in that meeting, and they gave me their
15  opinions, and they reflected what I was told by our
16  people.
17       Q.  Tell me what that was.
18       A.  That, basically, once ESPs are
19  installed on an oil well, that they require probably
20  less maintenance than a gas well.
21       Q.  How about prior to the installation of
22  an ESP, what was your understanding of the relative
23  labor demands of an oil well versus a gas well on
24  Steelhead?
25       A.  I think that's why they installed

8 (Pages 26 to 29)

**Exhibit 1**
**Page 4 of 9 Pages**

Mitch Fischbach

**42**

1 audited and have not issued an exception.
2     Q.  (By Mr. Quinn) So the dispute is
3 really the retroactive, whether something should be
4 done retroactively?
5     A.  Retroactively being 2002 forward, up
6 until '06?
7     Q.  Right. Let me ask you this: Do you
8 understand Marathon to be agreeable to the current
9 methodology?
10     MS. CRACRAFT: Objection, form. You
11 can answer.
12     Q.  (By Mr. Quinn) If you know?
13     A.  I'm not sure of their position, no.
14     MR. JAMIESON: Isn't that a question
15 that you should be asking one of your own --
16     MR. QUINN: There's helpful
17 intelligence to know what the other guy thinks.
18     (Exhibit 6 was marked for
19 identification.)
20     Q.  (By Mr. Quinn) Exhibit 6 is a
21 June 28, 2005, letter from Don Page, again to you
22 and Terry McMurray; and it's a follow-up to this
23 subcommittee meeting, which I gather was a
24 conference call, right, the subcommittee meeting?
25     A.  The June 20th one, yes, was a

**43**

1 conference call.
2     Q.  It says at this point that "Unocal
3 agreed to develop a couple hypothetical allocation
4 suggestions to allocate Steelhead costs that can't
5 be directly associated with the GGS or Oil WIPAs."
6 In other words, he's trying to come up with some
7 alternative approaches to resolve this dispute about
8 the cost center that we've identified; is that
9 right?
10     A.  That's correct.
11     Q.  He comes up with four different
12 approaches: "Continue to use the gross production
13 BOE allocation." And am I right that that would be
14 the most favorable to Forest?
15     A.  Most favorable compared to what?
16     Q.  Of the four options. Why don't we go
17 through them. No. 2: "Include water production in
18 the allocation methodology." That would be
19 something that would be less favorable to Forest,
20 right?
21     A.  That would be less favorable, yes.
22     Q.  No. 3: "Use well-count to allocate
23 cost that can't be directly associated with GGS or
24 Oil WIPAs." And that would be less favorable to
25 Forest, right, than continuing to use the gross BOE

**44**

1 allocation?
2     A.  It would depend on the production of
3 the wells over time. I mean, if your gas wells
4 started to decline significantly quicker than the
5 oil, then under BOE the oil would start getting a
6 higher percentage, and somewhere it would probably
7 pass a well count.
8     Q.  And No. 4 is: "Allocate costs that
9 can't be directly associated with GGS or Oil WIPAs
10 based upon a weighted average of current Steelhead
11 labor Prorates." That's the fourth.
12     Let me just ask you about these four
13 approaches. Let me back up. Your view is that the
14 goal here is to come up with a fair and equitable
15 approach to this allocation; am I right about that?
16     A.  At this point in time, I was involved.
17 As I put in my letter, my feeling on the matter was
18 always that Unocal is the operator. They implement
19 the process or allocation methodology that's going
20 to be used. And then if we have a problem with it,
21 it's our responsibility to document it and show why
22 it's not fair and equitable.
23     Q.  Good enough. So part of your job is
24 to evaluate whether a certain approach is fair and
25 equitable, but, really, your job is to react to what

**45**

1 Unocal does?
2     A.  Yes, if there's something wrong with
3 what they do, the burden is on me to demonstrate why
4 it's not fair and equitable.
5     Q.  Good enough. So at least this
6 analysis of whether something is fair and equitable
7 is part of your job?
8     A.  When we're looking at costs, yes.
9     Q.  Let me ask you this: In terms of
10 allocating this cost center, is fair and equitable
11 trying to best approximate the actual allocation of
12 expenses to oil and gas? Is that what Unocal should
13 be trying to do, to sort of get it as accurately as
14 possible, realizing that down to the penny is not
15 going to be possible, or at least there's going to
16 be gray areas, but the objective is to try to
17 reflect actual cost as between oil and gas?
18     A.  At the end of the day, that's what
19 you're trying to accomplish, but like I say, when
20 you're using allocations, it's very difficult to
21 determine what that right number is.
22     Q.  All right. Let's talk about the first
23 one: "Continue to use gross production BOE
24 allocation." So, essentially, this is one that
25 says -- sort of an implicit assumption in using this

