UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| MARATHON OIL COMPANY<br><br>Plaintiff,<br><br>vs.<br><br>FOREST OIL CORPORATION; PACIFIC ENERGY ALASKA OPERATING LLC; and UNION OIL COMPANY OF CALIFORNIA d/b/a UNOCAL ALASKA,<br><br>Defendants. | No. 3:06-cv-00102-JKS<br><br>MEMORANDUM DECISION AND ORDER<br>[Re:  Motions at Docket Nos. 39, 57, 72, 93 and 96] |

## I.  MOTIONS PRESENTED

At Docket No. 39 defendant Forest Oil Corporation ("Forest") has moved for summary judgment.  At Docket No. 57 defendant Union Oil Company of California d/b/a UNOCAL Alaska ("UOCC") has moved for summary judgment adopting the motion filed by Forest and at Docket No. 60 joined the motion filed by Forest.  At Docket No. 70 plaintiff Marathon Oil Company ("Marathon") opposed both motions to which Forest replied at Docket No. 85 and UOCC replied at Docket No. 87.

At Docket No. 72 Marathon cross-moved for partial summary judgment.  Forest opposed the motion at Docket No. 84 and UOCC opposed it at Docket No. 89, to which Marathon replied at Docket No. 94.  At Docket No. 96 Forest has requested oral argument on the motions at Dockets 39, 57, and 72.

At Docket 93, Marathon moved to strike the affidavit of Mitchell Fischbach.  Forest opposed the motion at Docket No. 97, and Marathon replied at Docket No. 98.

The Court having reviewed the moving and opposing papers has determined that oral argument would not assist the Court in deciding the motions.  The motions are submitted on the moving and opposing papers.  The motion for oral argument at Docket No. 96 will be denied.

## II. BACKGROUND

Marathon owns working interests in offshore gas leases located in Cook Inlet, Alaska. Forest and UOCC also own working interests in offshore oil and gas leases located in Alaska's Cook Inlet. This action relates to production from those leases through the Steelhead production platform, likewise located in Cook Inlet, Alaska.

The Steelhead platform was constructed by Marathon and UOCC in the 1980s and is owned by them, with Marathon having a majority ownership interest in the platform. From the time that the Steelhead platform was placed into operation, Marathon and UOCC have used the platform to support their operations. Both oil and natural gas wells have been drilled from the Steelhead platform, and both oil and natural gas are produced from the platform. At the time this action was filed, the Steelhead platform serviced five oil and two associated water injection wells and 13 gas wells.

Operation of the Steelhead platform is subject to the Unit Operating Agreement, Trading Bay Unit, Cook Inlet Alaska ("Unit Operating Agreement"). The original agreement was entered into in 1967, and has been modified from time to time by amendments and supplemental agreements. The Unit Operating Agreement governs the operation and development of the Trading Bay Unit Area. Within the unit area are a number of Working Interest Participating Areas ("WIPAs"). Ownership of the different WIPAs within the unit varies. With respect to the Steelhead platform, oil and natural gas are produced from different WIPAs.

Until 1996, Marathon and UOCC owned the working interests in the oil and gas leases underlying the platform and produced both oil and natural gas at the Steelhead platform. In 1996, Marathon sold its interests in the oil leases underlying the Steelhead platform to Forcenergy, Inc., which was subsequently acquired by Forest. Marathon retained its interest in its gas leases underlying the platform. At the time the complaint was filed and at all times relevant to this action, UOCC owned a 53.2% working interest ownership and Forest owned a 46.8% working ownership interest in the oil leases serviced by the Steelhead platform.[1]

---

[1] Forest transferred its interest in the oil field to Pacific Energy Alaska Operating LLC

(continued...)

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,* 3:06-cv-00102-JKS     2

Marathon owns a 51.2% working ownership interest and UOCC owns a 48.8% interest in the natural gas leases serviced by the Steelhead platform.

UOCC is the operator of the unit and the Steelhead platform. As such, it manages and operates the platform on behalf of itself, Marathon, and Forest. Its rights and duties as an operator include incurring costs necessary to the operation of the platform, subject, however, to the provisions of the Unit Operating Agreement and the amendments and exhibits incorporated into the agreement, and other agreements. UOCC's duties as operator are set forth in the Unit Operating Agreement, and include billing costs associated with the operation of the platform to the users of the platform, including itself, Marathon, and Forest. This allocation of costs is governed by the Unit Operating Agreement, including the accounting procedures incorporated therein.

Under § 10.2.A of the Unit Operating Agreement, costs incurred in the development and operation of a WIPA are borne by the parties to that WIPA. Accordingly, between owners of a WIPA, costs are borne upon the basis of their respective ownership percentage of that WIPA. Under § 16.3 of the Unit Operating Agreement, a fair and equitable apportionment of costs is made between the parties to the agreement for the use of the platform or other production facility.

Under § 19.1 of the Unit Operating Agreement, costs incurred for the benefit of a WIPA are initially paid by the operator. Each party is then required to reimburse the operator for its share of such costs. Under this section, all charges, credits, and accounting are allocated in accordance with Exhibit "C" to the Unit Operating Agreement. These procedures are known within the industry as the Council of Petroleum Accountants Society ("COPAS") provisions or COPAS procedures.

Until Marathon's sale of its oil lease interests in 1996, and continuing on throughout 2001, production costs were allocated between the oil WIPAs and the natural gas WIPA serviced by the platform using two different methods. First, costs were allocated to a specific oil or gas cost center to the maximum extent possible. For example, for personnel working on the

---

[1](...continued)
subsequent to the filing of this complaint. UOCC continues to own its interest in the oil leases.