12 (Pages 42 to 45)

**Exhibit 1**
**Page 5 of 9 Pages**

Mitch Fischbach

### 46

1  approach is that unallocated costs rise or fall in
2  relation to production; is that right?
3      A.   Basically, in allocating, yes, the
4  costs are following the production.
5      Q.   All right. Is that accurate to your
6  knowledge?
7      A.   Once again, what's accurate? It's an
8  accepted method in the industry.
9      Q.   All right. If there was evidence to
10  suggest that this implicit assumption in the BOE
11  approach was not accurate, would you agree that that
12  would not be a fair and equitable approach, at least
13  on this platform?
14      MS. CRACRAFT: Objection, form. You
15  can answer.
16      MR. JAMIESON: The same objection.
17      THE DEPONENT: If I was provided
18  information that demonstrated that the BOE was not
19  fair and equitable, yes.
20      Q.   (By Mr. Quinn) All right. Have you
21  at any time reviewed the deposition of Glenn Payment
22  taken in this case?
23      A.   No, I haven't.
24      Q.   Let me ask you this: Have you ever
25  been to the Steelhead Platform?

### 47

1      A.   No, I have not.
2      Q.   All right. Do you have an
3  understanding of the ratio of oil to water that is
4  typically produced at Steelhead on the oil side?
5      A.   No.
6      Q.   All right. And do you have any
7  knowledge -- obviously, the higher the oil ratio,
8  the more production, right, the more BOEs are being
9  produced? That is, if you have a 50-50 split on oil
10  and water, you're going to have a much higher BOE
11  than if you're producing 6 percent oil and
12  94 percent water? Am I right about that?
13      MR. JAMIESON: Object to form.
14      THE DEPONENT: No.
15      Q.   (By Mr. Quinn) Why am I not right?
16      A.   Because BOE doesn't include water.
17      Q.   I understand that. That's what I'm
18  saying: If the ratio is higher oil than water, in
19  other words, the higher the percentage of oil, the
20  higher the BOE, right?
21      A.   The higher the production of oil. I
22  mean, the water wouldn't matter in your BOE. You're
23  going to take your oil production divided by -- it's
24  going to be the barrel.
25      Q.   Well, do you know if it costs any more

### 48

1  to produce at a higher water-to-oil ratio than at a
2  lower water-to-oil ratio? Do you have any knowledge
3  of that?
4      MR. JAMIESON: Are you saying on the
5  Steelhead Platform?
6      MR. QUINN: Yes.
7      MR. JAMIESON: With this formation?
8      MR. QUINN: Yeah.
9      THE DEPONENT: The water is processed
10  on shore at TBU, at the facility. So the additional
11  water really shouldn't have any effect on additional
12  costs at the Steelhead.
13      Q.   (By Mr. Quinn) But if you're
14  producing -- let me just use a hypothetical. Let's
15  say one year your ratio is 50 percent water and
16  50 percent oil, and the next year it drops to
17  25 percent oil and 75 percent water. So that year
18  you produce half as much oil. Are costs on the
19  platform any different in those two years?
20      A.   Some of the costs probably would be.
21      Q.   Who would you want to ask to find that
22  out?
23      A.   The operators on the platform.
24      Q.   And have you made any inquiries of
25  them about this issue?

### 49

1      A.   What issue specifically?
2      Q.   The issue that I just asked, that is,
3  whether costs in a year that you produce twice as
4  much oil are higher than costs in the year that you
5  produce half that amount.
6      A.   No, I've had no reason to ask such a
7  question.
8      Q.   And if the answer to that question
9  were no, that the costs were the same, then doesn't
10  it follow that the BOE approach is not fair and
11  equitable?
12      MS. CRACRAFT: Objection to form.
13      MR. JAMIESON: Objection to form.
14      THE DEPONENT: Not specifically, no.
15      Q.   (By Mr. Quinn) Because wouldn't -- so
16  in one year, you would have twice the BOE and
17  therefore twice the allocation than the second year,
18  but, at least under my hypothetical, the costs would
19  be the same both years? So there's a problem,
20  right, in using the BOE approach, if my hypothetical
21  is correct?
22      MS. CRACRAFT: Objection, form. You
23  can answer.
24      MR. JAMIESON: Join the objection.
25      THE DEPONENT: I don't have any

13 (Pages 46 to 49)