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS     3

platform, the operator allocated the cost to the oil and gas using labor prorates, determining the percentage of time that each position devoted to oil or gas and allocated the costs accordingly. Certain miscellaneous costs, *e.g.*, transportation and catering, that could not be allocated to a specific oil or gas cost center were assigned to a separate miscellaneous cost center and allocated between the parties using a methodology known as "total fluids." Under this methodology, the production costs necessary to produce oil and natural gas, respectively, are allocated in proportion to the total fluids produced by the oil and gas wells respectively. Under the total fluids methodology, the fluids chargeable to owners of oil and gas interests respectively are the total of Barrels of Oil Equivalent ("BOE") production of oil or gas, plus the water that was produced together with the oil or gas, respectively. Costs are allocated in proportion to the fluids charged to that owner.[2]

This action relates to the allocation of the miscellaneous cost center. In January 2002 UOCC changed the method of allocating the miscellaneous costs from the total fluids method to a straight "BOE" methodology, eliminating water from the computation. Because more water is produced in connection with extracting oil than in extracting gas, this change significantly altered the allocation between the oil and gas WIPAs, shifting more of the miscellaneous costs to the gas WIPAs.[3] Prior to the 2002 change, the allocation was approximately 65% to the gas WIPAs and 35% to the oil WIPAS.[4] The parties agree that after the change the allocation was approximately

---

[2] It appears that the total fluids methodology was adopted as a "fair and equitable" method sometime prior to the construction of the Steelhead platform in ¶ VI of the May 1969 Second Supplemental Agreement to the Unit Operating Agreement. (Dkt 70-6, pp. 8–9). It was also utilized by UOCC and Marathon in June 1994 in ¶ IV.c of the Third Supplemental Agreement to the Unit Operating Agreement (Dkt 70-7, p. 7) and in November 1996 in ¶ 3 of the Agreement Re: Fuel Gas between Marathon and UOCC (Dkt 70-8, p. 8).

[3] By the end of 2001 all the oil wells serviced by the Steelhead platform had been converted to using electric submersible pumps ("ESPs"). The use of these ESPs significantly increased the percentage of water that accompanied the oil produced. It is solely this change that UOCC and Forest rely on as justifying the change from the total fluids to BOE method and, subsequently, the hybrid 50–50 BOE/number of wells methodology.

[4] Mitchell Fischbach Deposition, Exh 5 (Dkt 70-2, p. 10). Marathon states in its opposition that the allocation to oil was "about 45%" in 2001 and roughly "50/50" in 2002 and 2003, but does not cite

(continued...)

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,* 3:06-cv-00102-JKS    4

91–92 % to the gas WIPAs and 8–9 % to the oil WIPAs.  Marathon challenges that change as having been made without its consent and as contrary to the agreement of the parties.  Marathon alleges that because of the shift in allocation between the oil and gas WIPAs, it, as the holder of a gas WIPA only, has been paying more than a "fair and equitable" share of the miscellaneous costs.[5]  In January 2006, UOCC again changed the methodology shifting to a hybrid: 50% of the miscellaneous costs be allocated based upon the number of wells, oil or gas, and 50% allocated on the BOE method.

In its complaint Marathon alleges six causes of action.  Count I – Breach of contract against UOCC as the operator of the platform under the Unit Operating Agreement.  Count II – An unjust enrichment claim against UOCC as the owner of a working interest in the oil WIPAs serviced by the platform.  Count III – Breach of contract as against Forest arising out of the sale of Marathon's interest in the oil WIPAs to Forest.  Count IV – An unjust enrichment claim against Forest based upon its ownership interest in the oil WIPAs.  Count V – Seeks an accounting from all the defendants based upon a proper allocation of the miscellaneous costs between the oil and gas WIPAs.  Count VI – Declaratory relief declaring that the appropriate method of accounting for the miscellaneous costs is the total fluid method.

### III.  ISSUES RAISED

The motions and cross-motion raise two basic issues as between Marathon and UOCC:

1.  Did UOCC require the consent of all other working interest owners before changing the method of allocating the miscellaneous costs?

---

[4](...continued)
anything in the record to support its statement.  Dkt 70, p. 7.

[5] Although UOCC benefits to some extent from this shift, Donald Page, the UOCC designee, testified that because UOCC owned approximately 50% of both, UOCC was pretty much indifferent to the allocation between oil and gas.  Donald Page Deposition, p. 39, ll. 17-21 (Dkt 39-5, p. 9); p. 175, ll. 1-7 (Dkt 39-5, p. 34); p. 174, ll 11-16  (Dkt 70-3, p. 36); p. 177, ll. 2–9 (Dkt 70-3, p. 37).  Because it owns only an interest in oil WIPAs, Forest is the primary beneficiary of the shift in allocation from oil to gas WIPAs.  There is an indication in the record that in the three-and-a-half-year period between its inception and mid-2005, the change in methodology from total fluids to BOE resulted in "overcharges" of $2,184,000 to Marathon and "undercharges" of $187,000 and $1,996,000 to UOCC and Forest, respectively.  Mitchell Fischbach Deposition, Exh. 5 (Dkt No. 70-2, p. 10).

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS    5

2.  If the answer to the first question is negative, is the BOE method of allocating the miscellaneous costs "fair and equitable"?

If the answer to the first question is affirmative, Marathon prevails as against UOCC and there is no need to answer the second.  If the answer to the second question is negative, Marathon also prevails as against UOCC; but, if the answer to the second question is affirmative, both UOCC and Forest prevail.

UOCC's motion also raises the issue of whether Marathon is entitled to equitable relief in the form of unjust enrichment or restitution as alleged in Count II of the Complaint.

With respect to the case against Forest, assuming Marathon prevails as against UOCC does not mean that Marathon *ipso facto* prevails as against Forest.  In that event, assuming that the miscellaneous cost allocation was improper resulting in the underpayment of miscellaneous costs by Forest, the question becomes: is Forest liable to Marathon either—

1.  under the terms of the agreement between Marathon and Forest for the sale of Marathon's interest in the oil working interest to Forest's predecessor-in-interest; or

2.  because the underpayment unjustly enriched Forest at the expense of Marathon?

For Marathon to prevail, at least one of the two alternatives must be answered in the affirmative. If the answer to both questions is negative, Forest prevails.

## IV.  STANDARD OF REVIEW/APPLICABLE LAW

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment in its favor as a matter of law. Fed. R. Civ. P. 56(c); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (*en banc*); *Taylor v. List*, 880 F.2d 1040, 1044 (9th Cir. 1989).  Support and opposition to a motion for summary judgment is made by affidavit on personal knowledge of the affiant, depositions, answers to interrogatories, setting forth such facts as may be admissible in evidence. Fed. R. Civ. P. 56(e).  In response to a properly supported motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial. *Id*.; *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055-56 (9th Cir. 2002).  The issue of material fact required to be present to entitle a party to proceed to trial is

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.*,3:06-cv-00102-JKS      6

not required to be resolved conclusively in favor of the party asserting its existence; all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a trier of fact or judge to resolve the parties' differing versions of the truth at trial.  In order to show that a genuine issue of material fact exists, a non-moving plaintiff must introduce probative evidence that establishes the elements of the complaint.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–49 (1986).  Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Id.* at 255.  There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Generally, a federal court exercising diversity jurisdiction applies the law of the forum state, *Conestoga Servs. Corp. v. Executive Risk Indem., Inc.*, 312 F.3d 974 (9th Cir. 2002), including its choice of law rules, *Fields v. Legacy Health Systems*, 413 F.3d 943, 950 (9th Cir. 2005).  When interpreting state law, this Court is bound by the decisions of the state's highest court.  In the absence of a decision by the highest state court, this Court "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 473 (9th Cir. 2001); *Paulman v. Gateway Ventures Partners III L.P.* (*In re Filtercorp, Inc.*), 163 F.3d 570, 578 (9th Cir. 1998).