**Exhibit 1**
**Page 6 of 9 Pages**

Mitch Fischbach

**50**

1 specific knowledge of the operators and how their
2 time is being allocated versus higher or lower
3 production and whether it takes more time or not.
4  Q.  (By Mr. Quinn)  But wouldn't you need
5 to know that to find out whether BOE is fair and
6 equitable?
7  A.  Once again, from my perspective, the
8 only thing I'm required to do from an audit
9 perspective, which is where I'm involved, is to look
10 at what the exception was.  I looked at the
11 exception, and it had no basis.  And they
12 implemented BOE, and I've seen nothing from Marathon
13 to indicate that BOE is unequitable.
14  Q.  It sounds like what you're saying is
15 you've never really done an analysis as to whether
16 BOE is fair and equitable?
17  MS. CRACRAFT:  At the Steelhead
18 Platform?
19  MR. QUINN:  At the Steelhead Platform.
20  Q.  (By Mr. Quinn)  All you've done is
21 respond to Marathon's objection?
22  A.  We did the same analysis as we did
23 when it was total fluids.  And like I say, we didn't
24 take exception to total fluids.  At the time we
25 didn't take exception to BOE.

**51**

1  Q.  Item No. 2 says, "Include water
2 production in the allocation methodology."  Would it
3 be fair and equitable in your mind to include water
4 production as part of the methodology?
5  A.  In regards to Steelhead, it makes no
6 sense to me.
7  Q.  Why is that?
8  A.  Because the water is processed at the
9 TBU, at the facility, not on the Steelhead Platform.
10  Q.  So what you're saying is that the
11 costs are not tied to water production, and
12 therefore shouldn't be a factor?
13  A.  Right.  Increased water -- like I say,
14 when you install the ESPs, you know you're going to
15 have increased water production.  And if the intent
16 in installing the ESPs is to cut your costs, it
17 makes no sense that you would include it to increase
18 your costs.
19  Q.  So if the amount of water production
20 isn't really a variable, it isn't fair and equitable
21 to use it?
22  A.  I think if you use it, the oil gets a
23 proportionate share of the costs.
24  Q.  Isn't that true under BOE?  In other
25 words, if BOE production is not truly a variable

**52**

1 that affects costs, it's not true and accurate to
2 use that?
3  A.  Like I say, I've never been provided
4 any documentation to look at that supports that BOE
5 is not fair and equitable.
6  Q.  Theoretically, if BOE is not truly a
7 variable that affects costs, then that would not be
8 a fair and equitable variable to use?
9  MR. JAMIESON:  Object to form.
10  THE DEPONENT:  Theoretically, any of
11 these methods may not be fair and equitable.  It
12 depends on the circumstances.  And, once again, the
13 burden falls on the auditor.
14  Q.  (By Mr. Quinn)  No. 3 is well count.
15 Now, if it costs roughly the same to operate a gas
16 well as it does to operate an oil well, then well
17 count would be a pretty reasonable way to go,
18 wouldn't it?
19  A.  It was a method that was discussed,
20 yes.
21  Q.  And what's your view on whether it's a
22 good or bad idea?
23  A.  Well count is, like I say, another
24 accepted method in the industry.
25  Q.  So you wouldn't have an objection if

**53**

1 Unocal adopted well count as -- and that's in fact
2 what they've done, haven't they, at least as part of
3 the formula?
4  A.  They did 50 percent well count,
5 50 percent BOE.  From a straight well count
6 perspective, the problem I have is that, like I say,
7 Marathon picks one specific allocation out of
8 numerous, and it happens to be the one that would
9 have the most effect.  The other ones, which would
10 be labor costs and associated costs, they've never
11 said, "Let's do a well count over there."
12  Q.  No. 4 is Steelhead labor prorates.  To
13 the extent that this cost center is really a labor
14 -- at least primarily labor, this makes some sense,
15 doesn't it?
16  A.  It's another potential method.  But,
17 like I say, the costs -- there's other prorates in
18 labor prorates than what he's talking about.  And
19 the costs that ultimately go into the crane and
20 maintenance facility, I'm not sure that it's the
21 same people month to month.
22  Q.  But at least this would reflect a
23 variable that is relevant to this cost center
24 because it is primarily a labor cost center, isn't
25 it, 70 or 80 percent labor?