The Unit Operating Agreement, § 31.2, specifically provides that its interpretation is to be governed by the laws of the State of Alaska.[6]  In deciding choice of law questions, Alaska generally looks to the Restatement and for contract cases has adopted the approach of Restatement (Second) Conflict of Laws, § 187, that a choice of law clause in a contract will generally be given effect unless (1) the chosen state has no substantial relationship with the transaction or there is no other reasonable basis for the parties' choice, or (2) the application of

---

[6] Unit Operating Agreement, p. 43 (Dkt 39-4, p. 11).

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS        7

the law of the chosen state would be contrary to a fundamental public policy of a state that has a materially greater interest in the issue and would otherwise provide the governing law. *Peterson v. Ek*, 93 P.3d 458, 464 (Alaska 2004). Performance and the subject matter of the contract in question is in Alaska, and the parties have substantial operations in this state. No party has argued that the chosen law, which is also the law of the forum, should not apply. Consequently, the substantive law to be applied in this case is the law of Alaska.

Although a federal court when exercising diversity jurisdiction follows state substantive laws, it usually applies federal procedural rules, *Kohlrautz v. Oilmen Participation Corp.*, 441 F.3d 827, 830–32 (9th Cir. 2006), including the Federal Rules of Evidence, *Wray v. Gregory*, 61 F.3d 1414, 1417 (9th Cir. 1995). An exception exists, however, when the evidentiary rule is a part of state substantive law. *Id.*; *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 667 (9th Cir.2003).

## V. DISCUSSION

### A. Consent Requirement.

Marathon argues that, under the terms of the Unit Operating Agreement, its consent to the change in the miscellaneous cost allocation methodology was required, which it did not give. In support of its contention, Marathon quotes from the report of a retained expert, Patrick Martindale.[7] After reviewing certain provisions of the Unit Operating Agreement, Mr. Martindale opined that the change in allocation of the miscellaneous expense category required notification to and the approval of the non-operator working interest owners.

Interpretation of a contract is a question of law. *Kassbaum v. Steppenwolf Prod., Inc.* 236 F.3d 487, 490 (9th Cir. 2000); *accord*, *Jarvis v. Ensminger*, 134 P.3d 353, 357 (Alaska 2006). It is axiomatic that "an expert witness cannot give an opinion as to [his] *legal conclusion,* i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d

---

[7] As initially submitted with the cross-motion, as noted by UOCC and Forest, it was an unsworn document that did not meet the requirements of Rule 56(e)(1). Marathon corrected this deficiency in its reply by including the Affidavit of Mr. Martindale incorporating his report. Dkt No. 94-4. Although the Court does not condone the practice of using a reply brief to correct deficiencies in the motion and its accompanying papers, neither UOCC nor Forest has objected to consideration of the affidavit, other than the fact that the earlier submission was unsworn, or moved to strike the affidavit. Because it does not raise new issues or present new evidence and is, therefore, not prejudicial, the Court will consider it.

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.*,3:06-cv-00102-JKS      8

1031, 1058 (9th Cir. 2008) (emphasis the court's). Thus, to the extent that Mr. Martindale is giving his opinion on the proper interpretation of the Unit Operating Agreement, it is inadmissible. It certainly does not bind the Court.

The Unit Operating Agreement provisions referred to by Mr. Martindale, ¶¶ 4.2.J, 4.2.K, 5.3.E, and 8.3.D, provide in relevant part as follows:

4.2    <u>Particular Powers and Duties</u>. The matters to be passed upon and decided by the Parties as provided herein or in the Unit Agreement shall include, but not be limited to the following:

* * * *

J.    The making of any single expenditure in excess of One Hundred Thousand Dollars ($100,000.00) except in case of an emergency involving the preservation of life or property. (Amended 10/6/75, 1/1/90)

K.    The selling or otherwise disposing of any major item of surplus material or equipment, the current list price of new equipment similar thereto being Five Thousand Dollars ($5,000.00) or more; provided, however, surplus material or equipment classified as junk may be disposed of by the Unit Operator or the applicable Sub-Operator at prevailing prices.

5.3.    <u>Voting Procedure</u>.

* * * *

E .    <u>Major Expenditures</u>. The affirmative vote of the parties having eighty-five percent (85%) or more of the voting power as to any well, platform, or production facility shall be required  for the approval of an expenditure for a single project exceeding One Million Five Hundred Thousand Dollars ($1,500,000.00).  In the event that more than one WIPA is to be served by such proposed expenditure, the affirmative vote of the parties having eighty-five per cent (85%) or more of the voting power in each WIPA to be served shall be required for such approval.

* * * *

8.3.    <u>Unit Operator and Sub-Operators</u>.

* * * *

D.    <u>Expenditure Approval</u>.

* * * *

2.    For all projects exceeding twenty-five thousand dollars ($25,000.00), but less than one hundred thousand dollars ($100,000.00), an

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS    9

informational Authority for Expenditure (AFE) shall be prepared by the Operator or Sub-Operator and supplied by the Operator to all other parties. (Amended 10/6/75, 1/1/90)

The Court must determine, applying Alaska law, whether that language is susceptible to the interpretation that a change in the methodology for allocating miscellaneous expenses requires the consent of the non-operator owners of working interests.

> When interpreting a contract, we give effect to the parties' intentions by looking to the words of the contract and any extrinsic evidence regarding intentions when they entered into the contract, including evidence of the parties' subsequent conduct. But the words of the contract remain the most important evidence of intention and, unless otherwise defined, are given their "ordinary, contemporary, common meaning."

*Kay v. Danbar, Inc.*, 132 P.3d 262, 269 (Alaska 2006).