14 (Pages 50 to 53)

**Exhibit 1**
**Page 7 of 9 Pages**

Mitch Fischbach

98

1 there and is producing requires that it be
2 monitored/maintained, and therefore well count is
3 how such costs should be allocated."
4      So, again, this is suggesting that
5 this argument was advanced at this meeting, and it
6 sounds like you have a dim memory, at least, of well
7 count being advocated?
8      A.    No, I have a memory, I stated, I have
9 a memory of remembering it being discussed. As to
10 this specific example, I don't remember that
11 specifically.
12      Q.    Okay. Then Forest responded, it
13 sounds like, "Forest disagreed and maintained that
14 production volumes (BOE) should be the basis of
15 allocation," which was a 92-8 split, and that Forest
16 was opposed to any retroactive adjustment.
17      Was that Forest's position at this
18 meeting?
19      A.    My position at the meeting was that,
20 like I say, with the current BOE allocation, I had
21 seen nothing from Marathon to demonstrate that they
22 had been harmed. The exception, as written, was for
23 total fluids, and I've maintained all along that the
24 operator had the right to change it. And with the
25 change of operations, from my perspective, it made

99

1 sense to do that.
2      Q.    So is this accurate in terms of what
3 Forest's position was, that essentially we're
4 hanging tough; we want it to stay as it is, BOE?
5      A.    Like I say, with Marathon's
6 suggestion, they wanted to go back to 2002 and redo
7 stuff on a basis that they've never -- this is the
8 first time that it's changed from total fluids to
9 well count. And they wanted to go back.
10      And I said, "Well, to be fair to all
11 parties," which I felt like Forest -- Forest had
12 been harmed in 2001, when the ESPs were put in place
13 and water production skied, and so did our costs.
14 And we, in my opinion, paid a disproportionate share
15 of the costs in 2001. So I said, "If you want to
16 redo this, then let's go back prior to this period
17 so that all parties are made whole."
18      Q.    Then it says Marathon suggested the
19 possibility of using the average of BOE and well
20 count. And that is in fact what has been accepted
21 on a going-forward basis; am I right?
22      A.    That was, yes, implemented in January
23 of 2006, I believe.
24      Q.    And it says this results in a roughly
25 77-to-23 split. It says, "Forest indicated this

100

1 might be a possibility for future allocations, but
2 that retroactive adjustments were not appropriate."
3      Is that accurate in the sense of the
4 position you took at this meeting, that you'd
5 consider that, or did you say that you were
6 agreeable to that?
7      A.    I didn't say I was agreeable to it.
8 It was something that I would consider. And, once
9 again, Marathon wanted to just go to 2002. And I
10 said, "Let's go to the prior period and adjust it."
11      Q.    Did you have the authority to make an
12 agreement along these lines, or would this be
13 something you'd have to run by management?
14      A.    Depending on what it was, I would have
15 had the authority.
16      Q.    You would have had the authority?
17      A.    Yes.
18      Q.    So accepting the 77-23, that is, the
19 combined BOE and well count, on a going-forward
20 basis, that's something you had the authority to
21 agree to at this meeting?
22      A.    I -- yes.
23      Q.    And how about any retroactive
24 adjustment, would you have authority to do that, or
25 were your marching orders to not allow that?

101

1      A.    In, I think, one of those e-mails from
2 Leonard, he had given me the authority to settle the
3 issue. But I could not see doing anything
4 retroactive without including the period that I felt
5 Forest was harmed.
6      Q.    Did you -- who were you reporting to
7 with regard to this issue? Would it have been
8 Leonard?
9      A.    Yes.
10      Q.    And did he give you any marching
11 orders aside from you have authority to settle it?
12 Was it just kind of, "Use your judgment," or did he
13 give you parameters?
14      A.    No parameters.
15      Q.    Other than miscellaneous topics -- gas
16 owners benefiting from oil WIPA assets, waste heat;
17 oil owners benefiting from gas WIPA assets, ESPs
18 going down and gas lift needed; 3, Above two issues
19 somewhat offset each other" -- were those issues
20 raised at this meeting?
21      A.    Yes.
22      Q.    Then the meeting was concluded, and it
23 looks like there was -- attached is an analysis of
24 the dollar impact. I don't think I've even copied
25 that.

26 (Pages 98 to 101)

**Exhibit 1**
**Page 8 of 9 Pages**

Mitch Fischbach

154

```
1              I have read the foregoing
2   transcript of my testimony and have indicated the
3   same by my signature.
4
5
6                    _____
7                         MITCH FISCHBACH
8   STATE OF COLORADO
9   CITY AND COUNTY OF DENVER
10              Subscribed and sworn to before me by
11  MITCH FISCHBACH, on this  9/19/        , 2007.
12              My commission expires:  9/17/08   .
13
14
15
16                    _____
17                          Notary Public
18          907 17th St - Denver, CO 80202
19                          Address
20
21  Reporter:  JM
22
23
24
25
```

Exhibit 1
Calderwood-Mackelprang, Inc. 303.477.3500    Page 9 of 9 Pages