The contractual provisions requiring consent of the non-operator working interest owners all refer exclusively to "expenditures" or, in the case of ¶ 4.2.K, the disposition of surplus property or equipment. There is nothing in the ordinary meaning of the word "expenditure" that could be construed as encompassing reimbursement of the operator by the non-operating working interest owners for the expenditures made by the operator. It may very well be true that, as Mr. Martindale opines, the intent of the parties was that these provisions protect the non-operator owners, does not, as Mr. Martindale also opines, indicate an intention that a change in the cost allocation methodology also requires approval of the parties, irrespective of the dollar amount impact that change may have on a non-operator.

The Unit Operating Agreement further provides:

> 16.3.   <u>Use of Wells, Platforms, or Production Facilities</u>.  No well, platform, or production facility (including a pipeline) shall be used for other than that upon which ownership thereof is based without the approval of the Parties owning such well, platform, or production facility as provided in Subsection 5.3D. Upon such use, a fair and equitable apportionment of risks and liabilities, investment, and operating and other costs shall be made between the Parties therefor. Such use shall be include but not be limited to the Drilling of Wells, multiple completion of wells and other production, transportation and handling of Unitized Substances.  **(See First, Second and Third Supplemental Agreements to Unit Operation Agreement**)

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS      10

19.1    <u>Basis of Charge to Parties</u>.  All Cost incurred for the benefit of a WIPA initially shall be paid by Unit Operator or the Sub-Operator incurring same. Each party shall reimburse Unit Operator or such Sub-Operator for its BPI share of such Costs except as otherwise provided in Articles XIII, XVII, and XVIII.  All charges, credits and accounting shall be in accordance with Exhibit "C".

19.2    <u>Budgets</u>.  Each Sub-Operator will submit a proposed program and a proposed budget of estimated costs for the next calendar year to the Unit Operator by August 1 of each year.  The Unit Operator will, as soon as practical after receipt of the proposed programs and budgets, distribute the proposed programs and budgets to the Parties and give notice of a preliminary meeting to review the proposed programs and budgets.  This meeting shall be held by August 15.  Following this preliminary meeting and upon at least thirty (30) days' advance written notice which shall include the agenda for the meeting, Unit Operator shall call a meeting to be held not later than November 15, of each year. At such meeting, the representatives of the Parties shall compare the current year's program and budget to actual performance and shall endeavor to agree on the next year's program and budget after making such modifications as may be necessary; provided, however, that such agreement shall not constitute authority for the making of such expenditures, which shall be made only in accordance with the remaining provisions of this Agreement.  A budget shall not constitute authority for the making of such expenditures, which shall be made only in accordance with the remaining provisions of this Agreement.  A budget shall set forth the estimated annual Costs by semi-annual periods.  Budgets shall be estimates only, and shall be adjusted or corrected by the relevant Parties whenever an adjustment or correction is proper.  A copy of each budget and adjusted budget shall promptly be furnished to each party.  Each program shall show the portion of such program and budget applicable to or allocated to each WIPA.  (Amended 1/9/90)

Taken as whole, it is obvious that where the parties intended the consent of the non-operator working interest owners was necessary it was explicitly stated.  The only logical interpretation of the Unit Operating Agreement is that the parties did not intend to require the consent of the parties to a change in the allocation of costs by the operator among the working interest owners.  The Court agrees with UOCC and Forest that, under the terms of the Unit Operating Agreement, the allocation of the costs among the working interest owners is limited only to it being "fair and equitable."  The consent of the of the non-operator working interest owners to the change in the allocation methodology was not required by the terms of the Unit Operating Agreement.

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS    11

B. <u>BOE Method Fair and Equitable</u>.

The parties are in agreement that under § 16.3 of the Unit Operating Agreement the allocation of the miscellaneous cost center, no matter which methodology is used, must be "fair and equitable." While contract interpretation is ordinarily a matter of law, finding that the contract requires the method used must be "fair and equitable" does not resolve the controversy between the parties. The precise issue is whether the particular methodology used by UOCC is "fair and equitable." To make this determination, the Court must, by necessity, resort to extrinsic evidence. Under Alaska law, although the Court can certainly conclude as a matter of law that a breach has occurred where there are no disputed material facts, usually when the facts are in dispute whether a party has breached the contract presents a question for the trier of fact. *See Witt v. State, Dept. of Corrections*, 75 P.3d 1030, 1034 (Alaska 2003) (breach of the covenant good faith); *Holland v. Union Oil Co. of Calif. Inc.*, 993 P.2d 1026, 1032–33 (Alaska 1999) (same); *Geolar, Inc. v. Gilbert/Commonwealth Inc. of Mich.*, 874 P.2d 937 (Alaska 1994) (justification defense).

This issue presents two sides of the same coin. UOCC and Forest on one side argue in their motions that, as a matter of law, the use of the BOE method of allocation is "fair and equitable"; while, on the flip side, Marathon argues in its cross-motion that, as a matter of law, it is not fair and equitable. For UOCC and Forest to prevail on their motions, they must show that no reasonable trier of fact could find on the evidence in the record as a whole that the BOE method or the hybrid method adopted in 2006 was not fair and equitable. Marathon prevails on its motion only if a reasonable trier of fact could not find, on the basis of the evidence as a whole, that the BOE method (or hybrid method) is fair and equitable. In ruling on the cross-motions, the Court must view the evidence in the light most favorable to the non-moving party. Thus, on the one hand, in deciding the UOCC and Forest motions for summary judgment, the Court must view the evidence in the light most favorable to Marathon; on the other hand, in deciding the cross-motion by Marathon it must view the evidence in the light most favorable to UOCC and Forest. It must also do so separately for both the BOE methodology used during 2002 – 2005 and the hybrid BOE/well count methodology used since January 1, 2006.

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS    12

The evidentiary base for the motions and cross-motions consists primarily of the deposition testimony of Donald Page (UOCC designee),[8] Martin Fischbach (Forest Accountant), Ted Kramer (Forest Engineer), David Hall (Forest Petroleum Engineer), Glenn Payment (UOCC Platform Foreman), Philip Bindon (UOCC Petroleum Engineer), the affidavits of Wayman T. Gore and W. Patrick Martindale, experts retained by Marathon, incorporating their respective reports,[9] the Declaration of Howard Blunk, an expert retained by UOCC,[10] and Affidavit of Mitchell Fischbach.[11]

1. **BOE**.  Marathon argues that to be fair and equitable, to the extent possible, costs must be allocated based upon operating conditions, *i.e.*, reasonably related to whether the cost is incurred in the production of oil or gas.  Neither Forest not UOCC contest Marathon on this point.  Indeed, the deposition testimony of the Defendants' witnesses, Martin Fischbach and Donald Page, corroborate this basic proposition,[12] as does UOCC's retained expert, Howard Blunk.[13]  Marathon further argues that use of the BOE method in this case essentially allocates based upon the value of production, not cost.  Again, neither Forest nor UOCC contest Marathon

---

[8] Excerpts from the Page Deposition were submitted by both sides.  The excerpts submitted by Forest are at Docket No. 39-5; excerpts submitted by Marathon are at Docket No. 70-3; and excerpts submitted by UOCC are at Docket No. 87-2.

[9] As initially submitted by Marathon these reports were unsworn documents that did not meet the requirements of Rule 56(e)(1).  Marathon corrected this deficiency in its reply by including the Affidavits of Messrs. Gore and Martindale incorporating the reports.  Dkt Nos. 94-3 and 94-4, respectively.  As noted above, neither UOCC nor Forest has objected to consideration of the reports, other than the fact that the earlier submission was unsworn, or moved to strike the affidavits.  Because these affidavits do not raise new issues or present new evidence and are, therefore, not prejudicial, the Court will consider them.

[10] Appended to UOCC's brief in reply to Marathon's opposition to UOCC's motion for summary judgment.

[11] Appended to Forest's brief in reply to Marathon's opposition to Forest's motion for summary judgment.

[12] Fischbach Deposition, p. 45, ll. 9–21 (Dkt. 70-2, p. 7); Page Deposition, p. 151, ll. 4–6 (Dkt 70-3, p. 34).

[13] Blunk Declaration (Dkt 90-2, p. 4) ("whatever is the methodology employed it should reflect operating conditions").

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.*,3:06-cv-00102-JKS    13

on this point.  Indeed, the deposition testimony of Donald Page, UOCC's designee, corroborates Marathon's position.[14]

Donald Page testified that transportation costs for crew changes and catering costs were included in the miscellaneous cost center.[15]  He further testified that the ERA transportation billing was primarily crew changeouts,[16] and the bulk of the costs going into the miscellaneous category were people costs, transportation and catering.[17]  Page also testified that labor and transportation accounted for 70 to 80% of the costs included in the miscellaneous cost category.[18] Based upon his analysis of the cost data, Patrick Martindale, an expert retained by Marathon, determined that approximately 35% to 40% of the labor costs were allocated to oil and 20% to gas, with the balance allocated to the miscellaneous cost center.[19]  The result is that approximately 55% to 60% of direct labor costs are allocated at a 2:1 ratio, oil to gas, and the balance, 40% to 45% allocated to the common miscellaneous cost center, where they, along with 100% of the indirect labor support costs (transportation and catering), are allocated at 1:9, oil to gas, ratio.

Glenn Payment, also a UOCC witness, testified that whether the oil wells were producing 90% water and 10% oil or 90% oil and 10% water the costs incurred would not vary much.[20] Based on this testimony, the logical inference is that, under the BOE method, as water content

---

[14] Page Deposition, p. 132, ll. 17–19 (Dkt 87-2, p. 14) ("BOE, which in this case was follow the cash; whoever is making the most money is going to take the bulk of the allocation"); p. 133, l. 25 – p. 134, l. 2 (DKT 39-5, pp. 27–28) ("hey, how about we just take that methodology and go BOE equivalent and follow the cash").

[15] Page Deposition, p. 51, l. 13 – p. 52, l. 5 (Dkt 70-3, pp. 18–19).

[16] Page Deposition, p. 56, ll. 17–21 (Dkt 70-3, p. 23).

[17] Page Deposition, p. 60, ll. 5–22 (Dkt 70-3, p. 27).

[18] Page Deposition, p. 38, ll. 18–20 (Dkt 70-3, p. 10).  UOCC's expert, Howard Blunk, after reviewing the cost data found that the miscellaneous charges were predominantly associated with labor and related expenses.  Blunk Declaration (Dkt 90-2, p. 5).

[19] Martindale Affidavit (Dkt 90-4, p. 9).

[20] Payment Deposition, p. 38, ll. 3–14 (Dkt 70-5, p.3).  Another UOCC witness, David Hall, corroborated this testimony.  Hall Deposition, p. 43, l. 19 – 44, l. 3 (Dkt 70-4, pp. 4–5).

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,* 3:06-cv-00102-JKS    14

increases more of the miscellaneous costs are shifted from the oil WIPAs to the gas WIPAs. and as water content decreases the reverse occurs, more of the miscellaneous costs is shifted to the oil WIPAs from the gas WIPAs, without any significant change in the labor (personnel) costs of producing either the oil or gas.  Conclusion: the BOE method, as applied to the Steelhead platform follows production value, not costs.

Defendants' basic argument is that under industry standards there are several generally accepted methods for allocating miscellaneous costs that cannot necessarily be attributed to actual costs and that as the operator UOCC has substantial discretion in selecting the method utilized as long as it is fair and equitable.  The Court does not disagree with that argument; nor, for that matter does it appear that Marathon does.  The Court does not, however, agree with the premise that simply because BOE is an acceptable method, as applied to the Steelhead platform, it is necessarily fair and equitable.

Principally, Forest relies on the Affidavit of Mitchell Fischbach and UOCC relies on the report of its retained expert, Howard Blunk, to support their arguments that the BOE and its successor, the hybrid 50/50 BOE/well count, methods are fair and equitable.  Marathon objects to the use of the Fischbach affidavit on the grounds that he is an undisclosed expert, and to the Blunk declaration on the basis that it is conclusory in nature, lacking any foundation in fact. Both were filed with the Defendants' replies to Marathon's opposition to the motions filed by Defendants.  While, normally, this Court does not consider evidence first presented in a reply brief, it has the discretion to do so.  *See Lane v. Dept. of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008); *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir. 2001); *see also Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (holding that if the court permitted new evidence to be introduced in connection with a reply brief, it must give the other party an opportunity to rebut it).  The Court need not address Marathon's objections, because even considering the affidavit of Mr. Fischbach and the report of Mr. Blunk does not change the outcome.

Both Mr. Fischbach and Mr. Blunk premise the need to change the allocation methodology eliminating the water factor on the fact that with the installation of the submersible pumps the relative amount of water produced increased substantially.  In their opinions, this

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS    15

rendered the total fluids method inequitable as it would have shifted more of the miscellaneous costs to the oil side without any affect on the actual costs of the platform.[21]  Accepting that this change in the method of extracting the oil would have made the total fluids method less fair and equitable or even unfair and inequitable, does not necessarily mean, as Messrs. Fischbach and Blunk opine, that the BOE method is fair and equitable or even more fair and equitable.

What is missing from the opinions of both Mr. Fischbach and Mr. Blunk is how, if there is no significant change in the cost associated with producing either the oil or the gas,[22] it is fair and equitable to use the BOE method for miscellaneous expenses in light of the nature of those expenses, which, as discussed above, are predominantly people or labor-related.  The only change was an increase in the amount of water that was produced in connection with the extraction of the oil.  Although there is indication in the testimony that the use of the submersible pumps made the oil wells "more efficient," neither party points to any evidence in the record that the amount of oil produced on a daily basis increased.  Assuming no increase in the amount of oil produced, a trier of fact may logically infer that the entire burden of the effect of installation of the submersible pumps was shifted to the gas WIPAs.  Such an effect would render use of the BOE method arbitrary and capricious and the result unfair and inequitable.

Forest and UOCC argue that, even if the BOE method standing alone is not fair and equitable, the Court must look at the overall allocation of all the costs, not just the miscellaneous cost center, to determine if costs are being allocated in a fair and equitable manner.  The Court disagrees.  By adopting a different allocation methodology between oil and gas in different cost centers, UOCC has inferentially recognized that a "one size fits all" approach to allocation would

---

[21] Fischbach Affidavit, p.3, "first" ¶ 6 (Dkt 86, p. 3); Blunk Declaration, p. 2, ¶ 5 (Dkt 88, p. 2).

[22] The briefing and evidence presented to the Court is deficient and inadequate in one fundamental aspect: neither party has presented evidence in a comprehensible form addressing how the costs, particularly labor or labor related, attributable directly to oil or gas production changed, if at all, between the years preceding the change in allocation (through 2001) and the years after the change (2002 and later).

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS      16

not be fair and equitable.[23]   Accordingly, by electing to allocate costs in different cost centers using separate methods, UOCC has subjected the allocation methodology used for each cost center individually to the "fair and equitable" standard.  The Court agrees with Marathon that for the overall allocation to be fair and equitable, the allocation for each individual cost center must be fair and equitable.

Based upon that evidence, viewed in the light most favorable to the non-moving party (Marathon), it cannot be said that no rational trier of fact could find that the miscellaneous cost center allocation based upon BOE was not "fair and equitable."

The reverse side of the coin, whether a rational trier of fact could not find that the BOE method was fair and equitable presents a somewhat different and much closer picture.  Although the evidence in the record strongly supports an inference that the use of the BOE method is not "fair and equitable," the burden is on Marathon to establish entitlement to judgment as a matter of law.  Given the state of the evidence in the record, in particular the lack of evidence of the effect of the use of submersible pumps on labor and labor-related costs, the production of oil or the total fluids produced, it cannot conclusively be said that no rational trier of fact could find that the miscellaneous cost center allocation based upon BOE was "fair and equitable."

2.  **Hybrid (BOE/Number of Wells)**.  Marathon argues that, because under the hybrid method half the costs are based upon the inequitable BOE method, it is itself, *ipso facto*, not fair and equitable.[24]   Under this method, 90% of half the miscellaneous costs, or 45% of the total costs, plus 65% of the other half, or 32.5% of the total costs, a total of 77.5% of the costs, would be allocated to the gas WIPAs.  Marathon does not argue that an allocation of the miscellaneous cost center based upon a "per well" basis would not be fair and equitable.  In fact, one of Marathon's experts, Wayman T. Gore, opines that such an allocation method would be fair and

---

[23] By acquiescing in that approach, Forest has also inferentially recognized that it would not be fair and equitable.

[24] Like Defendants, the Court finds this argument somewhat disingenuous given that the method Marathon proposes uses BOE as a base.

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS      17

equitable.[25]  Using that methodology the miscellaneous cost center would be allocated 35% to oil and 65% to gas.  Assuming that a 35/65 allocation under the "per well" methodology is fair and equitable, it cannot be said that a rational jury could not find that the hybrid method, 22.5/77.5, is either fair and equitable or not fair and equitable.

Consequently, neither side is entitled to summary judgment in its favor on Count I of the complaint.

C.  Count II – Unjust Enrichment, UOCC.

In Count II Marathon seeks to recover from UOCC the amount that Marathon paid but should have been properly billed to UOCC as the owner of an oil WIPA.  Unjust enrichment sounds in equity.  *Nordin Constr. Co. v. City of Nome*, 489 P.2d 455, 467 (Alaska 1971).  "One who seeks the interposition of equity must generally show that he either has no remedy at law or that no legal remedy is adequate."  *Knaebel v. Heiner*, 663 P.2d 551, 553 (Alaska 1983).  The Alaska Supreme Court has indicated four types of cases in which damages may be inadequate, justifying equitable relief: "(1) when the thing that plaintiff has been deprived of is unique and irreplaceable, (2) when a legal remedy would require that the plaintiff bring more than one lawsuit, (3) when the defendant is insolvent, and (4) when the amount of damages is highly speculative."  *Id*.

Here it is clear that Marathon's entire case rests upon a single issue: whether the use of the BOE or hybrid 50-50 BOE/well count methodologies to allocate the miscellaneous costs by UOCC as the operator was "fair and equitable" as required by the Unit Operating Agreement.  In Count I, Marathon is suing on this alleged breach.  In the event that the trier of fact finds in favor of Marathon on that issue, Marathon will recover from UOCC an amount equal to the difference between what it should have paid and the amount it actually paid.  Marathon has made no showing that the remedy available to it on Count I is not an adequate remedy at law.

Accordingly, UOCC is entitled to judgment in its favor on Count II of the complaint as a matter of law.

---

[25] Gore Affidavit (Dkt 94-3, p. 11).

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS    18

D.  Count III - Breach of Contract, Forest.

In Count III Marathon alleges that Forest has breached the terms of the agreement under which Marathon transferred its interest in the oil WIPAs to Forest's predecessor-in-interest, Forcenergy.  Under that agreement, Forcenergy agreed to pay Marathon's obligations and liabilities related to the oil WIPAs transferred from Marathon to Forcenergy.  The provisions of the Agreement Marathon claims have been breached read, in relevant part:

> Purchaser shall be responsible for all necessary and reasonable expenses incurred for the operation of the Property from and after the Effective Date.  "Expenses" as used in this Section 10 shall include, without limitation, operation, production, workover and maintenance of the Property facilities, Leases and Wells.[26]

> As of the Effective Date. Purchaser shall assume and agrees to perform, pay for and comply with the obligations and liabilities (express or implied) of Seller relating to the property (i) of which Purchaser has knowledge and (ii) to the extent required by this Agreement or as set forth in the Official records, the associated contracts, the Leases, or applicable law or regulations, including without limitation, obligations arising with respect to plugging, abandonment and clearing of all Wells, jackets, and/or platforms insofar and only insofar as such Wells, jackets, and platforms are part of the Property.[27]

Marathon alleges Forest has breached that agreement in two respects: (1) that the obligation Forcenergy/Forest assumed was to pay the costs incurred in connection with the Steelhead platform using the total fluids methodology; and (2) breached the implied covenant of good faith and fair dealing by agreeing with UOCC to change the allocation of the miscellaneous cost center without notice to or the involvement of Marathon.

1.  **Costs Incurred**.

Forest agreed to pay "all necessary and reasonable expenses" associated with the oil WIPA its predecessor-in-interest acquired from Marathon.  Marathon points to nothing in the Forcenergy-Marathon agreement that specifies how those "necessary and reasonable expenses" are to be determined.  The agreement also contains an integration clause stating it constitutes the

---

[26] Purchase and Sale Agreement By and Between Marathon Oil Company and Forcenergy, Inc., p. 15, § 10 (Dkt 18-9, p. 22).

[27] *Id.*, p. 17, ¶ 12.a. (Dkt 18-10, p. 2).

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS    19

entire agreement and understanding of the parties.[28]  As discussed more fully in subpart V.G, below, there is no evidence in the record that the parties adopted the total fluids method of allocating the miscellaneous cost center *ad infinitum*.  While the total fluids method was certainly being applied at the time the Forcenergy-Marathon agreement was entered into, there is no evidence in the record that the parties intended continued use of that method notwithstanding future changes in operating conditions of the platform.

The obligations assumed by Forcenergy/Forest were the obligations of Marathon with respect to the oil WIPA Marathon sold.  At the time the complaint was filed, and continuing through the present, Forest has paid all obligations associated with the oil WIPA.  At present there is no obligation owed by Forest to Marathon, liquidated, unliquidated, or contingent.  Marathon has no claim for either indemnification or contribution for the simple reason that there is no evidence that Marathon will be assessed, directly or indirectly, for any of the costs allocated to the oil WIPA.  Nothing in the Forcenergy-Marathon sale agreement obligates the purchaser or Forest, as the successor-in-interest, to indemnify Marathon for costs other than cost associated with the property that was sold.  Forest certainly has no contractual obligation to indemnify Marathon for costs associated with the gas WIPA, irrespective of whether those costs were properly or improperly assessed.  In effect, Marathon is alleging a specie of anticipatory breach without any indication in the record that Forest has expressed an intention not to pay any assessment made against the oil WIPA it owns.  In short there has not been a repudiation of the agreement by Forest.  *See L. E. Spitzer Co., Inc. v. Barron*, 581 P.2d 213, 217 (Alaska 1978).

### 2.  **Food Faith and Fair Dealing**.

In Alaska there is implied in every contract a covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other party to receive the benefits of the agreement.  *Guinn v. Ha*, 591 P.2d 1281, 1291 (Alaska 1979).

> "The covenant of good faith and fair dealing is implied in every contract in order to effectuate the reasonable expectations of the parties to the agreement, not to alter those expectations."  The covenant of good faith and fair dealing "will not

---

[28] *Id.*, p. 25, § 21 (Dkt 18-10, p. 10).

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.*, 3:06-cv-00102-JKS     20

create a duty where one does not exist." The doctrine "does not provide courts with carte blanche to rewrite contracts," . . . .

*Casey v. Semco Energy, Inc.*, 92 P.3d 379, 385 (Alaska 2004) (footnotes and citations omitted).

As with much of Marathon's complaint, this claim is hinged on Marathon's theory that the parties were bound to apply the total fluids method of allocating the miscellaneous cost center *ad infinitum*. Marathon has introduced no evidence that it had a reasonable expectation at the time it entered into the agreement with Forcenergy that this would, in fact, occur, or that the costs would not be shifted from the oil WIPAs to the gas WIPAs. Marathon's reasonable expectation was that it would no longer be liable for any assessments made against the oil WIPA it sold to Forcenergy, nothing more. It had no reasonable expectation that its obligations as to the retained gas WIPA would not be altered, even adversely. Marathon's claim flounders on yet another shoal. It is UOCC, the operator of the Steelhead platform, not Forest, that makes the allocation. Accepting as true the allegation that UOCC consulted with Forest and not Marathon prior to making the January 2002 change, does not mean that Forest had an obligation under its agreement to ensure that Marathon participated.

Forest is entitled to judgment in its favor on Count III as a matter of law.

E. <u>Count IV – Unjust Enrichment, Forest</u>.

In Count IV Marathon alleges that Forest was unjustly enriched as a result of the improper allocation of the miscellaneous costs and seeks recovery from Forest the amount that Marathon paid but should have been properly billed to Forest. In Alaska, "unjust enrichment is not in and of itself a theory of recovery. Rather, it is a prerequisite for the enforcement of restitution." *Darling v. Standard Alaska Production Co.*, 818 P.2d 677, 680 (Alaska 1991), quoting *Alaska Sales & Service, Inc. v. Millet*, 735 P.2d 743, 746 (Alaska 1987). "Unjust enrichment exists where the defendant received a benefit from the plaintiff and it would be inequitable for defendant to retain the benefit without compensating plaintiff for its value." *Sparks v. Gustafson*, 750 P.2d 338, 342 (Alaska 1988). "A party seeking to recover for unjust enrichment must show (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance and retention by the defendant

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.*, 3:06-cv-00102-JKS    21

of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof." *Ware v. Ware*, 161 P.3d 1188, 1197 (Alaska 2007).

Factually, Marathon's claim fails. Although in this case it may be said that, because the miscellaneous expenses were improperly allocated, Marathon conferred a benefit on Forest by paying a portion of Forest's share of the miscellaneous expenses, thereby discharging a "debt" Forest contractually owed to UOCC. *See* Restatement of Restitution, § 1, cmt. b. Where Marathon's claim fails is the third prong. First, Marathon is not entitled to recover if it voluntarily paid under circumstances in which Marathon knew it did not owe the money. *See* Restatement of Restitution, § 1, cmt. c. Second, Marathon must show that the circumstances are such that, as between Marathon and Forest, it is unjust for Forest to retain the benefit conferred. *Id*. To recover property under an unjust enrichment theory, the person holding the property must be retaining it by unjust, unconscionable, or unlawful means. *Rausch v. Devine*, 80 P.3d 733, 744 (Alaska 2003). Marathon points to no conduct on the part of Forest that could be deemed as being unjust, inequitable, or unlawful.

As noted above in subpart V.C., Marathon's entire case rests upon a single issue: whether the use of the BOE or hybrid methodologies to allocate the miscellaneous costs by UOCC as the operator was "fair and equitable" as required by the Unit Operating Agreement. If Marathon is correct, it will be entitled to recoup the amount it was overcharged for the miscellaneous costs as damages from UOCC. Thus, Marathon has an adequate remedy at law.[29]

Forest is entitled to judgment in its favor on Count IV as a matter of law.

F. Count V - Accounting.

In Count V Marathon requests this Court perform an accounting of the amounts overpaid by Marathon and underpaid by UOCC and Forest. If, in fact, UOCC breached the contract as contended in connection with Count I, then Marathon is entitled to recover from UOCC as damages the difference between what it was charged and paid and what it should have been

---

[29] The Court has considered and rejects Marathon's "multiple lawsuit" argument. As Marathon candidly acknowledges, not one of the potential multiple lawsuits involve Marathon. As *Knaebel* made clear, for the legal remedy to be inadequate, the multiple lawsuits must involve the plaintiff. That is simply not the situation presented in this case.

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,* 3:06-cv-00102-JKS    22

charged.  The Court notes that the relief requested in Count V is nothing more than the measure of damages Marathon would be entitled  to recover from UOCC in the event Marathon prevails on its breach of contract claim, Count I.  Accounting is generally an equitable remedy.  *See Wolff v. Arctic Bowl*, 560 P.2d 758, 770 (Alaska 1977).  As noted above, equitable relief is available only if there is no remedy at law or the remedy at law is inadequate.  *Knaebel v. Heiner, supra*.  The relief Marathon seeks in Count V is nothing more than the damages it suffered as a result of the improper reallocation of the miscellaneous costs using the BOE method.  It is entitled to recover this amount only if UOCC breached its contractual obligation to allocate those costs in a fair and equitable manner.  Thus, Marathon's remedy at law is clearly adequate, and Marathon is not entitled to the equitable relief of an accounting.

UOCC and Forest are entitled to judgment in their favor on Count V of the Complaint as a matter of law.

G.  Count VI – Declaratory Relief.

In Count VI Marathon seeks a declaration by this Court that the parties are compelled under the terms of the Unit Operating Agreement to apply the total fluids methodology to allocate miscellaneous costs.  Marathon's position is predicated upon the assumption that either the Unit Operating Agreement itself or the subsequent conduct of the parties have adopted the total fluids methodology as the sole methodology that meets the "fair and equitable" standard *ad infinitum*.

First, the Court notes that the total fluids methodology was never at any time applied across the board to all costs associated with the operation of the Steelhead platform.  It was only applied to the miscellaneous cost center.  Second, the express language of the Unit Operating Agreement only restricts the allocation methodology to one that is "fair and equitable"; it says nothing about which methodology satisfies that standard or that the methodology cannot be changed.  Third, as even the experts retained by Marathon acknowledge, in order to meet the fair and equitable standard, there must be some relationship between the methodology utilized and the operating conditions of the platform.

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS    23

Marathon points to two subsequent agreements between Marathon and UOCC in which the total fluids methodology was specifically adopted: in June 1994 in ¶ IV.c of the Third Supplemental Agreement to the Unit Operating Agreement,[30] and in November 1996 in ¶ 3 of the Agreement Re: Fuel Gas between Marathon and UOCC.[31]  Marathon argues that those, coupled with the continued use of the total fluids methodology through the end of 2001, conclusively establishes that the parties adopted the total fluids methodology as the methodology to be utilized in allocating the miscellaneous cost center.  The Court disagrees.  What it does establish is that the parties agreed that, under the operating conditions as they existed through the end of 2001, application of the total fluids methodology to the miscellaneous cost center was "fair and equitable."  What it does not establish is that, notwithstanding any change in the operating conditions, the parties were "locked into" using the total fluids methodology of allocating the miscellaneous cost center.

UOCC and Forest are entitled to judgment in their favor on Count VI of the complaint, as a matter of law.

## VI.  CONCLUSION AND ORDER

1.    As a matter of law, UOCC was not required under the Unit Operating Agreement to obtain the consent of Marathon to the change in the methodology used to allocate the miscellaneous expenses.

2.    Whether the BOE methodology of allocating miscellaneous costs in this case during the period January 1, 2002, through December 31, 2005, was not fair and equitable presents a triable issue of fact for the trier of fact.

3.    Whether the hybrid BOE/number of wells methodology used since January 1, 2006, is fair and equitable presents a triable issue of fact for the trier of fact.

/

/

/

---

[30] Dkt 70-7, p. 7.

[31] Dkt 70-8, p. 8.

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,*3:06-cv-00102-JKS    24

For the foregoing reasons,

IT IS ORDERED THAT:

1.      Forest Oil Corporation's Motion for Summary Judgment at Docket No. 39 is GRANTED in part, and DENIED, in part;

2.      Union Oil Company of California's Motion for Summary Judgment at Docket No. 57 is GRANTED, in part, and DENIED, in part;

3.      Marathon Oil Company's Cross-Motion for Summary Judgment at Docket No. 72 is DENIED;

4.      The Motion to Strike the Affidavit of Mitchell Fischbach at Docket No. 93 is DENIED as moot; and

5.      The Motion for Oral Argument at Docket No. 96 is DENIED.

IT IS FURTHER ORDERED THAT Counts II, III, IV, V and VI of the Complaint are DISMISSED.

Dated:  September 9, 2008.

s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

MEMORANDUM DECISION AND ORDER
[Re: Motions at Docket Nos. 39, 57, 72, 93 and 96]
*Marathon Oil Co. v. Forest Oil Corp.,* 3:06-cv-00102-JKS    25